**BUCHALTER, A Professional Corporation**
Harry W.R. Chamberlain II (Bar No. 95780)
Email: *hchamberlain@buchalter.com*
Jason E. Goldstein (Bar No. 207481)
Email: *jgoldstein@buchalter.com*
Robert S. McWhorter (Bar No. 226186)
Email: *rmcwhorter@buchalter.com*
Jarrett S. Osborne-Revis (Bar No. 289193)
Email: *josbornerevis@buchalter.com*
Katharine H. Falace (Bar No. 222744)
Email: *kfalace@buchalter.com*
500 Capitol Mall, Suite 1900
Sacramento, CA 95814
Telephone:    916.495.5170

**WRIGHT, FINLAY & ZAK, LLP**
T. Robert Finlay (Bar No. 167280)
Email: *rfinlay@wrightlegal.net*

4665 MacArthur Court, Suite 200
Newport Beach, CA 92660
Telephone: 949.477.5050
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA MORTGAGE ASSOCIATION, a California nonprofit association; CALIFORNIA CREDIT UNION LEAGUE, a California nonprofit association; UNITED TRUSTEES ASSOCIATION, a nonprofit association; CHEN WANG QIN, an individual; SURF CITY INVESTORS, LLC, a California limited liability company; STEPHEN NG, an individual; NDETAIL CAPITAL LLC, a California limited liability company; BALBOA, LLC, a California limited liability company; WILLIAM TERRY HUNEFELD, an individual; and POSTCITY FINANCIAL CREDIT UNION, a non-profit financial cooperative; BEACON DEFAULT MANAGEMENT, INC., a California corporation; and ZBS LAW, LLP, a California limited liability partnership,<br><br>       Plaintiffs,<br><br>  v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California, Defendant. | Case No. 2:25-cv-02614-DAD-CKD<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1) VIOLATION OF THE CONTRACT CLAUSE UNDER 42 U.S.C. § 1983;**<br>**(2) VIOLATION OF DUE PROCESS UNDER 42 U.S.C. § 1983;**<br>**(3) VIOLATION OF EQUAL PROTECTION UNDER 42 U.S.C. § 1983;**<br>**(4) VIOLATION OF THE SUPREMACY CLAUSE UNDER 42 U.S.C. § 1983;**<br>**(5) INJUNCTIVE RELIEF;**<br>**(6) DECLARATORY RELIEF AND OTHER EQUITABLE RELIEF;**<br>**(7) ATTORNEYS' FEES AND COSTS UNDER 42 U.S.C. § 1988 AND ALL OTHER APPLICABLE STATUTES** |

**FIRST AMENDED COMPLAINT**

Plaintiffs, CALIFORNIA MORTGAGE ASSOCIATION, CALIFORNIA CREDIT UNION LEAGUE, UNITED TRUSTEES ASSOCIATION, nonprofit associations, CHEN WANG QIN, SURF CITY INVESTORS, LLC, STEPHEN NG, NDETAIL CAPITAL LLC, BALBOA, LLC, WILLIAM TERRY HUNEFELD, POSTCITY FINANCIAL CREDIT UNION, BEACON DEFAULT MANAGEMENT, INC., and ZBS LAW, LLP (collectively, referred to as "Plaintiffs") allege:

**INTRODUCTION**

1.  Plaintiffs bring this action against ROB BONTA ("Bonta" or "Defendant"), in his official capacity as the Attorney General for the State of California, seeking a declaration of unconstitutionality and enjoining the enforcement of section 2 of California Assembly Bill 130 ("AB 130").[1]

2.  The challenged provisions of AB 130 supposedly focused on remedying issues related to a narrow class of abandoned debts known as "zombie mortgages." However, as enacted, this new California Civil Code section 2924.13 ("Section 2924.13") casts a much wider net, drastically reducing, and in many instances eliminating, the enforceability of virtually all loans secured by subordinate liens on residential real property in California.

3.  A "zombie mortgage" commonly refers to a mortgage debt, often secured by a second mortgage or a similar type of "subordinate" lien on real property (e.g., a trust deed that is recorded behind the deed securing a first mortgage), that a homeowner may believe was resolved or forgiven long ago but is still active. The "zombie" rubric alludes to such debts that seemingly "arise from the dead" because the owner may not have received any statement or communication about the secured loan for years until contacted by a debt collector demanding payment, and possibly even threatening foreclosure.

4.  The challenged provisions of AB 130 purport to apply to existing and future subordinate liens on all residential properties—including 1 to 4 unit homes, apartment buildings (5+ units), and mixed-use properties. These provisions encompass both consumer and business loans, including home equity lines of credit ("HELOCs"). California Civil Code section 2024.13 defines certain actions by a

---

[1] AB 130, sec. 2 (2025-2026 Reg. Sess.), adding section 2924.13 to the California Civil Code (hereafter "challenged provisions" or "section 2024.13"– text attached hereto as **Exhibit A**). On June 30, 2025, the challenged provisions of AB 130 were signed into law by California Governor Gavin Newsom as part of the approval of the State's annual budget.

mortgage servicer, including any prior mortgage servicer, as "unlawful conduct." Such unlawful conduct provides grounds to avoid a creditor's legal remedies, including nonjudicial foreclosure and judicial foreclosure. It may even result in the exoneration of some or all of the debt secured. Section 2924.13 significantly alters the process for originating, servicing, and enforcing subordinate liens in California.

5.    Under the challenged provisions of AB 130, the subordinate lien may become *unenforceable* if any of the following practices, among others, occurred during the life of the loan:

      a.    No communication with the borrower for three (3) years;

      b.    Failure to send monthly mortgage statements;

      c.    Omission of ownership or servicing transfer notices;

      d.    Issuing a tax document to the borrower (such as an IRS Form 1099-C) that suggests the loan has been written off or exonerated.

6.    Before initiating foreclosure, the current loan servicer must furthermore *certify under oath* that none of these or any other ostensibly "unlawful practices" has ever occurred. Even if those events happened under a previous servicer, the declarant would not know about such events.

7.    The challenged provisions of AB 130, now embodied in Section 2924.13 of California's Civil Code, are unconstitutional for multiple reasons, including:

      a.    The challenged provisions of AB 130 unconstitutionally impair obligations of contract in violation of Article I, §10, Clause 1 of the U.S. Constitution and equivalent limitations of the California Constitution (Cal. Const. art. I, § 9), rendering Section 2924.13 null, void, and with no force or effect;

      b.    The challenged provisions of AB 130 violate the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, incorporating the Fifth Amendment's Taking Clause, and equivalent limitations of the California Constitution (Cal. Const. art. I, §§ 1 and 7) by impairing and taking the property of persons in this State without just compensation or reasonable remedy rendering Section 2924.13 null, void, and of no force or effect;

      c.    The challenged provisions of AB 130 violate the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and equivalent limitations of the

California Constitution (Cal. Const. art. I, §§ 1 and 7) impairing and taking property of persons who possess such interests denying them equal protection of the laws, and the privileges and immunities afforded to the same or similar class of mortgage lenders whose loans are secured by real estate in this State and the several States of the United States, rendering Section 2924.13 null, void, and with no force or effect;

d.    The challenged provisions of AB 130 purport to define certain acts or omissions as "unlawful practices" that are *not* "unlawful" at all. Federal mortgage servicing and consumer protection regulations (including, without limitation, activities regulated by the Truth in Lending Act, the Real Estate Settlement Procedures Act, and the IRS) govern the identified conduct of subordinate mortgage lenders and their mortgage servicers in conflict with AB 130's attempted regulation of this field. Section 2924.13 is preempted by virtue of the Supremacy Clause of Article IV, § 2 of the U.S. Constitution, rendering Section 2924.13 null, void, and of no force or effect.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF
## PLAINTIFF ASSOCIATIONS

8.    Plaintiff CALIFORNIA MORTGAGE ASSOCIATION ("CMA") is a nonprofit trade association comprised of private lenders and brokers. Its members include individuals as well as entities who make, arrange, sell, or service loans secured by deeds of trust on real property throughout the State of California. Most CMA members are licensed as real estate brokers under the California Bureau of Real Estate or as California Finance Lenders under the California Department of Business Oversight. CMA also represents affiliate members, including attorneys, escrow companies, accountants, software companies, and other entities interested in mortgage lending and loan servicing. CMA members either directly service mortgage loans they make or arrange, or they have other licensees (CMA members) specializing in mortgage loan servicing, who service their loan portfolios. The duties and liabilities of loan servicers and lenders of loans secured by deeds of trust on real property are a matter of great concern to CMA members. For over 60 years, CMA and its predecessors have been actively involved in

4

the California legislative process through its legislative advocates. The CMA's mission is to provide its members and the general public with a clear understanding of pertinent legislation and case law that impacts the private mortgage lending and loan servicing communities, including critical issues relating to lending, funding, servicing, and foreclosure of loans secured by deeds of trust. CMA is authorized to do business in California, maintains its principal offices and place of business in the City of Sacramento, and conducts operations within this judicial district. The CMA's members include California lenders that originate and service loans secured by subordinate residential mortgages, which are adversely affected by AB 130.

9.    Plaintiff CALIFORNIA CREDIT UNION LEAGUE ("League") is the largest state nonprofit trade association for credit unions in the United States, assisting member credit unions that collectively serve millions of credit union members. The League, over the past 90 years, has played a crucial role in ensuring the growth and financial health of its member credit unions, as well as their ability to provide the financing necessary to secure loans that facilitate home ownership. The League is authorized to conduct business in the State of California and does business within this judicial district. The League's members include California credit unions that originate and service loans secured by subordinate residential mortgages, which are adversely affected by AB 130.

10.    Plaintiff UNITED TRUSTEES ASSOCIATION ("UTA") is a nonprofit membership association comprised of individual and institutional members who perform services as trustees under real property deeds of trust, including employees of title companies, financial institutions, and independent companies. Since 1968, UTA has been the source for information, expertise, continuing education, and opinion on trustee issues and practices. Its mission is to ensure UTA members are always current on relevant case law, attend the best educational meetings and trade shows in the industry, and collectively advocate their views before state legislatures and the courts. UTA is authorized to conduct business in the State of California and does business within this judicial district. The UTA's members include trustees who foreclose on subordinate deeds of trust. The vague and uncertain nature of AB 130 undermines the ability of trustees to conduct nonjudicial foreclosures with confidence, exposes them to new litigation risks, and disrupts the predictability and stability of California's foreclosure process.

11.     Hereafter, CMA, the League, and UTA together will be referred to collectively as the "Plaintiff Associations." The Plaintiff Associations bring this action in a representative capacity on behalf of their members, many of whom are directly and immediately subject to the challenged provisions of AB 130. Each Plaintiff Association has members who are lenders or servicers of subordinate mortgage loans in California, who have already suffered and will continue to suffer concrete injury as a result of AB 130, including loss of foreclosure remedies, impairment of contractual rights, and the taking of secured interests without just compensation. The challenged provisions of AB 130 are germane to the Plaintiff Associations' missions of protecting the ability of their members to originate, service, and enforce mortgage loans. Neither the claims asserted nor the relief requested require the participation of individual members beyond those identified herein.

## CHEN WANG QIN

12.     Plaintiff CHEN WANG QIN ("Qin") is an individual who resides in the State of California and is a member of CMA. Qin is a widow who inherited multiple mortgage loans secured by secondary and subordinate liens that her late husband purchased. Qin has recorded at least one Notice of Default on a loan secured in second position before the senior lienholder recorded its Notice of Default, thereby allowing Qin to foreclose first and sell the property before the senior lienholder could complete its foreclosure. Qin cannot complete her foreclosure proceeding because of the challenged provisions of AB 130, which did not exist when the loan was transacted or when she acquired it. The challenged provisions of AB 130 have compelled her to rescind her Notice of Default and restart foreclosure proceedings with a new Notice of Default, accompanied by the certification required by AB 130, resulting in direct and immediate damage to her ability to enforce her contract rights and remedies. Having to comply with AB 130 and restart her foreclosure has allowed the senior lienholder, who is not subject to the requirements of AB 130, to "leapfrog" Qin's foreclosure and foreclose on the property before Qin. The lender in the senior position is not subject to the requirements of AB 130 and will now be able to foreclose on the security. Had Qin not been forced to restart her foreclosure proceeding, Qin believes that she could have foreclosed and sold the house, allowing her to pay the senior lien and recoup all or part of her defaulted loan. However, with the delay caused by restarting the foreclosure process, Qin will not be able to foreclose first and is not financially able to reinstate the amount of the

loan in first position, which will likely result in Qin's interests being extinguished and lost entirely by the foreclosure of the senior interest. Because of the challenged provisions of AB 130, Qin's ability to enforce her contract rights and remedies has been jeopardized, impaired, compromised, and damaged.

### SURF CITY INVESTORS, LLC

13.     Plaintiff, SURF CITY INVESTORS, LLC ("Surf City"), is a California limited liability company whose principal place of business is located in Huntington Beach, California.

14.     Surf City is in the business of buying loans which are secured by deeds of trust, which are recorded in a second priority lien position against real property in California, which fall within the scope of the "subordinate mortgage" under Section 2924.13(a)(3). During the last seven (7) years, Surf City has been mostly purchasing "seller carryback" subordinate mortgages and private money loans secured by second priority deeds of trusts encumbering residential properties.  A "seller carryback" occurs when a borrower obtains a first-priority lien position loan that is insufficient to pay the entire purchase price, and the seller agrees to "carry back" a loan for the remainder, which is secured by a subordinate mortgage.  Seller carryback loans facilitate a borrower achieving the dream of home ownership. The prior lender on many of the subordinate mortgages purchased by Surf City did little or nothing to collect, had little to no communication with the borrowers, and did not provide monthly statements. In addition, many of the subordinate mortgages purchased by Surf City resulted from situations where the original lender had passed away, and the subordinate mortgages were being sold by heirs who were unaware of their parents' or relatives' actions regarding collection or non-collection. In some instances, the borrowers were deceased, had not made payments in many years, or had received a bankruptcy discharge.

15.     Section 2924.13 has directly and substantially impaired Lender 1's contractual and property rights and inflicted economic injury on its business operations. The enactment of this statute has prevented Surf City from exercising its rights with respect to the Subordinate Mortgages as it could before its enactment. Surf City currently owns more than 20 subordinate mortgages that cannot foreclose upon because it cannot sign the certification required by Section 2924.13(c). Further, Surf City has been forced to cancel at least one foreclosure sale due to the enactment of Section 2924.13. The inability to foreclose directly harms Surf City because (i) it cannot exercise its power of sale rights under its

subordinate mortgages, (ii) without the ability to foreclose, Surf City's interest in subordinate mortgages are, or will be, jeopardized, impaired or eliminate by senior creditors who hold first priority deeds of trust who will commence nonjudicial foreclosure proceedings to wipe out Surf City's subordinate mortgages, and (iii) in at least one instance, Surf City cannot judicially foreclose because the statute of limitations has lapsed AND cannot non-judicially foreclose because it cannot sign the required Certification, rending the loan complete unenforceable and valueless. Section 2924.13 has resulted in Surf City being in the unenviable position of being unable to commence or continue foreclosure proceedings, all the while the amounts due and owing under its defaulted subordinate mortgages increase, while some of the real properties securing its subordinate mortgages are decreasing in value.

## STEPHEN NG

16.    Plaintiff, STEPHEN NG is an individual who resides in California. He supplements his retirement income by funding loans, with the assistance of California-licensed individuals and/or companies. These loans are secured by subordinate mortgages as defined under Section 2924.13(a)(3). Specifically, the loans are secured by junior deeds of trust recorded against residential properties in the state of California.

17.    One of the loans funded by Stephen Ng went into default. Before the enactment of Section 2924.13 and before the holder of the first priority deed of trust commenced foreclosure proceedings, Mr. Ng caused a Notice of Default and Election to Sell Under Deed of Trust to be recorded on the subordinate mortgage. However, Mr. Ng has been forced to stop his foreclosure proceedings because the servicer of the subordinate mortgage refused to sign certifications required under Section 2924.13(c) where it would be attesting to what a prior servicer did or did not do, thereby harming Mr. Ng. Mr. Ng planned to foreclose on the subordinate mortgage and, if the amounts due to him were not satisfied by a third-party bidder, to then take title to the secured real property and pay off the first priority deed of trust, but the enactment of Section 2924.13 has impaired Mr. Ng's ability to take such action. Further, Mr. Ng has been harmed by Section 2924.13 because paying off the first priority deed of trust will not solve his inability to foreclose upon his subordinate mortgage. Even if the first priority deed of trust is paid and his subordinate mortgage becomes a first lien position, Mr. Ng's loan will still, inexplicably, and always will be considered a subordinate mortgage under Section 2924.13.

**NDETAIL CAPITAL LLC**

18.     Plaintiff NDETAIL CAPITAL LLC ("Ndetail"), a California limited liability company whose principal place of business is located in Newport Beach, California 92663. Ndetail is duly licensed by the California Department of Financial Protection & Innovation as a California Finance Lender and Broker, license number: 60DBO-10857. Ndetail is a member of CMA. Ndetail is in the business of buying loans, many of which are secured by deeds of trust which are recorded in a second priority lien position against residential real property in California. These deeds of trusts constitute subordinate mortgages as defined under Section 2924.13. Ndetail currently has no less than five (5) subordinate mortgages as defined under Section 2924.13 which are in default, all of which were originated in the last twelve (12) months, and all of which are being serviced by the same loan servicer.

19.     Even though the same loan servicer has serviced all of the subordinate mortgages since their inception and Ndetail has not committed any "unlawful practices," as defined by California Civil Code § 2924.13(b), with respect to the subordinate mortgages, the loan servicer has refused to commence the nonjudicial foreclosure process because the loan servicer has refused to sign any certifications which are currently required by Section 2924.13(c). Furthermore, based on information and belief, the first lien position loans on each of the properties that secure Ndetail's subordinate mortgages are also in default.  Upon information and belief, those default first lien position loans have or will commence foreclosure proceedings, thereby extinguishing Ndetail's subordinate mortgages before Ndetail may foreclose. Section 2924.13 has resulted in Ndetail being in the unenviable position of having its loan servicer refuse to commence foreclosure proceedings. At the same time, the amount due under the defaulted subordinate mortgages increase, upon information and belief, the value of the real properties values securing the subordinate mortgages has or will decrease. The first priority secured creditors will likely be pursuing foreclosure. Ndetail has attempted unsuccessfully to obtain alternative loan servicers but has been unable to do so due to the cost and the reluctance of potential new loan servicers to execute the certifications required by Section 2924.13(c).  Ndetail is unable to self-service its loans. Thus, Section 2924.13 has prevented Ndetail from exercising its bargained-for and statutory power of sale rights with respect to the subordinate mortgages.

1

## BALBOA, LLC

2      20.      Plaintiff, BALBOA, LLC ("Balboa"), is a California limited liability company with its

3  principal place of business located in Westlake Village, California. Balboa is a member of CMA. Jack G.

4  Cohen serves as Balboa's manager and Chief Executive Officer. Established in 2015, Balboa specializes

5  in investing in and servicing subordinate loans secured by residential properties. AB 130 directly and

6  adversely impacts Balboa's real estate portfolio and operations. Its loan servicer is unable or unwilling

7  to execute the certification required by AB 130 because certain historical practices, including the failure

8  to provide ownership transfer notices when fractional interests in loans were sold to individual investors,

9  may be deemed "unlawful practices." Since the enactment of AB 130, Balboa has observed a marked

10  increase in defaults on subordinate deeds of trust, with borrowers openly invoking AB 130 to justify or

11  encourage strategic defaults. Balboa also holds loans secured by subordinate deeds of trust that

12  encumber residential real property, where borrowers are delinquent on insurance and property taxes. AB

13  130 impairs the ability to threaten foreclosure as provided under the applicable loan documents, thereby

14  hampering the ability to compel timely payment, thereby creating a risk that Balboa's collateral may be

15  uninsured or lost to a tax foreclosure. Moreover, AB 130 impairs Balboa's ability to advance payments

16  to protect its collateral, given the uncertainty over the enforceability of subordinate deeds of trust created

17  by AB 130. As a result of AB 130, Balboa will be unable and unwilling to continue acquiring and

18  funding subordinate residential loans so long as AB 130 remains in its present form.

19

## WILLIAM TERRY HUNEFELD

20      21.      Plaintiff WILLIAM TERRY HUNEFELD ("Hunefeld") is an individual residing in San

21  Diego County, California, and a member of CMA. After retiring in 2006, Hunefeld has made and holds

22  loans secured by subordinate deeds of trust encumbering residential property. Since the enactment of AB

23  130, his loan is unable or unwilling to execute the certification required by AB 130, precluding him from

24  commencing nonjudicial foreclosure proceedings on defaulted loans within his portfolio. AB 130

25  impairs, compromises, and jeopardizes Hunefeld's contract rights and remedies under his subordinate

26  deeds of trust by, among other things, causing him to lose his interest in deeds of trust without notice or

27  opportunity to respond and threatening the value, predictability, and enforceability of his real estate

28  portfolio. As a result of AB 130, Hunefeld is unwilling to continue buying or funding subordinate loans

if AB 130 remains in its current form.

## POSTCITY FINANCIAL CREDIT UNION

22.    Plaintiff POSTCITY FINANCIAL CREDIT UNION ("PostCity") is a California based not-for-profit financial cooperative comprised of members who are current or retired United States Postal workers and members of their families. PostCity is duly organized and existing as a lender in this State, which maintains its principal place of business in Long Beach and Sacramento, California, and other offices within this District. It is a member of the League. PostCity is in the business of, among other things, writing and servicing residential mortgage loans, including home equity loans and other "subordinate" loans secured by real property in California. PostCity transacts and services a portfolio of contracts represented by such "subordinate" loans. AB 130 has forced PostCity to restart its foreclosure proceeding on at least one subordinate lien encumbering a residential real property. PostCity's contractual and property rights and remedies have been. They will continue to be substantially impaired or lost entirely if the challenged provisions of AB 130 (as enacted in Section 2924.13) are implemented and enforced. PostCity has been directly and proximately damaged owing to the violation of its fundamental constitutional rights by virtue of the substantial alteration, impairment, and taking of such rights by the enactment of Section 2924.13.

## BEACON DEFAULT MANAGEMENT, INC. AND ZBS LAW, LLP

23.    Plaintiff BEACON DEFAULT MANAGEMENT, INC. ("Beacon") is a California corporation whose principal place of business is located at 30101 Agoura Court, Suite 203, Agoura Hills, California. Beacon is a trustee company that provides nonjudicial foreclosure and other default-related services to lenders (including, but not limited to, SBA lenders), credit unions, loan services, and others. Beacon is a member of UTA. Beacon frequently serves as trustee under subordinate deeds of trust securing residential properties in connection with Small Business Administration ("SBA") loans.

24.    Plaintiff ZBS Law, LLP ("ZBS") is a California limited liability partnership, with its principal place of business located at 30 Corporate Park, Suite 450, Irvine, California 92606. ZBS provides institutional lenders, servicers, credit unions, banks, commercial clients, and other stakeholders in the financial services industry with comprehensive default legal services throughout the Western United States. ZBS regularly serves as trustee for beneficiaries under deeds of trust secured by

residential real property. ZBS is a member of both CMA and UTA.

25.    AB 130 impairs the ability of Beacon, ZBS, and other members of UTA that serve as trustees of subordinate deeds of trust encumbering residential property to fulfill their duties as trustees by imposing vague, uncertain certification requirements that trustees or their beneficiaries must sign before threatening foreclosure or recording a notice of default per the newly enacted Section 2924.13(c). For instance, Section 2924.13(c) prohibits a beneficiary from threatening to conduct a nonjudicial foreclosure sale until after recording a notice of default and recording a certification, even though loan documents or applicable law may require prior notice before commencing foreclosure proceedings. These vague requirements heighten legal exposure to trustees, such as ZBS and Beacon, especially given the provisions of Civil Code sections 2924.13(d) through 2923.13(g), enacted under AB 130. These provisions impose risks of liability if the certification is later challenged or the vague or uncertain provisions of Section 2924.13 are not followed, even though trustees traditionally act in a ministerial capacity.

26.    Hereafter, the Plaintiffs Qin, Surf City, Stephen Ng, Ndetail, Balboa, Hunefeld, PostCity, Beacon, and ZBS will be collectively referred to as the "Plaintiff Lenders." Plaintiff Lenders, and each of them, are members of one or more of the "Plaintiff Associations." The Plaintiff Lenders have suffered and will imminently suffer harm due to AB 130. Plaintiff Lenders and Plaintiff Associations shall be collectively referred to as "Plaintiffs."

27.    Defendant Bonta is sued solely in his official capacity as Attorney General of the State of California. The State of California is a legal and political entity comprised of the branches authorized by the California Constitution to enact, execute, enforce and maintain the laws of this State consistent with the powers and limitations of the Constitutions of California and the United States;[2] including, among other mandates, that any enacted legislation may not impair the rights of its citizens or other persons under existing obligations of contract, may not take or impair their property rights without Due Process of law or without just compensation, and may not deny them Equal Protection of the laws of this State and of the United States.[3]

---

[2] Cal. Const. arts. IV, V.
[3] Cal. Const. art. I, §§ 1, 7 and 9; U.S. Const. art. I, §10, cl. 1; *id.*, Fifth and Fourteenth amends.

28.     Bonta, in his capacity as "Attorney General [is] the chief law officer of the State," vested with "the duty ... to see that the laws of [California] are uniformly and adequately enforced" (Cal. Const. art. 5, § 13) in a manner that faithfully upholds these constitutional mandates. Bonta, as Attorney General, maintains an office located at 1300 I Street, Sacramento, California 95814-2919.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution and the laws of the United States. Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation, under color of law, of rights secured by the Constitution and federal statutes and regulations. Plaintiffs also challenge provisions of AB 130 as preempted by federal law, thereby presenting federal questions within this Court's jurisdiction.

30.     Plaintiffs seek a judicial declaration and an "injunction[] to protect rights safeguarded by the Constitution," squarely presenting a federal question that the federal courts have jurisdiction to resolve under 28 U.S.C. § 1331. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n. 2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). Each Plaintiff Association has standing to bring this lawsuit because at least one of its members would have standing to sue in its own right, the interests it seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires an individual member to participate in this suit. *See California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099–1100 (9th Cir. 2024).

31.     Likewise, with exceptions not relevant here, any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

32.     Venue is proper under 28 U.S.C. § 1391 because Bonta, as Attorney General, maintains offices and conducts official duties in Sacramento, within the District.

33.     Venue is further proper in this District under 28 U.S.C. § 1391 because a substantial part of the events, acts, or omissions giving rise to this action occurred within this judicial district. The seat of government of the State[4] is located in the City of Sacramento, where the challenged provisions of AB

---

[4] *See* Cal. Const. art. III, § 2.

130 were enacted, and any related regulations regarding enforcement would be promulgated. In addition, CMA resides and maintains their principal administrative offices, and conduct their affected business operations within the Sacramento Division of this judicial district.

## BACKGROUND OF THE CHALLENGED PROVISIONS OF AB 130

34.     **Addressing the Problem of "Zombie Mortgages."**  The challenged provisions were initially part of another proposed bill during the 2025-2026 legislative session, SB 681, presenting a variety of issues related to "Housing."[5] As amended May 23, 2025, a coalition of representatives from the real estate and mortgage lending industries, including each of the Plaintiff Associations, opposed section 4 of SB 681.[6] Far from addressing the problem of "zombie mortgages" as described initially to the State Judiciary Committee, the proposed language of new Section 2924.13 of the Civil Code, as amended in SB 681, extended its operation to all subordinate mortgages. In reality, so-called "zombie mortgages" make up a very small fraction of subordinate mortgages, yet AB 130 now sweeps far more broadly.

35.     For instance, a zombie mortgage may refer to a deed of trust that remains on title long after the statute of limitations has run on the underlying debt. This situation might typically occur due to a deed of trust that was never formally released or foreclosed after the debt became uncollectible. Although the debt may be unenforceable through a judicial action, the deed of trust may continue to cloud title if the power of sale under the deed of trust remains valid under California Civil Code section 882.020. To illustrate, if a deed of trust recorded in 1990 secures a promissory note with no stated maturity date, the power of sale could survive for 60 years—perhaps until 2050—even if the underlying debt on the secured loan is time-barred, leaving the borrower unable to sell or refinance the encumbered property without first resolving the outdated lien. Several state and federal laws and regulations governing improper debt collection practices were already in existence before the enactment of AB 130, which addresses and remedies such abuses.

36.     "Historically, a judicial foreclosure action under a deed of trust was barred when the statute of limitations had run on the underlying obligation, and the lien was extinguished." *Robin v.*

---

[5]  *See* SB 681, 2025-2026 Reg. Sess., § 5, as amended Apr. 10, 2025 (Sen. Wahab).

[6]  *Id.*, SB 681, § 4, as amended May 23, 2025.

*Crowell*, 55 Cal.App.5th 727, 749 (2020). Before 1982, "the power of sale under a deed of trust was not barred, i.e., it 'never outlaws.'" *Ibid*. "The power of sale could be exercised by the trustee in a nonjudicial foreclosure even after the statute of limitations barred judicial foreclosure." *Ibid*.

37.    In 1982, the Legislature enacted the Marketable Record Title Act (Cal. Civ. Code §§ 880.020–887.090) that abolished the rule that the power of sale in a trust deed "never outlaws." *Ibid*. Civil Code section 882.020 provides that the power of sale under a deed of trust expires ten (10) years after the maturity date of the obligation if that date "is ascertainable from the recorded evidence of indebtedness" or 60 years after recordation of the deed, if "the last date fixed for payment of the debt … is not ascertainable from the recorded evidence of indebtedness." Cal. Civ. Code §§ 882.020(a)(1), (a)(2). To be "ascertainable from the record," the "recorded document must contain the requisite information." *Miller v. Provost*, 26 Cal.App.4th 1703, 1709 (1994). As *Miller* and other courts recognized, even if the statute of limitations barred the enforcement of the underlying secured debt, the power of sale under the deed of trust might still be exercised under the 10-year and 60-year provisions of section 882.020.[7]

38.    As might occur in the context of many types of credit transactions, some aspects of debt collection activity can be subject to abuse and improper tactics. That is doubtlessly the reason behind state and federal consumer protection laws, some of which are referenced by AB 130. Logically, if a lender or servicer *actually forgives a loan and issues a zero-balance statement to the borrower, the holder of that loan should not pursue* collection. The mortgage loan professionals who are members of Plaintiff Associations are well-trained in proper (as opposed to "unlawful") collection practices and would not condone or promote such abusive practices. But Section 2924.13's definition of "unlawful practices" arbitrarily applies to a vastly broader class of mortgage loans than this kind of outlier "zombie loan" that the new statute was intended to remedy.

39.    **Section 2924.13 Defines "Unlawful Practices" – Including Practices That Under Existing Law *Are Not* "Unlawful."** To illustrate: The challenged provisions of AB 130 purport to apply

---

[7]  Longer statutory time limits, logically, govern the right to enforce a mortgage lien under the trust deed's power of sale—given that the ascertainable obligations of the borrower to re-pay and the "maturity" date of such loans may continue for decades. *See Miller, op. cit.*, at pp. 1708-1709; Cal. Civ. Code § 882.020, *supra*.

to *any* subordinate loan that is secured by residential property, defining the following practices of lenders and mortgage servicers as "unlawful":

    a.    Failure to provide any written communication regarding the subordinate mortgage debt for at least 3 years;

    b.    Failure to provide a servicing transfer notice when required by the Real Estate Settlement Procedures Act (RESPA) Regulation X,[8] investor or guarantor requirements, or "other applicable law";

    c.    Failure to provide a loan ownership transfer notice when required by the Truth in Lending Act (TILA) Regulation Z,[9] investor or guarantor requirements, or "other applicable law";

    d.    Conducting or threatening to conduct a foreclosure sale after providing a form to the borrower indicating that the debt has been written off or discharged, such as an IRS Form 1099;

    e.    Conducting or threatening to conduct a foreclosure sale after the applicable statute of limitations period expired;

    f.    Failure to provide a periodic statement when required by TILA/Regulation Z, investor or guarantor requirements, or "other applicable law."

40.    **Compliance Certification.** Section 2924.13 further provides that a nonjudicial foreclosure cannot be conducted or threatened until the servicer, mortgagee, trustee, beneficiary, or authorized agent completes both of the following:

41.    AB 130 imposes unprecedented and burdensome requirements on mortgage servicers when initiating foreclosure. In addition to recording a notice of default, the servicer must also record a certification under penalty of perjury either denying any engagement in "unlawful practices" or listing every instance in which such practices allegedly occurred. At the same time, the servicer must mail to the borrower both the certification itself and a notice advising the borrower that they may petition a court for relief before the foreclosure sale if the borrower disputes the servicer's compliance. These

---

[8] 12 U.S.C. § 2601 and 12 C.F.R., Part 1024, hereafter "RESPA/Reg. X."
[9] 12 U.S.C. § 1601 et seq. and 12 C.F.R., Part 1206, hereafter "TILA/Reg. Z."

requirements not only complicate and delay the foreclosure process but also expose servicers to new litigation risk and potential loss of contractual remedies, thereby impairing the very rights and obligations that governed the loan at its inception.

42.    **Borrower Defenses and Additional Remedies in Response to Foreclosure.** The new law also provides borrowers with new defenses and additional remedies in response to nonjudicial and judicial foreclosures by a mortgage lender or creditor:

43.    If a borrower petitions the court for relief before a foreclosure pursuant to a power of sale, the court *shall* enjoin the foreclosure until some final determination of the issues has been made.

44.    In a judicial foreclosure, the borrower has an affirmative defense to foreclosure if the court finds that the mortgage servicer engaged in any of the "unlawful practices" defined above.

45.    A court may provide such equitable remedies as it deems appropriate, which may include striking all or a portion of the arrears claim, barring foreclosure, or permitting foreclosure subject to future compliance and a corrected arrearage claim.

46.    In a nonjudicial foreclosure, a borrower may petition the court to set aside the sale: (1) if the certification described above was never recorded, (2) when the recorded certification indicates that the mortgage servicer engaged in any of the unlawful practices defined above, or (3) if the borrower believes there was a misrepresentation of the compliance history.

47.    **The Challenged Provisions of AB 130 Are Passed by Approval of the State's Annual Budget.** In the months preceding the passage of Section 2924.13, the coalition from the real estate and mortgage finance industries (including Plaintiff Associations) offered specific solutions to deal with problems surrounding "zombie mortgages," without imposing the unprecedented and punitive destruction of mortgage lenders' contractual and legal rights affecting *all* junior liens as proposed by SB 681.

48.    While awaiting response to suggested amendments from Senate leadership, on June 3, 2025, the bill's author took three pages from SB 681 (containing proposed Section 2924.13) and transferred that section into AB 130, a 215-page "budget trailer bill," having nothing to do with the topic of real estate financing or junior liens. AB 130 was presented to Governor Newsome on June 30, 2025, for approval of the State's annual budget, a process requiring the Governor to "sign or veto" the entire

package. When the Governor signed AB 130 into law, Section 2924.13 became effective as part of the bill.

49.     **Consequences of the Challenged Provisions.** Many of Section 2924.13's new requirements for servicing subordinate loans, including its procedures and remedies that limit enforcement of such loans, substantially alter and unconstitutionally impair the rights of mortgage lenders under countless existing contracts across California.

50.     Soon after its passage, the bill's author, Senator Wahab, informed the media that these new rules were necessary and reasonable "given how complicated home ownership and mortgage finance can be." [10]

51.     On the contrary, Section 2924.13, which was ostensibly intended to "curb[] foreclosures on 'Zombie' second mortgages," unnecessarily and unreasonably complicates *all* residential financing involving *any* second mortgage or subordinate lien in this State. The many negative and immediate consequences include:

a.     Limiting homeowners' access to available equity in their residential property. For example, a middle-class family that has owned their home for years and secured a favorable first mortgage interest rate of 3% may be unable to "refinance" the entire loan amount because interest rates doubled in the intervening years. This homeowner-family will be frustrated in their efforts to utilize their equity to send a child to college, pay down unsecured debts with a HELOC, plan for retirement, or fix up their property, when, as a practical matter, second mortgages become unavailable. The cost of such financing drastically increases due to the impact of Section 2924.13 on subordinate lending.

b.     First time home buyers may no longer be able to obtain "seller financing" – secured by a "carryback" second mortgage enabling them to purchase an existing home – or obtain a second mortgage loan from institutional lenders to fund their down payment or make home improvements, as both types of these subordinate

---

[10] Andrew Oxford, *California Law Curbs Foreclosures on 'Zombie' Second Mortgages*, Bloomberg Government (July 11, 2025).

loans are now subject to the additional regulatory burdens and enforcement limitations of Section 2924.13.

c. "Federally related mortgage loans," as defined by RESPA, involving loans to be sold by the originating lender the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation (FHMC), or a financial institution from which it is to be purchased by FHMC, record those interests as liens subordinate to the principal loan – on the face of Section 2924.13, such liens are now subject to its additional burdens and enforcement limitations.

d. Section 2924.13 unconstitutionally impairs contract rights and remedies. The new law imposes impermissible barriers to the enforcement and foreclosure of all California "subordinate mortgages" on existing loans that are valid under existing law, by requiring a mortgage servicer to certify under penalty of perjury that the servicer, and all prior servicers, either did or did not engage in any "unlawful practices" defined in the bill.

e. Remarkably, Section 2924.13 contains examples of "unlawful practices" that are perfectly legal under existing state and federal mortgage laws. If the servicer cannot declare under perjury that *none* of the specified "unlawful practices" has ever occurred, at any time in the past, it can enforce its legitimate loan. Or, if the servicer proceeds with foreclosure after committing newly created "unlawful practices," borrowers are authorized to bring legal actions, enjoining any effort to enforce the applicable mortgages or deeds of trust. These injunctions would remain in place until the judge in each case makes some determination, without providing courts with any guidance on what standards to apply. As a practical matter, no mortgage servicer will be able to execute the certification required by Section 2924.13 where the servicer does not have the requisite personal knowledge, may not have business records from prior servicers over the course of many years, and will not have the resources to review the entire historical

servicing record of a loan, all under *threat of criminal prosecution* for "perjury" if his or her certification is wrong or incomplete under the statute.

f.     The statute effectively renders a subordinate loan unenforceable through judicial or nonjudicial foreclosure if, at any time during the loan's history, the mortgage servicer failed to provide a "transfer of loan servicing" notice, a "transfer of loan ownership" notice, or a single required periodic statement to the borrower. In effect, the entire loan would be unenforceable for the failure to send even one notice. However, federal law already provides for remedies, including damages and statutory penalties, for a lender or servicer's failure to send such required notices. [11]

g.     The new law also effectively makes the loan unenforceable if a prior servicer issued a charge-off determination notice, even though a charge-off notice does not necessarily mean the lender is not entitled to payment under the mortgage or deed of trust. With respect to charged-off loans secured by real property, this renders foreclosure on the security unenforceable, despite the clear intention in existing law and mortgage loan terms that these loans remain secured in the event of any forbearance or delay in collection or enforcement by the lender. Under prior existing law, borrowers are protected from personal liability by statutes of limitation governing contracts in the Code of Civil Procedure, [12] and there is a reasonable period of time for a secured lender to enforce a security interest in real property, based on Ancient Mortgage and Deed of Trust sections in the Civil Code. [13]

h.     Federal guidelines already provide protections for debtors against retroactive assessment of interest and late charges for periods when a loan is treated as

---

[11] *See* RESPA, 12 U.S.C. § 2605(f) and TILA, 15 U.S.C. § 1640(a).

[12] *See* Cal. Code Civ. Proc. § 336a (6-year limitation on enforcement of specified notes, mortgages and trust deeds); *id.* at § 337 (4-year limitation for default on a debt or other breach under a written contract).

[13] Cal. Civ. Code § 880.020, et seq.

charged off. Federal law appropriately *does not* eliminate a lender's ability to enforce its legitimate security interest if it pauses collection efforts due to a borrower's lack of response, a bankruptcy filing, or a temporary decline in market property value that renders foreclosure impractical. [14]

i.  Section 2924.13 places unreasonable and punitive restrictions on the ability of a lender to enforce a breach of contract against its real property security for the loan, depriving lenders and servicers of their contractual rights (under standard non-waiver clauses) and the rights afforded by federal law to cease collection of a loan for a period of time and later resume active collection. The challenged provisions unfairly and impermissibly impair the contractual right to pursue real property security for its loan based on a servicer's issuance or failure to issue specified loan servicing communications, even if the issuance or failure was due to the inadvertence or negligence of the servicer, and even if the lender has otherwise fully complied with the law.

j.  Section 2924.13 significantly disrupts the reliability of California's public land records by introducing "off-record" criteria for determining whether a recorded deed of trust remains enforceable. The bill would make a debt unenforceable based upon servicing conduct—such as failure to send a transfer notice or the issuance of a charge-off form—that is not documented in the official property records maintained by county recorders. As a result, a recorded subordinate deed of trust may appear valid and enforceable on its face, while being rendered void under criteria that exist entirely outside the chain of title and unknowable to third parties. This disconnect creates a cloud on title, undermining the ability of purchasers, lenders, and title insurers to rely on public records when evaluating encumbrances.

52.    The above examples are representative of the practical, legal, and constitutional problems created by Section 2924.13. This list is by no means exhaustive. The new law *unreasonably* complicates

---

[14] *See*, *e.g.*, TILA/Reg. Z, 12 C.F.R. §1026.41(e)(6) and 12 C.F.R. §226.5(b).

and conflicts with state and federal regulatory schemes governing the fields of "home ownership and mortgage finance."

53.    The challenged provisions impermissibly impair existing contractual obligations and result in the taking of property rights without due process or just compensation. Section 2924.13 now punishes lenders by inaccurately defining "unlawful practices," and providing a windfall to borrowers who received loan proceeds but failed to pay as agreed or respond to a lender's or servicer's historical engagement to address the delinquency, during the period of time when the lender voluntarily decides not to pursue collection owing to conservation/redirection of resources, bankruptcy, low property values or charge-off—all of which *are* "lawful" mortgage finance practices.

54.    Given the numerous infirmities in the challenged provisions of Section 2924.13, Plaintiffs bring the following claims for judicial relief:

## FIRST CLAIM FOR RELIEF

### (Violation of the Contract Clause Under 42 U.S.C. § 1983)

55.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 54 of this Complaint as if fully restated herein.

56.    By virtue of 42 U.S.C. § 1983, "any citizen of the United States or other person within the jurisdiction thereof [may sue for redress arising from] deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against state actors who are "liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress … ."

57.    The Contract Clause, U.S. Const., art. I, § 10, cl. 1, provides that no State of the United States may pass any "Law impairing the Obligation of Contracts," and a "law" in this context may be a statute, constitutional provision, or administrative regulation having the colorable power to enforce the infringement of such rights. *Dodge v. Woolsey*, 59 U.S. (18 How.) 331, 359-360 (1856); *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 625 (1819) (*Dartmouth College*) (per Chief Justice Marshall, the Contract Clause confers on the judiciary "the high and solemn duty of protecting, from even legislative violation, those contracts which the Constitution of our country has placed beyond legislative control"); *Appleby v. Delaney*, 271 U.S. 403, 411 (1926).

58.     Although the highest state court ordinarily has final authority in determining the construction as well as the validity of contracts entered into under that State's laws, this rule does not hold when the contract is one whose obligation is alleged to have been impaired by state law. The federal courts will construe state law independently, resulting in the impairment of contractual rights. *Douglas v. Kentucky*, 168 U.S. 488, 510 (1897). Otherwise, the challenged state authority could be vindicated through the simple device of a modification or outright nullification by the state court of the contract rights in issue. *Louisiana Ry. & Nav. Co. v. New Orleans*, 235 U.S. 164, 170-171 (1914); *McCulloch v. Virginia*, 172 U.S. 102, 125 (1898) ("the right acquired by the judgment creditor was not, and could not constitutionally be, taken away").

59.     The U.S. Supreme Court defines "contract obligation" as the law binding a party "to perform his [or her] undertaking" as required under the agreement to perform. *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 197 (1819). Contractual obligations are "*impaired* by a law which renders them invalid, or releases or extinguishes them ..., and impairment ... has been predicated upon laws which without destroying contracts derogate from substantial contractual rights." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431 (1934) (*Blaisdell*) (emphasis added). *Impairment* is the test; thus, the total and complete extinguishment of all the contract's obligations is not required. *Ibid*.

60.     Section 2924.13 substantially and materially "impairs" the obligations of existing subordinate mortgage contracts in material respects that render this law invalid under the Contracts Clause. The new law imposes additional burdens upon mortgage lenders and mortgage servicers that indisputably "impair" the administration and enforcement of the contract debtor's obligations to pay the mortgage loan. Section 2924.13 frustrates, and in many instances, entirely deprives the lender from pursuing collection by seeking enforcement under the security provided by the loan and trust deed.

61.     The U.S. Supreme Court instructs that: "Nothing can be more material to the *obligation [of contract] than the means of enforcement*. Without the remedy, the contract may, indeed, in the sense of the law, be said not to exist ...." *Von Hoffman v. City of Quincy*, 71 U.S. 535, 552 (1866) (emphasis added). Impairment of *the remedy* is considered an essential part of the law, supplying the *obligation of contracts*. *Ibid*.

---

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND OTHER RELIEF

62.     In the specific context of State laws that unconstitutionally impair creditors' rights to secure and enforce mortgage obligations, *Bronson v. Kinzie*, 42 U. S. 311, 319-320 (1843) (*Bronson*) involved a mortgage contract giving the mortgagee an unrestricted power of sale in case of the mortgagor's default. That power was impaired by an act of the Illinois Legislature, which required mortgaged premises to be sold for not less than two-thirds of the appraised value and allowed the mortgagor a year after the sale to redeem them. By altering the pre-existing remedies of the mortgage creditor to such an extent, the Illinois law was declared *void* in violation of the Contract Clause. *Id.* at p. 320 ("such modification of a contract by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligations, and is prohibited by the Constitution"). *Accord McCracken v. Haywood*, 3 U.S. (2 How.) 608, 612-613 (1844) (citing *Bronson*).

63.     Moreover, any substantive change to the creditors' contractual rights and remedies may not be given retroactive operation before the effective date of the newly enacted law (here, June 30, 2025). *See Barnitz v. Beverly*, 163 U.S. 118, 128-129 (1896) (stating the general rule that new legislation cannot permissibly "affect any remedy the mortgagee had by existing law for the enforcement of his contract").

64.     California likewise restricts the powers of its legislative and executive branches, founded on similar principles. Article 1, § 9 of the Cal. Const. provides: "A law … impairing the obligation of contracts may not be passed." The rules of construction in this State also generally preclude retroactive application of any changes in its laws—new statutes enacted by the California Codes are to be construed *prospectively* only, unless there is an express intent to the contrary. The Legislature's expression of retroactive intent must be clear and unequivocal, subject to the same constitutional and practical considerations limiting the exercise of its powers. *See* Cal. Civil Code § 3; *Evangelatos v. Superior Court*, 44 Cal. 3d 1188, 1207-1208 (1988). No such intent, express or implied, appears from the text of Section 2924.13. As such, this statute cannot be applied retroactively to impair or affect the myriad of mortgage contracts and subordinate liens that existed before its passage.

65.     For each and all of the foregoing reasons, Section 2924.13 violates the Contract Clause and should be declared null, void, and of no force or effect.

### SECOND CLAIM FOR RELIEF

### (Violation of Due Process Under 42 U.S.C. § 1983)

66.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 65 of this Complaint as if fully restated here.

67.     The Due Process Clause of the Fourteenth Amendment § 1 of the U.S. Const. precludes government action that deprives "any person of … property, without due process of law." The Fourteenth Amendment incorporates the Due Process and Takings Clauses of the Fifth Amendment to assure that State governments may not arbitrarily "take" property without providing the owner with fair compensation or a meaningful alternative remedy for the taking.

68.     The U.S. Constitution itself does not create property interests protected by the Due Process Clause of the Fourteenth Amendment. They are defined by existing rules or understandings that stem from independent sources, such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 577–78 (1972). These constitutionally protected interests extend beyond mere ownership of physical or tangible property and encompass any interest to which a person has a "legitimate claim of entitlement." *Fed. Home Loan Mortgage. Corp. v. SFR Invs. Pool 1, LLC*, 893 F.3d 1136, 1147 (9th Cir. 2018).

69.     Since statehood, California has recognized that mortgages, deeds of trust, contracts, and other obligations securing a debt constitute constitutionally protected property rights. See, e.g., *Bank of Willows v. County of Glenn*, 155 Cal. 352, 354 (1909). A deed of trust is a written instrument that conveys title from the trustor (borrower) to a trustee to secure repayment of a loan owed to the beneficiary (lender), and functions as the practical equivalent of a lien. *Jenkins v. JPMorgan Chase Bank, N.A.*, 216 Cal. App. 4th 497, 508 (2013), as modified (June 12, 2013), *disapproved on other grounds by Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919 (2016); see also Cal. Civ. Code §§ 2924 *et seq.*, 880.020, 882.020–882.040.

70.     "[A]cquiring, possessing, and protecting property" are among the fundamental rights secured by the California and U.S. Constitutions. (*See* Cal. Const. art. I, §§ 1 and 7; U.S. Const. 5th & 14th amends.) Like California, numerous federal and state courts acknowledge the constitutional protections afforded to the mortgage creditor's security under the Fifth and Fourteenth Amendments. A lender that loans money secured by a deed of trust acquires a protected property interest in that security

interest. That interest includes not only the lien itself, but also the lender's right to rely on the continuing validity of the deed of trust until the debt is satisfied or otherwise lawfully extinguished. The lender has a substantial and legitimate claim of entitlement and expectation that the security interest will not be impaired, released, or terminated without adequate notice and an opportunity to be heard. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (defendant has a "substantial and legitimate expectation" that State will honor a State-created procedural right, "and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation"). In addition, California law grants a secured creditor the right to enforce its lien through judicial foreclosure. See Cal. Civ. Code § 725a *et seq*. This statutory enforcement mechanism is itself a protectable property interest. The U.S. Supreme Court confirms this "cause of action [to enforce the security interest] is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co*., 455 U.S. 422, 428 (1982); *see also Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988).

71.     Section 2924.13 operates to impair and deprive the holders of interests in affected mortgage loans of their contractual right to repayment. Further, it deprives them of property rights by precluding foreclosure on the collateral securing those rights if the contract debtor defaults. By analogy to the sound reasoning of Contract Clause cases, compensation and meaningful alternative remedies are due even in circumstances where the Supreme Court has concluded that some public or economic "emergency" justified State action that only *temporarily* deprived a mortgage company of the immediate right to enforce its contractual rights, including the right to foreclose on defaulted loans.

72.     In *Blaisdale*, 290 U.S. 398, a closely divided Supreme Court sustained the Minnesota Moratorium Act of April 18, 1933. After reciting the existence of severe financial conditions continuing for several years during the Great Depression, which included the frequent occurrence of mortgage foreclosure sales for inadequate prices during that period, the majority held that such an economic emergency justified the extraordinary exercise of the State's police power. *Blaisdale* narrowly upheld the Moratorium Act, which authorized Minnesota courts to extend the period for the borrower's redemption from foreclosure sales for such additional time as those courts might deem just and equitable, although in no event beyond May 1, 1935. *Blaisdell*, 290 U.S. at pp. 416-424. The Court emphasized the Act merely *delayed* enforcement and, in the meantime, afforded meaningful financial

remedies to the mortgagee: "The statute does not affect the validity of the sale or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment if the mortgagor fails to redeem within the prescribed period. … While the mortgagor remains in possession, he must pay the rental value [of the dwelling] … as determined … by the [Minnesota] court." *Id*. at p. 425.

73.     By contrast, the Supreme Court declared other state laws unconstitutionally violated the Contract Clause, which also purported to enact "emergency" measures during the same period of the Great Depression, because those laws failed to provide the creditor just compensation or equivalent remedies, instead of the right to enforce the defaulted obligation by foreclosing on secured collateral. As Justice Cardozo aptly explained, while moderate extensions of the time to foreclose and alternative methods of compensation to a lender may be permitted, *The changes of remedy now challenged as invalid are to be viewed in combination*, with the cumulative significance that each imparts to all. So viewed, they are seen to be an *oppressive and unnecessary destruction* of nearly all the incidents that give attractiveness and value to collateral security." *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 62 (1935) (emphasis added) (Depression-era changes to Arkansas foreclosure laws declared invalid); *W. B. Worthen Co. v. Thomas*, 292 U.S. 426, 432-433 (1934) (altering creditors' right to enforce liens on property was an invalid impairment of contract debts, distinguishing *Blaisdell*).

74.     Here, there was no mortgage crisis or other financial emergency that would remotely justify the State's wholesale disregard of the lender's property rights under Section 2924.13. The statute fails to provide a subordinate lienholder with any alternative remedy or right to compensation after this confiscatory law took effect. Unless the mortgage servicer can affirmatively declare under oath that there was "no unlawful practice" committed during the life of the mortgage loan (under the statute's legally dubious definition of that phrase), then that lender's right to foreclose on a defaulted loan and other contractual remedies, as a practical matter, may be extinguished.

75.     For each and all of the foregoing reasons, the challenged provisions of Section 2924.13 violate the Due Process and Takings Clauses of the Fifth and Fourteenth Amendments by impairing and taking property rights without just compensation or reasonable remedy and, as such, are null, void, and of no force or effect.

### THIRD CLAIM FOR RELIEF

### (Violation of Equal Protection Under 42 U.S.C. § 1983)

76.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 75 of this Complaint as if fully restated herein.

77.     The Fourteenth Amendment § 1 of the U.S. Const., further provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; … nor deny to any person within its jurisdiction the equal protection of the laws."

78.     In addition to impairing the property rights of persons who possess interests in mortgages secured by subordinate liens, Section 2924.13 denies those creditors equal protection of the laws, and the privileges and immunities afforded to the same or similar class of mortgage lenders whose loans are secured by real estate in this State and the several States of the United States. [15]

79.     Unlike other forms of mortgage financing in California and other states (e.g., "primary" mortgage loans), section 2429.13 declares that the holder of a "subordinate mortgage" may not enforce creditors' rights "under a deed of trust and any security instrument that functions in the form of a mortgage, that was, at the time it was recorded, subordinate to another security interest encumbering the same residential real property." Section 2924.13, subd. (a)(3). The statute further unreasonably compels a creditor seeking to enforce their rights under a subordinate mortgage to provide a sworn certification regarding whether the servicing of that mortgage has been entirely free of "unlawful practices." *Id*., subd. (b)(1)-(6).

80.     Subdivision (a)(3) purports to define "subordinate mortgages"; however, it does so in a fashion that fails to consider the complexity of the federal regulations referenced elsewhere in the new law. For example a "federally related mortgage" as defined by RESPA (*see* 12 U.S.C. § 2605, subd. (1)) may include loans that are secured by a *first or subordinate lien* on residential real property, including refinanced primary loans, that are guaranteed or insured by a federal agency such as, the Federal National Mortgage Association (Fannie Mae) and Federal National Mortgage Corporation (Freddie

---

[15]  Equivalent provisions of the California Constitution, art. I, § 7(a) provide that: "A person may not be … denied equal protection of the laws[.]" *See also*, *id*. I, § 7(b): "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens."

Mac), or loans that the originating lender contemplates will be sold to such a federal agency. Any such "subordinate" lien securing the federally insured loan by residential property in California would be encompassed within Section 2924.13's strictures on reporting, communication, and foreclosure.

81.    Even if a federally related mortgage loan is secured by the newly-intended "first lien," if the deed on the refinanced loan *is recorded before the existing loan is reconveyed*, the new refi loan is "subordinate" to the original first lien. Moreover, the recorded interests in federally sponsored and regulated Veterans Administration (VA), Department of Housing & Urban Development (HUD), and Small Business Administration (SBA) mortgage loans are also "subordinate" interests to the lending institution's "first lien," even where that mortgage is intended to be primary. Are those sponsoring agencies likewise subject to the new "subordinate mortgage" rules? Are they exempt? The statute does not say one way or another. A mortgage secured by any deed of trust or other security interest is "subordinate" to any other lien "at the time it was recorded" as contemplated by Section 2924.13.

82.    The definition of several so-called "unlawful practices" as enumerated by Section 2924.13 are governed by state and federal regulatory schemes that involve mortgage financing and other consumer credit transactions (such as IRS regulations, TILA/Reg. Z, RESPA/Reg. X and California's Ancient Mortgage and Trust Deed Act), which practices are not deemed to be "unlawful" at all.

83.    Section 2924.13 arbitrarily and capriciously imposes additional burdens and conditions on the enforcement of subordinate mortgage loans, denying those persons their rights to equal protection of the laws, and the privileges and immunities afforded them as citizens of the United States. The challenged law presents many inconsistencies and obstacles to the enforcement of a "subordinate mortgage." It conflicts not only with this established body of federal regulations (see Fifth Claim for Violation of the Supremacy Clause below), but also with several areas of existing California law on the same topics.

84.    For each and all of the foregoing reasons, the challenged provisions of Section 2924.13 violate the Equal Protection Clause of the Fourteenth Amendment, and as such are null, void, and of no force or effect.

### FOURTH CLAIM FOR RELIEF

### (Violation of the Supremacy Clause Under 42 U.S.C. § 1983)

85.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 83 of this Complaint as if fully restated here.

86.     Under the Supremacy Clause, U.S. Const., art. VI, cl. 2, "when Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (citation and quotation marks omitted); *Chamber of Commerce of the United States v. Bonta*, 62 F.4th 473, 481-482 (9th Cir. 2023) (*Chamber of Commerce v. Bonta*) (citation omitted, emphasis added).

87.     Second, "[e]ven if Congress has not occupied the field [entirely], state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council* (2000) 530 U.S. 363, 372 (*Crosby*). Conflict preemption may occur either where it is "impossible for a private party to comply with both state and federal requirements," *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 303 (2019), or where, under the circumstances of a particular case, the challenged state law "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'" *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (emphasis added); *see also Chamber of Commerce v. Bonta*, 62 F.4th at pp. 482-483.

88.     A state law impermissibly "conflicts with" or imposes an "obstacle" to federal law in various ways: "There is no 'rigid formula or rule' for determining when an act of Congress preempts a state law. … If the purpose and intended effects of the federal statute are blocked by the state law, then 'the state law must yield to the regulation of Congress within the sphere of its delegated power.'" *Chamber of Commerce of the United States v. Bonta*, 62 F.4th at p. 482 (citations omitted). Section 2924.13 runs afoul of the Supremacy Clause in each of these respects. The challenged provisions of AB 130 create irreconcilable conflicts and obstacles to compliance with federal laws governing the subject matter of mortgage lending, including the "servicing" of subordinate liens.

89.     Section 2924.13's laundry list of ostensibly "unlawful practices" specifically references several notice and reporting requirements provided by federal regulations that govern credit transactions,

including mortgage loan servicing. When originally amended and presented in the Legislature as section 5 of SB 681 (April 10, 2025), the bill would have stated that a "debt securing a subordinate mortgage is deemed abandoned in its entirety" to the extent of any perceived deficiencies in these federally-regulated notice or reporting processes: [16]

> SEC. 5. Section 2924.13 is added to the Civil Code, to read:
>
> 2924.13. (a) A debt securing a subordinate mortgage is deemed abandoned in its entirety if any of the following conditions are met:
>
> (1) The mortgage servicer did not provide the borrower with any written communication regarding the loan secured by the mortgage for at least three years.
>
> (2) The mortgage servicer failed to provide a transfer of loan servicing notice to the borrower when required to provide that notice by law, including, but not limited to, the federal Real Estate Settlement Procedures Act [RESPA], as amended (12 U.S.C. Sec. 2601 et seq.).
>
> (3) The mortgage servicer failed to provide a transfer of loan ownership notice to the borrower when required to provide that notice by law, including, but not limited to, the federal Truth in Lending Act [TILA], as amended (15 U.S.C. 1601, et seq.).
>
> (4) The mortgage servicer provided a form to the borrower indicating that the debt had been written off or discharged, including, but not limited to, an Internal Revenue Service Form 1099. (Brackets and emphasis added)

90.    When enacted in its final form as Section 2924.13, the challenged provisions added two more "unlawful practices": Subdivisions—(b)(5) threatening or conducting a foreclosure sale after "the statute of limitations has expired …;" and (b)(6) failure to provide the borrower with periodic "account statements when required to provide that statement by law" including any account statements regulated by TILA. *See* Section 2924.13, subd. (b)(5), (6). Under the challenged statute, lenders and mortgage servicers must now affirmatively demonstrate compliance with "the law." It must do so under oath before "threatening" or proceeding with any foreclosure sale secured by the loan. The conflicts arising from these enumerated categories of ostensibly "unlawful practices" are summarized in turn:

---

[16] SB 681, 2025-2026 Reg. Sess., § 5, as amended Apr. 10, 2025. On its face, the bill's initial approach would appear to violate "California's strong public policy against 'technical forfeitures'" of property rights and contractual obligations (*Pitzer College v. Indian Harbor Ins. Co.*, 8 Cal.5th 93, 10 (2019)), and the equally fundamental constitutional prohibition against the State's taking of property by simply decreeing that those rights are forfeited; in the language of AB 681, the loan is "deemed abandoned." *Jones v. New York Guar. & Indem. Co*., 101 U.S. 622, 628 (1879) ("equity abhors forfeitures, and will not lend its aid to enforce them"); *cf*. Cal. Civ. Code § 1442 (same).

91. **Failure to Provide the Borrower with Communications, Statements, and Notices as Required "By Law."** TILA/Reg Z (12 C. F. R. Part 1026) implements the Truth in Lending Act (15 U.S.C. §§1601 – 1667f) whose purpose is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to [her or] him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit and credit billing practices." TILA,15 U.S.C.A. § 1601(a). Due to the complexity and variety of credit transactions, Congress delegated extensive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit (including mortgage servicing), resulting in the promulgation of TILA/Reg. Z to "at least partly fills the statutory gaps." (*Archer v. United Rentals, Inc.*, 195 Cal.App.4th 807, 821 (2011) quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559–560 (1980).

92. TILA/Reg. Z addresses both "closed-end" and "open-end" consumer credit. 12 C.F.R. § 1026.2(a)(10). Closed-end credit involves a single advance of funds repaid over time, such as a typical mortgage. An open-end credit means a plan in which the creditor reasonably contemplates repeated transactions, the creditor may impose a finance charge on time to time on the outstanding balance and the amount of credit may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid. 12 C.F.R. § 1026.2(a)(10).) A home equity line of credit (HELOC) is classified as open-end credit. A subordinate lien ordinarily secures a HELOC.

93. For open-end credit plans, such as HELOCs, TILA/Regulation Z requires the creditor to deliver a periodic statement for each billing cycle in which: (i) the account has a credit or debit balance of at least $1; or (ii) a finance charge has been imposed. 12 C.F.R. § 1026.5(b)(2). These statements must contain key disclosures, including the account balance, fees, interest charges, transaction details, and due dates. 12 C.F.R. § 1026.7. However, Reg. Z also provides that a creditor is not required to send a periodic statement under certain circumstances.

94. A periodic statement need not be sent for an account if the creditor deems it uncollectible, if delinquency collection proceedings have been instituted, if the creditor has charged off the account in accordance with loan-loss provisions and will not charge any additional fees or interest on the account,

1    or if furnishing the statement would violate Federal law. TILA/Reg. Z, 12 C.F.R. § 1026.5(b)(2)

2    (emphasis added).

3           95.     For closed-end residential mortgages secured by a dwelling, creditors must provide the

4    consumer, for each billing cycle, a periodic statement meeting certain specified requirements, such as

5    the payment due date, late payment fee, and the amount due. TILA/Reg. Z, 12 C.F.R. § 1026.41(a)(2),

6    (c), (d). TILA/Reg. Z exempts a creditor from sending periodic statement in the following situations: (1)

7    reverse mortgage transactions, (2) timeshare plans, (3) loans for which the servicer provides a coupon

8    book (with certain required disclosures), (4) small servicers (5,000 or fewer mortgage loans), (5) loans

9    that are charged off with no further collection efforts and no additional fees or interest imposed with

10   certain conditions, (6) loans where the consumer is in bankruptcy under certain conditions (stay orders,

11   etc.), and (7) loans transferred to a confirmed successor in interest with certain disclosures. TILA/Reg.

12   Z, 12 C.F.R. § 1026.41(e)(1)-(6), (g).

13          96.     The terms and conditions of the subordinate mortgage loan, in practical terms, may also

14   affect the timing and content of required account statements. Some balloon payment loans may not

15   mature and become due for five years or more. What would be the purpose of monthly statements of

16   account, or even "communications" about a non-delinquent amount that has not yet accrued, and is not

17   due to be paid for more than three years?

18          97.     Under federal law, a loan servicer of federally related mortgage loans (other than open-

19   end credit lines of credit, like a HELOC) must provide a servicing transfer notice in compliance with the

20   Real Estate Settlement Procedures Act (RESPA), specifically 12 U.S.C. § 2605, and its implementing

21   regulation, Regulation X under 12 C.F.R. § 1024.33(b). Subject to certain exceptions, these provisions

22   require that both the transferor and transferee servicers provide notice to the borrower of any servicing

23   transfer not less than 15 days before the effective date of transfer (transferor) and no later than 15 days

24   after (transferee), or jointly in a single notice. 12 C.F.R. § 1024.33(b)(1)-(b)(4).

25          98.     Similarly, TILA/Reg. Z requires the new owner of an existing mortgage loan secured by

26   the principal dwelling of a consumer to notify the borrower of the ownership transfer within 30 days.

27   TILA, 15 U.S.C. § 1641(g); TILA/Reg. Z, 12 C.F.R. §§ 1026.39(a)-(b).

28

99.    The remedies provided for lapse in providing timely statements or notices under TILA or RESPA are the loss of interest and collection fees. Those federal regulations do not remotely compel the "forfeiture" of indebtedness or the lender's ability to foreclose on the secured collateral if the loan remains in default after initiation of collection procedures.

100.    As recognized by federal regulations, the specific nature of the loan, federal laws relating to bankruptcy and consumer debt collection practices may affirmatively require that the creditor desist from communicating with the borrower by virtue of a mandatory stay, a decision to temporarily forbear in light of practical economic circumstances, creditor policies, or merely demand received from the borrower or their representative to be "left-alone."

101.    By way of example, Section 2924.13(b)(1) conflicts with the Bankruptcy Code. Section 2924.13(b)(1) states: (b) The following conduct constitutes an unlawful practice in connection with a subordinate mortgage:(1) The mortgage servicer did not provide the borrower with any written communication regarding the loan secured by the mortgage for at least three years. However, this 3-year mandate is overly broad and is in direct conflict with the automatic stay provisions under 11 U.S.C. § 362(a), imposes an automatic stay that prohibits creditors, including mortgage servicers, from engaging in any act to collect or recover a claim, including sending written communications such as periodic statements, which could be construed as attempts to collect a debt after a bankruptcy petition is filed. The imposition of written communication under Section 2924.13(b)(1) conflicts with the automatic stay, as it could compel servicers to send periodic statements to debtors who are under the protection of the bankruptcy court. This provision would subject mortgage servicers to potential violations of the automatic stay and expose debtors to unnecessary harassment during the pendency of bankruptcy proceedings. If statements are sent, the servicer may be liable for actual damages, punitive damages, and attorney fees and costs resulting from the violation of the automatic stay. 11 U.S.C. §362(k). As for subdivision (b)(1)'s imprimatur against failing to "provide the borrower with any written communication regarding the loan secured by the mortgage for at least three years," the above exemptions and exceptions to TILA and RESPA may authorize the lack of such "written communications" for periods much longer than just three years. Depending on the mortgage type, this may be much longer. And precisely how is "three years" calculated? "[A]t least three years"

consecutively (as in 365 days a year for at least 3 years, adding a day for a leap year)? "[A]t least three years" cumulatively by counting each day without a writing over the course of a 20-year loan period, all adding up to the minimal three years that will trigger each "written communication"? The statute provides no guidance on the method of calculation.

102.    This calculation is not simply an arithmetic or semantic exercise. The law in question charges the lender and servicer with "unlawful practices" based upon the absence of such "writings," and the declarant-loan servicer who incorrectly calculates the prohibited 3-year "lapse" in time when filling out the certificate of compliance under oath may result in that declarant being charged with a criminal offense. This instance is another example of the vagueness in Section 2924.13's mandates, raising questions about its enforceability given the technical and already highly regulated nature of mortgage loans.

103.    **Providing the Borrower with an IRS Form 1099 (or Similar Form) "Indicating the Debt Had Been Written Off."** The Internal Revenue Code requires creditors to file a Form 1099-C whenever certain "identifiable events" occur. 26 C.F.R. § 1.6050P-1(b). An "identifiable event" is specified in the Internal Revenue Service's ("IRS") regulations as including discharge of all or a portion of indebtedness by agreement of the borrower and creditor, or other circumstances, including a bankruptcy; which expiration of one or more statutes of limitation (provided that the borrower has prevailed in obtaining a final determination of that "affirmative defense"; or merely a decision by the creditor to discontinue collection activity (even temporarily) (see 26 C.F.R. § 1.6050P-1(b)(i)-(iii), defining what the IRS considers "Identifiable Events").

104.    Significantly, these IRS regulations confirm the critical distinction between an actual discharge of the debt as contrasted with a creditor's mere forbearance from pursuing collection; such that an actual discharge is not required to have occurred for a creditor to be obligated under federal law to file a Form 1099-C with the IRS. This distinction stems from the requirement that "a discharge of indebtedness is deemed to have occurred … if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred." 26 C.F.R.

§ 1.6050P-1(a) (emphasis added). The IRS has expressly affirmed that a creditor's issuance of a Form 1099 does not cancel or forgive an obligor's debt, stating:

> To briefly address your concerns about whether courts may view the filing of a Form 1099-C as a written admission that the creditor discharged the debt, and that debtors would be less willing to pay after your organization files a Form 1099-C, you should note the following. **The Internal Revenue Service does not view a Form 1099-C as an admission by the creditor that it has discharged the debt and can no longer pursue collection**. (Emphasis added).

See IRS Priv. Ltr. Rul. 2005-0207, 2005 WL 3561135 (Dec. 30, 2005).

105.     Simply stated, in the IRS's own words from its rulings on the 1099 reporting regulations: "**Section 6050P and the regulations do not prohibit collection activity after a creditor reports by filing a Form 1099-C.**" (Emphasis added). Section 2924.13 nonetheless asserts that a sale is prohibited as "unlawful."

106.     The majority of United States Courts have followed the express language of the IRS's regulations and its Letter Rulings. For example, in *FDIC v. Cashion*, 720 F.3d 169, 180-181 (4th Cir. 2013), the Fourth Circuit Court of Appeals affirmed summary judgment against a borrower who claimed his debt had been "canceled" and forgiven where the only evidence was a Form 1099-C completed by his creditor. *Cashion* held that a creditor's issuance of a Form 1099-C does not constitute a discharge of a debt or prevent a creditor from seeking payment of a debt. Issuing a Form 1099-C merely satisfies the regulatory reporting obligations to the IRS, but does not prohibit the collection of a debt or constitute evidence of its cancellation. *Id*. at p.180.

107.     The challenged provisions of Section 2924.13(b)(4) declare that it is an unlawful practice for a mortgage servicer to "conduct or threaten to conduct a foreclosure sale after providing a form to the borrower indicating that the debt had been written off or discharged, including, but not limited to, an Internal Revenue Service Form 1099." Section 2924.13, subd. (b)(4). This ignores that the IRS's Form 1099 regulations *do not evidence* the debt has been "written off or discharged." Yet the tautological language of the law will have substantive legal consequences for a lender, falsely assuming that a Form 1099 amounts to a "discharge" of debt, and then concluding (also falsely) that the creditor cannot thereafter proceed to collect. Both the premise and conclusion of Section 2924.13 are contrary to

controlling federal law. The IRS regulation under the Internal Revenue Code (cited by Section 2924.13) is controlling and preempts State law.

108.    First, the California statute directly conflicts with the federal tax reporting obligations by penalizing a creditor's compliance. Second, the challenged law poses an obstacle to Congress's objectives by discouraging creditors from filing required Forms 1099-C out of fear that doing so will impair their foreclosure rights, thereby frustrating the IRS's ability to enforce uniform national reporting standards. Section 2924.13(b)(4) is preempted by federal law because it stands as an obstacle to the stated objectives of the Internal Revenue Code and is flatly contradicted by (i.e., "conflicts with") the federal regulatory scheme governing the mandatory issuance by the lender of a Form 1099.

109.    Thus, the IRS interprets its regulations as authorizing a creditor to continue collecting a debt even after issuing a Form 1099-C as required by "identifiable events" specified in the regulations. To put it mildly, the contrary provisions of Section 2924.13 create confusion, obstacles, and inconsistency in the application of the very "practices" that the statute deems "unlawful." The IRS, which imposes this reporting requirement, does not support the State's mistaken assumption in subdivision (b)(4). To the extent that Section 2924.13 inconsistently charges that a creditor who proceeds with its contractual and statutory rights to foreclose has committed an "unlawful practice," California's contrary characterization is preempted by federal law under the Supremacy Clause.

110.    **Threatening or Conducting a Foreclosure Sale without First Recording the Required "Compliance" Certification Under Oath.** Section 2924.13, subdivision (c)(1) and (2) further prohibits servicers from *threatening to foreclose* or *conducting a foreclosure sale* until after recording the Certification of Compliance under oath that the loan is not subject to any undisclosed "unlawful practices"; that certification must be recorded simultaneously with the "notice of default." The borrower must be provided with this *recorded compliance certificate* by certified mail. In other words, the servicer may neither *threaten* to foreclose nor *conduct* a foreclosure until after the notice of default is recorded, together with the certification that commences that process.

111.    This new rule in Section 2924.13(c) has several practical implications that starkly conflict with both California and federal regulations concerning foreclosure sales, including:

a.    Under California's Homeowner's Bill of Rights or "HOBR" (a body of law already existing in the same Chapter of the Civil Code at §§ 2923.5 to 2915.19, inclusive), "[a] mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent *shall not record a notice of default* pursuant to Section 2924" until after contacting the borrower to assess the borrower's financial condition and discuss with borrower options to prevent foreclosure, including statutory "foreclosure prevention options." Section 2923.5, subd. (a).

b.    This HOBR dialogue between the servicer and the borrower must take place before the "notice of default" is recorded, so that "pre-foreclosure" discussion also presumably must take place before the servicer's "Certification" of Compliance. A certification that is processed "simultaneously" with the notice of default.

c.    Logically, how can the servicer discuss "foreclosure prevention options" (required by HOBR before certifying compliance and recording a notice of default) without discussing that a "foreclosure sale" may be commenced if the borrower is in default and cannot make satisfactory arrangements to pay the loan? Doesn't this mandatory HOBR disclosure—required weeks before the notice of default can be filed—compel the servicer to explain that the subordinate mortgage lender is prepared to "conduct or threaten[ing] to conduct a nonjudicial foreclosure" under section 2923.5? Is referencing "foreclosure prevention alternatives" a "threat" to foreclose, violating 2924.13? The conflict in these pre-foreclosure and foreclosure processes (mandated elsewhere) cannot be rationally reconciled with 2924.13.

d.    Moreover, certain "federally related mortgage loans" (e.g., Fannie Mae/Freddie Mac loans) secured by subordinate liens require a notice to be sent to the borrower that precedes the Notice of Default, entitled "Notice of Intent to Foreclose," before initiating foreclosure. Is the federal lender's required pre-foreclosure "Notice of Intent" a prohibited "threat"?

e.    Section 2924.13 is silent about these discrepancies in timing and process. As recognized by HOBR, educating borrowers on the risk of non-payment, including foreclosure, is an essential tool in the process of enforcing the loan contract and informing consumers of alternatives. Preventing lenders from taking these pre-foreclosure steps obstructs the servicer from providing this beneficial information, thereby frustrating important policies promoted by both federal and state law for the express purpose of helping consumers avoid foreclosure.

112.    Section 2924.13 is rife with such inconsistencies. The loan servicer must further declare (under oath) that the foreclosure sale reference in the Notice of Default was not threatened or conducted after "the *applicable* statute of limitations had expired." Section 2924.13, subd. (b)(5). Which statute of limitations is *applicable*? Is the servicer required to act as a lawyer or judge would in analyzing the legal question of whether the lender can proceed to enforce right to collect the unpaid debt due under the mortgage loan (a four to six year limitations period), the right to possess the property securing the loan under the trust deed (for a much more extended period up to sixty years under the Ancient Mortgage and Trust Deed Act), or both?

113.    The servicing agent (which could be a husband and wife who invest their retirement earnings in deeds of trust and service their own loans or a seller who takes back a subordinate lien when selling the property) who is required to make the certification under "penalty of perjury" must also assess what Section 2924.13 means by "unlawful practices" that supposedly consist of not communicating with the borrower in writing about the mortgage loan for "at least three years." Providing "account statements and notices under TILA, RESPA", "other law," or guarantor or investor requirements. TILA and RESPA do not necessarily require monthly account statements, or, in some circumstances, account statements at all. What is the "other law" that establishes an "unlawful practice" and "guarantor or investor requirements" that the servicer must comply with, as referenced by this section? The omission to provide any "required" notice or communication does not amount to grounds for avoiding the loan or forfeiting the right to foreclose on the property secured.

114.    The challenged provisions would criminalize incorrect statements made by the declarant in the certification. Obviously, attempting to chill and obstruct the enforcement of valid contract

obligations and property rights. As a practical matter, section 2024.13 fails to meaningfully identify what the servicer is required to "declare" under penalty of perjury. This absence renders Section 2924.13(c)'s threat to criminalize an inaccurate statement in that certification as "perjury" void: "[T]he void-for-vagueness doctrine [derives from the fundamental precept of Due Process which] requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." [17]

115.  **Section 2924.13 Makes Any Ostensibly Inaccurate Statements by the Mortgage Servicer in the Mandatory "Compliance Certificate" Subject to Prosecution as a Criminal Offense.** As *Chamber of Commerce v. Bonta* holds, attempts by the California Legislature to criminalize entirely lawful conduct authorized under applicable federal statutes and regulations will be preempted by the Supremacy Clause. *See* 62 F.4th at pp.  478, 486-489 (statute imposing criminal penalties on California employers for proposing agreements to arbitrate employment disputes was preempted by the Federal Arbitration Act). Mortgage lenders and their agents who are engaged in the entirely lawful collection of defaulted "subordinate mortgages" should not be subjected to criminal charges of perjury based upon the vague and largely undefined "practices" stated by Section 2924.13. To the extent that the practices referenced in Section 2924.13 are already defined and regulated by federal law, including TILA, RESPA, and Internal Revenue Service regulations, Section 2924.13 improperly re-characterizes those practices as "unlawful." See, e.g., Cal. Civ. Code § 2924.13, subd. (b)(1)–(6).

116.  Thus, even where the federal regulatory scheme does not necessarily reflect "a congressional intent to occupy the entire field," attempted regulation by a State law of the same subject matter "is naturally preempted to the extent of any conflict" or obstacles imposed by the State to fulfilling the purposes and objectives of controlling laws enacted by Congress. *Chamber of Commerce v. Bonta*, 62 F.4th at p. 482 (emphasis added), quoting *Crosby*, 530 U.S. at p. 372.

---

[17] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (striking down California's "loitering" statute that required a person to produce a "credible and reliable" form of identification upon demand): "[T]he [unconstitutional] statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute …." *Id.* at p. 358. By the same token, section 2924.13 compels mortgage servicers to "certify" information that epitomizes an arbitrary and imprecise attempt to exert the State's regulatory authority without any objectively rational purpose.

117.    As outlined above, Section 2924.13 imposes a conflicting and confusing set of requirements – contrary to the plain meaning of federal law governing the servicing and collection of subordinate mortgages, and inconsistent with California's own statutory framework.  In practice, any conduct defined as an "unlawful practice" (to the extent the statute even provides clear definitions) "makes it impossible for a private party to comply with both state and federal requirements." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. at 303. The vagueness and inconsistency of Section 2924.13 create an impermissible obstacle to "the accomplishment and execution of the full purposes and objectives of Congress" in the field of mortgage lending. Additionally, the statute results in a substantial impairment of existing contractual obligations and violates due process and equal protection guarantees.

118.    Section 2924.13 is therefore preempted under the Supremacy Clause.

### FIFTH CLAIM FOR RELIEF

### (Injunctive Relief)

119.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 118 of this Complaint as if fully restated herein.

120.    The challenged provisions of AB 130 (now Section 2924.13) deprive Plaintiffs and their members of enforceable "rights" as secured by federal law under the U.S. Constitution. The State Attorney General and DFPI are charged with implementing and enforcing Section 2924.13. This Court has broad inherent and equitable powers to enjoin unlawful actions by state officials. Such equitable relief is traditionally available in the federal courts to uphold and enforce such rights in actions under 42 U.S.C. § 1983.

121.    Plaintiffs' claims herein satisfy each of the principal factors entitling them to temporary and permanent injunctive relief:

> a.    **Violation of Plaintiffs' Rights**. Seeking a preliminary and permanent injunction against enforcement of the challenged provisions of AB 130 (now section 2924.3), they will demonstrate a substantial likelihood of success, and ultimately actual success on the merits, regarding the statute's violation of their constitutional rights and those of the Associations' members.

b.  **Irreparable Harm.** "The loss of [constitutional rights and] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted). Moreover, monetary damages are neither quantifiable nor recoverable in an action against the Defendant state officials.

c.  **Balance of Equities and Public Interest.** The balance of equities and the public interest weigh in Plaintiffs' favor as upholding Plaintiff's rights by enjoining invalid laws will promote continuous and robust access to markets for second mortgage loans and similar equity financing, without imposing legally invalid regulatory burdens and additional costs to the public at large. It is always in the public interest to enjoin unconstitutional laws.

d.  *See Miller v. Bonta*, 646 F.Supp.3d 1218, 1231 (S.D. Cal. 2022), citing *Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075, 1098 (9th Cir. 2022) ("When, as here, the party opposing injunctive relief is a government entity [or state official], the third and fourth factors—the balance of equities and the public interest—merge.").

122.  "The standard for a preliminary injunction is essentially the same [applying these four factors] as for a permanent injunction, with the exception that [as a threshold matter,] the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Miller v. Bonta, op. cit,* 646 F.Supp.3d at p. 1231.

123.  Accordingly, Plaintiffs respectfully request injunctive relief to remedy constitutional violations and enjoin Defendant from enforcing Section 2924.13.

**SIXTH CLAIM FOR RELIEF**

**(Declaratory Relief and Other Equitable Relief)**

124.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 123 of this Complaint as if fully restated herein.

125.    For each and all of the reasons stated herein, Section 2924.13 deprives Plaintiff Lenders and the Plaintiff Associations' members of their valid and enforceable "rights" secured by federal law and the United States Constitution.

126.    Plaintiffs seek a declaration and a judgment that, in light of these violations, Section 2924.13 is unconstitutional and the challenged provisions of that statute are null, void, and of no force or effect. Plaintiffs are informed and believe that Defendant denies and disputes such violations.

127.    By virtue of 42 U.S.C. § 1983 and the Declaratory Judgment Act, the claims alleged herein present a "case of actual controversy within [this court's] jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. This Court is empowered to grant declaratory relief and such other equitable relief as it deems warranted and necessary to remedy that harm.

128.    This Court can and should exercise its equitable powers to render such a declaration and to enter a judgment, deciding and declaring said rights as prayed.

**SEVENTH CLAIM FOR RELIEF**

**(Attorneys' Fees and Costs Under 42 U.S.C. § 1988 and**

**All Other Applicable Statutes)**

129.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 128 of this Complaint as if fully restated herein.

130.    Under 42 U.S.C. § 1988(b), "[i]n any proceeding to enforce" legal and constitutional rights under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee as part of its costs." Additionally, the court "may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(c).

131.    Plaintiffs are entitled to reasonable attorneys' fees, including expert fees and other costs, in this action, and they request that the Court award such fees under 42 U.S.C. § 1988 and all other applicable statutes.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** Plaintiffs respectfully pray that this Court render the relief requested for an order and ultimately award judgment in this action in their favor and against Defendant, as follows:

1      a.    Declaring that the challenged provisions of AB 130 violate the ban on impairment

2            of existing contractual obligations under Article I, §10 of the U.S. Constitution

3            and equivalent limitations of the California Constitution (Cal. Const. Art. I, § 9)

4            and are null, void, and of no force or effect;

5      b.    Declaring that the challenged provisions of AB 130 violate the Due Process and

6            Takings Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution

7            and equivalent limitations of the California Constitution (Cal. Const. Art. I, §§ 1

8            and 7) by impairing and taking property without just compensation or reasonable

9            remedy and as such are null, void, and with no force or effect;

10     c.    Declaring that the challenged provisions of AB 130 violate the Equal Protection

11           Clause of the Fourteenth Amendment of the U.S. Constitution and equivalent

12           limitations of the California Constitution (Cal. Const. Art. I, §§ 1 and 7) by

13           impairing and taking property in a manner that denies persons within the State

14           equal protection of the laws and as such are null, void, and with no force or effect;

15     d.    Enjoining the Defendant from implementing, applying, regulating, or taking any

16           action whatsoever to enforce the challenged provisions of AB 130;

17     e.    Enjoining the Defendant from implementing, applying, regulating, or taking any

18           action whatsoever to enforce the challenged provisions of AB 130;

19     f.    Awarding Plaintiffs their reasonable attorneys' and experts' fees incurred in

20           bringing this action under 42 U.S.C. § 1988 and all other applicable statutes; and

21     g.    Granting them such other and further relief as this Court deems just and proper.

22  DATED: November 13, 2025

                    **BUCHALTER**

23                    **A Professional Corporation**

24

25            By: _____

26                Harry W.R. Chamberlain II

27

28

1

**WRIGHT, FINLAY & ZAK, LLP**

2

3

By:  */s/ T. Robert Finlay (as authorized by 11-13-2025)*
4
          T. Robert Finlay

5
Attorneys for Plaintiffs CALIFORNIA MORTGAGE
ASSOCIATION, a California nonprofit association;
6
CALIFORNIA CREDIT UNION LEAGUE, a California
nonprofit association; UNITED TRUSTEES
7
ASSOCIATION, a nonprofit association; CHEN WANG
QIN, an individual; SURF CITY INVESTORS, LLC, a
8
California limited liability company; STEPHEN NG, an
individual; NDETAIL CAPITAL LLC, a California limited
9
liability company; BALBOA, LLC, a California limited
10
liability company; WILLIAM TERRY HUNEFELD, an
individual; and POSTCITY FINANCIAL CREDIT
11
UNION, a non-profit financial cooperative; BEACON
DEFAULT MANAGEMENT, INC., a California
12
corporation; and ZBS LAW, LLP, a California limited
13
liability partnership,

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT A**

**[Excerpt of Assembly Bill No. 130 (2025-2206 Reg. Sess)]**

## Assembly Bill No. 130

### CHAPTER 22

An act to amend Sections 714.3, 5850, and 5855 of, and to add Section 2924.13 to, the Civil Code, to amend Sections 12531, 54221, 65400, 65584.01, 65584.04, 65589.5, 65905.5, 65913.10, 65913.16, 65928, 65941.1, 65952, 65953, 65956, 66323, and 66499.41 of, to amend and repeal Sections 65940, 65943, and 65950 of, to add Section 8590.15.5 to, and to repeal Section 66301 of, the Government Code, to amend Sections 17958, 17958.5, 17958.7, 17973, 17974.1, 17974.3, 17974.5, 18916, 18929.1, 18930, 18938.5, 18941.5, 18942, 37001, 50222, 50223, 50253, 50515.10, 50560, 50561, 50562, 53560, and 53562 of, and to add Sections 17974.1.5, 50058.8, 50406.4, 50410, and 53568 to, the Health and Safety Code, to amend Sections 21180, 21183, and 30603 of, and to add Sections 21080.43, 21080.44, 21080.66, 30114.5, and 30405 to, the Public Resources Code, to amend Section 17053.5 of the Revenue and Taxation Code, and to amend Section 5849.2 of the Welfare and Institutions Code, relating to housing, and making an appropriation therefor, to take effect immediately, bill related to the budget.

[Approved by Governor June 30, 2025. Filed with Secretary of State June 30, 2025.]

LEGISLATIVE COUNSEL'S DIGEST

AB 130, Committee on Budget. Housing.

(1) Existing law, the Planning and Zoning Law, authorizes a local agency to provide for the creation of accessory dwelling units (ADUs) in single-family and multifamily residential zones by ordinance, and sets forth standards the ordinance is required to impose with respect to certain matters, including, among others, maximum unit size, parking, and height standards. Existing law authorizes a local agency to provide by ordinance for the creation of junior accessory dwelling units (JADUs), as defined, in single-family residential zones and requires the ordinance to include, among other things, standards for the creation of a JADU, required deed restrictions, and occupancy requirements.

Existing law makes void and unenforceable any covenant, restriction, or condition contained in any deed, contract, security instrument, or other instrument affecting the transfer or sale of any interest in real property that either effectively prohibits or unreasonably restricts the construction or use of an ADU or JADU on a lot zoned for single-family residential use that meets the above-described minimum standards established for those units. However, existing law permits reasonable restrictions that do not unreasonably increase the cost to construct, effectively prohibit the

95

construction of, or extinguish the ability to otherwise construct, an ADU or JADU consistent with those aforementioned minimum standards provisions.

This bill would prohibit fees and other financial requirements from being included in the above-described reasonable restrictions.

Existing law provides for the creation of ADUs in areas zoned for single-family or multifamily dwelling residential use, by ministerial approval if a local agency has not adopted an ordinance, in accordance with specified standards and conditions. Under existing law, a local agency is also required to ministerially approve an application for a building permit within a residential or mixed-use zone to create any of specified variations of ADUs. Existing law prohibits a local agency from imposing any objective development or design standard that upon any accessory dwelling unit that meets one of those specified variations of ADUs, except as specified.

Existing law authorizes a local agency to establish minimum and maximum unit size requirements for both attached and detached ADUs, subject to certain limitations. Notwithstanding that authorization and the ministerial approval requirement, as described above, existing law requires a local agency that adopted an ordinance by July 1, 2018, providing for the approval of ADUs in multifamily dwelling structures to ministerially consider a permit application to construct an ADU, as specified, and authorizes that local agency to impose objective standards including, but not limited to, design, development, and historic standards on said ADUs, except for requirements on minimum lot size.

This bill would remove the requirement that a local agency ministerially consider a permit application to construct one of the above-specified variations of ADUs, and would remove the authorization for a local agency to impose objective standards on those ADUs, as specified above. By further prohibiting local governments from imposing certain standards on ADUs, the bill would impose a state-mandated local program.

(2) Existing law prescribes various requirements to be satisfied before the exercise of a power of sale under a mortgage or deed of trust. Existing law authorizes a borrower to bring an action for injunctive relief to enjoin material violations of certain of these requirements, and requires that the injunction remain in place and any trustee's sale be enjoined until the court determines that the violations have been corrected, as specified.

This bill would make certain conduct an unlawful practice in connection with a subordinate mortgage, including, among others, that the mortgage servicer did not provide the borrower with any communication regarding the loan secured by the mortgage for at least 3 years. The bill would prohibit a mortgage servicer from conducting or threatening to conduct a nonjudicial foreclosure until the mortgage servicer (A) simultaneously with the recording of a notice of default, records or causes to be recorded a certification, as specified, under penalty of perjury that either the mortgage servicer did not engage in an unlawful practice or the mortgage servicer lists all instances when it committed an unlawful practice and (B) simultaneously with the service of a recorded notice of default, the mortgage servicer sends the recorded certification and a notice to the borrower, as specified. By

expanding the scope of a crime, this bill would impose a state-mandated local program.

(3) Existing law, the Davis-Stirling Common Interest Development Act, governs the formation and operation of common interest developments. Existing law requires that a common interest development be managed by an association.

Existing law, if an association adopts or has adopted a policy imposing any monetary penalty on any association member for a violation of the governing documents, requires the board to adopt and distribute to each member a schedule of the monetary penalties that may be assessed for those violations, as provided, and prohibits an association from imposing a monetary penalty on a member for a violation of the governing documents in excess of that schedule. Existing law requires the board to notify a member 10 days before a meeting to consider or impose discipline on the member, as specified. Existing law requires the board to provide a member with written notification of a decision to impose discipline on the member within 15 days.

This bill would prohibit monetary fees from exceeding the lesser of that specified schedule or $100 per violation, except as specified. The bill would require the board to give a member the opportunity to cure a violation prior to the meeting to consider or impose discipline, as specified. If the board and the member are in agreement after the meeting to consider or impose discipline, the bill would require the board to draft a written resolution. The bill would provide that the written resolution, signed by the association and member of a dispute pursuant to the procedure not in conflict with the law or governing documents, binds the association and is judicially enforceable. The bill would reduce the time to provide written notification of a decision to impose discipline from 15 days to 14 days.

(4) Existing law, until July 1, 2042, establishes the Seismic Retrofitting Program for Soft Story Multifamily Housing for the purposes of providing financial assistance to owners of soft story multifamily housing for seismic retrofitting to protect individuals living in multifamily housing that have been determined to be at risk of collapse in earthquakes, as specified. Existing law establishes the Seismic Retrofitting Program for Soft Story Multifamily Housing Fund, and its subsidiary account, the Seismic Retrofitting Account, within the State Treasury. Existing law requires the California Residential Mitigation Program, also known as the CRMP, to develop and administer the program, as specified.

This bill would require, upon appropriation by the Legislature, the CRMP to fund the seismic retrofitting of affordable multifamily housing, as specified. The bill would require the CRMP to prioritize affordable multifamily housing serving lower income households, as defined.

(5) Existing law creates the National Mortgage Special Deposit Fund in the State Treasury, which is continuously appropriated and subject to allocation by the Department of Finance, for the receipt of moneys from the National Mortgage Settlement. Existing law allocates $300,000,000 from the fund to be administered by the California Housing Finance Agency

purposes, and objectives that the tax credit will achieve, detailed performance indicators, and data collection requirements.

Existing law establishes the continuously appropriated Tax Relief and Refund Account in the General Fund and provides that payments required to be made to taxpayers or other persons from the Personal Income Tax Fund are to be paid from that account, including any amount allowable as an earned income tax credit in excess of any tax liabilities.

This bill, for taxable years beginning on or after January 1, 2026, and only when specified annually in a bill relating to the Budget Act, would increase the credit amount for a qualified renter to $250 and $500, as provided. In the event the increased credit amount is not specified in a bill relating to the Budget Act, the existing credit amounts of $120 and $60, as described above, respectively, would be the credit amounts for that taxable year. The bill would provide findings and declarations relating to the goals, purposes, and objectives of this credit.

(29)  This bill would make its provisions severable.

(30)  This bill would include findings that changes proposed by this bill address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities.

(31)  This bill would make legislative findings and declarations as to the necessity of a special statute for the City and County of San Francisco with respect to the above-described CEQA exemption and minimum wage requirements.

(32)  The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for specified reasons.

With regard to any other mandates, this bill would provide that, if the Commission on State Mandates determines that the bill contains costs so mandated by the state, reimbursement for those costs shall be made pursuant to the statutory provisions noted above.

(33)  This bill would declare that it is to take effect immediately as a bill providing for appropriations related to the Budget Bill.

Appropriation: yes.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 714.3 of the Civil Code is amended to read:

714.3.  (a)  Any covenant, restriction, or condition contained in any deed, contract, security instrument, or other instrument affecting the transfer or sale of any interest in real property that either effectively prohibits or unreasonably restricts the construction or use of an accessory dwelling unit or junior accessory dwelling unit on a lot zoned for single-family residential use that meets the requirements of Article 2 (commencing with Section 66314) of Chapter 13 or Article 3 (commencing with Section 66333) of

Chapter 13 of Division 1 of Title 7 of the Government Code is void and unenforceable.

(b) This section does not apply to provisions that impose reasonable restrictions on accessory dwelling units or junior accessory dwelling units. For purposes of this subdivision, "reasonable restrictions" means restrictions that do not unreasonably increase the cost to construct, effectively prohibit the construction of, or extinguish the ability to otherwise construct, an accessory dwelling unit or junior accessory dwelling unit consistent with the provisions of Article 2 (commencing with Section 66314) or Article 3 (commencing with Section 66333) of Chapter 13 of Division 1 of Title 7 of the Government Code. "Reasonable restrictions" shall not include any fees or other financial requirements.

SEC. 2.   Section 2924.13 is added to the Civil Code, to read:

2924.13.   (a)  As used in this section:

(1) "Borrower" has the same meaning as defined in Section 2929.5.

(2) "Mortgage servicer" includes the current mortgage servicer and any prior mortgage servicers.

(3) "Subordinate mortgage" means a security instrument in residential real property, including a deed of trust and any security instrument that functions in the form of a mortgage, that was, at the time it was recorded, subordinate to another security interest encumbering the same residential real property.

(b) The following conduct constitutes an unlawful practice in connection with a subordinate mortgage:

(1) The mortgage servicer did not provide the borrower with any written communication regarding the loan secured by the mortgage for at least three years.

(2) The mortgage servicer failed to provide a transfer of loan servicing notice to the borrower when required to provide that notice by law, including, but not limited to, the federal Real Estate Settlement Procedures Act, as amended (12 U.S.C. Sec. 2601 et seq.), and investor or guarantor requirements.

(3) The mortgage servicer failed to provide a transfer of loan ownership notice to the borrower when required to provide that notice by law, including, but not limited to, the federal Truth in Lending Act, as amended (15 U.S.C. 1601, et seq.), and investor or guarantor requirements.

(4) The mortgage servicer conducted or threatened to conduct a foreclosure sale after providing a form to the borrower indicating that the debt had been written off or discharged, including, but not limited to, an Internal Revenue Service Form 1099.

(5) The mortgage servicer conducted or threatened to conduct a foreclosure sale after the applicable statute of limitations expired.

(6) The mortgage servicer failed to provide a periodic account statement to the borrower when required to provide that statement by law, including, but not limited to, the federal Truth in Lending Act, as amended (15 U.S.C. 1601, et seq.), and investor or guarantor requirements.

(c)  A mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall not conduct or threaten to conduct a nonjudicial foreclosure until the mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent does both of the following:

(1)  Simultaneously with the recording of a notice of default, records or causes to be recorded, in the office of the county recorder of the county that the encumbered property is located, a certification under penalty of perjury that either:

(A)  The mortgage servicer did not engage in an unlawful practice as described in subdivision (b).

(B)  The mortgage servicer lists all instances when it committed an unlawful practice as described in subdivision (b).

(2)  Simultaneously with the service of a recorded notice of default, sends both of the following documents to the borrower by United States certified mail with return receipt requested to the last known mailing address of the borrower:

(A)  A notice providing that if the borrower believes the mortgage servicer engaged in an unlawful practice described in subdivision (b) or misrepresented its compliance history, the borrower may petition the court for relief before the foreclosure sale.

(B)  A copy of the certification recorded pursuant to paragraph (1).

(d)  Upon a borrower's petition to the court for relief before the foreclosure sale, the court shall enjoin a proposed foreclosure sale pursuant to a power of sale in a subordinate mortgage until a final determination on the petition has been made.

(e)  It shall be an affirmative defense in a judicial foreclosure proceeding if the court finds the mortgage servicer engaged in any of the unlawful practices specified in subdivision (b).

(f)  The court may provide equitable remedies that the court deems appropriate, depending on the extent and severity of the mortgage servicer's violations. The equitable remedies may include, but are not limited to, striking all or a portion of the arrears claim, barring foreclosure, or permitting foreclosure subject to future compliance and corrected arrearage claim.

(g)  A borrower may also petition the court to set a nonjudicial foreclosure sale aside when a certification required by subdivision (c) was never recorded or when a certification recorded pursuant to subdivision (c) indicates that the mortgage servicer engaged in an unlawful practice described in subdivision (b) or misrepresented its compliance history.

(h)  Any failure to comply with the provisions of this section shall not affect the validity of a trustee's sale or a sale in favor of a bona fide purchaser.

SEC. 3.  Section 5850 of the Civil Code is amended to read:

5850.  (a)  If an association adopts or has adopted a policy imposing any monetary penalty, including any fee, on any association member for a violation of the governing documents, including any monetary penalty relating to the activities of a guest or tenant of the member, the board shall adopt and distribute to each member, in the annual policy statement prepared