1  ROB BONTA
   Attorney General of California
2  LARA HADDAD, State Bar No. 319630
   Supervising Deputy Attorney General
3  WILLIAM BELLAMY, State Bar No. 347029
   Deputy Attorney General
4  CARTER M. JANSEN, State Bar No. 347116
   Deputy Attorney General
5    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
6    Telephone:  (213) 269-6601
     Fax:  (916) 731-2124
7    E-mail:  carter.jansen@doj.ca.gov
   *Attorneys for Rob Bonta in his official capacity as*
8  *Attorney General of the State of California*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                    SACRAMENTO DIVISION

12

13  **CALIFORNIA MORTGAGE**              Case No. 2:25-cv-2614-DAD-CKD
    **ASSOCIATION**, et al.,
14
                              Plaintiffs,
15                                          **DEFENDANT'S OPPOSITION TO**
          v.                                **PLAINTIFFS' MOTION FOR**
16                                          **PRELIMINARY INJUNCTION**

17  **ROB BONTA**, in his official capacity as    Hearing Date: February 17, 2026
    Attorney General of the State of California,  Time:         1:30 p.m.
18                                                Judge:        Hon. Dale A. Drozd
                              Defendant.          Courtroom:    4, 15th floor
19                                                Action Filed:  September 8, 2025

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

                                               **Page**

Introduction ............................................................................................. 1

Background ............................................................................................. 2

    I.     The Harms of the Zombie Mortgage Crisis ................................ 2

    II.    The Enactment of Section 2924.13 ........................................... 3

    III.   Procedural History ................................................................... 5

Legal Standard ...................................................................................... 5

Argument ............................................................................................... 6

    I.     Plaintiffs Are Not Likely to Succeed on the Merits..................... 6

         A.    Sovereign immunity bars Plaintiffs' claims........................ 6

         B.    Plaintiffs are not likely to succeed on their constitutional
             challenges. ........................................................................ 7

             1.    Section 2924.13 does not violate the Contract Clause. ................... 8

                a.    Section 2924.13 does not substantially impair any
                    contractual rights. ....................................................... 8

                   (1)   The statute merely alters the tools available
                        to creditors............................................... 8

                   (2)   The statute does not "extinguish" the ability
                        to foreclose. ............................................. 9

                   (3)   Potential restrictions arising under the statute
                        are consistent with the court's traditional
                        equitable powers..................................... 11

                   (4)   Home foreclosures are already subject to
                        extensive regulation. ............................. 12

                   (5)   The statute's certification requirement is not
                        overly burdensome in light of regular
                        industry practices and preexisting laws................. 13

         C.    Section 2924.13 advances a legitimate public purpose........... 15

         D.    Section 2924.13 should be given retroactive effect. .............. 17

             1.    Section 2924.13 does not violate the Due Process Clause........... 20

             2.    Section 2924.13 does not violate the Equal Protection
                Clause................................................................... 21

         E.    Section 2924.13 is not preempted by federal law. .................... 23

                a.    There is a strong presumption against preemption
                     because the regulation of foreclosures is a matter of
                     state, not federal, law. ............................................. 24

                  b.    Section 2924.13 does not conflict with federal
                     servicing notice requirements. ........................... 25

                  c.    Section 2924.13 does not conflict with federal law
                     regarding the issuance of Form 1099-Cs. ..................... 25

i

# TABLE OF CONTENTS
(continued)

Page

        d.     Section 2924.13 does not criminalize conduct that is authorized under federal law. ............................................... 26

        e.     Section 2924.13 does not violate the Takings Clause. ....... 26

II.    Plaintiffs Fail to Show Irreparable Harm. ............................................ 27

III.   The Balance of Equities and the Public Interest Weigh Against a Preliminary Injunction. ........................................................................ 29

IV.   Compliance with Local Rule 231(d). ................................................. 30

Conclusion ......................................................................................................... 30

Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction (2:25-cv-02614-DAD-CKD)

# TABLE OF AUTHORITIES

Page

**CASES**

*Angelotti Chiropractic, Inc. v. Baker*,
791 F.3d 1075 (9th Cir. 2015)............................................................................. 21

*Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021)................................................................................. 15

*Aurora Loan Servs., LLC v. Diakite*,
148 A.D.3d 662 (N.Y. App. Div. 2017)............................................................... 11

*Baer v. Douglas*,
No. D057811, 2012 WL 917190 (Cal. Ct. App. Mar. 19, 2012)........................ 23

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023)................................................................................. 6

*Bayview Loan Servicing, LLC v. Bartlett*,
87 A.3d 741 (Me. 2014)........................................................................................ 11

*Bennett v. Isagenix Int'l LLC*,
118 F.4th 1120 (9th Cir. 2024)....................................................................... 27, 28

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994).............................................................................................. 24

*Biancalana v. T.D. Serv. Co.*,
56 Cal. 4th 807 (2013).......................................................................................... 18

*Borden v. Div. of Med. Quality*,
30 Cal. App. 4th 874 (1994)................................................................................. 19

*Callet v. Alioto*,
210 Cal. 65 (1930)................................................................................................ 17

*Campanelli v. Allstate Life Ins. Co.*,
322 F.3d 1086 (9th Cir. 2003).......................................................................... 8, 17

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
844 F.2d 668, 674 (9th Cir. 1988)........................................................................ 27

*Casala, LLC v. Kotek*,
789 F. Supp. 3d 1025 (D. Or. 2025)..................................................................... 29

*Chamberlan v. Ford Motor Co.*,
314 F. Supp. 2d 953 (N.D. Cal. 2004).................................................................. 24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).............................................................................................. 28

iii

*Del Real, LLC v. Harris,*
966 F. Supp. 2d 1047 (E.D. Cal. 2013) ................................................................. 24

*Desai v. City of Los Angeles,*
602 F. App'x 392 (9th Cir. 2015) ......................................................................... 21

*Doe v. SEC,*
No. MC 11-80209 CRB, 2012 WL 78586 (N.D. Cal. Jan. 10, 2012) ...................... 29

*Energy Rsrvs. Grp. v. Kan. Power & Light Co.,*
459 U.S. 400 (1983) ............................................................................... 8, 12, 15

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................................................ 6

*F.D.I.C. v. Cashion,*
720 F.3d 169 (4th Cir. 2013) ............................................................................... 26

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000) ........................................................................................... 24

*Geo Grp., Inc. v. Inslee,*
151 F.4th 1107 (9th Cir. 2025) .......................................................................... 6, 7

*Davis Boat Mfg.-Nordic, Inc. v. Smith,*
95 Cal. App. 5th 660 (2023) ............................................................................. 8, 22

*Hassell v. Uber Techs., Inc.,*
No. 20-cv-04062-PJH, 2021 WL 2531076 (N.D. Cal. June 21, 2021) ..................... 17

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.,*
__ F. Supp. 3d __, 2025 WL 2782591 (N.D. Cal. Sept. 30, 2025) .......................... 10

*In re Rolando S.,*
197 Cal. App. 4th 936 (2011) .............................................................................. 26

*Jones v. Google LLC,*
73 F.4th 636 (9th Cir. 2023) ............................................................................... 24

*Katsivalis v. Serrano Reconveyance Co.,*
70 Cal. App. 3d 200 (Ct. App. 1977) .................................................................... 23

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
480 U.S. 470 (1987) ........................................................................................... 17

*Lac v. Nationstar Mortg. LLC,*
No. 2:15-cv-00523-KJM-AC, 2016 WL 4055041 (E.D. Cal. July 27, 2016) ............. 10

*Levald, Inc. v. City of Palm Desert,*
998 F.2d 680 (9th Cir. 1993) ............................................................................... 20

iv

*Liberty Nat'l Enters., L.P. v. Chicago Title Ins. Co.*,
217 Cal. App. 4th 62 (2013)........................................................................................ 23

*Martinez v. Specialized Loan Servicing, LLC*,
No. 2:24-cv-1387 WBS AC, 2025 WL 3030982 (E.D. Cal. Oct. 30, 2025) ............................ 20

*Maryland v. King*,
567 U.S. 1301 (2012).................................................................................................. 29

*McClellan v. I-Flow Corp.*,
776 F.3d 1035 (9th Cir. 2015)...................................................................................... 24

*Moeller v. Lien*,
25 Cal.App.4th 822 (1994)................................................................................... 12, 24

*Montoya v. FCI Lender Servs.*,
No. 5:25-cv-01732-JC, 2025 U.S. Dist. LEXIS 187209 (C.D. Cal. Sep. 22, 2025)............... 19

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)..................................................................................................... 7

*Morris v. JPMorgan Chase Bank, N.A.*,
78 Cal. App. 5th 279 (2022).......................................................................................... 17

*Munaf v. Geren*,
553 U.S. 674 (2008)...................................................................................................... 5

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................ 6, 29

*Olson v. California*,
104 F.4th 66 (9th Cir. 2024).......................................................................................... 21

*Palmer v. Stassinos*,
419 F. Supp. 2d 1151 (N.D. Cal. 2005) ........................................................................ 17

*Park v. First Am. Title Co.*,
201 Cal. App. 4th 1418 (2011)...................................................................................... 29

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984).................................................................................................... 20

*People v. Union Oil Co. of Cal.*,
48 Cal.2d 476 (1957) ............................................................................................ 17, 18

*Pro Value Props., Inc. v. Quality Loan Serv. Corp.*,
170 Cal. App. 4th 579 (2009)........................................................................................ 18

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025)......................................................................................... 7

*Ram v. OneWest Bank, FSB*,
  234 Cal. App. 4th 1 (2015) ........................................................................ 11

*Richmond Mortg. & Loan Corp. v. Wachovia Bank & Tr. Co.*,
  300 U.S. 124 (1937) ............................................................... 9, 11, 19, 20

*Robin v. Crowell*,
  55 Cal.App.5th 727 (2020) ........................................................................ 12

*Russell v. Super. Ct.*,
  185 Cal. App. 3d 810 (1986) ..................................................................... 18

*San Francisco Taxi Coal. v. City & Cnty. of San Francisco*,
  979 F.3d 1220 (9th Cir. 2020) ................................................................... 22

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) ............... 8

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ...................................................................................... 6

*Simon Newman Co. v. Fink*,
  206 Cal. 143 (1928) ................................................................................... 23

*Smith v. Ditech Fin. LLC*,
  No. EDCV 18-01411 JGB (SHKx), 2018 WL 6431406 (C.D. Cal. Aug. 27, 2018) ............ 11

*Spoklie v. Montana*,
  411 F.3d 1051 (9th Cir. 2005) ................................................................... 20

*Sveen v. Melin*,
  584 U.S. 811 (2018) ..................................................................................... 8

*U.S. Bank Nat'l Ass'n v. Blowers*,
  332 Conn. 656 (2019) ................................................................................ 11

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ................................................................................ 7, 10

*Westwood Montserrat, Ltd. v. AGK Sierra de Montserrat, L.P.*,
  No. C088859, 2022 WL 278150 (Cal. Ct. App. Jan. 31, 2022) ..................... 23

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ................................................................................... 6, 7

*Williams v. Alameda County*,
  642 F.Supp.3d 1001 (N.D. Cal. 2022) ...................................................... 8, 12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................ 6

vi

**STATUTES**

California Civil Code
  § 2897........................................................................................................... 23
  §§ 2923.3-2944.10 ................................................................................... 12, 24
  § 2923.5 ............................................................................................................ 12
  § 2924 .............................................................................................................. 17
  § 2924.13 .................................................................................................. *passim*
  § 2924.19 .......................................................................................................... 12

15 U.S.C.
  § 1610 .............................................................................................................. 25

California Penal Code
  § 118 .......................................................................................................... 13, 26

California Code of Civil Procedure
  §§ 725a-730.5 ........................................................................................... 12, 24

Ohio Rev. Code
  § 1349.78 ......................................................................................................... 16

Va. Code Ann.
  § 55.1-321 ........................................................................................................ 16

**OTHER AUTHORITIES**

12 C.F.R.
  § 1024.5 ........................................................................................................... 25
  § 1024.38 ......................................................................................................... 13

Assembly Bill No. 130 (2025-2026 Reg. Sess.)
  § 2....................................................................................................................... 3

Arnold, et al., "Zombie 2nd mortgages are coming to life, threatening thousands of Americans'
  homes," NPR (May 18, 2024), available at
  https://www.npr.org/2024/05/10/1197959049/zombie-second-mortgages-homeowners-
  foreclosure (last accessed December 15, 2025) ...................................................... 1, 3

Baxter Dunaway, *L. Distressed Real Est.*, § 19.2 (2025)........................................ 18

Jones, Buhayar, & Fan, "No Cop on the Beat," BLOOMBERG NEWS (Oct. 30, 2025), available
  at https://www.bloomberg.com/graphics/2025-zombie-home-mortgage-debt-collection-
  investigation/ (last accessed January 9, 2026) ........................................................ 3

Letter from Elizabeth Warren, Ranking Member of the United States Senate Committee on
  Banking, Housing, and Urban Affairs, to Joseph A. Smith (December 16, 2025), available at
  https://www.banking.senate.gov/imo/media/doc/letter_to_independent_monitor_re_zombie_m
  ortgages.pdf........................................................................................................ 1

Maryland House Bill No. 769 ................................................................................ 16

Maryland Senate Bill No. 682.......................................................................................... 16

Massachusetts S. 1071/H. 1983 ...................................................................................... 16

*See* Joyce Palomar, *Patton and Palomar on Land Titles*, § 422 (2025) ........................................ 18

*Survey of State Foreclosure Laws,* NATIONAL CONSUMER LAW CENTER, available at
https://www.nclc.org/wp-content/uploads/2022/09/survey-foreclosure-card.pdf (last accessed
January 4, 2025).......................................................................................................... 18

U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT, "Collecting, Analyzing, and Publicizing
Data on Housing Turnover: Report to Congress" (Dec. 2024) ,
available at https://www.huduser.gov/portal/portal/sites/default/files/pdf/Housing-Turnover-
Report.pdf .......................................................................................................... 1, 9, 21

**CONSTITUTIONAL PROVISIONS**

United States Constitution, Article I
§ 10, cl. 1.......................................................................................................... 8

California Constitution, Article I
§ 1.................................................................................................................. 21
§ 7.............................................................................................................. 20, 21

United State Constitution, Amendment XIV
§ 1.............................................................................................................. 20, 21

**INTRODUCTION**

The umbrella term "zombie mortgages" refers to a variety of cases in which homeowners believed their mortgages were long-settled, but debt-collectors suddenly reappear years or decades later demanding payment and threatening foreclosure. Zombie mortgages commonly arise out of subordinate mortgages that originated prior to the 2008 financial crisis, and they cause devastating harm to individual homeowners and their communities.[1] California Civil Code section 2924.13 ("Section 2924.13") addresses the harms caused by the zombie mortgage crisis, as well as other pervasive issues affecting subordinate mortgages, by providing additional protections to borrowers facing foreclosures on their subordinate mortgages, implementing additional notice requirements, and potentially requiring judicial oversight of foreclosures if certain suspect servicing activities have occurred.

These protections are patently reasonable. In fact, nonjudicial foreclosure is completely unavailable in about half of the jurisdictions across the United States.[2] Yet Plaintiffs, remarkably, claim that Section 2924.13—which implements additional procedural requirements and further regulates, but does not eliminate, nonjudicial foreclosures of second mortgages—is such a great burden to lenders' rights to foreclose that it is unconstitutional on its face. They further claim that this burden is so acute and harmful that a preliminary injunction must issue to enjoin Section 2924.13 while this lawsuit proceeds. Plaintiffs' arguments strain credulity.

Plaintiffs are not entitled to their requested injunctive relief for a multitude of reasons. At the outset, there is no need for the Court to consider the merits of Plaintiffs' claims because their suit against the Attorney General is barred by the doctrine of sovereign immunity. The Attorney General possesses no enforcement authority with respect to Section 2924.13; rather, it is the

---

[1] *See* Arnold, et al., "Zombie 2nd mortgages are coming to life, threatening thousands of Americans' homes," NPR (May 18, 2024), available at https://www.npr.org/2024/05/10/1197959049/zombie-second-mortgages-homeowners-foreclosure (last accessed December 15, 2025); Letter from Elizabeth Warren, Ranking Member of the United States Senate Committee on Banking, Housing, and Urban Affairs, to Joseph A. Smith (December 16, 2025), available at https://www.banking.senate.gov/imo/media/doc/letter_to_independent_monitor_re_zombie_mortgages.pdf (summarizing the rise of harmful zombie mortgages in recent years).

[2] U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT, "Collecting, Analyzing, and Publicizing Data on Housing Turnover: Report to Congress" (Dec. 2024) at 17, available at https://www.huduser.gov/portal/portal/sites/default/files/pdf/Housing-Turnover-Report.pdf.

affected borrower who may enforce the statute, if they so choose. Thus, no exceptions under *Ex parte Young* apply, and the Attorney General is not a proper defendant to this challenge.

The merits of Plaintiffs' claims fare no better. Plaintiffs bring a variety of constitutional challenges, alleging that Section 2924.13 violates the Contracts, Due Process, Equal Protection, Takings, and Supremacy Clauses. Plaintiffs are unlikely to succeed on any of these claims. At the outset, Plaintiffs cannot show that the statute is unconstitutional in all applications, as is required for their facial challenges. Further, Plaintiffs are unlikely to succeed on their Contracts Clause and Due Process Clause claims; the statute does not constitute a substantial impairment of contractual rights, and even if it did, it advances a legitimate public purpose and is not clearly arbitrary and unreasonable with no substantial relation to the public welfare. Plaintiffs are likewise not likely to succeed in showing that Section 2924.13 fails rational basis review, as required for their Equal Protection claim, or that the statute deprives lenders of all economically beneficial use of their property, as required for their Takings Clause claim. Finally, Plaintiffs are unlikely to succeed in in their preemption claims because there is no actual conflict between Section 2924.13 and federal law; rather, it reenforces or builds upon existing federal law.

Nor have Plaintiffs established the remaining factors required for injunctive relief. Plaintiffs' sparse anecdotal evidence shows no seismic upheaval to the subordinate mortgage market. Plaintiffs do not show that they have been or will be irreparably harmed if the statute continues to operate, as it has for the last 6 months, while this litigation is resolved. And the balance of the equities and the public interest tip heavily in favor of the Attorney General, given the public's significant interest in retaining the benefits of Section 2924.13's protections and the comparatively lesser compliance costs related to Section 2924.13, among other factors.

For all these reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

## BACKGROUND

### I. THE HARMS OF THE ZOMBIE MORTGAGE CRISIS.

"Zombie mortgages" is a phrase that refers to a wide variety of cases where servicers attempt to collect on mortgages that originated several years—sometimes decades—prior, which a borrower believed were foreclosed, forgiven, modified, or paid off. Declaration of Manisha

2

Padi ("Padi Decl."), ¶ 8.  One type of zombie mortgage is zombie second mortgages—subordinate mortgages on residential property that were commonly originated prior to the 2008 financial crisis, and which have "risen from the dead" in recent years to become zombie mortgages that surprise borrowers with collection attempts.  *See id.* ¶ 23; Request for Judicial Notice in Support of Motion to Dismiss, Dkt. No. 20-2 ("RJN"), Ex. 1 (Senate Judiciary Committee Analysis, S.B. 681 (April 29, 2025)) at 16.  These zombie second mortgages have become prevalent in recent years due to rises in housing prices.  *Id.*  They threaten to dispossess thousands of unsuspecting, disproportionately low-income borrowers of their homes, inflicting devastating harm on individuals and communities.  *See* Padi Decl. ¶¶ 13-15.[3]  Zombie mortgages "can result in serious financial losses to borrowers, worsen borrowers' health, destabilize children, decrease house prices, and increase issues like homelessness and crime in the neighborhoods."  Padi Decl. ¶ 10.  These unexpected foreclosures can also cause substantial harm to other creditors on the same property and the mortgage market more generally.  Padi Decl. ¶¶ 20-22.  And the problem is widespread; one source estimates that "[h]undreds of thousands [of] borrowers" in the U.S. are vulnerable to more than "$32 billion" in zombie mortgage loans.[4]

## II.    THE ENACTMENT OF SECTION 2924.13.

California legislators enacted Section 2924.13 to combat the harms associated with unexpected foreclosures caused by zombie mortgages, and to address other harmful aspects of the mortgage industry that contribute to the homelessness and affordable housing crises in California.  The statute was signed into law and went into effect on July 1, 2025.  Cal. Civ. Code § 2924.13.[5]  Initially, lawmakers introduced Senate Bill 681, which aimed in part to protect consumers from zombie mortgages.  *See* RJN, Ex. 1 at 16-17; *see also* First Amended Complaint ("FAC") ¶ 34.  Senate Bill 681 was not enacted, but portions of the bill directed at zombie mortgages were revised and re-introduced in section 2 of Assembly Bill 130.  A.B. 130, 2025-2026 Reg. Sess., § 2.  Assembly Bill 130 was signed into law and added Section 2924.13 to the Civil Code.

[3] *See* also NPR, *supra* n.1.
[4] Jones, Buhayar, & Fan, "No Cop on the Beat," BLOOMBERG NEWS (Oct. 30, 2025), available at https://www.bloomberg.com/graphics/2025-zombie-home-mortgage-debt-collection-investigation/ (last accessed January 9, 2026).
[5] All statutory citations are to the California Civil Code unless otherwise noted.

Section 2924.13 contains requirements applying to all "subordinate mortgages"[6] and consists of two main components.  First, the statute enumerates six "unlawful practices" of a servicer in connection with subordinate mortgages.  § 2924.13(b).  These include failing to provide the borrower with any written communication regarding the loan for three or more years; failing to provide periodic statements, loan servicing transfer notices, or loan ownership transfer notices when required to by law; and conducting or threatening to conduct a foreclosure sale after providing a form to the borrower indicating the loan had been written off or after the applicable statute of limitations expired.  § 2924.13(b)(1)-(6).  Second, the statute implements a certification and notice requirement for nonjudicial foreclosures.  With respect to the certification requirement, Section 2924.13(c)(1) provides that, prior to conducting or threatening to conduct a nonjudicial foreclosure, the "mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent" must record, along with the Notice of Default, a certification under penalty of perjury that either:

> (A) The mortgage servicer did not engage in an unlawful practice as described in subdivision (b); [or,]
>
> (B) The mortgage servicer lists all instances when it committed an unlawful practice as described in subdivision (b).

With respect to the notice requirement, Section 2924.13(c)(2) requires that, prior to conducting or threatening to conduct a nonjudicial foreclosure, the foreclosing party must send the borrower a copy of the certification described above and a notice explaining the borrower's right to petition the court for relief before the foreclosure sale.  The foreclosing party must send via certified mail:

> (A) A notice providing that if the borrower believes the mortgage servicer engaged in an unlawful practice described in subdivision (b) or misrepresented its compliance history, the borrower may petition the court for relief before the foreclosure sale; [and,]
>
> (B) A copy of the certification recorded pursuant to [subdivision (c)(1)].

The remedies available under Section 2924.13 depend on whether the creditor seeks judicial or nonjudicial foreclosure.  For judicial foreclosures, the statute deems it an "affirmative defense" on behalf of the borrower "if the court finds the mortgage servicer engaged in any of the unlawful practices specified in subdivision (b)."  § 2924.13(e).  For nonjudicial foreclosures, the

---

[6] "Subordinate mortgages" are defined as "a security instrument in residential real property, including a deed of trust and any security instrument that functions in the form of a mortgage, that was, at the time it was recorded, subordinate to another security interest encumbering the same residential real property."  § 2924.13(a)(3).

borrower can petition the court for relief before the foreclosure sale occurs if the borrower believes that the mortgage servicer engaged in one of the unlawful practices enumerated in subdivision (b) or misrepresented its compliance history in the certification under subdivision (c). *See* § 2924.13(c)(2)(A). If the borrower submits such a petition, the court must enjoin the nonjudicial foreclosure "until a final determination on the petition has been made." § 2924.13(d). Borrowers can also petition the court to set aside a nonjudicial foreclosure sale that has already occurred if the required certification was never recorded, or if the certification that was recorded indicates that the mortgage servicer engaged in an unlawful practice listed under subdivision (b) or misrepresented its compliance history. § 2924.13(g).[7]

In evaluating any petitions made, the court may, in its discretion, provide an appropriate equitable remedy "depending on the extent and severity of the mortgage servicer's violations." *See* § 2924.13(f). The remedies "*may* include, but are not limited to, striking all or a portion of the arrears claim, barring foreclosure, or permitting foreclosure subject to future compliance and corrected arrearage claim." *Id.* (emphasis added).

### III. PROCEDURAL HISTORY.

On September 8, 2025—several months after the statute went into effect—Plaintiffs brought suit against the Attorney General, asserting a variety of constitutional challenges and seeking injunctive relief to invalidate Section 2924.13. Dkt. No. 1. They subsequently filed a First Amended Complaint on November 13, 2025. Dkt. No. 14 ("FAC"). On December 15, 2025, Defendant filed a Motion to Dismiss the FAC (Dkt. No. 20, *see also* Dkt. No. 24), and Plaintiffs filed the instant Motion for Preliminary Injunction, seeking to enjoin the enforcement of Section 2924.13 pending final judgment. Dkt. No. 19 ("Mot.").

### LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation modified). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat.*

---

[7] However, the purchase by a bona fide purchaser cannot be set aside under this provision. Section 2924.13(h) provides that "[a]ny failure to comply with the provisions of this section shall not affect the validity of a trustee's sale or a sale in favor of a bona fide purchaser."

*Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain a preliminary injunction, the moving party must demonstrate that (1) it "is likely to succeed on the merits" of its claims; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor"; and (4) the proposed "injunction is in the public interest." *Id*. at 20.  The likelihood of success on the merits is a threshold inquiry and is the most important factor for preliminary injunction; a court "need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citation modified). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

**A.    Sovereign immunity bars Plaintiffs' claims.**

As a threshold matter, Plaintiffs' claims are barred by sovereign immunity.  Sovereign immunity is the principle contained in the Eleventh Amendment that a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (citation modified).  The Supreme Court's decision in *Ex parte Young* created an exception that allows official-capacity suits against State officials. *Ex parte Young*, 209 U.S. 123, 159–60 (1908).  But the exception only "authorizes federal courts to enjoin certain state officials from enforcing state laws." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021).  If a plaintiff cannot "'direct [the] Court to any enforcement authority the attorney general possesse[s] in connection with'" the challenged law, then the Attorney General is not a proper defendant in a suit against the State. *Geo Grp., Inc. v. Inslee,* 151 F.4th 1107, 1124 (9th Cir. 2025) (quoting *Whole Woman's Health*, 595 U.S. at 43).

In *Whole Woman's Health*, plaintiffs challenged the constitutionality of the Texas Heartbeat Act, a statute that provided for a private enforcement mechanism, much like Section 2924.13. 595 U.S. at 35-36.  The Supreme Court held that sovereign immunity barred the claims asserted against the state's attorney general because there was no "enforcement authority the attorney general possesses . . . that a federal court might enjoin him from exercising." *Id.* at 43.  Likewise,

in *Geo Grp., Inc. v. Inslee*, the Ninth Circuit found that the state attorney general was "not [a] proper defendant[ ]" in an action challenging a Washington law that "provided no cause of action to the Attorney General," but instead provided a "private cause of action" to certain detained persons. 151 F.4th at 1124. Here, too, Plaintiffs cannot "direct the Court" to any enforcement authority that the Attorney General possesses with respect to Section 2924.13. *Whole Woman's Health*, 595 U.S. at 43; *see* § 2924.13. Much like the statutes at issue in *Whole Woman's Health* and *Geo Grp.*, Section 2924.13 provides that individuals borrowers may enforce the statute by petitioning the court for relief if violations occur. *See* § 2924.13(c)(2)(A), (d), (g); *Whole Woman's Health*, 595 U.S. at 43; *Geo Grp., Inc. v. Inslee*, 151 F.4th at 1124. Plaintiffs' claims against the Attorney General are therefore barred by sovereign immunity.

**B.  Plaintiffs are not likely to succeed on their constitutional challenges.**

A statute is facially unconstitutional only if "no set of circumstances exists under which the [statute] would be valid"—in other words, the statute must be "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). The Supreme Court has "made facial challenges hard to win" because "[f]or a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Here, Plaintiffs bring facial challenges. *See Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (challenges are facial if the requested relief "would reach beyond the particular circumstances of that plaintiff") (citation modified). They seek to "enjoin[ ] and restrain[ ] Defendant, Rob Bonta . . . from implementing, enforcing, invoking or otherwise giving effect to any provision of California Civil Code section 2924.13." Mot. 2; *see also* FAC ¶ 126 (seeking a declaration that "Section 2924.13 is unconstitutional and the challenged provisions of that statute are null, void, and of no force or effect"). Plaintiffs' constitutional challenges are therefore facial ones, and they face the high burden of demonstrating that "the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449; *see also Moody v. NetChoice*, 603 U.S. at 723 (noting that the decision to litigate constitutional claims as facial challenges "comes at a cost"). Plaintiffs cannot meet this burden.

7

**1.     Section 2924.13 does not violate the Contract Clause.**

The Contract Clause (U.S. Const., Art. I, § 10, cl. 1) protects contractual arrangements, but it gives way to the State's police power "to safeguard the vital interests of its people." *Energy Rsrvs. Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983); *see also Sveen v. Melin*, 584 U.S. 811, 819 (2018) ("[N]ot all laws affecting pre-existing contracts violate the [Contract] Clause."). The threshold inquiry is whether a challenged law "substantially impair[s]" the contractual relationship. *Sveen*, 584 U.S. at 819. If substantial impairment is found, the law is still constitutional if it is an "'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (citation omitted). The parallel provision under the California Constitution is subject to the same federal Contract Clause analysis. *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1097 (9th Cir. 2003).

**a.     Section 2924.13 does not substantially impair any contractual rights.**

To determine if there is a substantial impairment of contracts, courts consider the extent to which the law undermines the contractual bargain; whether it interferes with a party's reasonable expectations; and whether it prevents the party from safeguarding or reinstating his rights. *Sveen*, 584 U.S. at 819. For an impairment to be "substantial," it must "deprive a private party of an important right, thwart performance of an essential term, defeat the expectations of the parties, or alter a financial term." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003) (citation modified).

**(1)     The statute merely alters the tools available to creditors.**

First, Section 2924.13 does not substantially impair creditors' contractual rights because it merely "alters the tools available to [the challenging party] to protect [his] interest" without preventing the party from safeguarding his rights. *Williams v. Alameda County*, 642 F.Supp.3d 1001, 1023-24 (N.D. Cal. 2022) (eviction moratorium did not constitute a substantial impairment because "[w]hile eviction may be the landlords' preferred remedy, the prohibition on most evictions does not eliminate the landlords' ability to safeguard their rights because they can still sue for breach of contract"); *see also Davis Boat Mfg.-Nordic, Inc. v. Smith*, 95 Cal. App. 5th 660, 678 (2023) (retroactive application of a law that prevented the seizure of a debtor's home to

8

satisfy his consumer debt did not constitute a substantial impairment of the lender's contractual rights because "[o]ther methods of recovery—such as wage garnishment and levying upon deposit accounts—[were] left intact.") (citations omitted); *Richmond Mortg. & Loan Corp. v. Wachovia Bank & Tr. Co.*, 300 U.S. 124, 131 (1937) (upholding statute's retroactive application that limited the availability of deficiency judgments after nonjudicial foreclosures because the lender still had the option to pursue judicial foreclosure; "[i]f [] the Legislature of the state had elected altogether to abolish the remedy by trustee's sale, we could not say that it had not left the mortgagee an adequate remedy for the enforcement of his contract."). Under Section 2924.13, creditors continue to have the option of pursuing nonjudicial foreclosure—unlike approximately half of the U.S. states in which nonjudicial foreclosure is not permitted[8]—if they comply with the certification and notice requirements implemented by Section 2924.13. If they choose not to comply, they can continue to pursue *judicial* foreclosures. Creditors can also elect to pursue various other alternatives altogether. For example, mortgage defaults can be resolved by non-foreclosure alternatives, such as entering into loan modification plans or "consensually transferring title to the lienholder through the deed-in-lieu process."[9] Padi Decl. ¶ 12.

### (2) The statute does not "extinguish" the ability to foreclose.

Section 2924.13 does not "extinguish" the ability of subordinate lienholders to foreclose or enforce their rights, as Plaintiffs contend. *See, e.g.,* Mot. 12. Rather, the statute implements procedural certification and notice requirements for nonjudicial foreclosures and permits, but does not require, borrowers under the threat of nonjudicial foreclosure to petition a court for relief if they contend certain requirements were not complied with (or raise noncompliance as an affirmative defense in a judicial foreclosure). § 2924.13(d)-(g). The statute does not guarantee that any relief will be granted if the borrower petitions the court for relief (§ 2924.13(f)), and the discretion afforded to the court allows it to avoid inequitable or unconstitutional awards. *See, e.g.*, *Lac v. Nationstar Mortg. LLC*, No. 2:15-cv-00523-KJM-AC, 2016 WL 4055041, at *6 (E.D.

---

[8] *Supra* at 1, n. 2.
[9] Deed-in-lieu of foreclosure refers to "a process where a borrower consensually remits title to the creditor, usually in exchange for the right to live in the property for an extended timeline, resulting in less property depreciation." Padi Decl. ¶ 21.

Cal. July 27, 2016); *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, __ F. Supp. 3d __, No. 5:21-CV-02777-EJD, 2025 WL 2782591, at *9 (N.D. Cal. Sept. 30, 2025) (under the "Constitutional avoidance doctrine", courts should avoid interpreting a statute "in ways that would render it unconstitutional or questionably constitutional"). This alone is fatal to Plaintiffs' claims because they cannot show that the statute even has *any effect on* the ability to foreclose in all circumstances, let alone that the statute constitutes a substantial impairment in all applications as required for Plaintiffs' facial challenge. *See Wash. State Grange*, 552 U.S. at 449.

Plaintiffs also repeatedly falsely claim that, in order to proceed with nonjudicial foreclosure, the lender must first record a certification "confirming that *none* of the six categories of 'unlawful practices' have occurred." Mot. 18 (emphasis added); *see also* Mot. 11, 35-36; Laddusaw Decl. ¶ 9; Griffith Decl. ¶ 10; Knight Decl. ¶ 12; Treder Decl. ¶ 5, 9; Wilson Decl. ¶ 6. This claim is belied by the plain language of the statute, which also permits lenders to proceed with nonjudicial foreclosure after they record a certification that *discloses* any unlawful practices that occurred. § 2924.13(c)(1)(B). Similarly, Plaintiffs incorrectly claim that the statute "bar[s] foreclosure altogether whenever the certification cannot be made." Mot. 36; *see also* Wilson Decl. ¶ 6. But the statute does not require any certification whatsoever for *judicial* foreclosures; foreclosures are certainly not "barred altogether" whenever the certification is not recorded. Finally, Plaintiffs falsely claim that the existence of "affirmative defenses" in judicial foreclosure (§ 2924.13(e)) means that judicial foreclosure is prohibited if an unlawful practice has occurred. *See, e.g.,* Christian Decl. ¶ 10 (claiming that the possibility of affirmative defenses under Section 2924.13 "prohibit[s]" the lender from engaging in judicial foreclosure); Hunefeld Decl. ¶ 12 (same); Long Decl. ¶ 11 (same). Not so: a borrower *may* (but need not) raise the occurrence of unlawful practices as affirmative defenses during a judicial foreclosure, and the court *may* (but need not) limit the creditor's relief in some way as a result, "depending on the extent and severity of the mortgage servicer's violations." § 2924.13(e), (f). Nothing in the statute states that judicial foreclosure would be entirely barred merely because an "unlawful practice" has occurred; it rather confirms the court's discretion to apply different remedies—discretion courts already have in many circumstances, *see infra* at I.B.1.a.(3). Indeed, Plaintiffs' own evidence shows that

10

lenders are able to proceed with judicial foreclosure as an alternative to nonjudicial foreclosure after the passage of Section 2924.13 (as is required in much of the country). *See, e.g.,* Jones Decl. ¶ 20 (noting that lenders are "opting to foreclose judicially or seriously considering switching to a judicial foreclosure model to foreclose on Subordinate Mortgages in California"); Kass Decl. ¶ 15 ("Surf City is also considering utilizing the [courts] to pursue judicial foreclosures, instead of the nonjudicial process"); Treder Decl. ¶ 7 (holder of impacted subordinate mortgages are "seriously considering" switching to the judicial foreclosure process).

### (3) Potential restrictions arising under the statute are consistent with the court's traditional equitable powers.

Additionally, the restrictions of Section 2924.13—i.e., implementing additional procedural and notice requirements for nonjudicial foreclosures, and permitting borrowers to petition the court for equitable relief due to the servicer's potential misconduct—are within courts' traditional equitable powers and happen regularly in jurisdictions across the country. *See, e.g.*, *Smith v. Ditech Fin. LLC*, No. EDCV 18-01411 JGB (SHKx), 2018 WL 6431406, at *5 (C.D. Cal. Aug. 27, 2018) (noting remedy of postponing foreclosure sale for failure to abide by requirements of § 2923.5); *U.S. Bank Nat'l Ass'n v. Blowers*, 332 Conn. 656, 671 (2019) ("When a mortgagee's conduct is inequitable, a trial court in foreclosure proceedings has discretion to withhold foreclosure or to reduce the amount of the stated indebtedness.") (citation modified); *Ram v. OneWest Bank, FSB*, 234 Cal. App. 4th 1, 11 (2015) ("The traditional method to challenge a nonjudicial foreclosure sale is a suit in equity to have the sale set aside and to have the title restored.") (cleaned up); *Bayview Loan Servicing, LLC v. Bartlett*, 87 A.3d 741, 748-49 (Me. 2014) (upholding the lower court's dismissal with prejudice of a foreclosure action because the mortgagee had repeatedly failed to appear for mediation sessions that were required by state statute); *Aurora Loan Servs., LLC v. Diakite*, 148 A.D.3d 662, 664 (N.Y. App. Div. 2017) (affirming lower court's order tolling interest, costs, and attorney fees for a four-year period during which servicer failed to participate in good faith in foreclosure settlement conferences mandated by state law). By confirming the court's equitable powers, the statute does not substantially impair existing contracts. *See Richmond Mortg. & Loan Corp.*, 300 U.S. at 131

11

(upholding law that retroactively limited lender's ability to seek a deficiency judgment after nonjudicial foreclosure because the law "has merely restricted the exercise of the contractual remedy to provide a procedure which, to some extent, renders the remedy by a trustee's sale consistent with that in equity. This does not impair the obligation of the contract.").

### (4) Home foreclosures are already subject to extensive regulation.

In the same vein, there is no substantial impairment because the more extensive the pre-existing regulation of an industry when parties executed the contract, the weaker a party's argument that a substantial property right was impaired by post-contract regulatory changes. *See Energy Rsrvs. Grp.,* 459 U.S. at 416 (finding no substantial impairment of the parties' reasonable expectations because of the "existence of extensive regulation" in the field); *Williams* 642 F.Supp.3d at 1023 ("[T]he County's moratorium does not interfere with the landlords' reasonable expectations because there is a long history of regulations governing the landlord-tenant relationship[.]"). Home foreclosures, both judicial and nonjudicial, are already subject to extensive statutory regulation. *See* §§ 2923.3-2944.10 (laws governing nonjudicial foreclosure process), Civ. Proc. §§ 725a-730.5 (laws governing judicial foreclosure process); *see also Moeller v. Lien*, 25 Cal.App.4th 822, 830 (1994) ("Civil Code sections 2924 through 2924k provide a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust."); *Robin v. Crowell*, 55 Cal.App.5th 727, 751 (2020) ("The exercise of the power of sale in a deed of trust is carefully circumscribed by statute.") (citation modified). Many of these laws prescribe similar requirements to the ones being challenged here or provide remedies like those available under Section 2924.13. For example, Cal. Civ. Code section 2923.5 requires that the lender certify its compliance with certain procedural requirements before initiating the nonjudicial foreclosure process. § 2923.5(b). Similarly, Cal. Civ. Code section 2924.19 (i) permits borrowers to "bring an action for injunctive relief to enjoin [certain material violations]" of the statutes governing nonjudicial foreclosures, and (ii) requires that nonjudicial foreclosure sales "be enjoined until the court determines [that the violations are corrected]." § 2924.19(a)(1), (2). Federal law likewise mandates that servicers accurately document and retain information regarding their past communications with borrowers

12

and transfer such documentation to new servicers when there has been a servicing transfer; it further imposes an affirmative obligation on transferee servicers to obtain any missing documentation from prior servicers. *See* 12 C.F.R. §§ 1024.38(b)(4)(i), (b)(4)(ii), (c).

Because there is a "long history of regulations" in this area, several of which the statute confirms or builds upon, Plaintiffs cannot show that Section 2924.13 interferes with their reasonable expectations. *Id.*

**(5) The statute's certification requirement is not overly burdensome in light of regular industry practices and preexisting laws.**

Plaintiffs make much of the fact that current loan servicers often lack knowledge of "activity performed by prior loan servicers." Mot. 26. They claim that because current servicers often cannot certify whether unlawful practices occurred during the life of the loan, nonjudicial foreclosure is entirely unavailable. *Id.* But under federal law, servicers must accurately document and retain information regarding past communications with borrowers and transfer such documentation to new servicers when there has been a servicing transfer, and new servicers have an *affirmative obligation* to obtain any missing documentation from the old servicer.[10] *See* 12 C.F.R. §§ 1024.38(b)(4)(i), (b)(4)(ii), (c). Moreover, "mortgage servicing transfers contain numerous metrics and safeguards to assure the completeness of the data and ensure that documentation is transferred accordingly [and] proper due diligence is performed by the transferee servicer prior to the transfer." Patterson Decl. ¶ 29. Servicing transfer agreements, executed by servicers when a servicing transfer occurs, commonly include a "[f]ull data and document transfer of all servicing file and accounting ledgers" and require "[d]ue diligence by the transferee servicer of the data, documents, and loan statuses." *Id.* ¶ 23.   For example, the Fannie

---

[10] Remarkably, Plaintiffs claim that some servicers are unwilling to execute the required certification *even when* those servicers know or believe that no unlawful practices have occurred, ostensibly because they fear potential criminal prosecution. *See, e.g.,* Christian Decl. ¶ 9; Long Decl. ¶ 10. This refusal to execute certifications is patently unreasonable, given the strict intent requirement of California's perjury statute (Cal. Penal Code § 118(a)) and the fact that "[i]t is common and routine among mortgage servicers to issue sworn certifications" similar to the one required by Section 2924.13. Patterson Decl., ¶¶ 32-35. These servicers' irrational refusals to issue the required certifications are not grounds to invalidate the statute or this requirement.

13

Mae Single-Family Servicing Guide instructs that servicing transfer agreements should include provisions requiring the new servicer to:

> 1. [A]ssume[ ] responsibility for all of the seller/servicer's contractual obligations related to the mortgage loans, including all selling warranties and any other liabilities that arise in connection with the mortgage loans or the servicing of them prior to the delivery of the mortgage loans.
> 2. [P]erform[ ] due diligence review(s) of the servicing portfolio to its satisfaction, which includes examination of the books, records, and custodial accounts of the seller/servicer with respect to the servicing portfolio.
> 3. [A]ssume[ ] full responsibility to Fannie Mae for the correctness of such books and records.

*Id.* ¶ 25. Similarly, the servicing transfer guidelines published by the Mortgage Bankers Association[11] recommends that transferring servicers provide "the complete books and records of each mortgage loan," including "all . . . documents pertinent to servicing mortgage loans" and "all customer correspondence and responses"; that transferee servicers "[p]erform a due diligence review on the loans in the transfer"; and that transferee servicers "[i]dentify loans that have partial or incomplete [documentation] and determine what documentation is missing and whether applicable notices under Regulation X have been sent." *Id.* ¶ 28, Ex. D at 6, 7.

The aforementioned federal servicing requirements, combined with regular industry practices as encompassed by the servicing guidelines discussed above, belie Plaintiffs' claims regarding the frequency and extent to which past servicing activity is unknowable. They also demonstrate that there cannot be substantial impairment in every application of Section 2924.13 to existing contracts, because it does not substantially impair the loans of servicers who abided by these federal servicing requirements and industry guidelines.[12]

Finally, "[i]t is common and routine among mortgage servicers to issue sworn certifications, affidavits, declarations, and/or court filings under penalty of perjury" attesting to

---

[11] These guidelines are attached as Exhibit D to the Patterson Declaration and can be viewed at https://cdn.ymaws.com/www.usfn.org/resource/collection/653240D6-CA59-4AD3-82FF-3057B7320DE2/17251_MBA_Servicing_Transfer_Matrix-Private%280%29.pdf.

[12] In fact, Plaintiffs' claims regarding their inability to verify past servicing conduct illustrate that Section 2924.13 is operating as it should—to potentially require judicial scrutiny over foreclosures on loans in which, due to the servicer's failure to comply with federal servicing requirements and industry standards, it cannot be verified that borrowers have received adequate communications regarding the loan. *See* Padi Decl. ¶ 11.

14

information that is similar to that contained in Section 2924.13's certification. Patterson Decl. ¶¶ 32-35. For example, servicers commonly file Proofs of Claim in Bankruptcy Court that require "the same or similar diligence by the servicers as what would be required" to issue the certification under Section 2924.13, "including having access to and reviewing previous servicers' records." *Id.* ¶ 34. Servicers who file false information in these documents "could be fined up to $500,000, imprisoned for up to 5 years, or both." *Id.* ¶ 33. Servicers also commonly execute affidavits under penalties of perjury to be attached to court pleadings. *Id.* ¶ 35. Given the frequency with which servicers file similar certifications in the context of administering or enforcing mortgage agreements, Plaintiffs cannot credibly claim that Section 2924.13's certification is so onerous that it constitutes a per se substantial impairment.

**C. Section 2924.13 advances a legitimate public purpose.**

Even if Plaintiffs could show substantial impairment, which they cannot, Section 2924.13 is a reasonable way to advance a "significant and legitimate state interest[ ]," such as remedying a general social or economic problem. *Energy Rsrvs. Grp.,* 459 U.S. at 416. When, as here, "the government is not party to the contract being impaired, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 913 (9th Cir. 2021) (cleaned up).

As noted in the Legislative Analysis for Section 2924.13's precursor, Senate Bill 681, the challenged provisions of Section 2924.13 were adopted in part to mitigate the harms of the "zombie mortgage" crisis. *See* RJN, Ex. 1 at 16 (noting "provisions aimed at protecting California homeowners from 'zombie' mortgages"), 17 ("SB 681 aims to . . . limit zombie mortgages and the degree to which they may be resurrected[.]"). Section 2924.13 was also enacted to preserve and protect existing housing and to mitigate the harms of increased housing prices. *Id.* at 9 ("California's affordability crisis is pushing families into homelessness . . . SB 681 takes decisive action to put affordability front and center" by "prioritiz[ing] preserving housing that serves moderate- and low-income families[.]"). These objectives clearly constitute a significant and legitimate public purpose. *See Apartment Ass'n of Los Angeles Cnty., Inc.*, 10 F.4th at 914 ("preventing displacements from homes" deemed to be a legitimate public purpose).

Moreover, the connection between Section 2924.13 and these stated purposes is clear; it protects homeowners facing foreclosures on their second mortgages—including foreclosures from "zombie" second mortgages—by permitting them to seek judicial relief if certain, potentially suspect servicing activities occurred. *See* § 2924.13(c)(2)(A), (d), (f). And Section 2924.13 is likely to be effective at averting harmful unexpected foreclosures. *See* Padi Decl. ¶¶ 30-35. "Subordinate liens likely make up the bulk of cases where a servicer has stopped attempting collection for a significant period of time because subordinate lienholders are less likely to get paid when prices are low." *Id.* ¶ 29.[13] Section 2924.13 therefore reasonably provides borrowers of subordinate loans with additional protections. *See* § 2924.13(a)(3). Additionally, the "unlawful practices" delineated in Section 2924.13(b) may result in a reasonable borrower believing that their subordinate liens were no longer owed. Padi Decl. ¶ 30. When such circumstances have occurred, Section 2924.13 accordingly provides the borrower with additional protections, such as additional affirmative defenses for borrowers and the right to ask that the nonjudicial foreclosure sale be stayed pending judicial review.[14] § 2924.13(c)(2), (d), (e).

In light of the "substantial deference given to legislative judgment as to the necessity and reasonableness of economic statutes," Section 2924.13 is a reasonable means of achieving its

---

[13] Plaintiffs inaccurately claim that there are only 525 "zombie" mortgages in California, which make up only ".04% of active subordinate mortgages." Laddusaw Decl. ¶ 19; Mot. 24. The methods used to reach this number (*see* Laddusaw Decl. ¶¶ 13-18) "do not create an accurate picture of zombie mortgages." Padi Decl. ¶ 25. The two criteria used in Plaintiffs' calculation—subordinate mortgages that were originated prior to 2008 and for which a notice of default was filed in 2025—do not capture the circumstances in which a zombie mortgage may be present. *Id.* ¶ 25; Patterson Decl. ¶ 37. For example, this method does not capture zombie mortgages that have not had a notice of default filed, or that were originated after 2008. Padi Decl. ¶ 25; Patterson Decl. ¶ 36-39. "To correctly identify zombie mortgages, Laddusaw would need to limit to subordinate liens where: 1) the borrower was in default, whether or not a notice of default was filed in any particular time frame, and 2) servicers had not contacted borrowers, or had led borrowers to believe they did not owe money on the loan." Padi Decl. ¶ 25. Plaintiffs' calculation is therefore likely to underestimate the frequency and impact of zombie mortgages. And *even if* the estimate were accurate, the statute would still benefit the public significantly by protecting these borrowers. *Id.* ¶ 35 (noting that averting even 850 foreclosures could provide "over $100 million in benefits to the public").

[14] Nor is the Legislature's approach out of the ordinary: other states have similarly enacted or considered legislation that require additional notice requirements and implement borrower protections to avert unexpected foreclosures. *See* Padi Decl. ¶¶ 28-30; Ohio Rev. Code § 1349.78; Va. Code Ann. § 55.1-321; Maryland H.B. 769 and S.B. 682; Massachusetts S. 1071/H. 1983; *see also* Padi Decl. ¶ 27 (noting federal laws in the post-financial crisis era that "aimed to limit the number of costly foreclosures that occurred" by "strengthening notice requirements" and "providing for more affirmative defenses against foreclosure.").

stated purposes. *Campanelli v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1099 (9th Cir. 2003); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 506 (1987) (noting that courts should not "second-guess" the government's determination as to "the most appropriate ways of dealing with the problem" at issue).

**D.     Section 2924.13 should be given retroactive effect.**

Contrary to Plaintiffs' claims, the "unlawful practices" set forth in subdivision (b) may be given retroactive effect to the extent that they impact foreclosures initiated after the statute became law. *See* Mot. 21-22.

First, the general rule against retroactive application does not apply when the challenged legislation repeals or limits "a purely statutory cause of action." *Palmer v. Stassinos*, 419 F. Supp. 2d 1151, 1155 (N.D. Cal. 2005). "The justification for this rule is that all statutory remedies are pursued with full realization that the legislature may abolish the right to recover at any time." *Callet v. Alioto*, 210 Cal. 65, 67-68 (1930); *see also Hassell v. Uber Techs., Inc.*, No. 20-cv-04062-PJH, 2021 WL 2531076, at *13 (N.D. Cal. June 21, 2021) ("[W]hat a legislature gives, a legislature may take."); *People v. Union Oil Co. of Cal.*, 48 Cal.2d 476, 481-482 (1957) ("Since . . . there is no vested right to the refund of the taxes [under the Franchise Tax Act,] but rather such action is a matter of legislative grace, it necessarily follows that the right to the payment of interest on such refunds is not vested and the Legislature may enact a statute cutting off such right theretofore accorded the taxpayer."). "[A] cause of action or remedy dependent on a statute falls with a repeal of the statute, even after the action thereon is pending[.]" *Callet*, 210 Cal. at 67-68.

The right to conduct a nonjudicial foreclosure (or "trustee's sale") derives from California Civil Code section 2924, which provides that when a mortgage or deed of trust includes a power of sale clause, that power may be exercised without a court's intervention if certain requirements are met. § 2924, et seq. "California's system of nonjudicial foreclosure has long been governed by a detailed scheme of statutes . . . that evolved over time from the <u>original legislative grant of power to conduct trustee sales</u> in the late 1920s." *Morris v. JPMorgan Chase Bank, N.A.*, 78 Cal. App. 5th 279, 294 (2022) (emphasis added); *see also Biancalana v. T.D. Serv. Co.*, 56 Cal. 4th

17

807, 816 (2013) (noting that nonjudical foreclosures occur via a "statutory foreclosure sale process"); *Pro Value Props., Inc. v. Quality Loan Serv. Corp.*, 170 Cal. App. 4th 579, 583 (2009) ("A nonjudicial foreclosure sale is a creature of statute."). Indeed, it is the case across the country that nonjudicial foreclosures are permitted only when a state's statute expressly authorizes it.[15] *See* Joyce Palomar, *Patton and Palomar on Land Titles*, § 422 (2025) ("Approximately one-half of the states today have statutory schemes that permit the inclusion of an express power of sale clause in mortgages or in deeds of trust."); Baxter Dunaway, *L. Distressed Real Est.*, § 19.2 (2025) ("[T]he Legislature's carefully crafted statutory framework [governing nonjudicial foreclosures] leaves no room for parties privately to agree on a purely contractual, unregulated power of sale."). The right to conduct a nonjudicial foreclosure pursuant to a power of sale is therefore a "matter of legislative grace." *Union Oil Co. of Cal.*, 48 Cal.2d at 481-482. The California Legislature accordingly has the power to pass legislation (such as Section 2924.13) that limits the circumstances in which nonjudicial foreclosure can proceed—including when such limitations may result from past conduct. *Id.*

Even if the right to nonjudicial foreclosure were not a statutory right, the statute should nonetheless be given retroactive effect with respect to foreclosures initiated after its enactment because the Legislature's stated purpose in enacting this statute clearly indicates that this type of retroactive effect was intended. "The presumption against retroactivity, often discussed as if it were a substantive rule of law, is a rule of construction subordinated to the most fundamental rule of construction, namely that a statute must be interpreted so as to effectuate legislative intent." *Russell v. Super. Ct.*, 185 Cal. App. 3d 810, 818 (1986) (cleaned up). "In the absence of . . . an express declaration of legislative intent for retroactive application, a court may look to a variety of other factors to determine such legislative intent, such as the context of the legislation, its objective, the evils sought to be remedied, the history of the times and similar legislation, public policy, and/or contemporaneous statutory construction." *Borden v. Div. of Med. Quality*, 30 Cal.

---

[15] *See Survey of State Foreclosure Laws,* NATIONAL CONSUMER LAW CENTER, available at https://www.nclc.org/wp-content/uploads/2022/09/survey-foreclosure-card.pdf (last accessed January 4, 2025) (listing state statutes authorizing nonjudicial foreclosures in each of the states that permits them).

App. 4th 874, 882 (1994). Here, legislators specifically stated that one of the purposes of this law was to alleviate the harms associated with zombie mortgages, many of which were originated prior to the 2008 financial crisis and have now become increasingly prevalent. *See* RJN, Ex. 1 at 16. If no past conduct can be deemed "unlawful" for purposes of the statute's certification requirement, Section 2924.13 would be effectively toothless in its ability to remedy the harms associated with these specific mortgages called out by the Legislature.[16] This cannot be the result intended by the Legislature, which enacted the statute in an urgent effort to mitigate the ongoing housing and affordability crises that Californians face. *See, e.g.,* RJN, Ex. 1 at 9 (noting that California's housing affordability "crisis" is worsened by "[d]ebt collectors [that] are aggressively pursuing second mortgages long thought forgiven"). The Legislature intended that the statute would "ensure[ ] protections **are in place** to shield . . . homeowners from abusive financial practices that deepen [California's affordability] crisis." *Id.* (emphasis added). The use of present tense in this quote indicates that the Legislature intended Section 2924.13's protections to have effect immediately. Indeed, one district court has observed that pre-enactment violations of Section 2924.13(b) can support a current claim for a violation of California's public policy with respect to loan servicing practices. *See Montoya v. FCI Lender Servs.*, No. 5:25-cv-01732-JC, 2025 U.S. Dist. LEXIS 187209, at *22 n.9 (C.D. Cal. Sep. 22, 2025) (permitting UCL claims premised on the failure to send notices required by the federal Truth in Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA")—which occurred prior to Section 2924.13's enactment—because Section 2924.13 "provides . . . support that the alleged conduct violates public policy in California concerning fair loan servicing practices.").

*Richmond Mortg. & Loan Corp. v. Wachovia Bank & Tr. Co*, 300 U.S. 124 (1937), is particularly instructive. In this case, a lender challenged the constitutionality of a state statute that allowed a debtor, in the event of a trustee's sale, to defeat a deficiency judgment by showing that the price paid was less than the true value of the property. *Id.* at 126-127. The lender argued that

---

[16] If the statute is not applied retroactively, borrowers would essentially only gain the protection of Section 2924.13 if there were "unlawful practices" in the six months of the statute's operation. But zombie mortgages typically encompass old, dormant mortgages for which there might have been *years* of problematic servicing practices. Borrowers would only gain protection with respect to these quintessential zombie mortgages if the statute applies retroactively.

the statute could not be applied with respect to its trust deed, which had been executed prior to the challenged statute's enactment, because this would constitute an impermissible impairment of its preexisting right to seek a deficiency judgment against the debtor. *Id.* at 128. The court rejected this argument and held that the law could be retroactively applied to the prior deed of trust due to the remaining option of traditional judicial foreclosure: "The particular remedy existing at the date of the contract [i.e., the right to a trustee's sale] may be altogether abrogated if another equally effective for the enforcement of the obligation remains [i.e., the right to traditional judicial foreclosure]." *Id.* at 128-131. Here, too, Section 2924.13's retroactive application is permissible because the option of judicial foreclosure remains.

Plaintiffs cite to an unpublished decision, *Martinez v. Specialized Loan Servicing, LLC*, No. 2:24-cv-1387 WBS AC, 2025 WL 3030982, at *5 (E.D. Cal. Oct. 30, 2025), to support the proposition that Section 2924.13 cannot be applied retroactively. Mot. 12, n.2, 21-22. However, the plaintiff in *Martinez* did not raise the argument described above (that the right to nonjudicial foreclosure is created by statute and not subject to the regular retroactivity analysis), and it appears that the *Martinez* court did not consider this argument. *See Martinez*, 2025 WL 3030982, at *5. Even if the *Martinez* court did consider this argument (and there is no evidence it did), Defendant respectfully submits that this Court should still hold that Section 2924.13 applies retroactively with respect to foreclosures initiated after its enactment for the reasons above.

### 1. Section 2924.13 does not violate the Due Process Clause.

The standard for establishing a due process violation is the same as the deferential second step under the Contract Clause analysis. U.S. Const. amend. XIV, § 1; Cal. Const., art. I, § 7. A statute is constitutional under the Due Process Clause as long as it is not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005). As with Contracts Clause analysis, courts "give great deference to the judgment of the legislature" "[i]n reviewing economic legislation on substantive due process grounds[.]" *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir. 1993). And "retroactive application . . . is justified by a rational legislative purpose." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984).

20

For the same reasons that Section 2924.13 is a reasonable means of advancing a legitimate public purpose for purposes of the Contract Clause analysis, Section 2924.13 likewise passes the Due Process Clause's highly deferential test. Section 2924.13 is undoubtedly a reasonable means of achieving the Legislature's public purposes for enacting the law. It potentially subjects nonjudicial foreclosures to judicial scrutiny before they can proceed—which is effectively required by nearly half of other states that require *all* foreclosures to proceed via the judicial process and do not allow nonjudicial foreclosures at all.[17] The statute appropriately focuses on subordinate mortgages and certain practices that may increase the likelihood of an unexpected foreclosure occurring. *Supra* I.B.1.b; Padi Decl. ¶¶ 27-30, 35.

## 2. Section 2924.13 does not violate the Equal Protection Clause.

Plaintiffs claim that Section 2924.13 violates the Equal Protection Clause of the U.S. Constitution (U.S. Const. amend. XIV, § 1) and analogues in the California Constitution (Cal. Const. art. I, §§ 1, 7) because it "irrationally imposes . . . burdens solely on holders of 'subordinate mortgages,'" as defined by the statute. Mot. 12. Plaintiffs cannot meet the deferential "rational basis" standard that applies to their Equal Protection claim.

"[E]qual protection challenges to economic legislation . . . are evaluated under rational basis review." *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1085 (9th Cir. 2015). Rational basis review also applies to retrospective economic legislation. *Desai v. City of Los Angeles*, 602 F. App'x 392, 393 (9th Cir. 2015). Under this standard of review, the law is constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Angelotti Chiropractic*, 791 F.3d at 1085. The court "need not rely on the legislature to proffer its actual rationale motivating the legislation"; it may consider "*any* other rational purposes *possibly* motivating enactment of the challenged statute." *Olson v. California*, 104 F.4th 66, 78 (9th Cir. 2024) (emphasis in original; citation omitted).

It is entirely rational that Section 2924.13 focuses on subordinate mortgages. "Subordinate liens likely make up the bulk of cases where a servicer has stopped attempting collection for a significant period of time." Padi Decl. ¶ 29. This is because "subordinate lienholders are less

---

[17] *Supra* at 1, n. 2.

likely to get paid when prices are low," and during the 2008 financial crisis, many subordinate liens "were never settled and were instead sold at highly discounted prices." *Id.* The legislative analysis relating to Senate Bill 681, Section 2924.13's precursor, explains that this is why Section 2924.13 focuses on subordinate mortgage holders as opposed to primary mortgage holders. *See* RJN, Ex. 1 at 16-17 (noting that zombie mortgages have become especially prevalent in the past few years because holders of long-dormant second mortgages, which were commonly originated before the 2008 financial crisis, are now collecting on the debt because of rising housing prices). Section 2924.13's focus on subordinate mortgages thus easily passes rational basis review. *See, e.g., San Francisco Taxi Coal. v. City & Cnty. of San Francisco*, 979 F.3d 1220, 1225 (9th Cir. 2020) (economic legislation's classification passed rational basis review when the law focused on "those most affected by a shift in the market"); *Davis Boat Mfg.-Nordic, Inc. v. Smith*, 95 Cal. App. 5th 660, 679 (2023) (finding a "plausible basis" for the differential treatment of financial institutions and "creditors who are not financial institutions").

Indeed, several of Plaintiffs' declarants describe situations in which there is a high risk of unexpected foreclosure, illustrating that the statute is effectively capturing circumstances where zombie mortgages may be present. For example, Surf City Investors notes that "[t]he prior lender on many of the Subordinate Mortgages purchased by Surf City did little or nothing to collect, had little to no communications with the borrowers and did not provide monthly statements." Kass Decl. ¶ 7. This is precisely the situation in which zombie mortgages arise and the protections of Section 2924.13 stand to protect borrowers. *See* Padi Decl. ¶ 30. Likewise, if a loan servicer cannot determine what, if any, communications the prior loan servicer had with the borrower, it is entirely possible that there has been a lack of adequate communication to the borrower. *See* Parelskin Decl. ¶ 9; Wilson Decl. ¶ 6; Zieve Decl. ¶ 9 (noting that many loan servicers cannot determine what communications the prior servicer had with the borrower). That Section 2924.13 captures these circumstances, as well, further shows that the statute's scope is appropriate.

Moreover, Plaintiffs' objections to the definition of "subordinate mortgage" under Section 2924.13, on the basis that it arbitrarily includes a number of liens that should not be covered by the statute, are unfounded. *See* Mot. 29-31. By defining a lien as subordinate based on its

priority at the time of recording, the statute follows long-established California precedent. California is a modified race-notice state, meaning that the first recorded lien takes priority, with some exceptions. *See* § 2897; *Baer v. Douglas*, No. D057811, 2012 WL 917190, at *4-5 (Cal. Ct. App. Mar. 19, 2012). The principle behind this is that liens recorded later have notice, actual or constructive, that a senior lien exists. *See Westwood Montserrat, Ltd. v. AGK Sierra de Montserrat, L.P.*, No. C088859, 2022 WL 278150, at *6 (Cal. Ct. App. Jan. 31, 2022). Thus, if a lender intends to record a first lien, they should search for and settle any existing senior liens prior to proceeding. Title companies usually specialize in this process, looking into both recorded and unrecorded liens and insuring that the title is free and clear of encumbrances. *See Liberty Nat'l Enters., L.P. v. Chicago Title Ins. Co.*, 217 Cal. App. 4th 62, 75 (2013) (describing title insurer's investigations). So, if property taxes are owed when a senior lien is intended to be recorded, and the tax lien is not settled, the new lien is, in fact, subordinate. *See* Mot. 30.

A case of unintended recording of a subordinate lien due to technicalities in the process of refinancing is unlikely to result in a first lien being subject to this rule, as Plaintiffs argue (Mot. 30), due to the doctrine of equitable subrogation. Under this long-standing common law principle, when the parties bargained for and intended a particular order of priority at the time of recording, that priority will be enforced. *See Simon Newman Co. v. Fink*, 206 Cal. 143 (1928) (establishing doctrine of equitable subordination); *Katsivalis v. Serrano Reconveyance Co.*, 70 Cal. App. 3d 200, 215 (Ct. App. 1977) (applying doctrine to refinancing transaction).

Finally, Plaintiffs are incorrect that the statute "freezes lien priority." Mot. 30. The statute does not impact the actual priority of liens; it merely uses the priority of liens at the time of recordation in its definition of "subordinate mortgages." § 2924.13(a)(3). Therefore, a lien that must comply with the statute in 2026 may have to do so based on recording order in an earlier time, but if the lien is currently "in first-priority position" it will maintain seniority in case of liquidation. Mot. 30.

**E.    Section 2924.13 is not preempted by federal law.**

Plaintiffs allege that various aspects of Section 2924.13 are preempted because they conflict with federal law. Mot. 32-34. Conflict preemption has two forms: impossibility and obstacle

preemption. *Jones v. Google LLC*, 73 F.4th 636, 644 (9th Cir. 2023). Impossibility preemption occurs when it is impossible for a private party to comply with both state and federal law. *Id.* Obstacle preemption occurs when the state law "prevent[s] or frustrate[s] the accomplishment of a federal objective." *Id.* Preemption only exists if there is "clear evidence" of a conflict. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). "Speculative or hypothetical conflict is not sufficient: only State law that 'actually conflicts' with federal law is preempted." *Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 957 (N.D. Cal. 2004). Here, there is no preemption because Plaintiffs have not identified any actual conflict with federal law. Nor can they.

### a. There is a strong presumption against preemption because the regulation of foreclosures is a matter of state, not federal, law.

The "presumption against preemption applies with particular force when Congress has legislated in a field occupied by the States." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015); *see also Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1054 (E.D. Cal. 2013) ("In all preemption cases, and *particularly in those in which Congress has legislated in a field which the States have traditionally occupied*, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (*quoting Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011)) (cleaned up and emphasis added).

The process of foreclosure, including the availability of and restrictions on nonjudicial foreclosure, is undoubtedly a matter of state law. *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 541-542 (1994) ("States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers."); *see also* §§ 2923.3-2944.10 (laws governing nonjudicial foreclosures), Civ. Proc. §§ 725a-730.5 (laws governing judicial foreclosures); *Moeller*, 25 Cal.App.4th at 830 ("[California statutes] provide a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust"). Thus, a strong presumption against preemption exists with respect to Section 2924.13.

### b. Section 2924.13 does not conflict with federal servicing notice requirements.

Plaintiffs claim that Section 2924.13 is preempted because "the failure to provide a consumer with a periodic statement is unlawful" under Section 2924.13, while federal law does not always require periodic statements to be sent. Mot. 33. Plaintiffs' argument makes little sense. Section 2924.13 deems it an unlawful practice "when a mortgage servicer fails to provide the borrower with periodic statements, servicing transfer notices, and ownership transfer notices *when required by law*." § 2924.13(b)(2), (3), (6) (emphasis added). That federal law provides exceptions to these periodic statement and notice requirements is immaterial, since a violation only occurs if the notices are required by law in the first place. *Id.* Section 2924.13 necessarily encompasses the exceptions that Plaintiffs cite, and there is no conflict with federal servicing notice requirements. Further, to the extent that Section 2924.13 implements servicing notice requirements beyond those required by federal law, this does not mean that there is a *conflict* with federal law. Indeed, the federal servicing laws that Plaintiffs claim preempt Section 2924.13—TILA and RESPA—specifically state that they do not preempt any state laws that give greater protections to consumers. *See* 12 C.F.R. § 1024.5(c)(2) (state laws are not "inconsistent with RESPA" if they give "greater protection to the consumer"); 15 U.S.C. § 1610(a)(1) (TILA requirements do not "annul, alter, or affect the laws of any state" unless the state laws are inconsistent with TILA, and "then only to the extent of the inconsistency").

### c. Section 2924.13 does not conflict with federal law regarding the issuance of Form 1099-Cs.

Plaintiffs incorrectly claim that under Section 2924.13, the issuance of an I.R.S. Form 1099-C results in a bar on foreclosure, and thus the statute is preempted by federal law stating that the issuance of a Form 1099-C does not indicate actual discharge of debt that forbids further collection attempts. Mot. 21, 34. But the statute plainly does *not* bar foreclosure if a Form 1099-C is issued. Rather, the issuance of a 1099-C prior to initiating nonjudicial foreclosure merely serves as a "flag" that may—if the borrower so petitions—lead to judicial scrutiny before the nonjudicial foreclosure can proceed. *See* § 2924.13(d), (f). Moreover, under federal law, courts

25

may take the issuance of a Form 1099-C into account when determining whether a debt has been discharged. *See F.D.I.C. v. Cashion*, 720 F.3d 169, 181 (4th Cir. 2013) (treating a Form 1099-C as one piece of circumstantial evidence that debt has been discharged). Section 2924.13's framework—treating the issuance of a Form 1099-C as a potential trigger for additional judicial scrutiny, if the borrower so petitions—is not inconsistent with federal law.

### d. Section 2924.13 does not criminalize conduct that is authorized under federal law.

Plaintiffs claim that Section 2924.13 is preempted because it "criminalizes entirely lawful conduct authorized under applicable federal statutes." Mot. 34. But Section 2924.13 does not criminalize *any* conduct, let alone conduct authorized by federal law. Plaintiffs seem to suggest that the statute's certification requirement has the effect of criminalizing the "unlawful activities" listed in subdivision (b). Mot. 34. This argument is patently incorrect. Making an act "unlawful" under a *civil* code does not criminalize that act for purposes of the *penal* code. *See, e.g., In re Rolando S.*, 197 Cal. App. 4th 936, 946 (2011) (noting that "[c]rimes are strictly creatures of penal statutes," and "the term 'unlawful' [may] include wrongful conduct which is not criminal"). Section 2924.13 merely requires that the certification be made under penalty of perjury. § 2924.13(c). This "under penalty of perjury" requirement does not itself impart any criminal liability; it is an entirely separate statute, Cal. Penal Code § 118, that criminalizes deliberately giving false testimony under penalty of perjury. Servicers or lenders would only face criminal penalties if they *willfully and knowingly* make a false statement in the certification—as is the case with any statement made under penalty of perjury. *See* Cal. Penal Code § 118(a) (perjury occurs if the declarant "willfully" states as true a matter that "he or she knows to be false."). Lenders would not be penalized for merely engaging in the "unlawful activities."

### e. Section 2924.13 does not violate the Takings Clause.

As Plaintiffs claim, to show a violation of the Takings Clause, a plaintiff must "allege that either the government caused the owner to suffer a permanent and physical invasion of his property or completely deprived the owner of all economically beneficial use of the property without just compensation." Mot. 34.

Plaintiffs claim that Section 2924.13 constitutes an unconstitutional taking because it "deprive[s] junior lien holders of their vested property interests[.]"  Mot. 34.  However, for the reasons discussed above, Plaintiffs cannot even show that Section 2924.13 causes a substantial impairment, let alone a complete deprivation of property value.  *See supra* I.B.1.a.  Implementing additional notice and certification requirements for nonjudicial foreclosures falls far short of depriving lenders of the value of their property.

Plaintiffs attempt to meet this standard by blatantly mischaracterizing the statute, claiming that Section 2924.13 "bars foreclosure altogether" if a Form 1099-C has been issued.  Mot. at 34-35.  Plaintiffs are wrong.  As discussed at above, the occurrence of any of the "unlawful practices" delineated in subsection (b)—including initiating foreclosure after issuing a Form 1099-C—does not bar foreclosure.  *Supra* I.B.1.a.(2).  Rather, the statute requires that lenders disclose that this practice occurred in the required certification before initiating nonjudicial foreclosure.  § 2924.13(c).  If the borrower decides to petition the court for relief (which is not guaranteed), the issuance of the 1099-C is then one factor that the court may consider when determining whether the borrower is entitled to some form of equitable relief.  *See* § 2924.13(f).  Lenders can also forego the issuance of any certification and instead initiate *judicial* foreclosure.  And even beyond these two options, lenders can engage in other alternatives (such as offering loan modifications or other options) to collect on their loan.  Padi Decl. ¶ 31; *supra* I.B.1.a.(1).

## II.  PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM.

A plaintiff seeking a preliminary injunction must demonstrate they will suffer irreparable harm in the absence of equitable relief.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Alleging a "[s]peculative injury" is insufficient; rather, the plaintiff must show "immediate threatened injury."  *Id.*  Furthermore, a preliminary injunction is only proper if there is "no adequate legal remedy" to address the harm.  *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024).  Significantly, "the fact that a party has voluntarily chosen to *forego* a legal remedy does not mean that 'no adequate legal remedy' exists in the sense traditionally required to obtain the extraordinary remedy of a preliminary injunction."  *Id.*

1     "[W]hen a harm is 'largely self-inflicted,' that fact 'severely undermines [a] claim for equitable

2     relief.'" *Id.* (quoting *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020)).

3          Plaintiffs fail to establish irreparable injury; instead, they misrepresent that Section

4     2924.13 entirely wipes out their ability to foreclose and recoup amounts owed to them.

5     They claim they cannot initiate foreclosure without "a sworn certification attesting that no

6     'unlawful practices' occurred." Mot. 35-36. Not so. In reality, and as discussed at length above

7     (*supra* I.B.1.a.(2)), they can either certify that they did not engage in the enumerated unlawful

8     practices *or* identify instances of unlawful practices before proceeding with nonjudicial

9     foreclosure. § 2924.13(c)(1). They can also seek *judicial* foreclosure if they do not wish to

10    comply with the certification requirement, which only applies to *nonjudicial* foreclosures.

11    § 2924.13(c). Their decision to forego this legal remedy of seeking a judicial foreclosure is a

12    simply a self-inflicted harm that cannot support a preliminary injunction. *See Bennett*, 118 F.4th

13    at 1129. Borrowers may raise unlawful practices as an affirmative defense in a judicial

14    foreclosure proceeding, but under the statute, the court retains discretion to "provide equitable

15    remedies that the court deems appropriate." § 2924.13(f). Any claim that the plaintiffs are

16    currently prevented from pursuing judicial foreclosure based on the affirmative defense under

17    2924.13(e) is sheer speculation, in the absence of any allegation that the plaintiffs have attempted

18    judicial foreclosure, the borrower raised the statute as an affirmative defense, and the court

19    limited Plaintiffs' relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413-414 (2013)

20    (explaining that "'[i]t is just not possible for a litigant to prove in advance that the judicial system

21    will lead to any particular result in his case'") (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 159-

22    160 (1990).

23         Plaintiffs also claim that because they cannot nonjudicially foreclose, due to their purported

24    inability to complete the required certification, senior lienholders will foreclose first, preventing

25    them from recovering on their loan. Wilson Decl., ¶ 16; Hunefield Decl., ¶ 9; Kass Decl., ¶ 19.

26    In other words, Plaintiffs appear to assume that if they foreclosed before the senior lienholder,

27    they would obtain a sale price sufficient to cover the senior lien and their subordinate lien, but if

28    the senior lienholder foreclosed first, the senior lienholder would obtain a lower sale price,

leaving nothing for subordinate lienholders. Setting aside the availability of judicial foreclosure, these claims are simply further speculation as to what would occur at a foreclosure sale, unsupported by any evidence. *See Park v. First Am. Title Co*., 201 Cal. App. 4th 1418, 1424 (2011) ("[I]n order to prove it was damaged by the irregularities in the foreclosure sale which dissuaded or prevented a higher bid, the junior lienor would have to produce a ready, willing and able buyer who would have paid the higher price but for the wrongful conduct.").

Plaintiffs' speculative claims of injury fail entirely to establish irreparable harm.

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.

Plaintiffs have not established that the balance of equities and public interest favor granting the extraordinary remedy of preliminary relief. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

Any injunction interfering with the California Legislature's priorities is itself a substantial harm in the balance of the equities analysis. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation modified). Moreover, "[t]he Government's interest is . . . presumed to be the public's interest." *Doe v. SEC*, No. MC 11-80209 CRB, 2012 WL 78586, at *6 (N.D. Cal. Jan. 10, 2012) (quoting *United States v. Rural Elec. Convenience Coop. Co*., 922 F.2d 429, 440 (7th Cir.1991)); *see also Casala, LLC v. Kotek*, 789 F. Supp. 3d 1025, 1032 (D. Or. 2025).

Additionally, the public has substantial interest in retaining the protections of Section 2924.13 given the irreparable harm caused by unexpected foreclosures. As explained above, unexpected foreclosures cause significant financial harm to individual borrowers, including the loss of homes, financial distress, and long-term decreases to their credit scores—injuries that are particularly acute because they tend to occur when the borrower is recovering from past financial distress. Padi Decl. ¶¶ 14, 15. Foreclosures are also associated with various non-pecuniary harms such as "the possibility of homelessness, emotional distress, and disruption, all of which are likely worse when the foreclosure was unexpected." *Id.* ¶ 14. Zombie mortgages also harm entire communities in a variety of ways. The "spillover" effects of foreclosures can cause devastating decreases in home prices

29

across neighborhoods and a subsequent increase in defaults and foreclosures. *Id.* ¶ 16. Foreclosures also result in "serious non-pecuniary harms to neighborhoods," such as increases in crime. *Id.* ¶ 17. Zombie mortgages that lead to foreclosures on residential rental properties can lead to the forced eviction of tenants, causing a "variety of long- term harms, including higher rates of homelessness, health problems, and financial distress." *Id.* ¶ 18. The harms of zombie mortgages can also extend to a variety of other parties, such as general taxpayers, homebuyers who are unaware of liens on the property, lienholders, and other creditors on the same property. *Id.* ¶¶ 19-22. Section 2924.13 is likely to mitigate these harms by averting unexpected foreclosures, "provid[ing] significant value to borrowers, communities, and mortgage markets." *See id.* ¶¶ 29-30, 35.

Moreover, the compliance costs that would be incurred if Section 2924.13 remains in place are minimal. *See* Padi Decl. ¶¶ 31-34. As discussed above, Plaintiffs exaggerate the burden of complying with Section 2924.13 and the extent to which it makes nonjudicial foreclosures unavailable. *See supra* I.B.1.a; Patterson Decl. ¶¶ 29-35. And a variety of alternatives to nonjudicial foreclosure are available, including judicial foreclosure, loan modifications, short sale, or deed-in-lieu procedures, mitigating any harms caused by the alleged reduced availability of nonjudicial foreclosures. Padi Decl. ¶¶ 10, 31.[18]

## IV. COMPLIANCE WITH LOCAL RULE 231(D).

The Attorney General does not intend to present oral testimony at the hearing. The Attorney General anticipates that the hearing will require approximately one hour.

## CONCLUSION

For the reasons discussed above, the Attorney General respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunction.

---

[18] Plaintiffs also argue that a bond should not issue because it would "burden" their "exercise of constitutional rights." Mot. 39. Plaintiffs fail to show how a bond would interfere with the exercise of their rights, and the Court should reject their argument.

Dated:  January 12, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
LARA HADDAD
Supervising Deputy Attorney General
WILLIAM BELLAMY
Deputy Attorney General


CARTER M. JANSEN
Deputy Attorney General
*Attorneys for Defendant Rob Bonta in his official capacity as Attorney General of the State of California*