**BUCHALTER LLP**
Harry W.R. Chamberlain II (Bar No. 95780)
Email: *hchamberlain@buchalter.com*
Jason E. Goldstein (Bar No. 207481)
Email: *jgoldstein@buchalter.com*
Robert S. McWhorter (Bar No. 226186)
Email: *rmcwhorter@buchalter.com*
500 Capitol Mall, Suite 1900
Sacramento, CA 95814
Telephone: 916.495.5170

**WRIGHT, FINLAY & ZAK, LLP**
T. Robert Finlay (Bar No. 167280)
Email: *rfinlay@wrightlegal.net*
4665 MacArthur Court, Suite 200
Newport Beach, CA 92660
Telephone: 949.477.5050

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION**

CALIFORNIA MORTGAGE ASSOCIATION, a California nonprofit association; UNITED TRUSTEES ASSOCIATION, a nonprofit association; CHEN WANG QIN, an individual; SURF CITY INVESTORS, LLC, a California limited liability company; STEPHEN NG, an individual; NDETAIL CAPITAL LLC, a California limited liability company; BALBOA, LLC, a California limited liability company; WILLIAM TERRY HUNEFELD, an individual; BEACON DEFAULT MANAGEMENT, INC., a California corporation; and ZBS LAW, LLP, a California limited liability partnership,

Plaintiffs,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

Defendant.

Case No. 2:25-cv-02614-DAD-CKD

**SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' POST-JUDGMENT MOTION SUBMITED WITH THEIR REPLY MEMORANDUM;**

**INDEX OF APPENDED SUPPLEMENTAL RJN EXHIBITS; TREATISES AND TEXT AUTHORITIES REFERENCED IN PLAINTIFFS' REPLY**

Date: October 19, 2026
Time: 1:30 p.m.
Judge: Hon. Dale Drozd
Crtrm: 4
Location: 501 I St, 15th Floor
Sacramento, CA 95814

# SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, Plaintiffs respectfully request that this Court judicially notice the Supplemental RJN Exhibits attached to this request and indexed below. The Supplemental RJN Exhibit Numbers resume with No. 8 as Plaintiffs' prior Judicial Notice Request ended with No. 7.

| Supp. RJN Ex. | Description of Supp. RJN Exhibit |
|---|---|
| 8 | Dodd-Frank Wall Street Reform and Consumer Protection Act:: Congressional Report (April 17, 2021) |
| 9 | *State of New York v. Vought Complaint*, Case No. 25-cv-02384 (D. Ore. Dec. 22, 2025) |
| 10 | Press Release: Attorney General Bonta Sues Trump Administration, Demands the Continued, Lawful Funding of the CFPB (Dec. 22, 2025) |
| 11 | Press Release: Attorney General Bonta: California's Unfair Competition Law Supersedes Insurance Policy Statute of LimitationsSB 825 Assem Banking Cmte Analysis (April |

**RJN Supp. Ex. 8** is a true and correct copy of California Senate Bill No. 825 (2025-2026 Reg. Sess.), and **Supp. RJN Ex. 9** is a true and correct copy of the complaint in *State of New York v. Vought*, Case No. 25-cv-02384 (D. Ore. Dec. 22, 2025) in which Rob Bonta is counsel for the State of California. These Supplemental RJN Exhibits are subject to judicial notice because courts may judicially notice legislative history materials of state and federal legislative bodies concerning statutes relevant to the case, and under Rule 201 of court records involving pending actions concerning parties to the litigation. *California v. Infineon Techs*. AG, 531 F. Supp. 2d 1124, 1172 (N.D. Cal. 2007).

**Supp. RJN Ex. 10** is a true and correct copy of the press release by Attorney General Rob Bonta on on the official Attorney General website, titled "Attorney General Bonta Sues Trump Administration, Demands the Continued, Lawful Funding of the CFPB (Dec. 22, 2025).. **Supp. RJN Ex. 11** is a true and correct copy of another press release by Mr Bonta on the Attorney General's official website, titled "Attorney General Bonta: California's Unfair Competition

Law Supersedes Insurance Policy Statute of Limitations (April 11, 2024). [A] court can take judicial notice of a government's website." *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1321 (C.D. Cal. 2023). As Bonta's counsel point out in another judicial notice request they filed on September 28, the press releases contained in each supplemental exhibit is suitable for judicial notice "as a matter of public record that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Argueta v. Walgreens Co*., 760 F. Supp. 3d 1028, 1034 (E.D. Cal. 2024) (quoting Fed. R. Evid. 201(b)(2)) (judicial notice properly taken of information from a government website).

| Supp. Ex. No. | Description of Treatise or Text |
|---|---|
| 12 | O'Melveny Insights, State Attorneys General Positioning to Fill Enforcement Gaps Based on Changing Priorities of Federal Agencies (April 23, 2025) |
| 13 | William Stern, Bus. & Prof. C. § 17200 Practice, Chapter 7A (The Rutter Group 2023) |

The remaining "Supplemental Exhibits" are true copies of texts and treatise authorities referenced in the Plaintiffs' Reply Memorandum. They are not subject to the Supplemental Judicial Notice requrest but are provided for the convenience of the Court and counsel. These Supplemental Exhibits are numbered sequentially after the Supplemental RJN Nos. indexed above.

DATED: October 13, 2026

**BUCHALTER LLP**

By: *//s// Harry W.R. Chamberlain II*

**WRIGHT, FINLAY & ZAK, LLP**

By: *//s// T. Robert Finlay (as authorized by co-counsel)*
T. Robert Finlay

Attorneys for Plaintiffs, CALIFORNIA MORTGAGE, et al.

Congressional Research Service
Informing the legislative debate since 1914

# The Dodd-Frank Wall Street Reform and Consumer Protection Act: Background and Summary

Updated April 21, 2017

**Supp. RJN Ex. 8**

**Congressional Research Service**
https://crsreports.congress.gov
R41350

# Summary

Beginning in 2007, U.S. financial conditions deteriorated, leading to the near-collapse of the U.S. financial system in September 2008. Major commercial banks, insurers, government-sponsored enterprises, and investment banks either failed or required hundreds of billions in federal support to continue functioning. Households were hit hard by drops in the prices of real estate and financial assets, and by a sharp rise in unemployment. Congress responded to the crisis by enacting the most comprehensive financial reform legislation since the 1930s.

Then-Treasury Secretary Timothy Geithner issued a reform plan in the summer of 2009 that served as a template for legislation in both the House and Senate. After significant congressional revisions, President Obama signed H.R. 4173, now titled the Dodd-Frank Wall Street Reform and Consumer Protection Act (P.L. 111-203), into law on July 21, 2010.

Perhaps the major issue in the financial reform legislation was how to address the systemic fragility revealed by the crisis. The Dodd-Frank Act created a new regulatory umbrella group chaired by the Treasury Secretary—the Financial Stability Oversight Council (FSOC)—with authority to designate certain financial firms as *systemically important* and subjecting them and all banks with more than $50 billion in assets to heightened prudential regulation. Financial firms were also subjected to a special resolution process (called "Orderly Liquidation Authority") similar to that used in the past to address failing depository institutions following a finding that their failure would pose systemic risk.

The Dodd-Frank Act made other changes to the regulatory structure. It created the Office of Financial Research to support FSOC. The act consolidated consumer protection responsibilities in a new Bureau of Consumer Financial Protection (CFPB). It consolidated bank regulation by reassigning the Office of Thrift Supervision's (OTS's) responsibilities to the other banking regulators. A federal office was created to monitor insurance. The Federal Reserve's emergency authority was amended, and its activities were subjected to greater public disclosure and oversight by the Government Accountability Office (GAO).

Other aspects of Dodd-Frank addressed particular sectors of the financial system or selected classes of market participants. Dodd-Frank required more derivatives to be cleared and traded through regulated exchanges, reporting for derivatives that remain in the over-the-counter market, and registration with appropriate regulators for certain derivatives dealers and large traders. Hedge funds were subject to new reporting and registration requirements. Credit rating agencies were subject to greater disclosure and legal liability provisions, and references to credit ratings were required to be removed from statute and regulation. Executive compensation and securitization reforms attempted to reduce incentives to take excessive risks. Securitizers were subject to risk retention requirements, popularly called "skin in the game." It made changes to bank regulation to make bank failures less likely in the future, including prohibitions on certain forms of risky trading (known as the "Volcker Rule"). It created new mortgage standards in response to practices that caused problems in the foreclosure crisis.

This report reviews issues related to financial regulation and provides brief descriptions of major provisions of the Dodd-Frank Act, along with links to CRS products going in to greater depth on specific issues. It does not attempt to track the legislative debate in the 115th Congress.

# Contents

Introduction ... 1
Legislative History ... 2
Financial Crisis ... 2
The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (P.L. 111-203) ... 4
Systemic Risk ... 4
Financial Crisis Context ... 4
Provisions in the Dodd-Frank Act (Titles I and VIII) ... 4
Federal Reserve ... 5
Financial Crisis Context ... 5
Provisions in the Dodd-Frank Act (Title XI) ... 6
Resolution Regime for Failing Firms ... 6
Financial Crisis Context ... 6
Provisions in the Dodd-Frank Act (Title II) ... 8
Securitization ... 9
Financial Crisis Context ... 9
Provisions in the Dodd-Frank Act (Title IX) ... 10
Bank Regulation ... 10
Financial Crisis Context ... 10
Provisions in the Dodd-Frank Act (Title I, III, VI, and X) ... 12
Consumer Financial Protection ... 14
Financial Crisis Context ... 14
Provisions in the Dodd-Frank Act (Title X) ... 16
Mortgage Standards ... 18
Financial Crisis Context ... 18
Provisions in the Dodd-Frank Act (Title XIV) ... 18
Derivatives ... 19
Financial Crisis Context ... 19
Provisions in the Dodd-Frank Act (Titles VII and XVI) ... 19
Credit Rating Agencies ... 20
Financial Crisis Context ... 20
Provisions in the Dodd-Frank Act (Title IX) ... 21
Investor Protection ... 21
Financial Crisis Context ... 21
Provisions in the Dodd-Frank Act (Title IX) ... 22
Hedge Funds ... 23
Financial Crisis Context ... 23
Provisions in the Dodd-Frank Act (Title IV) ... 25
Executive Compensation and Corporate Governance ... 26
Financial Crisis Context ... 26
Provisions in the Dodd-Frank Act (Title IX) ... 26
Insurance ... 27
Financial Crisis Context ... 27
Provisions in the Dodd-Frank Act (Title V) ... 27
Miscellaneous Provisions in the Dodd-Frank Act ... 28

## Figures

Figure 1. Changes to Thrift Regulation ........ 13
Figure 2. Changes to Consumer Protection Regulation ........ 17

## Tables

Table 1. Overview of Federal Financial Regulators Discussed in this Report ........ 1
Table 2. Membership of the Financial Stability Oversight Council ........ 5

Table A-1. Selected Statutory Changes to the Dodd-Frank Act ........ 29

## Appendixes

Appendix. Statutory Changes to the Dodd-Frank Act ........ 29

## Contacts

Author Information ........ 30
CRS Contacts for Areas Covered by Report ........ 30

# Introduction

In response to problems raised by the 2007-2009 financial crisis, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010[1] (Dodd-Frank) was enacted on July 21, 2010. Since enactment, there has been congressional debate over whether—and how much—the act should be amended. Proponents believe that Dodd-Frank has successfully created a more stable financial system and better protected consumers and investors, while opponents believe that the act is partly to blame for restricted credit availability and the sluggish economic recovery that, in some ways, persists to this day. It should be noted that while Dodd-Frank is the largest source of new financial regulations since the crisis, it is not the only one.[2]

This report provides a brief summary of the major provisions of the Dodd-Frank Act and how they relate to the financial crisis. It begins with a table (**Table 1**) listing the financial regulators discussed in the report, followed by a summary of the act's legislative history and the financial crisis.

**Table 1. Overview of Federal Financial Regulators Discussed in this Report**

| Name/Acronym | Composition/General Responsibilities |
|---|---|
| *Regulators* | |
| Commodity Futures Trading Commission (CFTC) | Regulation of derivatives markets |
| Consumer Financial Protection Bureau (CFPB) | Regulation of financial products for consumer protection |
| Federal Deposit Insurance Corporation (FDIC) | Provision of deposit insurance, regulation of banks, receiver for failing banks |
| Federal Housing Finance Agency (FHFA) | Regulation of housing-government sponsored enterprises |
| Federal Reserve System (Fed) | Monetary policy; regulation of banks, systemically important financial institutions, and the payment system |
| Federal Trade Commission (FTC) | Regulation of nondepository lending institutions prior to the Dodd-Frank Act |
| National Credit Union Administration (NCUA) | Provision of deposit insurance, regulation of credit unions, receiver for failing credit unions |
| Office of the Comptroller of the Currency (OCC) | Regulation of banks |
| Securities and Exchange Commission (SEC) | Regulation of securities markets |
| *Other Federal Financial Entities* | |
| Financial Stability Oversight Council (FSOC) | Council of financial regulators and state and industry representatives accountable for financial stability |
| Office of Financial Research (OFR) | Provides research support to FSOC |
| Federal Insurance Office (FIO) | Monitors insurance industry and represents federal interests in insurance |

**Source:** Table compiled by the Congressional Research Service (CRS).

[1] P.L. 111-203.

[2] For example, the Basel III accord was a significant source of new post-crisis banking regulations. For more information, see CRS Report R44573, *Overview of the Prudential Regulatory Framework for U.S. Banks: Basel III and the Dodd-Frank Act*, by Darryl E. Getter.

## Legislative History

The 111th Congress considered several proposals to reorganize financial regulators and to reform the regulation of financial markets and financial institutions. Following House committee markups on various bills addressing specific issues, then-Chairman Barney Frank of the House Committee on Financial Services introduced the Wall Street Reform and Consumer Protection Act of 2009 (H.R. 4173), incorporating elements of numerous previous bills.[3] After two days of floor consideration, the House passed H.R. 4173 on December 11, 2009, on a vote of 232-202.

Then-Chairman Christopher Dodd of the Senate Committee on Banking, Housing, and Urban Affairs issued a single comprehensive committee print on November 16, 2009, the Restoring American Financial Stability Act of 2009. This proposal was revised over the following months, and the Restoring American Financial Stability Act of 2010 was marked up in committee on March 22, 2010, and reported as S. 3217 on April 15, 2010. The full Senate took up S. 3217 and amended it several times, finishing consideration on May 20, 2010, when it substituted the text of S. 3217 into H.R. 4173. The Senate then passed its version of H.R. 4173 on a vote of 59-39.

Following a conference committee, the House on June 30, 2010, agreed to the H.R. 4173 conference report by a vote of 237-192. The Senate agreed to the report on July 15, 2010, by a vote of 60-39. The legislation was signed into law on July 21, 2010, as P.L. 111-203.

In addition to Chairman Dodd's and Chairman Frank's bills, other proposals were made but not scheduled for markup. For example, then-House Financial Services Committee Ranking Member Spencer Bachus introduced a comprehensive reform proposal, the Consumer Protection and Regulatory Enhancement Act (H.R. 3310), and offered a similar amendment (H.Amdt. 539) during House consideration of H.R. 4173. In March 2008, then-Treasury Secretary Hank Paulson issued a "Blueprint for a Modernized Financial Regulatory Structure."[4] The Obama Administration released "Financial Regulatory Reform: A New Foundation"[5] in June 2009, and followed this with specific legislative language that provided a base text for congressional consideration.

## Financial Crisis

Understanding the fabric of financial reform proposals requires some analysis both of financial disruptions that peaked in September 2008, as well as of more enduring concerns about risks in the financial system.[6]

The financial crisis focused policy attention on systemic risk, which had previously been a subject of interest to academics and central bankers, but was not seen as a significant threat to economic stability. The last major systemic risk episode was sparked by bank runs in the Great Depression, and the main elements of the current bank regulatory regime and federal safety net were put in place to prevent a similar recurrence. Between the end of the Great Depression and the early 2000s, the financial system weathered numerous shocks, failures, and crashes, with limited spillover into the real economy. Typically, the Federal Reserve (Fed) would announce that

[3] Initially incorporated bills included H.R. 2609, H.R. 3126, H.R. 3269, H.R. 3817, H.R. 3818, H.R. 3890, andH.R. 3996.

[4] U.S. Treasury, *Blueprint for a Modernized Financial Regulatory Structure*, March 2008, at https://www.treasury.gov/press-center/press-releases/Documents/Blueprint.pdf.

[5] U.S. Treasury, *Financial Regulatory Reform: A New Foundation*, June 17, 2009, at https://www.treasury.gov/press-center/press-releases/Pages/20096171052487309.aspx.

[6] See, for example, "The Panic of 2008," a speech given by Federal Reserve Governor Kevin Warsh on April 6, 2009, for discussion of aspects of typical financial panics and historical examples, available at http://www.federalreserve.gov/newsevents/speech/warsh20090406a.htm.

it stood ready to provide liquidity to the system, and that proved sufficient to stem panic. The idea that a financial shock could cause the entire system to spin out of control and collapse, and that the flow of credit might stop altogether, seemed to be a remote prospect. De facto policy was to rely on the Fed to deal with crises after the fact.

The events of 2007 and 2008 caused a sharp reassessment of the robustness and the self-stabilizing capacity of the financial system. As then-Treasury Secretary Timothy Geithner noted in written testimony delivered to the House Financial Services Committee on September 23, 2009, "The job of a financial system … is to efficiently allocate savings and risk. Last fall, our financial system failed to do its job, and came precariously close to failing altogether."[7]

A number of discrete failures in individual markets and institutions led to global financial panic. Notably, many of these failures were not banks, seen historically as the primary source of systemic risk. U.S. financial firms suffered heavy losses in 2007 and 2008, primarily because of declines in the value of mortgage-related assets. During September 2008, Fannie Mae and Freddie Mac were placed in government conservatorship. Merrill Lynch was sold in distress to Bank of America in a deal supported by the Fed and Treasury. The Fed and Treasury failed to find a buyer for Lehman Brothers, which subsequently filed for bankruptcy, disrupting financial markets. A money market mutual fund (the Reserve Primary Fund) that held debt issued by Lehman Brothers announced losses, triggering a run on other money market funds, and Treasury responded with a guarantee for money market funds. The American International Group (AIG), an insurance conglomerate with a securities subsidiary that specialized in financial derivatives, including credit default swaps, was unable to post collateral related to its derivatives and securities lending activities. The Fed intervened with an $85 billion loan to prevent bankruptcy and to ensure full payment to AIG's counterparties. In response to the general panic, Congress approved the $700 billion Troubled Asset Relief Program (TARP); the Fed introduced several lending facilities to provide liquidity to different parts of the financial system; and the Federal Deposit Insurance Corporation (FDIC) introduced a debt guarantee program for banks.[8] The panic largely subsided through the latter part of 2008, although confidence in the financial system returned very slowly.

It was widely understood that the panic had its roots in the subprime mortgage market, in which years of double-digit housing price increases had fed a bubble mentality and caused lenders to relax underwriting standards. That the housing market would cool, as it began to do in 2006, was not a great surprise. What was generally unexpected was the way losses caused by rising foreclosures and bad loans rippled through the system. Major financial institutions had constructed highly leveraged speculative positions that magnified the subprime shock, so that a setback in a $1 trillion segment of the U.S. housing market generated many times that amount in financial losses.

Giant financial institutions were shown to be vulnerable to liquidity runs, and many failed or had to be rescued as short-term credit dried up. The value of complex financial instruments created through securitization became completely uncertain, and market participants lost confidence in each other's creditworthiness. Risks that were thought to be unrelated became highly correlated; a negative spiral that showed all financial risk taking to be interconnected and all declines to be

---

[7] Treasury Secretary Timothy F. Geithner, *Written Testimony on Financial Regulatory Reform*, in U.S. Congress, House Committee on Financial Services, *The Administration's Proposals for Financial Regulatory Reform*, 111th Cong., 1st sess., September 23, 2009, at http://financialservices.house.gov/media/file/hearings/111/printed%20hearings/111-76.pdf.

[8] For more information see CRS Report R43413, *Costs of Government Interventions in Response to the Financial Crisis: A Retrospective*, by Baird Webel and Marc Labonte.

self-reinforcing took hold. Doubts about counterparty exposure were magnified by opacity in derivatives markets.

Disruption to the financial system exacerbated recessionary forces already at work in the economy. Asset prices plunged and consumers suffered sharp losses in their retirement and college savings accounts, as well as in the value of their homes. The financial crisis accelerated declines in consumption and business investment, which in turn made banks' problems worse. Overall, the recession proved to be the deepest and longest since the Great Depression.

# The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (P.L. 111-203)

The Dodd-Frank Act included measures to improve systemic stability, improve policy options for coping with failing financial firms, increase transparency throughout financial markets, and protect consumers and investors. The act included provisions that affected virtually every financial market and that amended existing or granted new authority and responsibility to nearly every federal financial regulatory agency.

Under each of the areas treated below, the financial crisis context and the corresponding provisions in the Dodd-Frank Act are included.

## Systemic Risk

### Financial Crisis Context[9]

Systemic risk refers to sources of instability for the financial system as a whole, often through "contagion" or "spillover" effects against which individual firms cannot protect themselves. Although regulators took systemic risk into account before the crisis, and systemic risk can never be entirely eliminated, analysts have pointed to a number of ostensible weaknesses in the precrisis regulatory regime's approach to systemic risk. First, there had been no regulator with overarching responsibility for mitigating systemic risk. Some analysts argue that systemic risk can fester in the gaps in the regulatory system where one regulator's jurisdiction ends and another's begins. Second, the crisis revealed that liquidity crises and runs were not just a problem for depository institutions. Third, the crisis revealed that nonbank, highly leveraged firms, such as Lehman Brothers and AIG, could be a source of systemic risk and "too big (or too interconnected) to fail." Finally, there were concerns that the breakdown of different payment, clearing, and settlement (PCS) systems that make up the "plumbing" of the financial system, which were not regulated consistently, could be another source of systemic risk.

### Provisions in the Dodd-Frank Act (Titles I and VIII)

Rather than creating a dedicated systemic risk regulator with broad powers to neutralize sources of systemic risk as they arise, Dodd-Frank instead created a Financial Stability Oversight Council (FSOC), composed of the Treasury Secretary as chair along with eight heads of federal regulatory agencies (including the newly created Consumer Financial Protection Bureau) and a presidential appointee with insurance experience as voting members. The act created an Office of Financial Research to support the council. See **Table 2** below.

[9] For more information, see out-of-print CRS Report R40877, *Financial Regulatory Reform: Systemic Risk and the Federal Reserve*, by Marc Labonte (available to congressional clients upon request).

**Table 2. Membership of the Financial Stability Oversight Council**

| Voting Members (Heads of) | Nonvoting Members |
| --- | --- |
| Department of the Treasury | Office of Financial Research (OFR) Director |
| Federal Reserve Board (FRB, or the Fed) | Federal Insurance Office Director |
| Office of the Comptroller of the Currency (OCC) | A state insurance commissioner |
| Consumer Financial Protection Bureau (CFPB) | A state bank supervisor |
| Securities and Exchange Commission (SEC) | A state securities commissioner |
| Federal Deposit Insurance Corporation (FDIC) | |
| Commodity Futures Trading Commission (CFTC) | |
| Federal Housing Finance Agency (FHFA) | |
| National Credit Union Administration (NCUA) | |
| Insurance expert (appointed by the President) | |

**Source:** Dodd-Frank §111(b).

The council is authorized to identify and advise its member regulators on sources of systemic risk and "regulatory gap" problems, but has limited rulemaking, examination, or enforcement powers of its own. The council is authorized to identify systemically important financial firms regardless of their legal charter, and the Fed will subject them and all bank holding companies with over $50 billion in assets to stricter prudential oversight and regulation, including counterparty exposure limits set at 25% of total capital, annual stress tests and capital planning requirements, resolution planning ("living wills"), early remediation requirements, and risk management standards. Many large firms were already regulated by the Fed for safety and soundness as bank holding companies; the act prevented most firms from changing their charter in order to escape Fed regulation (known as the "Hotel California" provision). In addition, the Dodd-Frank Act included a 10% liability concentration limit for financial firms and mechanisms by which the Fed would be empowered to curb the growth or reduce the size of large firms if they pose a risk to financial stability.[10]

Title VIII also provided for many PCS systems and activities deemed systemically important by the council to be regulated for safety and soundness by (depending on the type) the Fed, the Securities and Exchange Commission (SEC), or the Commodities Futures Trading Commission (CFTC) and to have access to the Fed's discount window in "unusual and exigent circumstances."

## Federal Reserve

### Financial Crisis Context[11]

During the recent financial turmoil, the Fed engaged in unprecedented levels of emergency lending to nonbank financial firms through its authority under Section 13(3) of the Federal Reserve Act. At that time, this statute stated that "in unusual and exigent circumstances, the Board of Governors of the Federal Reserve System, by the affirmative vote of not less than five

[10] For more information, see CRS Report R42150, *Systemically Important or "Too Big to Fail" Financial Institutions*, by Marc Labonte.

[11] For more information, see CRS Report RL34427, *Financial Turmoil: Federal Reserve Policy Responses*, by Marc Labonte.

members, may authorize any Federal reserve bank ... to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange….”[12]

Such loans can be made only if secured to the Fed’s satisfaction and if the targeted borrower is unable to obtain the needed credit through other banking institutions. In addition to the level of lending, the form of the lending was novel, particularly the creation of a series of liquidity facilities for nonbank financial firms and three limited liability corporations controlled by the Fed, to which the Fed lent a total of $72.6 billion to purchase illiquid assets from Bear Stearns and AIG. The Fed’s actions under Section 13(3) generated debate in Congress about whether measures were needed to amend the institution’s emergency lending powers.

### Provisions in the Dodd-Frank Act (Title XI)

The Dodd-Frank Act included several provisions related to the Federal Reserve’s Section 13(3) lending authority. In particular, the act stipulated that, although the Fed may authorize a Federal Reserve Bank to make collateralized loans as part of a broadly available credit facility, it may not authorize a Federal Reserve Bank to lend to only a single and specific individual, partnership, or corporation. When using this emergency authority, the Fed is required to seek approval from the Treasury Secretary.[13] Title XI would also allow the FDIC to set up emergency liquidity programs to guarantee the debt of bank holding companies, similar to the 2008 Temporary Liquidity Guarantee Program.

In addition, the Dodd-Frank Act allowed the Government Accountability Office (GAO) to audit the Fed’s lending facilities and open market operations for internal controls and risk management, and it called for a GAO audit of the Fed’s actions during the crisis. The act required disclosure of Fed borrowers and borrowing terms, but with a time lag. The act prohibited firms regulated by the Fed from participating in the selection of directors of the regional Federal Reserve Banks.[14] The act also created a new presidentially appointed Vice Chair of Supervision on the Board of Governors.

## Resolution Regime for Failing Firms

### Financial Crisis Context[15]

Most companies, including many financial companies, that fail in the United States are resolved through a judicial process in accordance with the U.S. Bankruptcy Code.[16] The primary objective of a corporate[17] bankruptcy is to provide the debtor with a “fresh start” by discharging the company’s legal obligations to make further payments on existing debts.[18] This generally is accomplished by either (1) liquidating the debtor company’s assets so as to maximize returns to

[12] 12 U.S.C. §343.

[13] For more information, see CRS Report R44185, *Federal Reserve: Emergency Lending*, by Marc Labonte.

[14] For more information, see CRS Report R42079, *Federal Reserve: Oversight and Disclosure Issues*, by Marc Labonte.

[15] For more information, see archived CRS Report R40530, *Insolvency of Systemically Significant Financial Companies (SSFCs): Bankruptcy vs. Conservatorship/Receivership*, by David H. Carpenter.

[16] 11 U.S.C. §109.

[17] Individuals also may file as debtors under the Bankruptcy Code. 11 U.S.C. §109.

[18] See generally “Process – Bankruptcy Basics,” Admin. Off. of the U.S. Courts, http://www.uscourts.gov/services-forms/bankruptcy/bankruptcy-basics/process-bankruptcy-basics; Eva H.G. Hüpkes, THE LEGAL ASPECTS OF BANK INSOLVENCY: A COMPARATIVE ANALYSIS OF WESTERN EUROPE, THE UNITED STATES AND CANADA, pp. 17-20 (2000).

creditor classes based on a statutorily defined priority scheme, or (2) reorganizing the company's debts so that creditor classes receive more than they would have through liquidation, while also enabling the debtor to maintain operations as a going concern.[19]

However, federal law does not permit every financial company to file for protection under the Bankruptcy Code.[20] For example, depository institutions (i.e., banks and thrifts) that hold FDIC-insured deposits cannot be debtors under the Bankruptcy Code.[21] Instead, these insured depositories are subject to a special resolution regime, called a conservatorship or receivership (C/R), that typically is administered by the FDIC.[22]

Unlike the bankruptcy process, this C/R resolution regime is a largely nonjudicial, administrative process through which the FDIC assumes control over a troubled depository for the purpose of either preserving and conserving the institution's assets as conservator[23] or liquidating the institution as receiver.[24] The FDIC, as conservator or receiver, assumes broad and flexible powers, including "all the powers of the members or shareholders, the directors, and the officers of the institution."[25] One of the primary objectives of the FDIC as conservator or receiver is to protect federally insured deposits of the failed institution by either paying them off or transferring them to another institution.[26] This process generally requires significant disbursements from the FDIC's Deposit Insurance Fund and often results in the FDIC being the largest creditor of the failed institution.[27] The FDIC is generally required by statute to choose the "least-cost resolution" strategy that will result in the lowest cost to the Deposit Insurance Fund.[28] However, the FDIC may waive the least-cost resolution requirement under certain circumstances to "avoid serious adverse effects on economic conditions or financial stability."[29]

The financial turmoil at the end of the last decade that resulted from the Lehman Brothers bankruptcy and the federal government's provision of ad hoc emergency financial assistance to prevent the bankruptcies of AIG, Bear Stearns, and others focused congressional attention on options for resolving large, complex financial companies while maintaining the stability of the U.S. financial system. More specifically, policymakers questioned whether the Bankruptcy Code, as it was structured at the time of the financial crisis, could effectuate the resolution of large, complex financial companies without undermining financial stability.[30] Some believed that

---

[19] Ibid.

[20] 11 U.S.C. §109.

[21] 11 U.S.C. §109(b)(2), (e).

[22] For a discussion of the legal and policy justifications for having a special insolvency regime for insured depository institutions, see the section titled "Comparison of Depository Institutions and Systemically Significant Financial Institutions" in archived CRS Report R40530, *Insolvency of Systemically Significant Financial Companies (SSFCs): Bankruptcy vs. Conservatorship/Receivership,* by David H. Carpenter.

[23] The FDIC as conservator can operate a depository institution as a going concern for the purpose of stabilizing its finances and returning it to normal operations or, more frequently, to pave the way for the institution's liquidation through a receivership.

[24] For a more detailed analysis of these two insolvency regimes, see archived CRS Report R40530, *Insolvency of Systemically Significant Financial Companies (SSFCs): Bankruptcy vs. Conservatorship/Receivership*, by David H. Carpenter.

[25] 12 U.S.C. §1821(d)(2).

[26] Federal Deposit Insurance Corporation (FDIC), *The FDIC's Role as Receiver,* p. 213, at https://www.fdic.gov/bank/historical/managing/history1-08.pdf.

[27] FDIC, *Overview of the Resolution Process*, p. 60, at https://www.fdic.gov/bank/historical/managing/history1-02.pdf.

[28] 12 U.S.C. §1823(c)(4).

[29] See 12 U.S.C. §1823(c)(4)(G)(i) and 12 U.S.C. §1823(d)(4)(G)(ii), (iii), and (iv) for full waiver requirements.

[30] See, for example, *The Administration's Proposals for Financial Regulatory Reform: Hearing Before the House*

establishing a special resolution regime for large, complex financial companies modeled after the nonjudicial C/R process for resolving failed depositories would reduce the likelihood that the federal government would need to provide taxpayer-backed financial assistance to reduce the potential systemic disruptions of one or more financial companies entering bankruptcy.[31] Opponents argued that the establishment of a special resolution regime would enable policymakers to provide beneficial treatment to favored creditors and counterparties of failing firms.[32] Rather than establishing a new administrative resolution regime, some policymakers argued that these systemic risk concerns could be effectively addressed through amendments to the Bankruptcy Code.[33] Ultimately, Congress can be seen to have chosen a path somewhat in the middle of these policy proposals.

## Provisions in the Dodd-Frank Act (Title II)

Title II of the Dodd-Frank Act establishes a new resolution regime for certain financial companies, called the "Orderly Liquidation Authority" (OLA). OLA is an administrative process modeled after the C/R regime for failed depository institutions. However, OLA is statutorily structured as a fallback alternative to the normally applicable Bankruptcy Code[34] that is to be utilized only under extraordinary circumstances.[35] Under normal circumstances, failed financial companies would be resolved under the Bankruptcy Code.[36] OLA, on the other hand, may be utilized only if, at the time when an eligible financial company is in default or in danger of default, various federal regulators determine that the company's resolution under the Bankruptcy Code[37] would pose dangers to the U.S. financial system.[38]

OLA is largely modeled after the C/R regime for failed depository institutions described above, but with some notable distinguishing characteristics. Like the C/R regime for depositories, OLA is a largely nonjudicial, administrative process that typically would be administered by the

---

*Committee on Financial Services*, 111th Cong., 1st sess., September 23, 2009, at https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg54867/pdf/CHRG-111hhrg54867.pdf.

[31] Ibid. (statement of Timothy F. Geithner, Secretary, U.S. Department of the Treasury).

[32] See, for example, *Experts' Perspectives on Systemic Risk and Resolution Issues: Hearing Before the House Committee on Financial Services*, 111th Cong., 1st sess., September 24, 2009, pp. 42-44, at https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg54869/pdf/CHRG-111hhrg54869.pdf.

[33] Ibid.

[34] The Bankruptcy Code is not the only other potential resolution process. For example, insurance companies generally are resolved in accordance with insolvency proceedings established by state law. See *Receiver's Handbook for Insurance Company Insolvencies*, National Association of Insurance Commissioners, p. ii, 2016, at http://www.naic.org/documents/prod_serv_fin_receivership_rec_bu.pdf.

[35] 12 U.S.C. §5383.

[36] 12 U.S.C. §5383(b).

[37] Resolution could also be possible under other available law, if the relevant company is not a valid debtor under the Bankruptcy Code. 12 U.S.C. §5383(b).

[38] For an eligible financial company to be resolved under the special regime, a group of regulators (the FDIC, the SEC, or the Director of the Federal Insurance Office, based on their respective oversight roles) *and* the Federal Reserve Board must make a written recommendation for the company's resolution based on standards delineated in the Dodd-Frank Act. 12 U.S.C. §5383(a). After the recommendation, the Secretary of the Treasury (Secretary), in consultation with the President, must make a determination that (1) the "company is in default or in danger of default"; (2) the company's resolution under otherwise available law would "have serious adverse effects on [the] financial stability of the United States"; (3) "no viable private sector alternative is available"; and (4) certain other statutory considerations are met. 12 U.S.C. §5383(b). A company that disputes the Secretary's determination has limited rights to appeal that determination in federal court. 12 U.S.C. §5382.

FDIC.[39] Additionally, the FDIC's powers under OLA are similar to those assumed by the FDIC under the C/R regime for depositories.[40]

Unlike the C/R regime, which is limited to depository institutions and their subsidiaries, OLA is available to a broad array of financial companies, including bank holding companies, thrift holding companies, and insurance holding companies, as well as many of their subsidiaries.[41] However, depository institutions continue to be resolved under the C/R regime, and insurance companies and certain securities broker-dealers are subject to distinct resolution requirements.[42]

While the chief objective of the C/R regime is to protect federally insured deposits and minimize the cost to the Deposit Insurance Fund, the primary objective of the OLA is "to provide the necessary authority to liquidate failing financial companies that pose a significant risk to the financial stability of the United States in a manner that mitigates such risk and minimizes moral hazard."[43] To further this objective, OLA authorizes only receiverships, not conservatorships. The Dodd-Frank Act states that "[a]ll financial companies put into receivership under this title shall be liquidated and no taxpayer funds shall be used to prevent the liquidation of any financial company under this title."[44]

The funding mechanism for resolutions under the OLA also differs from the C/R regime for depositories. Whereas the Deposit Insurance Fund is prefunded based on assessments against insured depositories, the Orderly Liquidation Fund established for funding resolutions under the OLA is not prefunded.[45] Instead, the FDIC is authorized to borrow from the Treasury as necessary to fund a specific OLA receivership, subject to explicit caps based on the value of the failed company's consolidated assets.[46] If the failed companies' assets are insufficient to repay fully what was borrowed from the Treasury, then the FDIC is empowered to recover the shortfall from the financial industry.[47]

## Securitization

### Financial Crisis Context

Securitization is the process of turning mortgages, credit card loans, and other debt into securities that can be purchased by investors. Securitizers acquire and pool many loans from lenders and then issue new securities based on the flow of payments from the underlying loans. Banks can reduce the risk of their retained portfolios by securitizing the loans they hold, spreading risks to other types of investors more willing to bear them. If the risks are adequately managed and understood, this can enhance financial stability. Also, securitization is a source of funding for nonbank lenders, and thus can increase the total amount of credit available to businesses and consumers.

Securitization risks were not properly managed leading up to the crisis, contributing in part to the housing bubble and financial turmoil. Lenders collect origination fees, but if they sell their loans

[39] 12 U.S.C. §§1823, 5381(a)(8), (a)(9), (a)(11)(B)(iv).

[40] Compare 12 U.S.C. §5390(a), with 12 U.S.C. §1823(d).

[41] 12 U.S.C. §5381(8), (9).

[42] 12 U.S.C. §5385 (broker dealers); 12 U.S.C. §5383(e) (insurance companies).

[43] 12 U.S.C. §5384(a).

[44] 12 U.S.C. §5394(a).

[45] 12 U.S.C. §5390(n)

[46] 12 U.S.C. §5390(n).

[47] 12 U.S.C. §5390(o)(1)(D)

they are not exposed to loan losses if borrowers default. This creates an incentive to originate loans without appropriate underwriting. Prior to the crisis, these incentives likely led to deteriorating underwriting standards, and certain lenders may have been indifferent to whether loans would be repaid. Private securitization was especially prevalent in the subprime mortgage market, the nonconforming mortgage market, and in regions where loan defaults were particularly severe. Losses and illiquidity in the mortgage-backed securities (MBS) market led to wider problems in the crisis, including a lack of confidence in financial firms because of uncertainty about their exposure to potential MBS losses, through their holdings of MBS or off-balance sheet support to securitizers.

One approach to address incentives in securitization is to require loan securitizers to retain a portion of the long-term default risk. An advantage of this "skin in the game" requirement is that it may help preserve underwriting standards among lenders funded by securitization. Another advantage is that securitizers would share in the risks faced by the investors to whom they market their securities. A possible disadvantage is that if each step of the securitization chain must retain a portion of risk, then less risk may be shifted out to a broader sector of investors willing and able to bear it, raising the cost of credit. Concentrating risk in certain financial sectors could increase financial instability.

### Provisions in the Dodd-Frank Act (Title IX)

The Dodd-Frank Act generally required securitizers to retain some of the risk if they issue asset-backed securities. The amount of risk required to be retained depends in part on the quality and type of the underlying assets. Regulators are instructed to write risk retention rules requiring less than 5% retained risk if the securitized assets meet prescribed underwriting standards. For assets that do not meet these standards, regulators were instructed to require not less than 5% retention of risk. Securitizers were prohibited from hedging the retained credit risk.

In the case of residential mortgages that are securitized, the Dodd-Frank Act allowed for a complete exemption from risk retention if all of the mortgages in the securitization meet the standards of a "Qualified Residential Mortgage." Subsequently, regulators decided to use the same definition for a "Qualified Residential Mortgage" and a "Qualified Mortgage."[48] The act exempted certain government-guaranteed securities.

The act required securitizers to perform due diligence on the underlying assets of the securitization and to disclose the nature of the due diligence. In addition, investors in asset-backed securities are to receive more information about the underlying assets.

## Bank Regulation

### Financial Crisis Context[49]

During the crisis, banks and their parent companies, called *bank-holding companies* (BHC), came under significant stress, and over 500 banks would eventually fail, presenting an opportunity to reexamine bank regulation. Areas of concern that emerged included capital requirements; debit

[48] For more information on the Qualified Mortgage, see the section entitled "Provisions in the Dodd-Frank Act (Title XIV)" below.

[49] For more information on these topics, see CRS In Focus IF10205, *Leverage Ratios in Bank Capital Requirements*, by Marc Labonte; CRS Report R41913, *Regulation of Debit Interchange Fees*, by Darryl E. Getter; and CRS Insight IN10398, *FDIC's Deposit Insurance Assessments and Reserve Ratio*, by Raj Gnanarajah.

interchange fees; regulatory fragmentation; federal deposit insurance; and risky activities by banks.

**Capital Requirements.** Bank organizations fund themselves with liabilities and capital. Capital can absorb losses while the bank continues to meet its obligations on liabilities, and hence avoid failure. Safety and soundness regulations require banks to hold a certain amount of capital.

Following the crisis, some observers asserted that capital requirements should be more stringent, and requirements facing BHCs and certain nonbanks should be at least as stringent as those faced by depositories. Proponents argued that BHCs should be a "source of strength" to support distressed depository subsidiaries. They further claimed that differing requirements allowed banking organizations to take on more risk. Opponents argued that regulators should have discretion over what should be imposed across different company types to allow for differences in business models. They asserted this was especially true of nonbank institutions, with insurance companies in particular arguing those companies have substantially different risk profiles than banks.

**Interchange Fees.** When a debit card is used to make a purchase, the merchant making the sale pays a fee—known as the *interchange fee*—to the bank that issued the debit card (the issuer). The fee is compensation for services provided by the issuer, including facilitating authorization, clearance, and settlement and fraud prevention. Network providers set the rates for interchange fees, acting as an intermediary between issuers and merchants.

Merchants asserted that large network providers and issuing banks exercised market power to charge fees above market prices. Network providers and issuing banks argued that prices are appropriately set and reflected the costs—including fixed and card reward program costs overlooked by critics—of facilitating the transactions. Proponents of fee limits asserted the measures would eliminate anticompetitive pricing and benefit merchants and consumers. Opponents asserted that price restrictions would lead to inaccurate prices that created economic distortions and costs in other parts of the system.

**Regulatory Consolidation.** Commercial banks and similar institutions are subject to regulatory examination for safety and soundness. Prior to the crisis, these institutions—depending on their charter type—may have been examined by the Federal Reserve, OCC, the FDIC, the Office of Thrift Supervision (OTS), the National Credit Union Administration, or a state authority.

The system of multiple bank regulators was believed to have problems, some of which could be mitigated by consolidation. Consistent enforcement may be difficult across multiple regulators. To the extent that regulations are applied inconsistently, institutions may have an incentive to choose the regulator that they feel will be the least intrusive. While depositories of all types failed in the crisis, shortcomings in the OTS's supervision of large and complex institutions under its purview received particular criticism. An argument against consolidation is that regulatory consolidation could change the traditional U.S. dual banking system in ways that could put smaller banks at a disadvantage. Another argument for maintaining the current system is interaction between regulators monitoring different types of institutions may allow one regulator to alert others if it identifies emerging risks or regulatory weakness.

**Federal Deposit Insurance.** The Federal Deposit Insurance Corporation (FDIC) insures deposits, guaranteeing that (up to a certain account limit) depositors will not lose any deposits. FDIC funding comes from charging banks premiums—called *assessments*—which are used to maintain the Deposit Insurance Fund (DIF). The ratio of the value of the DIF to domestic deposits is called the *reserve ratio*.

At the onset of the crisis, the FDIC insured up to $100,000 per account, and was required to maintain a reserve ratio between 1.15% and 1.5%. During this crisis, the FDIC temporarily raised

the maximum insured deposit amount to $250,000, because many depositors held accounts larger than $100,000. Also, the rapid increase in bank failures depleted the DIF. Observers argued that the FDIC needed greater latitude to collect assessments and maintain a higher reserve ratio.

**Risky Activities.** Crisis-related bank failures led some to call for new limits on risky activity. Paul Volcker, former Chair of the Federal Reserve (Fed) and former Chair of President Obama's Economic Recovery Advisory Board, argued that "adding further layers of risk to the inherent risks of essential commercial bank functions doesn't make sense, not when those risks arise from more speculative activities far better suited for other areas of the financial markets."[50]

While proprietary trading and hedge fund sponsorship pose risks, it is not clear whether they pose greater risks to bank solvency and financial stability than "traditional" banking activities, such as mortgage lending. They could be viewed as posing *additional* risks that might make banks more likely to fail, but alternatively those risks might better diversify a bank's risks, making it less likely to fail. Critics argue that banning proprietary trading or hedge fund sponsorship is "a solution in search of a problem—it seeks to address activities that had nothing to do with the financial crisis, and its practical effect has been to undermine financial stability rather than preserve it."[51]

## Provisions in the Dodd-Frank Act (Title I, III, VI, and X)

**Capital Requirements.** Section 171 in Title I of Dodd-Frank—also known as the Collins Amendment—directed federal banking agencies to establish minimum capital requirements for insured depository institutions (except federal home loan banks), BHCs, and Federal Reserve supervised nonbank financial companies. The requirements on BHCs and certain nonbank companies generally cannot be less stringent than requirements on depositories. Small institutions received grandfathering, phase-ins, and exemption from parts or all of its requirements.[52]

**Interchange Fees.** Section 1075 in Title X of Dodd-Frank—also known as the Durbin Amendment—authorized the Federal Reserve Board to prescribe regulations to ensure that any interchange transaction fee received by a debit card issuer is reasonable and proportional to the cost incurred. Debit card issuers with less than $10 billion in assets were exempted by statute from the regulation. In addition, network providers and debit card issuers are prohibited from imposing restrictions on a merchant's choice of the network provider through which to route transactions.[53]

**Regulatory Consolidation.** Title III of Dodd-Frank did not effect a complete consolidation of banking agencies, but did eliminate the Office of Thrift Supervision as an independent agency and reassigns responsibility for regulating thrifts to the FDIC, the OCC, and to the Federal Reserve (see **Figure 1**).

---

[50] Paul Volcker, "How to Reform Our Financial System," *New York Times*, January 30, 2010, p. WK11, at http://www.nytimes.com/2010/01/31/opinion/31volcker.html.

[51] House Financial Services Committee, *The Financial CHOICE Act: Comprehensive Summary*, June 23, 2016, at http://financialservices.house.gov/uploadedfiles/financial_choice_act_comprehensive_outline.pdf.

[52] P.L. 113-250 raised the exemption from the Collins Amendment to $1 billion in assets.

[53] For more information, see CRS Report R41913, *Regulation of Debit Interchange Fees*, by Darryl E. Getter.

**Figure 1. Changes to Thrift Regulation**




**Source:** CRS.

**Notes:** Blue = existing, red = eliminated. See text for details.

**Federal Deposit Insurance.** Title III also made changes to federal deposit insurance. A new assessment formula is based on the total assets minus the average tangible equity of the depository, rather than on deposits. The minimum DIF reserve ratio was raised to 1.35% from 1.15%, and the 1.5% percent maximum was eliminated. The insured deposit limit was permanently raised to $250,000 from $100,000.[54]

**Risky Activities.** Section 619 of the Dodd-Frank Act—also known as the Volcker Rule—has two main parts. It prohibits banks from proprietary trading of "risky" assets and from "certain relationships" with risky investment funds; banks may not "acquire or retain any equity, partnership, or other ownership interest in or sponsor a hedge fund or a private equity fund."[55] The statute carves out exemptions from the rule for trading activities that Congress viewed as legitimate for banks to participate in, such as risk-mitigating hedging and market-making related to broker-dealer activities. It also exempts certain securities, including those issued by the federal government, government agencies, states, and municipalities, from the ban on proprietary trading.[56]

[54] For more information, see CRS Report R41339, *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Titles III and VI, Regulation of Depository Institutions and Depository Institution Holding Companies*, by M. Maureen Murphy.

[55] Dodd-Frank Act, §619. For more information, see CRS Legal Sidebar WSLG767, *What Companies Must Comply with the Volcker Rule?*, by David H. Carpenter.

[56] For more information, see CRS Report R43440, *The Volcker Rule: A Legal Analysis*, by David H. Carpenter and M. Maureen Murphy.

# Consumer Financial Protection[57]

## Financial Crisis Context

Before Title X of the Dodd-Frank Act (entitled the Consumer Financial Protection Act) went into effect,[58] federal consumer financial protection regulatory authority was split between five banking agencies—the OCC, Fed, FDIC, NCUA, and OTS[59]—as well as the FTC and HUD. These seven agencies shared (1) the authority to write rules to implement most federal consumer financial protection laws; (2) the power to enforce those laws; and (3) supervisory authority over the individuals and companies offering and selling consumer financial products and services.[60] The jurisdictions of these agencies varied based on the type of institution involved and, in some cases, based on the type of financial activities in which institutions engaged.[61]

The regulatory authority of the banking agencies varied by depository charter. The OCC regulated depository institutions with a national bank charter.[62] The Fed regulated the domestic operations of foreign banks and state-chartered banks that were members of the Federal Reserve System (FRS).[63] The FDIC regulated state-chartered banks and other state-chartered depository institutions that were not members of the FRS.[64] The NCUA regulated federally insured credit unions,[65] and the OTS regulated institutions with a federal thrift charter.[66]

The banking agencies were charged with a two-pronged mandate to regulate depository institutions within their jurisdiction for safety and soundness, as well as consumer compliance.[67] The focus of safety and soundness regulation is ensuring that institutions are managed in a safe and sound manner so as to maintain profitability and avoid failure.[68] The focus of consumer compliance regulation is ensuring that institutions abide by applicable consumer protection and fair lending laws.[69] To reach these ends, the banking agencies held broad authority to subject depository institutions to upfront supervisory standards, including the authority to conduct regular, if not continuous, on-site examinations of depository institutions.[70] They also had flexible

---

[57] For more information, see archived CRS Report R41338, *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Title X, The Consumer Financial Protection Bureau*, by David H. Carpenter (available to congressional clients upon request).

[58] Most of Title X went into effect on July 21, 2011, which the act refers to as the "designated transfer date." See Designated Transfer Date, 75 Fed. Reg. 57252 (Sept. 20, 2010).

[59] The OTS was eliminated, and its powers were transferred to the OCC, FDIC, Fed, and CFPB. Dodd-Frank Act §§300-378.

[60] See *infra* notes 62-84.

[61] Ibid.

[62] 12 U.S.C. §1813(q) (2009).

[63] 12 U.S.C. §1813(q)(3) (2009). The Fed also supervised bank holding companies. 12 U.S.C. §1844 (2009).

[64] 12 U.S.C. §1813(q) (2009). The FDIC, which administers the Deposit Insurance Fund, also has certain regulatory powers over state and federal depositories holding FDIC-insured deposits. However, these authorities generally are secondary to those of the institution's primary federal regulator. See, for example, 12 U.S.C. §1820.

[65] 12 U.S.C. §1766 (2009).

[66] The OTS also supervised thrift holding companies. 12 U.S.C. §1467a(b) (2009).

[67] 12 U.S.C. §1(a) (2009) (OCC); 12 U.S.C. §248(p) (2009) (Fed); 12 U.S.C. §1463 (2009) (OTS); 12 U.S.C. §1766 (2009) (NCUA); 12 U.S.C. §1820(b) (2009) (FDIC).

[68] Heidi Mandanis Schooner, "Consuming Debt: Structuring the Federal Response to Abuses in Consumer Credit," *Loyola Consumer Law Review*, vol. 18, n. 1 (2005), pp. 43, 52-53.

[69] Ibid, pp. 50 and 54-55.

[70] 12 U.S.C. §1820(b) (2009) (OCC, Fed, FDIC, OTS); 12 U.S.C. §1756 (2009) (NCUA). All depositories generally must be examined at least once every 18 months, but the largest depositories have examiners on-site on a continuous

enforcement powers to redress consumer harm, as well as to rectify proactively compliance issues found in the course of examinations and the exercise of their other supervisory powers, potentially *before* consumers suffered harm.[71]

The FTC was the primary federal regulator for nondepository financial companies, such as payday lenders and mortgage brokers.[72] Unlike the federal banking agencies, the FTC had little upfront supervisory or enforcement authority.[73] For instance, the FTC did not have the statutory authority to examine nondepository financial companies regularly or impose reporting requirements on them as a way proactively to ensure they were complying with consumer protection laws.[74] Instead, the FTC's powers generally were limited to enforcing federal consumer laws.[75] However, because the FTC lacked supervisory powers, it generally initiated enforcement actions in response to consumer complaints, private litigation, or similar "triggering events [that] postdate injury to the consumer."[76]

Additionally, both depository institutions and nondepository financial companies were subject to federal consumer financial protection laws.[77] Together, these federal laws establish consumer protections for a broad and diverse set of activities and services, including consumer credit transactions,[78] third-party debt collection,[79] and credit reporting.[80] Before the Dodd-Frank Act went into effect, the rulemaking authority to implement federal consumer financial protection laws was largely held by the Fed.[81] However, the authority to enforce federal consumer financial protection laws and regulations was spread among all of the banking agencies, the FTC, and HUD.[82]

Some scholars and consumer advocates argued that the complex, fragmented federal consumer financial protection regulatory system in place before the Dodd-Frank Act was enacted failed to protect consumers adequately and created market inefficiencies to the detriment of both financial companies and consumers.[83] Some argued that these problems could be corrected if federal

---

basis. See, for example, 12 U.S.C. §1820(d) (2009) (banks and thrifts); 12 U.S.C. §1756 (2009) (credit unions).

[71] See, for example, 12 U.S.C. §§1818 and 1831o (2009) (OCC, Fed, FDIC, OTS); 12 U.S.C. §1766 (2009) (NCUA).

[72] 15 U.S.C. §45 (2009). The FTC also has regulatory jurisdiction over many nonfinancial commercial enterprises. Ibid.

[73] Federal Trade Commission, *Operating Manual*, Ch. 11, pp. 4-5, at https://www.ftc.gov/sites/default/files/attachments/ftc-administrative-staff-manuals/ch11judiciaryenforcement.pdf.

[74] Heidi Mandanis Schooner, "Consuming Debt: Structuring the Federal Response to Abuses in Consumer Credit," *Loyola Consumer Law Review*, vol. 18, no. 1 (2005), pp. 43, 56-58. The FTC also did not have any direct safety and soundness authority over companies.

[75] Ibid, pp. 3-18.

[76] Ibid. p. 57. Nondepository financial companies also were subject to varying levels of supervision by state regulators. Oren Bar-Gill and Elizabeth Warren, "Making Credit Safer," *University of Pennsylvania Law Review*, vol. 157, no. 1 (Nov. 2008), p. 89.

[77] Ibid., pp. 87-89.

[78] 15 U.S.C. §§1601-1667f.

[79] 15 U.S.C. §§1692-1692p.

[80] 15 U.S.C. §§1681-1681x.

[81] To a lesser extent, other agencies held rulemaking authority under federal consumer laws. For example, rulemaking authority under the Real Estate Settlement Procedures Act of 1974 (RESPA) was held by HUD. 12 U.S.C. §2617 (2009).

[82] Heidi Mandanis Schooner, "Consuming Debt: Structuring the Federal Response to Abuses in Consumer Credit," *Loyola Consumer Law Review*, vol. 18, no. 1 (2005), pp. 43, 56-58; Oren Bar-Gill and Elizabeth Warren, "Making Credit Safer," *University of Pennsylvania Law Review*, vol. 157, no. 1 (Nov. 2008), pp. 86-97 (Nov. 2008).

[83] See, for example, Heidi Mandanis Schooner, "Consuming Debt: Structuring the Federal Response to Abuses in Consumer Credit," *Loyola Consumer Law Review*, vol. 18, no. 1 (2005), pp. 43, 82; Oren Bar-Gill and Elizabeth

consumer financial regulatory powers were strengthened and consolidated in a single regulator with a consumer-centric mission and supervisory, rulemaking, and enforcement powers akin to those held by the banking agencies.[84]

## Provisions in the Dodd-Frank Act (Title X)

The Dodd-Frank Act establishes the Bureau of Consumer Financial Protection (CFPB, or Bureau) as an independent agency within the Federal Reserve System.[85] The CFPB is headed by a single Director and funded primarily by a transfer of nonappropriated funds from the Federal Reserve System's combined earnings in an amount "determined by the Director to be reasonably necessary to carry out the authorities of the Bureau," subject to specified caps.[86] The CFPB has rulemaking, enforcement, and supervisory powers over many consumer financial products and services, as well as the entities that sell them.[87] The Dodd-Frank Act explicitly exempts certain industries from CFPB regulation, however.[88] The Dodd-Frank Act significantly enhances federal consumer protection regulatory authority over nondepository financial companies, for instance, by providing the CFPB with supervisory and examination authority over certain nondepository financial companies akin to those powers long held by the banking agencies over depository institutions.[89] Although the Dodd-Frank Act consolidates in the CFPB much of the federal consumer financial protection authority, as shown in **Figure 2**, at least six other agencies—the OCC, Fed, FDIC, NCUA, HUD, and FTC—retain some powers in this field.[90]

---

Warren, "Making Credit Safer," *University of Pennsylvania Law Review*, vol. 157, no. 1 (Nov. 2008), pp. 98-100.

[84] Ibid.

[85] 12 U.S.C. §5491(a).

[86] 12 U.S.C. §5491(b), 12 U.S.C. §5497. A mortgage company has challenged the constitutionality of the CFPB's structure in a lawsuit that currently is before the full U.S. Court of Appeals for the District of Columbia. See PHH Corp. v. Consumer Fin. Prot. Bureau, No. 15-1177, 2017 U.S. App. LEXIS 2733 (D.C. Cir., Feb. 16, 2017) (granting petition for rehearing by full court and vacating the court's three-judge panel decision in the case). The constitutionality of the CFPB's structure is outside the scope of this report.

[87] 12 U.S.C. §5492. Under the Dodd-Frank Act, the Bureau has authority over an array of consumer financial products and services, including deposit taking, mortgages, credit cards and other extensions of credit, loan servicing, check guaranteeing, collection of consumer report data, debt collection associated with consumer financial products and services, real estate settlement, money transmitting, and financial data processing. 12 U.S.C. §5481(15). The Bureau also has authority over "service providers," that is, entities that provide "a material service to a covered person in connection with the offering or provision of a consumer financial product or service." 12 U.S.C. §5481(26).

[88] 12 U.S.C. §§5517, 5519. For example, the CFPB generally does not have rulemaking, supervisory, or enforcement authority over automobile dealers; merchants, retailers, and sellers of nonfinancial goods and services; real estate brokers; insurance companies; or accountants. Ibid. However, certain business practices of these generally exempt entities could trigger CFPB regulatory authority (e.g., engaging in an activity that makes an otherwise exempt entity subject to an enumerated consumer law). See, for example, 12 U.S.C. §5517(a)(2)(C)(ii)(II).

[89] 12 U.S.C. §5514. The CFPB is authorized to supervise three groups of nondepository financial companies. First, the CFPB may supervise nondepository financial companies, regardless of size, in three specific markets—mortgage companies (such as lenders, brokers, and servicers), payday lenders, and private education lenders. 12 U.S.C. §5514(a)(1)(A), (D), (E). Second, the CFPB may supervise "larger participants" in consumer financial markets. 12 U.S.C. §5514(a)(1)(B). The Bureau has designated certain entities as larger participants in several markets, including consumer debt collection, consumer reporting, and student loan servicing. 12 C.F.R. §§1090.104-108. Third, although it has not exercised the authority to date, the CFPB may supervise a nondepository financial company if the Bureau has reasonable cause to determine that the company poses risks to consumers in offering its financial services or products. 12 U.S.C. §5514(a)(C).

[90] 12 U.S.C. §§5515-17, 5519.

**Figure 2. Changes to Consumer Protection Regulation**




**Source:** CRS.

**Notes:** Blue = existing, green = new, red = eliminated. Existing regulators retained certain consumer regulatory responsibilities. See text for details.

The Dodd-Frank Act transferred from the banking agencies to the bureau primary consumer compliance authority over banks, thrifts, and credit unions with more than $10 billion in assets.[91] However, the banking agencies continue to hold safety and soundness authority over these "larger depositories,"[92] as well as both consumer compliance and safety and soundness authority over "smaller depositories" (i.e., bank, thrifts, and credit unions with $10 billion or less in assets).[93]

The law also transferred to the bureau the primary rulemaking authority over 19 "enumerated consumer laws,"[94] which, with one exception,[95] were enacted prior to the Dodd-Frank Act.[96] Additionally, the CFPB is authorized to prohibit unfair, deceptive, and abusive acts or practices associated with consumer financial products and services that fall under the bureau's general regulatory jurisdiction.[97] The bureau also is authorized to enforce consumer financial protections laws either through the courts[98] or administrative adjudications.[99] The CFPB is authorized by statute to redress violations of consumer financial protection laws through the assessment of civil monetary penalties, restitution orders, and various other forms of legal and equitable relief.[100]

[91] 12 U.S.C. §5515. The CFPB's regulatory authorities over larger depositories include the power to conduct examinations, impose reporting requirements, enforce consumer financial laws, and prescribe consumer financial regulations. Ibid.

[92] 12 U.S.C. §§5515-5516.

[93] 12 U.S.C. §5516.

[94] 12 U.S.C. §5481(12).

[95] 12 U.S.C. §§5581-87. The bureau acquired rulemaking authority pursuant to most provisions of the Mortgage Reform and Anti-Predatory Lending Act, which was enacted as Title XIV of the Dodd-Frank Act. 12 U.S.C. §5481 note; Dodd-Frank Act §1400. For more information on Title XIV, see "Provisions in the Dodd-Frank Act (Title XIV)."

[96] Dodd-Frank Act §§1081-1104 (codified in numerous places throughout the U.S. Code).

[97] 12 U.S.C. §5531.

[98] 12 U.S.C. §5564.

[99] 12 U.S.C. §5563.

[100] 12 U.S.C. §5565.

## Mortgage Standards

### Financial Crisis Context

Beginning around the middle of 2006, residential mortgage delinquency and foreclosure rates rose sharply in many regions of the United States. In addition to the negative effects on some homeowners, the increase in nonperforming mortgages contributed to the financial crisis by straining the balance sheets of financial firms that held those mortgages. Although all kinds of mortgages experienced increases in delinquency and foreclosure, many poorly performing mortgages exhibited increasingly complex features, such as adjustable interest rates, or nontraditional mortgage features, such as negative amortization. While such nontraditional or complex mortgage features may be appropriate for some borrowers in some circumstances, many were made available more widely. In addition, some observers view certain mortgage features, such as high prepayment penalties, as predatory. Although not all troubled mortgages exhibited these or similar features, and not all loans that exhibited such features became troubled, some observers point to the widespread use of such mortgage terms as having exacerbated the housing "bubble" and its subsequent collapse.

The role that nonperforming mortgages played in the financial crisis led some to suggest actions to protect consumers from risky mortgage products and to protect the U.S. financial system from experiencing major losses due to troubled mortgages in the future. One way to minimize mortgage defaults and foreclosures is to limit or prohibit certain mortgage features that are viewed as especially risky. Another would be to require mortgage lenders to offer consumers basic mortgage products with traditional terms alongside any loan with nontraditional features. Although either of these approaches may reduce the chances of widespread mortgage failures, and might help preserve financial stability, both could also limit consumer choice or prevent borrowers from taking out loans with nontraditional features that may be advantageous given their specific circumstances. Some also argue that such approaches could limit financial innovation in mortgage products or reduce competition among lenders.

### Provisions in the Dodd-Frank Act (Title XIV)

The Dodd-Frank Act amended the Truth in Lending Act (TILA)[101] to set minimum standards for certain residential mortgages. Under the *Ability-to-Repay* requirements, lenders are required to determine that mortgage borrowers have a reasonable ability to repay the mortgages that they receive, based on the borrowers' verified income and other factors. Certain "Qualified Mortgages" with traditional mortgage terms are presumed to meet these requirements. The CFPB was also directed to issue regulations prohibiting mortgage originators from "steering" consumers to mortgages that (1) those consumers do not have a reasonable ability to repay, (2) exhibit certain features that are determined to be predatory, or (3) meet certain other conditions. It was also directed to issue regulations prohibiting any practices related to residential mortgage lending that it deems to be "abusive, unfair, deceptive, [or] predatory." The act restricted the use of prepayment penalties. Mortgage originators are prohibited from receiving compensation that varies in any way based on the applicable mortgages terms or conditions, other than the principal amount. The act also required increased disclosures to consumers on a range of topics, including disclosures related to how certain features of a mortgage may affect the consumer.

---

[101] P.L. 90-321, 82 Stat. 146. The Dodd-Frank Act transferred responsibility for TILA to the Consumer Financial Protection Bureau (see the section above entitled "Consumer Financial Protection").

New requirements related to "high-cost mortgages" are included in the act, such as limitations on the terms of such mortgages and a requirement that lenders verify that borrowers have received prepurchase counseling before obtaining such a mortgage.

## Derivatives[102]

### Financial Crisis Context

Derivatives are financial contracts whose value is linked to some underlying asset price or variable. They fall into three types of instruments—futures, options, and swaps. Some derivatives are traded on organized exchanges with central clearinghouses that guarantee payment on all contracts, while swaps are traded in an over-the-counter (OTC) market, where credit risk is borne by the individual counterparties.

The Commodity Futures Modernization Act of 2000 (CFMA)[103] largely exempted swaps and other derivatives in the OTC market from regulation. The collapse of AIG in 2008 illustrated the risks posed by large OTC derivatives positions not backed by collateral or margin (as a central clearinghouse would require). If AIG had been required to post margin on its credit default swap contracts, it would have been unlikely to build such a large position, which could have reduced the threat to systemic stability and the resulting large taxpayer bailout. Further, opacity in the OTC market made it difficult for policymakers and market participants to gauge firms' risk exposures, arguably exacerbating the panic.

Such disruptions in markets for financial derivatives during the financial crisis led to calls for changes in derivatives regulation, particularly whether the swap (OTC) markets should adopt features of the regulated markets.

### Provisions in the Dodd-Frank Act (Titles VII and XVI)

Under the Dodd-Frank Act, the Commodities Futures Trading Commission regulates "swaps," which include contracts based on interest rates, currencies, physical commodities, and some credit default swaps, whereas the SEC has authority over a much smaller slice of the market, including "security-based swaps," which are mostly other credit default swaps and equity swaps.[104]

The Dodd-Frank Act mandated centralized clearing and exchange-trading of many OTC derivatives, but provided exemptions for certain market participants. In general, swaps that must be cleared must also be traded on an exchange or exchange-like facility that provides price transparency. The regulators were given considerable discretion to define the forms of trading that will meet this requirement.

The Dodd-Frank Act included an exemption from the clearing requirement, if desired, if at least one party to the trade is an "end user,"[105] defined as parties that are not financial entities[106] and are

[102] For more information, see CRS Report R41398, *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Title VII, Derivatives,* by Rena S. Miller and Kathleen Ann Ruane.

[103] P.L. 106-554, 114 Stat. 2763.

[104] Dodd-Frank Act §723 (swaps) and §763 (security-based swaps). Contracts with a large number of underlying securities will be swaps; contracts based on single securities or narrow-based security indexes will be security-based swaps. Hereafter, for brevity, this section does not distinguish between swaps and security-based swaps.

[105] Dodd-Frank Act §723 (swaps) and §763 (security-based swaps).

[106] Financial entities are defined, for the purposes of these subsections, as swap dealers, security-based swap dealers, major swap participants, major security-based swap participants, commodity pools, private funds, employee benefit

using the swaps to hedge or mitigate commercial risk. An exempted party must inform the CFTC or SEC (depending on the contract) on how they generally meet their financial obligations when entering into uncleared swaps.

The act requires regulators to impose registration and capital requirements on swap dealers and major swaps participants. It requires regulators to impose margin requirements on certain swaps that remain uncleared by any clearinghouse. It also requires reporting of all swaps, including those not subject to or exempt from the clearing requirement, to swap data repositories. Both agencies were given the power to promulgate rules to prevent the evasion of the clearing requirements created by the act.

Section 716, which was a widely debated section of the act, prohibited federal assistance to any swaps entity and became known as the "swaps pushout rule." It included an exemption, however, that appeared to address concerns that under previous language large commercial banks would have been unable to hedge their risk without becoming ineligible for federal assistance, including access to the Federal Reserve's discount window or any other Fed credit facility and FDIC insurance. Furthermore, depository institutions were permitted to establish an affiliate that was a swap entity as long as it was supervised by the Fed. P.L. 113-235, an omnibus appropriations bill, included language narrowing Section 716 of the Dodd-Frank Act.[107]

## Credit Rating Agencies

### Financial Crisis Context[108]

Credit rating agencies provide investors with an evaluation of the creditworthiness of bonds issued by a wide spectrum of entities, including corporations, sovereign nations, and municipalities. The grading of the creditworthiness is typically displayed in a letter hierarchical format: for example, AAA being the safest, with lower grades representing greater risk. Credit rating agencies (CRAs) are typically paid by the issuers of the securities being rated by the agencies, which could be seen as a conflict of interest. In exchange for adhering to various policies and reporting requirements, the SEC can confer on interested CRAs the designation of a Nationally Recognized Statistical Rating Organization (NRSRO). Historically, the designation was especially significant because a host of state and federal laws and regulations referenced or required NRSRO-based credit ratings.[109]

In the run-up to the financial crisis, the provision of investment-grade ratings[110] by the three dominant CRAs—Moody's, Standard & Poor's, and Fitch—was a critical part of the process of

plans, and persons predominantly engaged in activities that are in the business of banking or are financial in nature. The CFTC and SEC are given the power to exempt small banks, savings associations, farm credit system institutions, and credit unions from the definition of financial entities. §723 (Swaps) and §763 (SBS) of the Dodd-Frank Act.

[107] For additional details, please see, for example, Davis Polk, "Swaps Pushout Provision Amended: Pushout Requirement in Section 716 Now Limited to Certain ABS Swaps," December 17, 2014, at https://www.davispolk.com/swaps-pushout-provision-amended-pushout-requirement-section-716-now-limited-certain-abs-swaps/. See also Cleary Gottlieb, "Amendments to Dodd Frank Swaps Pushout Provision Passed in Omnibus Spending Bill," December 17, 2014, at https://www.clearygottlieb.com/~/media/cgsh/files/news-pdfs/pres-obama-signs-bill-enacting-significant-amendments-to-swaps-push-out-requirements.pdf.

[108] For more information, see CRS Report R40613, *Credit Rating Agencies and Their Regulation*, by Gary Shorter and Michael V. Seitzinger.

[109] For more information, see archived CRS Report RS22519, *Credit Rating Agency Reform Act of 2006*, by Michael V. Seitzinger (available to congressional clients upon request).

[110] This is a bond rating that indicates that the bond's issuer is believed to be able to meet its financial obligations, thus subjecting the bondholders to minimal default risk, the risk that an entity will be unable to make required payments on

structuring the residential mortgage-backed securities and collateralized debt obligations that held subprime housing mortgages. Many observers believed that the three leading CRAs fundamentally failed in their rating of these securities, exacerbating the market collapse. During the housing boom preceding the financial crisis, the CRAs often gave top-tier AAA ratings to many structured securities, only to downgrade many of them later to levels often below investment grade status. One argument for the dominant rating agencies' failings was their reliance on a business model in which issuers paid the agencies for their rating services. This *issuer-pays* model was criticized for potentially creating bias toward providing overly favorable ratings.

Criticism of the CRAs, however, was not universal. A common defense of their failings was that their rating missteps could be traced in part to their view that the rising housing prices would be sustained, a perspective also said to be held by a number of respected financial market observers at the time.[111]

### Provisions in the Dodd-Frank Act (Title IX)

The Dodd-Frank Act contains provisions that enhanced SEC regulation of credit rating agencies. It established the SEC Office of Credit Ratings; imposed new reporting, disclosure, and examination requirements on NRSROs; established new standards of legal liability; and required the removal of references to NRSRO ratings from federal statutes and regulations.

In an attempt to mitigate some of the potential bias in the issuer-pays model, the Dodd-Frank Act directed the SEC to study the feasibility of establishing a public utility/self-regulatory body that would randomly assign NRSROs to provide credit ratings for structured finance products. After completion of the study, unless the SEC "determines an alternative system would better serve the public interest and protection of investors," the agency was required to implement the proposed public utility/self-regulatory organization system. Released in 2012, the study recommended that the SEC convene a roundtable of stakeholders to discuss the merits of several alternative business models for rating structured products.[112] The public utility system has not been adopted to date.

## Investor Protection

### Financial Crisis Context

Before his arrest in 2008, Bernard Madoff was responsible for the theft of billions of dollars of his client's funds using a massive Ponzi scheme conducted through his securities firm.[113] The firm was a registered broker-dealer subject to oversight by Financial Industry Regulatory

its debt obligations.

[111] For example, see Jack Milligan, "The Model Meltdown: The Credit-Rating Agencies Were Caught by Surprise When the Mortgage Meltdown Hit. Their Models Were Based on More Traditional Loans and Borrower Behavior That Now Seem Outdated," *Mortgage Banking*, vol. 68, no. 7, April 2008.

[112] Securities and Exchange Commission (SEC), Report to Congress on Assigned Credit Ratings as Required by Section 939F of the Dodd-Frank Wall Street Reform and Consumer Protection Act, December 2012, at https://www.sec.gov/news/studies/2012/assigned-credit-ratings-study.pdf. Among the models discussed at the 2013 roundtable were the aforementioned public utility model; a model that would involve an investor-owned credit rating agency; and a model in which issuers would select their own credit raters whose remuneration would come from transaction fees. A webcast of the roundtable can be found at https://www.sec.gov/news/otherwebcasts/2013/credit-ratings-roundtable-051413.shtml.

[113] SEC, "SEC Charges Bernard L. Madoff for Multi-Billion Dollar Ponzi Scheme," press release, December 11, 2008, at https://www.sec.gov/news/press/2008/2008-293.htm.

Authority (FINRA, the self-regulatory organization for broker-dealers overseen by the SEC) and was also a registered investment adviser subject to SEC oversight. One consequence of the Madoff affair was heightened interest and concern over the adequacy of investor protection in the regulatory realm.

The SEC is funded through the congressional appropriation process. It has been argued that the SEC needs similar budgetary independence to other financial regulators to help close the resource gap between the agency and its regulated entities.[114] Through the years, however, a key criticism of proposals for SEC self-funding was that it would undermine agency accountability and oversight provided by the congressional appropriation process.[115]

Principally regulated by FINRA, broker-dealers are required to make investment recommendations that are "suitable" to their customers, meaning that they must do what is suitable for an investor, based on that investor's particular circumstances. SEC-registered investment advisers have a "fiduciary duty" to their customers with respect to investment recommendations under the Investment Advisers Act of 1940.[116] It is an obligation to place their client's best interests above their own—a more demanding duty to their clients than the suitability standard. The services provided by broker-dealers and investment advisers, however, often overlap—both can provide investment advice—and there are some concerns that customers may falsely assume that the person advising them has a fiduciary duty to them.

## Provisions in the Dodd-Frank Act (Title IX)

The Dodd-Frank Act established an Investor Advisory Committee within the SEC whose purpose is to advise and consult with the SEC on regulatory priorities from an investor protection perspective. The act also created an Office of the Investor Advocate within the SEC. It also enhanced rewards and protection to whistleblowers of securities fraud.

The Dodd-Frank Act also required the SEC to produce a study on the effectiveness of the standards of care required of broker-dealers and investment advisers. Released in 2011, the study recommended that the SEC establish a uniform fiduciary standard for broker-dealers and investment advisers when they provided personalized investment advice on securities to retail customers, a standard that should not be any less stringent than the fiduciary standard for investment advisers under the Investment Advisors Act of 1940. To date, the SEC has not acted on this recommendation.[117]

---

[114] See, for example, Chairman Mary L. Schapiro, *Speech by SEC Chairman: Statement Concerning Agency Self-Funding*, Securities and Exchange Commission, April 15, 2010, at https://www.sec.gov/news/speech/2010/spch041510mls.htm.

[115] For example, see U.S. General Accounting Office, *SEC Operations: Implications of Alternative Funding Structures*, GAO-02-864, July 2002, at http://www.gao.gov/new.items/d02864.pdf GAO-02-864.

[116] P.L. 76-768.

[117] SEC, *Study on Investment Advisers and Broker-Dealers as Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act,* January 2011, at https://www.sec.gov/news/studies/2011/913studyfinal.pdf. A related fiduciary development occurred at the Department of Labor (DOL), which regulates employee benefit plans sponsored by private-sector employers. In April 2016, DOL issued a controversial final rule, the fiduciary rule, slated to begin to be phased in starting on April 10, 2017. Under the rule, financial professionals who manage retirement plans such as Individual Retirement Accounts would be required to provide retirement planning investment advice at a fiduciary level. However, on February 23, 2017, President Trump issued an executive memorandum directing the DOL to analyze the fiduciary rule's impact. If the study found that the rule would negatively affect investors in certain ways, the agency was then authorized to either rescind or revise the rule. Employee Benefits Security Administration, Department of Labor, "Definition of the Term Fiduciary," 81 *Federal Register* 21928, April 8, 2016, at https://www.federalregister.gov/documents/2015/04/20/2015-08831/definition-of-the-term-fiduciary-conflict-of-interest-rule-retirement-investment-advice. Executive Office of the President, Memorandum for the Secretary of Labor,

The Dodd-Frank Act required financial advisors in municipal securities markets to register with the SEC and permits the Municipal Securities Rulemaking Board to promulgate rules governing their behavior. The Dodd-Frank Act also allows the Public Company Accounting Oversight Board to examine auditors of broker-dealers and exempts small firms from external audit requirements found in Section 404(b) of the Sarbanes-Oxley Act.[118]

The Dodd-Frank Act as enacted did not provide for a self-funded SEC. It did, however, give the agency some budgetary autonomy.[119] One such measure was the establishment of a SEC Reserve Fund to be used as the agency "determines is necessary to carry out the functions of the Commission." The SEC was authorized to deposit up to $50 million a year into the Reserve Fund from registration fees collected from SEC registrants, up to a fund balance limit of $100 million. To date, Congress has rescinded $25 million from the fund in two years.[120] The SEC has used the Reserve Fund to help modernize its information technology.

## Hedge Funds

### Financial Crisis Context[121]

The term "hedge fund" is not defined by federal law, but it is generally used to describe a privately organized, pooled investment vehicle not widely available to the public.[122] Some hedge funds can also be distinguished from other investment funds by their pronounced use of leverage, along with hedge funds' use of active trading strategies in which investment positions change frequently.[123] Some potential risks hedge fund investing might pose to the markets as a whole were revealed in 1998 when the hedge fund Long-Term Capital Management (LTCM) teetered on the brink of collapse.[124] Concerns over the systemic implications of LTCM's collapse resulted in the New York Fed engineering a multibillion-dollar private rescue of the fund.[125] Hedge fund failures apparently did not play a prominent role in precipitating or spreading the 2008 financial crisis.[126] Nonetheless, the collapse of LTCM and the systemic issues that it revealed led the 111th

"Fiduciary Duty Rule," 82 *Federal Register* 9675, February 7, 2017, at https://www.federalregister.gov/documents/2017/02/07/2017-02656/fiduciary-duty-rule.

118 P.L. 107-204.

119 For example, see Bruce Carton, "How Can Congress Kill Dodd-Frank? By Underfunding It." *Compliance Week*, January 19, 2011, at https://www.complianceweek.com/blogs/bruce-carton/how-can-congress-kill-dodd-frank-by-underfunding-it#.

120 P.L. 113-235 and P.L. 114-1.

121 See archived CRS Report R40783, *Hedge Funds: Legal History and the Dodd-Frank Act*, by Kathleen Ann Ruane and Michael V. Seitzinger (available to congressional clients upon request).

122 See David A. Vaughn, *Comments for the U.S. Securities and Exchange Commission Round Table on Hedge Funds; What Is a Hedge Fund*, May 13, 2003, at https://www.sec.gov/spotlight/hedgefunds/hedge-vaughn.htm (collecting various definitions of "hedge fund" employed by government entities and private practitioners).

123 President's Working Group on Financial Markets, *Hedge Funds, Leverage, And The Lessons Of Long-Term Capital Management*, pp. 4-5 (April 1999), at https://www.treasury.gov/resource-center/fin-mkts/Documents/hedgfund.pdf [hereinafter President's Working Group Report].

124 President's Working Group Report, pp. 10-17.

125 Ibid.

126 See U.S. Congress, Senate Committee on Banking, Housing, and Urban Affairs, *THE RESTORING AMERICAN FINANCIAL STABILITY ACT OF 2010*, 111th Cong., 2nd sess., April 30, 2010, S.Rept. 111-176, pp. 71-73, at https://www.congress.gov/111/crpt/srpt176/CRPT-111srpt176.pdf.

Congress to consider the laws that applied or, more accurately, did not apply to hedge funds and their managers.[127]

Prior to the enactment of the Dodd-Frank Act, most hedge funds and their managers were not required to register with the SEC[128] due to a combination of interlocking and commonly used exemptions in the Investment Company Act of 1940 (ICA)[129] and the Investment Advisers Act of 1940 (IAA).[130]

Generally, the ICA requires investment companies, broadly defined to include companies that invest in securities and offer their own securities to the public,[131] to register with the SEC and comply with the provisions of the act.[132] Under Section 3(c)(1) of the act, issuers with fewer than 100 beneficial owners that do not make public offerings of their securities are not deemed to be investment companies.[133] Section 3(c)(7) also generally exempts from the act's definition of "investment companies" those companies that sell shares only to "qualified purchasers"[134] and do not make public offerings of their securities.[135] Hedge funds, and other private investment vehicles, typically avail themselves of one of these two exemptions, which means that the ICA, for the most part, does not apply to the funds themselves.[136]

Subject to certain exemptions, the IAA defines an "investment adviser" as a person "who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.... "[137] Investment advisers generally are required to register with the SEC and otherwise comply with the act.[138]

However, under the "private adviser" exemption in the IAA that existed prior to the enactment of the Dodd-Frank Act, advisers were not required to register with the SEC if, during the preceding 12 months, they (1) did not hold themselves out to the public as investment advisers, (2) had fewer than 15 clients, and (3) did not act as advisers to an investment company registered under the ICA.[139] Clients, under this exemption, referred to entire investment funds if they were not registered investment companies and not to each individual investor in those funds.[140] Therefore,

---

127 Ibid.

128 President's Working Group Report, Appendix B, pp. B1-B3.

129 15 U.S.C. §80a-1 *et seq*.

130 15 U.S.C. §80b-1 *et seq*.

131 15 U.S.C. §80a-3.

132 See, for example, 15 U.S.C. §§80a-7 (prohibiting investment companies to purchase or sell securities without registration), 80a-8 (providing for registration), 80a-14 (prohibiting the offering of securities in an investment company unless minimum capital requirements are met), 80a-30 (imposing recordkeeping requirements).

133 15 U.S.C. §80a-3(c)(1).

134 15 U.S.C. §80a-2(a)(51) (defining qualified purchaser).

135 15 U.S.C. §80a-3(c)(7).

136 President's Working Group Report, Appendix B, p. B1.

137 15 U.S.C. §80b-2 (a)(11).

138 See, for example, 15 U.S.C. §§80b-3 (generally requiring registration), 80b-4 (requiring record-keeping and reporting).

139 15 U.S.C. §80b-3(b)(3) (2008).

140 See Goldstein v. SEC, 451 F.3d 873, 876 (D.C. Cir. 2006) ("As applied to limited partnerships and other entities, the Commission had interpreted this provision to refer to the partnership or entity itself as the adviser's 'client.' Even the largest hedge fund managers usually ran fewer than fifteen hedge funds and were therefore exempt." (internal citations omitted).

before the enactment of the Dodd-Frank Act, an adviser could manage up to 14 hedge funds without being required to register as an investment adviser.[141]

## Provisions in the Dodd-Frank Act (Title IV)

The Dodd-Frank Act preserved the ICA exemptions from the definition of an "investment company" most often used by hedge funds and other private pooled investment vehicles, and the act also codified a statutory definition for "private fund[s]" based upon whether the funds availed themselves of those exemptions.[142] More importantly, the Dodd-Frank Act eliminated the "private adviser" exemption in the IAA.[143] This modified a regulatory framework that had prevented the government from having access to information about the size and trading strategies of hedge funds, as well as such funds' positions in the market.[144] Access to information of that sort, it was argued by proponents of the act, would be critical to any future government response to a financial crisis.[145]

The repeal of the exemption generally required advisers to private funds, including hedge funds, with more than $150 million in assets under management to register with the SEC.[146] Advisers are also required to provide such information about their investment portfolios and strategies to the extent the SEC, in consultation with the FSOC, deems necessary to monitor systemic risk.[147] Advisers to venture capital funds[148] and private funds with assets under management of $150 million or less[149] are exempt from the registration requirement, but must submit reports and information to the SEC as the SEC deems necessary.[150] The Dodd-Frank Act also raised the asset threshold for SEC registration of investment advisers to funds that are not investment companies from $25 million to $100 million.[151]

---

141 S.Rept. 111-176, p. 73.

142 Dodd-Frank Act §402, 15 U.S.C. § 80b-2(a)(29).

143 Dodd-Frank Act §403, 15 U.S.C. § 80b-3.

144 S.Rept. 111-176, pp.71-73.

145 Ibid.

146 Dodd-Frank Act §403 (repealing the "private adviser" exemption).

147 Dodd-Frank Act §404, 15 U.S.C. § 80b-4 (authorizing the SEC to require the maintenance of records and reporting by advisers to private funds); see also Exemptions for Advisers to Venture Capital Funds, Private Fund Advisers with Less than $150 Million in Assets Under Management, and Foreign Private Advisers, 76 *Federal Register*, 39646-47 (July 6, 2011) (noting that through the Dodd-Frank Act Congress had generally applied IAA registration to hedge fund advisers).

148 Dodd-Frank Act §407, 15 U.S.C. § 80b-3(l) (exempting advisers to venture capital funds from registration but mandating the reporting of information to the SEC). See 17 C.F.R. §275.203(l)-1(a) (defining venture capital fund).

149 Dodd-Frank Act §408, 15 U.S.C. §80b-3(m) (exempting certain private fund advisers from registration but mandating the reporting of information to the SEC). *See* 17 C.F.R. §275.203(m)-1 (describing private fund investment advisers).

150 17 C.F.R. 275.204-4 (requiring reports from advisers relying on the registration exemptions for private funds and venture capital funds). Family offices, as those types of offices are defined by SEC rules, are exempt from both registration and reporting requirements under the IAA. Dodd-Frank Act §409, 15 U.S.C. §80b-2(a)(11). See Family Offices, 76 *Federal Register*, 37983, 37994 (June 29, 2011) (The rule "imposes no reporting, recordkeeping or other compliance requirements.").

151 Dodd-Frank Act §410, 15 U.S.C. § 80b-3a. Subject to certain exemptions, advisers to funds with assets under management of $25 million or less (or such high amount as the commission may deem by rule to be appropriate) may not register with the SEC unless the adviser is not regulated by a state or the adviser is an adviser to an investment company registered under the ICA. 15 U.S.C. §80b-3a(a)(1); 17 C.F.R. 275.203A-2 (listing exemptions from the prohibition on registration). Advisers to funds with assets under management between $25 million and $100 million (or such greater amount as the SEC may deem appropriate) also may not register with the SEC as long as they are regulated by state law and they do not advise an investment company registered under the ICA. 15 U.S.C. §80b-

## Executive Compensation and Corporate Governance

### Financial Crisis Context

Although some observers have questioned the validity of such links,[152] the financial crisis raised concerns that incentive compensation arrangements (compensation based on an employee's performance) at various financial firms created incentives for executives at those firms to take excessive risks.[153] The Dodd-Frank Act addressed this issue and also contained executive compensation provisions that were not directly linked to the financial crisis and which applied to all public companies.

### Provisions in the Dodd-Frank Act (Title IX)

Dodd-Frank required the SEC to issue rules that would affect all companies listed on a stock exchange. These rules would require a company found to be in material noncompliance with financial disclosure requirements in federal securities laws to claw back incentive-based executive officer compensation awarded during the three years before it is required to restate its financials.

Dodd-Frank also directed federal financial regulators to adopt new rules to jointly prescribe regulations or guidelines aimed at prohibiting incentive compensation arrangements that might encourage inappropriate risks at financial institutions with a $1 billion or more in assets.

The act also required public companies to disclose the ratio of the chief executive officer's (CEO's) compensation to that of their median employee (excluding CEO pay). In addition, at least once every three years, public company shareholders are entitled to cast a nonbinding vote on whether they approve of executive compensation, popularly known as "say on pay."

The Dodd-Frank Act also granted the SEC explicit authority to issue rules providing for shareholder proxy access, the ability of shareholders to nominate outsider directors to a company's board.[154]

---

3a(a)(2). If, however, this exemption would require the adviser to register in 15 or more states, the adviser may choose to register with the SEC. Ibid. The SEC has created a "buffer" for SEC registration ranging from $90 million in assets under management, at which point an adviser may register with the SEC, to $110 million in assets under management, at which point an adviser must register with the SEC. 17 C.F.R. 275.203A-1.

[152] For example, see Rudiger Fahlenbrach, Rene Stulz, and Rene M. Bank, "CEO Incentives and the Credit Crisis," *Charles A. Dice Center Working Paper No. 2009-13*, July 27, 2009, at http://ssrn.com/abstract=1439859.

[153] Federal Reserve, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation, "Guidance on Sound Incentive Compensation Policies," 75 *Federal Register* 36395, June 25, 2010, at https://www.gpo.gov/fdsys/pkg/FR-2010-06-25/html/2010-15435.htm.

[154] The SEC Rule 14a-11 implementing this provision was nullified by the U.S. Court of Appeals for the D.C. Circuit in the case of *Business Roundtable and Chamber of Commerce v. Securities and Exchange Commission*, No. 10-1305 slip op. (D.C. Cir. Jul. 22, 2011).

## Insurance[155]

### Financial Crisis Context

Under the McCarran-Ferguson Act of 1945,[156] insurance regulation is generally left to the individual states. For several years prior to the financial crisis, some Members of Congress introduced legislation to federalize insurance regulation along the lines of the dual regulation of the banking sector.[157]

The financial crisis, particularly the problems with insurance giant AIG and the smaller monoline bond insurers, changed the tenor of the debate around insurance regulation with increased emphasis on the systemic importance of some insurance companies. Although it was argued that insurer involvement in the financial crisis demonstrated the need for full-scale federal regulation of insurance, the financial regulatory reform debate generally did not include such a federal system. Instead, such proposals typically included the creation of a somewhat narrower federal office focusing on gathering information on insurance and setting policy on international insurance issues. Proposals relating to consumer protection, investor protection, bank and thrift holding company oversight, and systemic risk also had the potential to affect insurance, absent exemptions.

### Provisions in the Dodd-Frank Act (Title V)

The Dodd-Frank Act created a new Federal Insurance Office within the Treasury Department. In addition to gathering information and advising on insurance issues, this office has limited preemptive power over state insurance laws and regulations. This preemption is limited to cases in which state regulation results in less favorable treatment of non-U.S. insurers and to those covered by an existing international agreement.[158] Insurers were exempted from oversight by the act's new Consumer Financial Protection Bureau. Under the act, systemically important insurers are subject to identification by the Financial Stability Oversight Council and regulation by the Federal Reserve. Insurers also may be subject to resolution by the special authority created by the act at the holding company level, although resolution of state-chartered insurance companies continues to occur under the state insurer insolvency regimes. Consolidation of bank and thrift holding company oversight resulted in several insurers with depository subsidiaries being overseen by the Federal Reserve after abolishment of the Office of Thrift Supervision. The Collins Amendment (addressed above in "Bank Regulation") could have imposed additional capital requirements on insurers overseen by the Federal Reserve; however, this provision was later amended by P.L. 113-279 to allow flexibility in its implementation. In addition, the Dodd-Frank Act streamlined the state regulation of surplus lines insurance and reinsurance.[159]

---

155 See CRS Report R44046, *Insurance Regulation: Background, Overview, and Legislation in the 114th Congress*, by Baird Webel.

156 15 U.S.C. §1011 *et seq*.

157 See archived CRS Report R40771, Insurance Regulation: Issues, Background, and Legislation in the 111th Congress, by Baird Webel (available to congressional clients upon request).

158 The first of these "covered agreements" was recently finalized and presented to Congress. See CRS Insight IN10648, *What is the Proposed U.S.-EU Insurance Covered Agreement?*, by Baird Webel and Rachel F. Fefer.

159 For more information, see CRS Report RS22506, *Surplus Lines Insurance: Background and Current Legislation*, by Baird Webel.

## Miscellaneous Provisions in the Dodd-Frank Act

The Dodd-Frank Act contains several miscellaneous provisions in various titles of the legislation, including the following:

- **Title XII: Improving Access to Mainstream Financial Institutions.** This title included provisions to expand access to the banking system for families with low and moderate incomes by (1) authorizing a program to help such individuals open low-cost checking or savings accounts at banks or credit unions; and (2) creating a pool of capital to enable community development financial institutions to provide small, local, retail loan programs.
- **Title XIII: The TARP Pay it Back Act.** This title reduced the amount authorized to be outstanding under the TARP to $475 billion; it was originally $700 billion. It also prohibited the Treasury from using repaid TARP funds to make new TARP investments.[160]
- **Title XV: Miscellaneous Provisions.** This title required the Administration to assess proposed loans by the International Monetary Fund to middle-income nations. If it determined that the loan recipient's public debt exceeds its annual gross domestic product, it will have to oppose the loan unless it can certify to Congress that the loan is likely to be repaid. The act also stipulated that entities responsible for production processes or manufactured output that depend on minerals originating in the Democratic Republic of Congo and adjoining countries will be required to provide disclosures to the SEC on the measures taken to exercise due diligence with respect to the source and chain of custody of the materials, and products manufactured from them. In addition, companies will be required to disclose (1) payments to foreign governments for mineral extraction rights, and (2) information regarding mine safety violations. The latter provision was repealed by P.L. 115-4.
- **Section 342: Office of Women and Minority Inclusion.** This provision created an office at Treasury offices and each financial regulator to promote equal opportunity, diversity, and increased participation by women-owned and minority-owned businesses.

---

[160] For more information see CRS Report R41427, *Troubled Asset Relief Program (TARP): Implementation and Status*, by Baird Webel.

# Appendix. Statutory Changes to the Dodd-Frank Act

**Table A-1. Selected Statutory Changes to the Dodd-Frank Act**

| Dodd-Frank Provision | Dodd-Frank Title/ Section # | P.L. # Changing | Description of Change |
|---|---|---|---|
| CFPB Audit | Section 1016A | 112-10 | Annual GAO audit of CFPB's financial statements |
| Executive Compensation | Section 953 | 112-106 | Exempts emerging growth companies from pay ratio requirement |
| CFPB Confidentiality | Title X | 112-215 | Protection of privileged supervisory information submitted to the CFPB |
| CFPB | Section 1024 | 113-173 | Permits information sharing with certain state agencies |
| Swap Pushout Rule | Section 716 | 113-235 | Broadens exemption from pushout rule |
| SEC Reserve Fund | Section 991 | 113-235 | Rescinds $25 million in unobligated balances |
| Collins Amendment | Section 171 | 113-250 | Raises asset threshold for exemption |
| Collins Amendment | Section 171 | 113-279 | Allows regulators to exempt insurers |
| Employee Benefit Plans | Section 1027 | 113-295 | Adds 529A plans to those exempt from CFPB jurisdiction |
| Swaps Margin Requirements | Section 731, 764 | 114-1 | Broadens exemption for end users |
| SEC Reserve Fund | Section 991 | 114-113 | Rescinds $25 million in unobligated balances |
| Swaps Requirements | Section 723 | 114-113 | Affiliate exemption for centralized treasury unit |
| CFPB | Title X | 114-113 | Applies Federal Advisory Committee Act to CFPB |
| Orderly Liquidation Authority | Section 203-204 | 114-113 | Requires FDIC to consult with state insurance regulators before taking a lien on insurance subsidiary assets |
| Collins Amendment | Section 171 | 114-94 | Change of exemption date |
| Swaps Data Repository Indemnification | Section 728 | 114-94 | Repeals indemnification requirement |
| Mortgage Rules | Title XIV | 114-94 | Permits counties to petition for rural exemption |
| Conflict Minerals | Section 1502 | 114-301 | Changed reporting requirements |
| Resource Extraction Payments Disclosure | Section 1504 | 115-4 | Nullifies implementation of rule under the Congressional Review Act |

**Source:** CRS.

**Note:** Resource Extraction Payments Disclosure nullified the rule implementing the statute; it did not change the statute.

## Author Information

Baird Webel, Coordinator
Specialist in Financial Economics

Rena S. Miller
Specialist in Financial Economics

David H. Carpenter
Legislative Attorney

David W. Perkins
Analyst in Macroeconomic Policy

Raj Gnanarajah
Analyst in Financial Economics

Gary Shorter
Specialist in Financial Economics

Katie Jones
Analyst in Housing Policy

N. Eric Weiss
Specialist in Financial Economics

Marc Labonte
Specialist in Macroeconomic Policy

## CRS Contacts for Areas Covered by Report

| Issue Area | Name |
|---|---|
| Systemic Risk | Marc Labonte |
| Federal Reserve | Marc Labonte |
| Resolution Regimes | Raj Gnanarajah |
| Securitization and Shadow Banking | David Perkins |
| Bank Supervision | David Perkins |
| Derivatives | Rena Miller |
| Credit Rating Agencies | Gary Shorter |
| Insurance | Baird Webel |
| Investor Protection | Gary Shorter |
| Executive Compensation | Raj Gnanarajah; Gary Shorter |
| Mortgage Standards | Eric Weiss; Katie Jones |
| Legal Questions | Jay Sykes; Nicole Vanatko; David Carpenter; Maureen Murphy |

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

DAN RAYFIELD
Attorney General
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
JOSEPH PLATT #T2511101, IL SBA #6317731
Senior Assistant Attorneys General
DEREK OLSON #225504
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Joseph.Platt@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

STATE OF NEW YORK; STATE OF OREGON; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; and STATE OF WISCONSIN;

*Plaintiffs,*

v.

RUSSELL T. VOUGHT, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*; CONSUMER FINANCIAL PROTECTION BUREAU; and BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM;

*Defendants.*

Case No. **6:25-cv-2384**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Supp. RJN Ex. 9**



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Since its inception in the aftermath of the 2008 financial crisis, the Consumer Financial Protection Bureau ("CFPB") has, by statutory command from Congress, aided the Plaintiffs in their zealous advocacy for and protection of consumers in their respective jurisdictions.

2. Among CFPB's many important directives are the maintenance of a multifaceted consumer response system mandated by the Dodd-Frank Act, as well as ensuring the compilation of public data on home loans as required by the Home Mortgage Disclosure Act. Both of these statutorily mandated programs provide the Plaintiffs with valuable assistance in their efforts to combat consumer fraud and discriminatory lending practices, monitor consumer and homeowner trends in their states, and open and pursue investigations into potential violations of state and federal consumer protection laws.

3. To carry out the CFPB's mission, Congress has directed that the Board of Governors of the Federal Reserve System (the "Board of Governors") shall transfer to the CFPB, "from the combined earnings of the Federal Reserve System, the amount determined by the [CFPB's] Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau." 12 U.S.C. § 5497(a)(1). The Board of Governors and—until recently—CFPB's Directors have consistently complied with this provision on the understanding that the CFPB's funding comes from *gross revenues* generated by the Federal Reserve System (the "Federal Reserve").

4. Since his appointment to the CFPB as Acting Director on February 7, 2025, Defendant Russell T. Vought has worked tirelessly to terminate the CFPB's operations by any means necessary—denying Plaintiffs access to CFPB resources to which they are statutorily entitled. In this action, Plaintiffs challenge Defendant Vought's most recent effort to do so.

5. In a reversal of the position the CFPB and Board of Governors have held for more than a decade, Defendant Vought, and through him the CFPB, now take the position that the



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Federal Reserve's "combined earnings," from which CFPB's funding flows, are limited to the Federal Reserve's "profits" rather than its gross revenue. Thus, according to Defendant Vought, when the Federal Reserve is not "profitable," there is no money available for the Federal Reserve to transfer to the CFPB. Defendant Vought has thus determined both that he (i) *cannot* legally request funding from the Federal Reserve when its interest expenses exceed its interest income and (ii) *will not* request funding from the Federal Reserve, because the Federal Reserve's interest expenses currently exceed its income. These two decisions (collectively, the "Challenged Decisions") make it all but certain that the CFPB will run out of funding completely in January 2026.

6. Because the Challenged Decisions are contrary to Congressional mandates, they violate the Administrative Procedure Act ("APA") and the United States Constitution.

7. An inoperable CFPB will immediately harm the Plaintiffs, which will lose statutorily guaranteed access to data and systems that each Plaintiff State uses to further their own regulatory goals and protection of their citizens.

8. For the reasons set forth in this Complaint, Plaintiffs are entitled to judgment that declares unlawful, sets aside, and enjoins the Challenged Decisions.

## JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

10. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. The State of Oregon, including the Oregon Department of Justice, resides in Marion County, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Marion County and the District of Oregon.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## PARTIES

### A. Plaintiffs

11. Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

12. Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

13. Plaintiff the State of New Jersey, represented by and through its Attorney General Matthew J. Platkin, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

14. Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

15. Plaintiff the State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta. The Attorney General is the chief legal representative of the state and is authorized to pursue this action by California State Constitution, article V, section 13.

16. Plaintiff the State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state of the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3).

17. Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

18. Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

19. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

20. Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

21. Plaintiff the State of Illinois, represented by and through its Attorney General. Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

22. Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

23. Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

24. Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

25. Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

26. Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

27. Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

28. Plaintiff the State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez. The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

29. Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

30. Plaintiff the State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

31. Plaintiff the State of Vermont, represented by and through its Attorney General, Charity R. Clark, is a sovereign state of the United States of America. The Vermont Attorney General is authorized to act on behalf of the State in this matter. *See* 7 V.S.A. § 152.

32. Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

**B. Defendants**

33. Defendant Russell T. Vought is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

34. Defendant the Consumer Financial Protection Bureau is an agency of the United States.

35. Defendant the Board of Governors of the Federal Reserve System is the governing body of the Federal Reserve System and is an agency of the United States comprised of seven members serving staggered 14-year terms who are nominated by the President and confirmed by the Senate. The Board of Governors is named solely for purposes of declaratory relief pursuant to Plaintiffs' sixth cause of action.

## ALLEGATIONS

**A. The CFPB's Mandate and Partnership with the States**

36. In 2008, the United States mortgage market collapsed, resulting in the most severe financial recession since the Great Depression. More than $10 trillion in American household wealth was wiped out. Millions of Americans lost their jobs, their life savings, their retirements, and their homes. Assessing the fallout, Congress concluded that one of the major causes of the collapse was the failure of fragmented federal banking regulators to address significant consumer protection issues that undermined the safety and soundness of the banking system. In response, Congress enacted the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1955 (2010), which created the CFPB as the first federal financial regulator with a primary consumer protection mandate.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

37. Congress tasked the CFPB with the administration of 18 federal consumer protection statutes and "charged the Bureau with enforcing consumer financial protection laws to ensure . . . 'that markets for consumer financial products and services are fair, transparent, and competitive.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)). To fulfill this mandate, Congress provided the CFPB with supervisory, enforcement, and rulemaking authorities. To date, the CFPB has returned more than $21 billion improperly taken from over 205 million Americans.

38. The Dodd-Frank Act also tasks the CFPB with non-discretionary obligations to provide the States with information, resources, and coordination in carrying out consumer protection work. Of paramount importance to the States, as described below, is the CFPB's statutory obligation to maintain a consumer complaint response system and to "share consumer complaint information with . . . State agencies." 12 U.S.C. § 5493(b)(3)(D). Similarly, the CFPB is also responsible for administering the collection of demographic and geographic lending data under the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, on which States and regulators rely to identify inequitable or discriminatory lending patterns.

39. The Dodd-Frank Act also requires the CFPB to "issue a notice of proposed rulemaking whenever a majority of the States has enacted a resolution in support of the establishment or modification of a consumer protection regulation by the Bureau." 12 U.S.C. § 5551(c)(1).

40. Congress also provided the CFPB with statutory responsibilities to carry out critical functions necessary for the functioning of a safe consumer marketplace and on which the Plaintiffs rely, which no other federal agency is authorized to perform. For example, the CFPB is the only federal agency authorized to supervise the nation's largest banks for their compliance with the federal consumer financial protection laws. 12 U.S.C. § 5515(b)(1)(A). Additionally, the CFPB is responsible for the weekly publication of the benchmark mortgage interest calculation called the Average Prime Offer Rates (APOR). *See* 12 C.F.R. § 1026.35(a)(2). APOR data is necessary for



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

lenders to comply with ability-to-pay rules in setting interest rates, the loss of which would be catastrophic to the market and to Plaintiffs' residents. Key regulatory frameworks that govern lender compliance obligations are written relative to APOR and will be impossible to comply with absent APOR data, resulting in regulatory chaos. *See*, *e.g.*, *id.* § 1026.35(a)(1).

41. The Dodd-Frank Act also provides the States with authorities to enforce various federal consumer financial laws, thereby facilitating cooperative state and federal consumer protection work. *See* 12 U.S.C. § 5552(a). And the CFPB has been a critical partner to the States as the States have performed their many consumer-protection functions. The States have relied on the CFPB's use of its resources and authorities in jointly carrying out consumer protection work, resulting in efficiencies, cost savings, and improved outcomes for consumers.

**B. The CFPB's Funding Structure**

42. The Dodd-Frank Act provides the CFPB with a permanent and sufficient funding source outside of the Congressional appropriations process. *See* S. Rep. No. 111-176 at 162-64 (2010) (describing that the Act "will ensure that the Bureau has the funds to perform its mission" and finding that "assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential").

43. The Dodd-Frank Act provides that, subject to a statutory cap and on an annual or quarterly basis, the Federal Reserve "Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

44. Jerome Powell, the Chair of the Federal Reserve, testified to the Senate Committee on Banking, Housing and Urban Affairs earlier this year that the Federal Reserve is required to fund the CFPB even when it is operating at a loss. *The Semiannual Monetary Policy Report to the Congress*: *Hearing Before the S. Comm. on Banking, Housing & Urban Affs.*, 119th Cong. (Feb.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

11, 2025) (testimony of Jerome Powell, Chair, Bd. of Govs. of the Fed. Reserve Sys., at 1:24:50-1:26:02).[1]

45. In 2024, the United States Supreme Court upheld the constitutionality of the CFPB's funding mechanism against a challenge that it violated the Appropriations Clause of the United States Constitution. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024).

46. Following the Supreme Court's decision, and in response to renewed attacks on the CFPB's funding structure, the CFPB consistently maintained, and the courts who considered the issue agreed, that interpreting the definition of combined earnings to mean "net excess earnings" was not the best reading of the statute. *See, e.g.*, Opp. to Mot. Dismiss at 6, *CFPB v. Purpose Fin., Inc.*, No. 7:24-cv-3206 (D.S.C. Oct. 3, 2024), ECF No. 48; Mem. & Recommendation at 9, *Texas v. Colony Ridge, Inc.*, No. H-24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 (recommending that the district court deny defendant's motion to dismiss, among other reasons, because the Supreme Court in *CFPB v. Community Financial Services Ass'n of America, Ltd.*, 601 U.S. 441 (2024), had "found that the CFPB is constitutionally funded" at a time when there were no net excess earnings and thus, under defendant's argument, could not have been constitutionally funded, *see* Order at 3, *CFPB v. SoLo Funds, Inc.*, No. 2:24-cv-4108 (C.D. Cal. Oct. 17, 2024), ECF No. 54 (rejecting defendant's argument that the Federal Reserve's lack of net excess earnings requires dismissal, and finding that it need not interpret the Bureau's funding provision at all because it was not "persuaded . . . that the Bureau's source of funding," even if it were somehow "illegitimate," would be "grounds for dismissal."); *CFPB v. Active Network, LLC*, No. 4:22-cv-00898, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024) (denying a motion to dismiss and summarily dismissing defendant's argument that a Bureau action must be dismissed because the Bureau may draw funds from the Federal Reserve only when it generates net excess earnings).

[1] https://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

47. Similarly, the Congressional Budget Office, in analyzing the One Big Beautiful Bill Act's reduction of the statutory cap for Bureau funding, explained that it expected the Federal Reserve to continue to transfer money to the Bureau, despite its recognition of the Federal Reserve's recent "net losses." *See* Cong. Budget Off., *Reconciliation Recommendations of the House Committee on Financial Services* 4 (May 7, 2025).[2]

**C. Overview of the Federal Reserve System**

48. Established by Congress in 1913, the Federal Reserve is the central bank of the United States and is composed of the Board of Governors, twelve regional Federal Reserve banks ("Reserve Banks"), and the Federal Open Market Committee ("FOMC"). Fed. Reserve Sys., *The Fed Explained: What the Central Bank Does* 2 (11th ed. 2021) (hereinafter "*The Fed Explained*").[3] While "parts of the Federal Reserve System share some characteristics with private-sector entities, the Federal Reserve was established to serve the public interest." *Id.*

49. The Federal Reserve has a dual statutory mandate to promote maximum employment and stable prices, *see* 12 U.S.C. § 225a, and pursues this mandate primarily through its influence on short-term and long-term interest rates. *See The Fed Explained* 24-25. To achieve these aims, Congress structured the Federal Reserve as an independent agency "to ensure that its decisions are based on facts and objective analysis and serve the best interests of all Americans." *Id.* at 22. The Federal Reserve balances this independence with an "obligation for transparency" to ensure that it remains "accountable to Congress and the American people for its actions." *Id.*

50. The Federal Reserve is primarily funded from interest earned on securities it holds, fees for services provided to depository institutions by Reserve Banks, and interest charged on loans. *See generally* 12 U.S.C. §§ 342-361.

51. The Federal Reserve uses this income to pay "necessary expenses," *see id.* § 289(a)(1)(A), including operating expenses for the Board of Governors, *id.* § 243, dividends to

---

[2] https://www.cbo.gov/system/files/2025-05/HFS_Reconciliation2025.pdf

[3] https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

member banks, *id.* § 289(a)(1), payments to credit surplus accounts at each Reserve Bank, *id.* § 289(a)(2), and the funds transferred to the CFPB under 12 U.S.C. § 5497(a). Any remaining funds are transferred to the general fund of the Department of the Treasury. *Id.* § 289(a)(3)(B); *id.* § 290.

52. Reserve Banks also pay "earnings on balances," or interest payments, on balances maintained by or on behalf of depository institutions at the Reserve Banks at rates set by the Federal Reserve. *Id.* § 461(b)(12).

53. When the Federal Reserve's total expenditures exceed its income, the Federal Reserve stops remitting funds to Treasury, and instead records a "deferred asset" on its balance sheet, which represents "the amount of future net earnings to be realized before remittances to Treasury resume." Fed. Reserve Bank of N.Y., *Open Market Operations During 2024* 32 (2025) (hereinafter "*2024 Open Market Operations*").[4] This tends to occur during periods of tighter monetary policy, when the Federal Reserve increases interest rates to control rising prices, because Reserve Banks must immediately pay increased interest payments to depository institutions while the Reserve Banks' long-term securities continue to generate returns at lower interest rates. Miguel Faria-e-Castro & Samuel Jordan-Wood, *The Fed's Remittances to the Treasury: Explaining the 'Deferred Asset'*, Fed. Reserve Bank of St. Louis: On the Economy Blog (Nov. 21, 2023).[5] When the Federal Reserve's income once again exceeds its expenditures, "the deferred asset will be reduced and eventually extinguished," and remittances to Treasury will resume. *2024 Open Market Operations* 32.

54. To reduce rising inflation in the aftermath of the COVID-19 pandemic, the Federal Reserve raised interest rates, and as a result, in September 2022, most Reserve Banks stopped remitting funds to Treasury and began recording a deferred asset on their balance sheets. Fed.

[4] https://www.newyorkfed.org/medialibrary/media/markets/omo/omo2024-pdf.pdf

[5] https://www.stlouisfed.org/on-the-economy/2023/nov/fed-remittances-treasury-explaining-deferred-asset



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Reserve Bank of N.Y., *Open Market Operations During 2022* 19 (2023) (hereinafter "*2022 Open Market Operations*").[6]

55. At the end of 2024, the cumulative deferred asset for all Reserve Banks was approximately $216 billion, *see* Fed. Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* 3 (2025) (hereinafter "*2024 Financial Statements*"),[7] and it continued to increase for most of 2025. However, in recent weeks, the size of the deferred asset has started to decrease, from $243.8 billion as of November 5, 2025, to $242.7 billion as of December 17, 2025. *Compare Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, Bd. of Govs. of the Fed. Reserve Sys.: Data (Nov. 6, 2025, at 16:30 ET) (listing the cumulative deferred asset amount as $243.818 billion in table 6 under the label "Earnings remittances due to the U.S. Treasury"),[8] *with Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, Bd. of Govs. of the Fed. Reserve Sys.: Data (Dec. 18, 2025, at 16:30 ET) (listing the cumulative deferred asset amount as $242.728 billion in table 6 under the label "Earnings remittances due to the U.S. Treasury");[9] *see also* Michael S. Derby, *Fed Data Suggests Central Bank Has Stopped Losing Money*, Reuters (Dec. 3, 2025, at 16:30 UTC).[10]

56. Critically, the existence and size of the deferred asset "has no effect on the ability of the Federal Reserve to implement monetary policy or meet any of its financial obligations." *2024 Open Market Operations* at 32. As recognized in the 2022 report to the FOMC, "income is not a policy objective for the FOMC, but rather an outcome of conducting policy to achieve its employment and price stability objectives." *2022 Open Market Operations* 34; *see also* Seth Carpenter et al., *The Federal Reserve's Balance Sheet and Earnings: A Primer and Projections*,

[6] https://www.newyorkfed.org/medialibrary/media/markets/omo/omo2022-pdf.pdf

[7] https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2024.pdf

[8] https://www.federalreserve.gov/releases/h41/20251106/

[9] https://www.federalreserve.gov/releases/h41/20251218/

[10] https://www.reuters.com/business/fed-data-suggests-central-bank-has-stopped-losing-money-2025-12-03/



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

11 Int'l J. Central Banking 237, 270 (2015) ("[A] central bank differs from a private corporation in that its objective is not profit maximization . . . and it can therefore operate with negative equity.").

57. The Federal Reserve does not use the kinds of accounting procedures and terminology that private sector banks use. Because the Federal Reserve's actions are driven by public policy goals—like economic stability—rather than an attempt to produce a profit for shareholders, the Federal Reserve has created its own "specialized accounting principles" specific to "the nature and function of a central bank." *See Federal Reserve System Audited Annual Financial Statements*, Bd. of Govs. of the Fed. Reserve Sys.: About the Fed (Mar. 21, 2025).[11]

58. Consistent with the Federal Reserve's unique responsibilities described above, a group of former Federal Reserve employees, spanning functions such as legal, operations, consumer affairs, and members of the Board of Governors, recently expressed their collective view that, among other things, because "[n]either the Board of Governors nor the [Federal] Reserve Banks are profit-maximizing private enterprises," a "lack of 'profits' does not prevent the Federal Reserve from continuing to meet any of its obligations, including the obligation to make requested transfers to the CFPB under the terms of 12 U.S.C. § 5497(a)." Brief of *Amici Curiae* Former Federal Reserve Officials in Support of Plaintiff's Motion to Clarify 7, 10, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C.), ECF No. 162.

**D. The Consumer Response System**

59. As required by the Dodd-Frank Act, the CFPB has created and maintained a system for collecting, tracking, sharing, and facilitating responses to consumer complaints across the spectrum of consumer financial products (the "Consumer Response System"). The Consumer Response System includes, among other things, a statutorily required database of consumer complaints, 12 U.S.C. § 5493(b)(3)(A), statutorily required "procedures to provide a timely

[11] https://www.federalreserve.gov/aboutthefed/audited-annual-financial-statements.htm



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

response to consumers," *id.* § 5534(a), and statutorily required data sharing to States and other entities, *id.* § 5493(b)(3)(D).

60. According to its 2024 Consumer Response Annual Report, the CFPB received over 3 million complaints via the statutorily mandated portal in 2024. Consumer Fin. Prot. Bureau, *Consumer Response Annual Report 2024* (May 2025).[12] This includes 317,668 complaints from consumers in California; 208,305 complaints from consumers in New York; 115,158 complaints from consumers in New Jersey; 25,161 complaints from consumers in Connecticut; 19,082 complaints from consumers in Colorado; 83,033 complaints from consumers in Maryland; 20,226 complaints from consumers in Wisconsin; and 8,822 complaints from consumers in Oregon. *Id.* at 89-92. Despite a freeze on the CFPB's outreach to consumers, it has received over 5.3 million complaints in 2025 per the publicly searchable version of the database. Consumer Complaint Database (last updated Dec. 19, 2025) (filtered to complaints received between 1/1/2025 – 12/19/2025).[13] And the CFPB has received more complaint information on the Government Portal, which is limited to law enforcement and includes consumer contact information, company responses, and attachments. Many consumers submit attachments with documentation in support of their complaints to the CFPB complaint database.

61. Covered persons subject to supervision and enforcement by the CFPB are required to file a timely response to consumer complaints that come in through this system. 12 U.S.C. § 5534(b). According to the CFPB's 2024 Consumer Response Annual Report, companies reported providing monetary relief totaling over $90 million directly to consumers in response to complaints in 2024. This includes over $21 million to consumers in California, $8.5 million to consumers in New York, $3.2 million to consumers in New Jersey, $1.8 million to consumers in Colorado, $1.1 million to consumers in Connecticut, $1.7 million to consumers in Maryland,

[12] https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2025-05.pdf

[13] https://www.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&date_received_max=2025-12-19&date_received_min=2025-01-01&lens=Product&searchField=all&subLens=sub_product&tab=Trends



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

$370,000 to consumers in Wisconsin, and $710,000 to consumers in Oregon. *Consumer Response Annual Report 2024 supra* n. 12, at 93-96

62. State agencies—after executing an agreement with the CFPB that, among other things, affirms that they will protect consumer personal identifying information—are given access to consumers' complaints and contact information, the company's response, and any attachments provided by the consumer or company.

63. As required by 12 U.S.C. § 5493(b)(3)(D), the CFPB has shared consumer complaint information with the States, which in turn have used such access to support investigations and litigation, to spot and monitor trends, and to explore opportunities for coordinated multi-state investigations and litigation. Plaintiffs' staff with access to the Consumer Response System use it to identify harms to consumers and locate investigation and litigation witnesses.

64. Unlike other complaint systems, the CFPB Consumer Response System requires certain covered persons to respond to the consumer complaints. States make regular use of the company complaint responses, which can include explanations of the companies' behavior or admissions of wrongdoing.

65. States have also regularly referred thousands of residents to the CFPB's Consumer Response System for a variety of reasons, including when the CFPB had a track record for being able to quickly connect consumers with relevant providers (such as education lenders, mortgage originators, or servicing companies).

66. For example, New Jersey has relied on hundreds of CFPB consumer complaints in multiple successful enforcement actions that recovered tens of millions on behalf of consumers. New Jersey's consumer protection agencies also receive quarterly reports from CFPB of those companies that have been the subject of consumer complaints to CFPB. The New Jersey Office of Consumer Protection utilizes the reports to determine areas of investigative interest and focus its resources on New Jersey based companies.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

67. New York relies on the hundreds of thousands of consumer complaints made by New York residents to the CFPB to open and conduct investigations, support litigation, and engage in other consumer protection work.

68. Minnesota relies on the Consumer Response System when conducting consumer protection investigations and supporting litigation. This database provides invaluable information such as complaints submitted by Minnesota consumers, responses to those complaints made by our investigative targets and defendants, and additional evidence consumers submit to the CFPB. This information helps Minnesota connect with and learn from complainants, who might not otherwise be reachable. The consumer complaints also inform which targets Minnesota will pursue and the claims brought against those targets.

69. California also uses the CFPB complaint portal as a source of intelligence to support consumer protection law enforcement investigations and resulting enforcement actions. The information in the portal complements other sources of information, helps identify victims and witnesses, and aids in identifying and understanding business practices that may violate state or federal law.

70. Maryland's Consumer Protection Division uses the CFPB database to identify financial products that may violate Maryland law and to identify the frequency and severity of companies engaging with such products. Maryland also relies on the database to identify Maryland consumers who can assist during investigations by providing more detail and documentation of their experience.

71. Arizona uses the system to search for complaints about particular conduct or particular entities. This system and its search capabilities have been very beneficial to some of Arizona's most successful consumer protection cases, and Arizona may not have been able to obtain the same information from other sources.

72. Massachusetts uses data available through the Consumer Response System to support its ongoing consumer protection work. Consumer complaints and supporting documents



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

maintained by the CFPB's Consumer Response System provide important information that aids in ongoing investigations and consumer protection efforts. Massachusetts also uses the Consumer Response System to help assess and respond to complaints that have been filed with the Massachusetts Attorney General's Office and the CFPB and to forward complaints to the CFPB.

73. Illinois also uses complaint data from the CFPB's consumer complaints database to investigate potential violations of Illinois and federal consumer protection laws. In particular, Illinois relies on the CFPB's complaint database over other sources of consumer complaint information because the search functions of the CFPB's database are more flexible and sophisticated.

74. Wisconsin's Department of Financial Institutions ("WDFI") uses the CFPB's consumer complaints database on a daily basis to carry out its regulatory responsibilities. Among other things, WDFI relies on the database to obtain information about companies subject to consumer complaints; to assess whether a complaint fits with a pattern or history of conduct; and to determine whether to refer a complaint.

75. Colorado uses the CFPB complaint portal as a valuable source of information for consumer protection enforcement cases and to prioritize its limited supervision resources.

76. From 2023 to 2024, Oregon saw a 51% increase in complaint volume to the CFPB Consumer Response System. State agencies in Oregon routinely review data and information made available through the Consumer Response System to assess consumer complaints, identify trends warranting further inquiry, and investigate potential violations of federal and state law. In addition, Oregon state agencies direct consumers to the Consumer Response System when they have complaints, because many times the fact of entering a complaint and getting a response can resolve a consumer's issue, saving state resources.

77. Many of the Plaintiffs are currently using the CFPB's consumer complaint database to support ongoing inquiries, investigations, and litigation. Losing access to the database will prejudice those Plaintiffs in these active matters by depriving the Plaintiffs of a tool that Congress



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

created on which they are presently relying. For example, many Plaintiffs are currently conducting investigations that originated in part from complaint information derived from the CFPB consumer complaint database and consumer complaint information remains relevant to the matters. Many Plaintiffs are also using CFPB complaint data in other active inquiries and investigations. Moreover, many Plaintiffs are engaged in active litigation in which CFPB consumer complaint data was used in drafting the complaints, thereby remaining relevant to the actions.

**E. The Home Mortgage Disclosure Act Database**

78. Several Plaintiffs also rely on Home Mortgage Disclosure Act ("HMDA") data maintained by CFPB to support a range of ongoing investigations and enforcement actions.

79. Congress enacted HMDA in 1975 in response to its findings that "some depository institutions have sometimes contributed to the decline of certain geographic areas by their failure pursuant to their chartering responsibilities to provide adequate home financing to qualified applicants on reasonable terms and conditions." Pub L. 94-200, § 301, 89 Stat. 1124, 1125 (1975) (codified at 12 U.S.C. § 2801(a)). To rectify this failure, HMDA was intended "to provide the citizens and public officials of the United States with sufficient information to enable them to determine whether depository institutions are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located and to assist public officials in their determination of the distribution of public sector investments in a manner designed to improve the private investment environment." *Id.* § 2801(b). Under HMDA, Congress requires "depository institutions" to maintain and make available to the public information regarding home improvement and residential mortgage loans. *See id.* § 2803.

80. Congress amended HMDA in 1988 and 1989 to "expand[] the coverage of depository and nondepository institutions, require[] transaction-level disclosure of applications and loans, and add[] new reporting requirements regarding the applicant's or borrower's race,



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

gender, and income." Consumer Fin. Prot. Bureau, *Report on the Home Mortgage Disclosure Act Rule Voluntary Review* 22 (2023).[14]

81. Recognizing the need for increased public availability of mortgage data in light of the 2008 mortgage market collapse, Congress again amended HMDA and transferred its rulemaking authority and other functions from the Federal Reserve to the CFPB when it passed the Dodd-Frank Act. *Id.* at 23 n.53 (identifying the relevant portions of the Dodd-Frank Act); *see also* 12 U.S.C. § 5512 (transferring rulemaking authority to the Bureau); *id.* § 5581(b)(1) (transferring consumer financial protections function from the Board of Governors to the CFPB); *id.* § 2803 (amending HMDA to expand the scope of information that institutions must collect and report).

82. The CFPB is now empowered to "prescribe such regulations as may be necessary to carry out the purposes" of the statute, 12 U.S.C. § 2804(a), and has "principal authority to examine and enforce compliance" with HMDA. *Id.* § 2804(d). The public data required by HMDA is compiled by the Federal Financial Institutions Examination Council (FFIEC), an interagency body composed of five different federal financial regulators, including the CFPB. *Id.* § 2809(a). The CFPB is statutorily required to "provide staff and data processing resources to the [FFIEC] to carry out" its compilation requirements. *Id.* § 2809(b). The data from 2017 onward is available online on the HMDA Platform, a website created and maintained by the CFPB. *The Home Mortgage Disclosure Act*, CFPB: FFIEC, https://ffiec.cfpb.gov/ (last visited Dec. 17, 2025).

83. Several Plaintiffs have used and are currently using the HMDA data that CFPB staff compile to support ongoing investigations and litigation. Losing access to the data will prejudice the Plaintiffs by depriving Plaintiffs of a tool on which they are presently relying. For example, Plaintiff New Jersey's Division of Civil Rights uses the data as an essential tool in identifying lenders that lend far less to minorities and those in minority areas than their competitors. Plaintiff Michigan's Department of Civil Rights ("MDCR") Housing Investigators

[14] https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-review_2023-03.pdf.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

use HMDA data for comparative information necessary to carry out an investigation. Plaintiff Maryland's Civil Rights Division uses HMDA data to identify potential race discrimination in mortgage lending and to develop evidence necessary to initiate and pursue an investigation of a Maryland Bank. Maryland plans to continue to reference HMDA data to identify additional lending institutions that may have discriminatory practices.

**F. The Trump Administration's Early Efforts to Shut Down the CFPB**

84. On February 7, 2025, Defendant Vought was appointed by President Trump as Acting Director of the CFPB and immediately moved to dismantle the agency. That day, Elon Musk—who, as a "Special Government Employee," was assisting Defendant Vought's efforts to shut down the CFPB—posted a tombstone emoji and the words "CFPB RIP" on his social media site X.[15]

85. On February 8, 2025, Defendant Vought sent a letter to the Federal Reserve Chair Jerome Powell requesting $0 to fund the CFPB's operations for the third quarter of fiscal year 2025, stating that the CFPB would rely on its reserve fund to fund its operations for that period. Defendant Vought said that he was requesting $0 because the CFPB's "funds are more than sufficient" to carry out the CFPB's authorities.[16] Defendant Vought did not suggest that he was legally barred from seeking funding. Indeed, although the Federal Reserve was not running a profit at the date of his letter, Defendant Vought reiterated that the Dodd-Frank Act "requires . . . the Federal Reserve System to transfer each quarter an 'amount determined by the Director to be reasonably necessary'" for the CFPB's operations.

[15] Elon Musk (@elonmusk), X (Feb. 7, 2025, at 16:41 ET), https://x.com/elonmusk/status/1887979940269666769.

[16] Letter from Russell Vought, Acting Dir., CFPB, to Jerome Powell, Chair, Bd. of Govs. of the Fed. Reserve Sys. (Feb. 8, 2025), https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-to-cfpb_2025-02.pdf.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

86. On February 10, Defendant Vought sent an email to all CFPB staff ordering them to "stand down from performing any work task."[17] He set up a "tip line" for the public to report "being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order."[18] In accordance with Defendant Vought's orders, CFPB personnel stopped performing the CFPB's statutorily required functions.

87. On February 10, 2025, when asked by a reporter about the efforts to eliminate the CFPB, President Trump referred to the agency in the past tense, stating that "we did the right thing" and "that was a very important thing to get rid of."[19]

88. Defendant Vought then moved to fire nearly the entire CFPB workforce. After firing approximately 85 CFPB probationary employees and 130 term employees on February 11 and 13, 2025, Defendant Vought moved to fire nearly all the agency's approximately 1,200 remaining employees on February 14. Defendant Vought's plan was to have a skeleton staff of CFPB personnel finish winding down the agency and then fire remaining staff in another round of layoffs. The plan, allegedly in the words of one of Defendant Vought's senior executives, was to turn the CFPB into a "room . . . with five men and a phone in it."[20]

89. Before Defendant Vought could finalize his plan to fire the 1,200 CFPB employees by end of day on February 14, 2025, a CFPB employee union and other plaintiffs sued for a temporary restraining order (TRO). On February 14, the U.S. District Court for the District of Columbia held a hearing on the TRO application at which the court suggested, and the parties

---

[17] Stacy Cowley, *Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau*, New York Times (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/business/cfpb-shutdown-confusion.html.

[18] CFPB Tipline (@cfpb_tipline), X, https://x.com/CFPB_tipline.

[19] White House Rapid Response (@RapidResponse47), X (Feb. 10, 2025, at 18:48 ET), https://x.com/RapidResponse47/status/1889099138941235509.

[20] Declaration of Drew Doe, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 38-5 ¶ 10 (D.D.C. Feb 7, 2025); Hugh Son, *Trump Administration, Musk's DOGE Plan to Fire Nearly All CFPB Staff and Wind Down Agency, Employees Say*, CNBC (Feb. 28, 2025), https://www.cnbc.com/2025/02/28/cfpb-leaders-and-elon-musk-doge-planned-to-fire-nearly-all-staff.html.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

agreed, to enter into a consent order pausing the firings and dismantling of the agency while the district court decided whether to enter a preliminary injunction.

90. The district court entered a preliminary injunction on March 28, 2025, enjoining Defendant Vought from taking further action to dismantle the CFPB. The district court found that Defendant Vought "engaged in a hurried effort to dismantle and disable the agency entirely," and that defendants' representations to the court were "so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything." *Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 11 & 57 (D.D.C.), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025).

91. In entering the preliminary injunction, the district court expressed particular concern about injuries caused by the "shutdown of the statutorily required consumer complaint system," which the court found to be "the heartbeat of the agency subscribed to by more than 70 stakeholders, Members of Congress, state regulators, and the only existing means within the federal government to resolve the over 350,000 consumer complaints per year . . . ." *Id.* at 71. The court found that if Defendant Vought succeeded in terminating the contracts that supported the consumer complaint database the system would "collapse," and that the plaintiff consumer groups who rely on the Consumer Response System to facilitate their work would suffer irreparable harm. *Id.* at 79.

92. The CFPB's Consumer Response System did, in fact, suffer degradation and harm which, but for the district court's intervention and injunction, would have been irreparable. All contracts for the companies that managed the maintenance and functionality of the Consumer Response System were cancelled.[21] Activities to monitor and safeguard the system to prevent bad

[21] *See* Declaration of Erie Meyer, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 25 (D.D.C. Feb 14, 2025).



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

actors from misusing it stopped.[22] Contracts for virus scanning software were terminated.[23] As a result of this lack of maintenance, the Consumer Response System began to crash and break down.

93. The breakdown of the Consumer Response System caused harm to the Plaintiffs during the period prior to the entry of the district court's injunction. The contracts necessary for "enabling consumer complaint information to be shared with the public and with states" were cancelled.[24] Complaints referred by Plaintiffs to the CFPB were not reviewed and sent to companies because doing so requires manual intervention by CFPB staff.[25] Any complaints involving the Plaintiffs' residents that would have normally been escalated to the CFPB's Consumer Response's Escalated Case Management Team—including those related to imminent foreclosures or consumers who may be a risk to others or to themselves—were not addressed.[26] And many complaints from Plaintiffs' residents made to the CFPB during this time went into a backlog of tens of thousands of complaints.[27]

94. On August 15, 2025, a divided panel of the United States Court of Appeals for the District of Columbia Circuit vacated the district court's preliminary injunction but stayed the issuance of the mandate during the plaintiff's application for *en banc* review. On December 17, 2025, the full United States Court of Appeals for the District of Columbia Circuit granted the plaintiffs' application for *en banc* review and vacated the panel's August 15 judgment. Oral argument before the full Court of Appeals sitting *en banc* is currently scheduled for February 24, 2026.

[22] *See* Declaration of Matthew Pfaff, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 26 (D.D.C. Feb 27, 2025).

[23] *See id.* ¶ 30.

[24] *See* Declaration of Charlie Doe, *Nat'l Treasury Emps. Union v. Vought*, No. No. 1:25-cv-00381-ABJ, ECF No. 38-4 ¶ 5 (D.D.C. Feb 27, 2025).

[25] *See* Declaration of Matthew Pfaff, *Nat'l Treasury Emps. Union v. Vought*, No. No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 12 (D.D.C. Feb 27, 2025).

[26] *See id.* ¶ 19.

[27] *See id.* ¶ 30.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

95. Notwithstanding the district court's injunction remaining in effect pending the resolution of the *en banc* petition, Defendant Vought stated in an October 15, 2025 interview that his team was working to "close down the agency" and estimated that he would "be successful probably within the next two or three months."[28] That timeline aligns with the early-2026 date on which the CFPB states that it expects to run out of funding.

**G. The Challenged Decisions—Defendant Vought's Most Recent Attempt to Shut Down the CFPB**

96. Opening another front in his effort to unlawfully close the CFPB, Defendant Vought has now decided to starve the agency of funds based on the implausible proposition that Congress, in enacting the Dodd-Frank Act, intended for the CFPB to periodically shut down whenever the Federal Reserve's interest expenses exceeded its interest income. That argument cannot be squared with the text or the structure of the CFPB's statutory funding provisions and thus neither can the Challenged Decisions.

97. On November 20, 2025, Defendant Vought wrote to President Trump and the Chair of the Senate Committee on Appropriations to provide CFPB's report required by 12 U.S.C. § 5497(e)(1)(B). In that report, Defendant Vought admitted that, at the very least, CFPB's "'funding need' for Fiscal Year 2026 is $279,566,358.82." Attached as Exhibit A. But Defendant Vought stated that the normal mechanism for obtaining funding for CFPB—a request from CFPB to the Board of Governors for funding from the "combined earnings" of the Federal Reserve pursuant to 12 U.S.C. § 5497(a)(1)—was insufficient to cover CFPB's funding requirements. *Id.*

98. This was because, as stated in the report, Defendant Vought has determined that "the amount currently available for [CFPB] to request" from the Federal Reserve "is legally $0." In support of this conclusion, Defendant Vought cited an Office of Legal Counsel ("OLC") memorandum "conclud[ing] that the Federal Reserve System has no combined earnings from

[28] Nandita Bose, Doina Chiacu & Douglas Gillison, *White House Budget Director Plans to Shut US Consumer Finance Watchdog Within Months*, Reuters (Oct. 15, 2025), https://www.reuters.com/business/world-at-work/white-house-budget-director-vought-says-over-10000-federal-workers-could-be-laid-2025-10-15/.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

which the Bureau can legally request funds at this time." *Id.* That is, Defendant Vought determined that he, as Acting Director, cannot request funds from the Federal Reserve at any time when its interest expenses exceed its interest income.

99. OLC's memorandum, dated November 7, 2025, is attached as Exhibit B to this Complaint. That memorandum was requested by Defendant Vought, who "informed [OLC] that, upon further consideration . . . [t]he CFPB now believes its source of funding—the combined earnings of the Federal Reserve—has been exhausted." *Id.* at 9.

100. OLC's strained interpretation of "combined earnings" is legally erroneous. It is contrary to the plain meaning of the term, inconsistent with structure of the Dodd-Frank Act and Congressional intent, at odds with the statutory purpose of the Federal Reserve, and based on illogical inferences.

101. For example, OLC quotes the secondary definition of "earnings" from *Merriam-Webster* ("the balance of revenue after deduction of costs and expenses") while ignoring the primary definition: "something (such as wages) earned."[29] The same dictionary defines "earned" as "to receive as return for effort and especially for work done or services rendered."[30] The two main funding streams for the Federal Reserve—interest and the provision of professional expertise—are income streams flowing from "services rendered" and form the basis for calculation of "combined earnings."

102. Indeed, the Dodd-Frank Act clearly uses the term "earnings" to refer specifically to income elsewhere in the text. *See, e.g.*, Pub. L. No. 111-203, 124 Stat. 1506 (defining "proceeds" to mean, among other things, "interest and other earnings from investments"); *id.* at 1743 ("the amount of earnings on investments of amounts in the Fund during the preceding fiscal year"); *id.* at 1812 (authorizing Federal Reserve Banks to "pay earnings on balances maintained by or on

---

[29] *Earnings*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earnings (last visited Dec. 17, 2025).

[30] *Earned*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earned (last visited Dec. 17, 2025).



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

behalf of a designated financial market utility in the same manner and to the same extent as the Federal Reserve Bank may pay earnings to a depository institution under the Federal Reserve Act").

103. OLC's definition of "combined earnings" also relies on a complicated inferential chain to argue that "earnings" is total income minus *interest* expenses, but not *operating* expenses. But nothing in the OLC memo suggests that either the plain meaning or any agreed-on technical meaning of "combined earnings" is the difference between total income and a certain *type* of expense.

104. OLC's conclusion regarding the meaning of "combined earnings" is also at odds with the Federal Reserve's unique responsibility for setting monetary policy and its dual mandate to maximize employment and stabilize prices, not turn profits. Defining "combined earnings" as profits directly constrains the Federal Reserve's independence by attaching draconian consequences to the tools used by the Federal Reserve to set monetary policy. As explained above, net interest losses are a predictable consequence of the Federal Reserve's decision to increase interest rates, and the recording of a deferred asset to reflect these losses does not affect the Federal Reserve's ability "to implement monetary policy or meet any of its financial obligations." *2024 Open Market Operations* at 32. Yet under OLC's interpretation, the Federal Reserve's decision to tighten monetary policy for a sustained period in response to rising inflation would effectively shut down the CFPB's operations, an agency that the Federal Reserve collaborates with to promote consumer protection aims.

105. Defendant Vought's and CFPB's unreasonable reliance on an unreasonable and unlawful interpretation of "combined earnings" in making the Challenged Decisions puts the CFPB at risk of losing all of its funding as early as January 2026.

**H. Plaintiffs Will Be Harmed as a Result of the CFPB Being Defunded**

106. The Plaintiffs will be injured if Defendant Vought engineers a CFPB shutdown by unlawfully refusing to request operating funds from the Federal Reserve. The failure to request



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

funding will cripple or entirely shut down the CFPB's Consumer Response System to Plaintiffs' detriment. Much of the damage will be irreversible.

107. Should Defendant Vought succeed in starving the CFPB of funding, consumers will be unable to make complaints in the CFPB's Consumer Response System. The CFPB uses a cloud-based service provider to facilitate complaint processing and must pay the service provider a fee that scales with the number of consumers making complaints. CFPB's inability to pay the cloud-based service provider will cause the system to shut down and consumers will be unable to lodge complaints. Plaintiffs will lose a critical source of information that is necessary for conducting investigations, supporting litigations, monitoring the marketplace, and assisting harmed consumers, to which they are *statutorily entitled*. The Plaintiffs' ongoing investigations and litigations will be impaired.

108. Many Plaintiffs will also lose access to material information regarding millions of consumer complaints in the database, including company responses to consumer complaints documentation provided by consumers and companies, that are already in CFPB's consumer complaint database. Some of this information concerns subjects of active litigations and confidential investigations by the Plaintiffs. In addition, many complaints that would have come in during the indefinite funding lapse will not come in later because it is highly unlikely that frustrated consumers will re-attempt to lodge the complaints in a system that does not appear to work. *See* Jean-Charles Chebat, Moshe Davidow & Isabelle Codjovi, *Silent Voices: Why Some Dissatisfied Consumers Fail to Complain*, 7 J. Serv. Rsch. 328, 328 (2005) (citing Steve Downton, *Measurements to Achieve Customer Focus* (2002)).[31] States will lose the ability to use CFPB complaints and company responses that would have come in absent the shutdown to monitor trends and open new investigations. Many of Plaintiffs' residents make complaints to the CFPB that are not also directly made to Plaintiffs' agencies, and absent a functioning CFPB Consumer Response System the Plaintiffs will not be able to obtain that information.

[31] https://chaireomerdesserres.hec.ca/wp-content/uploads/2020/05/Silent-Voices.pdf



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

109. Even if the system were somehow able to receive new complaints despite a funding termination, certain categories of consumer complaints that require manual routing would not get processed due to the absence of the relevant CFPB staff. For example, complaints about companies that are not yet onboarded onto the consumer complaint database system require staff review to be processed and sent to the companies. Similarly, incomplete consumer complaints or complaints in which consumers misspell the name of the company are not sent to the companies without manual intervention.

110. The Plaintiffs will also suffer harm by being unable to refer complaints from their residents to the CFPB. Presently, the Plaintiffs refer certain complaints from their residents to the CFPB for resolution through a portal that is set up and maintained by the CFPB. For example, from 2023 to the present, New York referred approximately 2,170 consumer complaint intakes to the CFPB. Similarly, since January 1, 2023, Maryland has referred 461 complaints to the CFPB. Using the CFPB's complaint system in this way allows the Plaintiffs to assist their residents in a cost effective manner.

111. Critical consumer complaint data is also at risk of being permanently deleted if the CFPB is not funded. The CFPB relies on cloud-based software companies to maintain much of the consumer complaint data in their cloud storage systems. Much of the data, including the company responses to the consumer complaints and relevant attached documents, is not held anywhere else. The CFPB is obligated to pay the contractors to maintain the data. It is industry practice for contractors to delete government data if they are not permitted to retain that data once they no longer have a contract to perform work that requires it. Contractors also delete data once contracts end pursuant to broadly applicable data retention and deletion protocols. Should consumer complaint information be deleted from these cloud systems the Plaintiffs will be harmed by forever losing key sources of information needed to conduct Plaintiffs' consumer protection work.

112. A lapse in funding also poses a risk of the consumer complaint data being permanently corrupted or manipulated due to the CFPB's inability to monitor the Consumer



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Response System for anomalous data and to respond to bad actors and computer viruses. The CFPB's consumer complaint database is a potential target for hackers, given that it holds the sensitive personal identifying information of millions of consumers, many of whom are Plaintiffs' residents, as well as consumer complaints that allege illegal conduct by third parties. The CFPB performs regular security monitoring to determine if inappropriate access to the system has occurred. Regular maintenance, such as implementing software updates to address security vulnerabilities, is performed by CFPB personnel multiple times per month to keep the Consumer Response System functioning properly. Monitoring also includes generating audit logs when certain types of activity, such as mass downloads, occur. Audit logging systems require active maintenance and trained personnel to review logs and identify anomalies and escalate and respond to issues. Without funding, audit log review stops immediately and escalation of and response to suspicious activity is not possible. And even if funding were restored, the lack of audit activity would make it impossible for the CFPB to reconstruct what occurred and remedy the data corruption. As a result, the Plaintiffs would be harmed by being deprived of reliable consumer complaint data necessary for their consumer protection work.

113. The Plaintiffs would not be able to avoid the harm from the loss of the CFPB's Consumer Response System because no other equivalent nationwide system exists. The Federal Trade Commission's ("FTC") Consumer Sentinel Network, for example, is not a substitute because it does not collect company responses or attachments submitted by consumers and companies, both of which many Plaintiffs find to be valuable in their consumer protection work. The documentation uploaded to the CFPB consumer complaint database by consumers and companies can be relevant to ascertaining whether a consumer complaint is credible and worth devoting Plaintiffs' resources to investigating. Moreover, the Sentinel Network relies heavily on complaints provided through the CFPB's complaint system that are forwarded to the FTC. Thus, any interruption in the ability of CFPB to receive and process consumer responses will necessarily undermine Plaintiffs' ability to utilize the Sentinel Network to access complaint information. And



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

it would be enormously costly, and in any event not feasible, for the Plaintiffs to attempt to replicate the functionalities of the CFPB's nationwide Consumer Response System.

114. Several Plaintiffs would also be harmed by losing access to HMDA data that the CFPB collects and publishes. Those Plaintiffs use HMDA data that CFPB staff compile to support ongoing investigations and litigations of state and federal antidiscrimination laws. Losing access to the data will prejudice the affected Plaintiffs by depriving them of a tool on which they are presently relying.

**FIRST CAUSE OF ACTION**

**Violation of Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority and Contrary to Law**
**(Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)**

115. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

116. The APA requires that a court set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

117. The APA also requires that a court set aside final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

118. Congress has mandated that the CFPB administer federal consumer protection statutes to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Among the CFPB's many statutory duties, it is required to create and maintain a system for fielding and responding to consumer complaints regarding the whole gamut of consumer financial products, and to share this consumer complaint information with the States. 12 U.S.C. §§ 5493(b)(3), 5534, 5493(b)(3)(D). The CFPB is also required to collect data under HMDA and to provide staff and data processing resources to the FFIEC to carry out its compilation requirements. 12 U.S.C. §§ 2803(h)(1), 2809(b).

119. Furthermore, Congress has mandated that the "Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

120. The Challenged Decisions are final agency actions. First, Defendant Vought has determined that the CFPB cannot legally request funds from the Board of Governors at any point in time during which the Federal Reserve's interest expenses exceed its interest income. That determination is contrary to the meaning of "combined earnings" in the Dodd-Frank Act. Moreover, even if CFPB's conclusion about the meaning of "combined earnings" were correct, that does not bar CFPB from requesting funds from the Federal Reserve.

121. Second, Defendant Vought has decided not to request funds from the Federal Reserve because, under Defendant Vought's reading of the Dodd-Frank Act, the Federal Reserve was operating at a loss as of November 2025. Defendant Vought is obligated to determine an amount necessary to carry out the CFPB's authorities and request such funding from the Board of Governors. Defendant Vought's failure to do so is in direct contravention of 12 U.S.C. § 5497(a)(1). And it is also "not in accordance with the law" because it is based on an erroneous interpretation of "combined earnings" in the Dodd-Frank Act.

122. No constitutional or statutory authority authorizes the CFPB to refrain from fulfilling its statutory duties, or to violate federal law by refusing to request funding sufficient to maintain its statutory obligations, including maintenance of the Consumer Response System it is required to make available to Plaintiffs. By failing to request funding from the Board of Governors, Defendant Vought puts the operations of the CFPB as a whole at risk of imminent cessation in their entirety.

123. The Challenged Decisions will directly impact Plaintiffs' legal right to the Consumer Response System and the HMDA data maintained by the CFPB.

124. Plaintiffs are injured by the Challenged Decisions because they will deny Plaintiffs access to statutorily required resources, which the Plaintiffs use, among other things, to enforce



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

the law within their authority.

125. Because the Challenged Decisions are outside of CFPB's authority and contrary to its statutory obligations, they violate the APA.

126. For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violate the APA.

127. Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

**SECOND CAUSE OF ACTION**

**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

**(Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)**

128. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

129. Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made") (internal quotation marks omitted); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

130. When changing positions, an agency must consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

131. An agency must not take action that "entirely fail[s] to consider an important aspect of the problem" or "relie[s] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

132. The Challenged Decisions are final agency action that fail to comply with these bedrock requirements for multiple reasons.

133. First, with the Challenged Decisions, Defendants have changed their position on how and when the CFPB can request funds to operate without an adequate explanation for the change in position. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. It must also "display awareness that it is changing position" and "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox Television Stations*, 556 U.S. at 515). For years, the CFPB has requested funding from the Federal Reserve in the ordinary course regardless of whether the Federal Reserve is operating at a profit. Moreover, they have long taken the position that "earnings," as used in the relevant statute, does not refer to profits net of expenses. Now, they have suddenly reversed course, rubber-stamping an OLC opinion without any acknowledgement of their change in position or thoughtful assessment of how to reconcile them.

134. Second, CFPB's stated reasons for the Challenged Decisions for refusing to request funding from the Federal Reserve are pretextual. *See Dep't of Com. v. New York*, 588 U.S. 752, 780-85 (2019). Though the agency now claims that it cannot request funds from the Federal Reserve because it has no "combined earnings"—a legal theory that finds no support in the text, history, or purpose of the statute, nor in any case law—this manufactured change in CFPB's legal position is meant to obscure the real reason for its decision not to request funds: to further Defendant Vought's year-long effort to dismantle the agency for policy and political reasons.

135. Third, Defendants have entirely ignored the reliance interests that have accrued for Plaintiffs who have now, for years, come to rely on CFPB's statutory functions. They have also



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

failed to consider the fallout of the timing of the Challenged Decisions. Given how the CFPB has not yet sought any funding from the Federal Reserve, it is now guaranteed that there will be a gap in operations.

136. Fourth, Defendants' decision not to request funding from the Federal Reserve is arbitrary and capricious because it is based on a legally erroneous determination—that CFPB cannot request funds from the Board of Governors at any point in time during which the Federal Reserve's interest expenses exceed its interest income.

137. Plaintiffs are injured by the Challenged Decisions because they have denied Plaintiffs access to statutorily guaranteed resources, which the Plaintiffs use to enforce the law within their authority.

138. Because the Challenged Decisions are arbitrary and capricious, they violate the APA.

139. For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violate the APA.

140. Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

## THIRD CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Unlawfully Withheld Agency Action

**(Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)**

141. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

142. Under the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (holding that courts must grant relief where "an agency failed to take a *discrete* agency action that it is *required to take*").



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

143. To fund the CFPB, 12 U.S.C. § 5497 requires that the Board of Governors "shall transfer" to the CFPB "beginning on the designated transfer date, and each quarter thereafter" the amount "determined by the Director to be reasonably necessary to carry out the [CFPB's] authorities."

144. This mandatory directive imposes interlinked affirmative obligations on the CFPB and the Federal Reserve. The Director must submit to the Board of Governors the amount of money he determines is needed to fund the agency's operations for purposes of obtaining such funds, and the Federal Reserve in turn "shall transfer" that amount from its "combined earnings."

145. Defendant Vought has stated that he will not comply with his duties under 12 U.S.C. § 5497(a)(1) on the ground that the Federal Reserve lacks the "combined earnings" necessary to cover the CFPB's costs. But nothing in the statute permits Defendant Vought to decline to submit his determination of CFPB's funding needs to the Board of Governors, let alone on the grounds that the Federal Reserve lacks the necessary funding to provide for those needs.

146. Nor does anything in 12 U.S.C. § 5497(e) exempt the Director from his obligation under § 5497(a)(1) to convey his determination of the Bureau's funding needs to the Board of Governors for purposes of obtaining funding. Rather, the mechanisms under § 5497(e) necessarily follow the funding process in § 5497(a)(1), meaning that the function and purpose of § 5497 does not contemplate filing a report under subsection (e) without submitting to the Board of Governors the determination required by subsection (a).

147. Plaintiffs are injured by the Director's failure to submit the statutorily required determination of CFPB's funding needs to the Board of Governors because it has denied them access to statutorily required resources, which the States use to enforce the law within their authority.

148. Plaintiffs are thus entitled to an order compelling Defendant Vought to submit to the Board of Governors his determination of the funding necessary for the Bureau's continued operation pursuant to 12 U.S.C. § 5497(a)(1).



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**FOURTH CAUSE OF ACTION**

***Ultra Vires* Agency Action Not Authorized by Congress**

**(Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)**

149. Plaintiffs realleges and incorporate by reference the allegations set forth in each of the preceding paragraphs.

150. An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

151. Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

152. Congress has directed CFPB to identify to the Board of Governors the amounts "reasonably needed" to carry out CFPB's duties. Defendants' decision not to request funds from the Board of Governors is contrary to Congress's specific mandate that "the Board of Governors *shall* transfer to" the CFPB "the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the [CFPB]" and therefore *ultra vires*. 12 U.S.C. § 5497(a)(1) (emphasis added).

153. Furthermore, Congress has mandated that the CFPB "shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a).

154. Plaintiffs are injured by Defendants' decision not to request funds because it denies Plaintiffs access to statutorily required resources, which the Plaintiffs use to enforce the law withing their authority.

155. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

156. For these reasons, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the decision not to request funds from the Board of Governors is *ultra vires*.

157. Plaintiffs are also entitled to vacatur of the decision not to request funds and injunctive relief prohibiting Defendants from implementing that decision.

**FIFTH CAUSE OF ACTION**

**Violation of the Separation of Powers Doctrine – Usurping Legislative Authority**

**(Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)**

158. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

159. Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, sec. 1.

160. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350 (J. Madison)).

161. Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

162. The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *Seila Law LLC*, 591 U.S. at 227.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

163. Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

164. Here, where Congress has created the CFPB, given it statutory mandates, and authorized it *without exception* to obtain funding by requesting it periodically from the Federal Reserve, the Challenged Decisions have violated constitutional and statutory mandates, contravened Congressional intent, and are unlawful.

165. This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579.

166. Plaintiffs are injured by the Challenged Decisions because they have denied Plaintiffs access to statutorily required resources, which the Plaintiffs use to enforce the law within their authority.

167. For these reasons, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violates the constitutional separation of powers doctrine and impermissibly arrogates to the executive power that is reserved to Congress.

168. Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

## SIXTH CAUSE OF ACTION

**Declaratory Judgment**
**5 U.S.C. § 703; 28 U.S.C. § 2201**

**(Against All Defendants)**

169. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

170. Defendants Vought and CFPB have decided that they cannot and will not request funds from the Board of Governors because the Board of Governors cannot, according to



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Defendant Vought, lawfully provide funds when the Federal Reserve's interest expenses exceed its interest income. That determination is contrary to the meaning of "combined earnings" in the Dodd-Frank Act, which refers to the gross revenues of the Federal Reserve without any deduction for interest or other expenses.

171. Moreover, the Board of Governors is required by statute to transfer to the CFPB, from the combined earnings of the Federal Reserve System, "the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

172. Because the statute compels Defendant Vought to determine the amount necessary to carry out the statute and, in turn, compels the Board of Governors to transfer those funds on a quarterly or annual basis, the Board of Governors does not have the ability to decline transfer absent some accounting of other funds available to the CFPB. 12 U.S.C. § 5497(a)(1).

173. An actual and substantial controversy exists between Plaintiffs and Defendants about whether the Board of Governors must provide to the CFPB funds "determined by the Director to be reasonably necessary to carry out the [CFPB's] authorities" when its interest expenses exceed its interest income.

174. Plaintiffs rely on the CFPB's operations, as described above, for critical consumer protection activities. Plaintiffs therefore have powerful reliance interests in the continuation of CFPB funding.

175. Declaratory relief is necessary to provide clarity regarding Plaintiffs' rights and Defendants' obligations with respect to funding the CFPB's operations and to ensure that Plaintiffs can continue to rely on the CFPB's operations.

176. Specifically, the Court should declare, pursuant to 28 U.S.C. § 2201, that the "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deduction for its expenses, and that the Federal



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays that the Court:

a. Declare that the Challenged Decisions are unlawful because they: (a) violate the APA; and (b) are contrary to the Constitution of the United States;

b. Declare that Defendants' decision not to request funds from the Board of Governors is ultra vires;

c. Declare that the "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deduction for its expenses;

d. Declare that the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations;

e. Set aside the Challenged Decisions pursuant to 5 U.S.C. § 706(2);

f. Permanently enjoin the Challenged Decisions and any steps taken to implement the Challenged Decisions;

g. Compel Defendants Vought and the CFPB pursuant to 5 U.S.C. § 706(1) to take the actions required by 12 U.S.C. § 5497;

h. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

i. Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j. Award such additional relief as this Court may deem just and proper.



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Dated: December 22, 2025,

Respectfully submitted,

**LETITIA JAMES**
Attorney General of New York

By: *s/ Stephen Thompson*
Stephen C. Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Patrick Gibson
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Counsel for the State of New York*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Leanne Hartmann*
Leanne Hartmann #257503
Brian Simmonds Marshall #196129
Joseph Platt #T2511101, IL SBA #6317731
*Senior Assistant Attorneys General*
Derek Olson #225504
*Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Joseph.Platt@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: *s/ Shankar Duraiswamy*
Shankar Duraiswamy
*Deputy Solicitor General*
Monica E. Finke
Amanda McElfresh
Jake Mazeitis
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Shankar.Duraiswamy@njoag.gov

*Counsel for Plaintiff State of New Jersey*

**PHILIP J. WEISER**
Attorney General of Colorado

By: *s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Martha Upton Fulford
*Assistant Deputy Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Martha.Fulford@coag.gov

*Counsel for Plaintiff State of Colorado*

**ROB BONTA**
Attorney General of California

By: *s/ Asal Akhondzadeh*
Asal Akhondzadeh
*Deputy Attorney General*
Nicklas Akers
*Senior Assistant Attorney General*
Michele VanGelderen
*Supervising Deputy Attorney General*
300 S Spring St, Ste 1702
Los Angeles, CA 90013-1256
asal.akhondzadeh@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: *s/ William Y. Durbin*
William Y. Durbin
*Senior Litigation Counsel*
Office of the Attorney General
2005 North Central Ave.
Phoenix, Arizona 85004
602-542-3333
William.Durbin@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Rebecca Borne*
Rebecca Borne
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5400
Rebecca.Borne@ct.gov

*Counsel for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Plaintiff State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Mitchell P. Reich*
MITCHELL P. REICH
Senior Counsel to the Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General of Illinois

By: *s/ Katharine Roller*
Katharine Roller
Complex Litigation Counsel
Sarah J. Gallo
Ethics Unit Supervisor, Special Litigation Bureau
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov
Sarah.gallo@ilag.gov

*Counsel for Plaintiff State of Illinois*

**AARON M. FREY**
Maine Attorney General

By: *s/ Katherine W. Thompson*
Katherine W. Thompson
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: *s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.maryland.gov

*Counsel for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: *s/ Nita K. Klunder*
Katherine Dirks
*Chief State Trial Counsel*
Nita K. Klunder*
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
katherine.dirks@mass.gov
nita.klunder@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: *s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

By: *s/ Sarah Doktori*
Katherine Bies
Sarah Doktori
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 583-6694
sarah.doktori@ag.state.mn.us
katherine.bies@ag.state.mn.us

*Counsel for the State of Minnesota*



Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**AARON D. FORD**
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. Brunetti Ireland (Nevada Bar No. 15368)
Chief Deputy Attorney General, Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**RAÙL TORREZ**
New Mexico Attorney General

By: *s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
(505) 270-4332
ASamant@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
Attorney General of North Carolina

**LAURA HOWARD**
Chief Deputy Attorney General

By: *s/ Daniel P. Mosteller*
Daniel P. Mosteller
*Associate Deputy Attorney General*
Daniel T. Wilkes
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: *s/ Alex Carnevale*
Alex Carnevale
Special Assistant Attorney General
Office of the Attorney General – State of Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Ryan P. Kane*
Ryan P. Kane
*Deputy Solicitor General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: *s/ Samuel T. Ward-Packard*
Samuel T. Ward-Packard
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938
samuel.ward-packard@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

functions necessary to the functioning of the financial system. For 14 years, the CFPB has served as an invaluable partner to state attorneys general and state banking regulators, as an enforcer, regulator, and resource for consumers. Shortly after taking office, the Trump Administration launched a campaign of destruction and systemic shuttering of the CFPB, threatening catastrophic harm to hardworking families and consumer financial markets nationwide. Today's lawsuit challenges the latest step in the Trump Administration campaign to shutter the agency.

“President Trump seems intent on making life more unaffordable for Americans — whether by withholding food assistance, pushing policies that would make energy more expensive, or by placing chaotic tariffs on essential items. At the same time, the Administration continues to abandon its responsibility to protect and defend American consumers being taken advantage of by Big Corporations, dismantling the agency that stands up for consumers against big banks, debt collectors, and credit reporting companies,” **said Attorney General Bonta.** “The Trump Administration’s latest effort to destroy the CFPB means that hundreds of thousands of consumer complaints will fall on deaf ears. If you have ever had issues with your car loan, mortgage loans, or bank fees, if you have ever disputed a credit score error and expected to have the federal government on your side, this impacts you. By refusing to fund the CFPB, even when legal and appropriate funding mechanisms are available, the Trump Administration has sharpened its message that it does not care about affordability, that it does not care to be on the side of families and working Americans. California cares. With this lawsuit, we demand that the federal government keep up its side of the deal by lawfully funding the Bureau and its critical work.”

**BACKGROUND**

After the 2008 financial crisis, Congress enacted the Dodd-Frank Act, establishing the CFPB as a federal financial regulator whose first priority is protecting consumers. The CFPB is tasked with enforcing numerous federal consumer protection statutes and enacting regulations to further these efforts.

As the cornerstone of federal consumer financial protections for 14 years, the CFPB has been an invaluable enforcement partner to California, working to protect hardworking families and make the marketplace fairer here in California and across the country, returning over $20 billion to Americans since its creation. Among other important functions, the CFPB maintains a publicly available online complaint handling system and database through which consumers can submit complaints about financial products and services and receive responses from regulated entities.

The Trump Administration has taken a series of actions intended to debilitate the CFPB, including issuing a suspension of work across the agency, terminating probationary employees, attempting to issue reduction in force notices to 90% of the CFPB's workforce — a move that was swiftly blocked by the courts. The continued gutting of the CFPB leaves no oversight over large, national banks and credit unions, guts oversight of payday lenders, the mortgage markets, and credit reporting agencies — and dramatically shrinks the Bureau's supervisorial oversight of the markets for auto finance, consumer reporting, debt collection, and international money transfer services — leaving millions of consumers unprotected.

**THE LAWSUIT**

On November 10, the CFPB gave notice that it would not request funding from the Federal Reserve to continue its operations based on legal analysis it had received from U.S. DOJ advising that it could not lawfully draw funds from the Federal Reserve because the Federal Reserve is "unprofitable." The CFPB also stated it has sufficient

funds to operate until at least December 31, 2025. At that time, the CFPB is expected to imminently cease operations, including taking its online consumer complaint handling system and database offline.

U.S. DOJ's interpretation of the statute has been widely criticized by consumer advocates as well as former CFPB and Federal Reserve officials as being unlawful. The attorneys general argue U.S. DOJ's advice comes from a misreading of language in the Dodd-Frank Act authorizing the CFPB to draw its funding from "the combined earnings of the Federal Reserve System." The CFPB and U.S DOJ's conclusion that the term "combined earnings of the Federal Reserve System" refers to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues, is an incorrect and unlawful interpretation.

In the lawsuit today, the attorneys general allege that CFPB's refusal to seek funding to continue its operations, including operating its consumer complaint database is ultra vires, contrary to law, and arbitrary and capricious as the Dodd-Frank Act clearly provides a mechanism for funding the CFPB to perform its statutorily mandatory functions — which include:

- Rooting out unfair, deceptive, or abusive acts or practices by writing rules, supervising companies, and enforcing the law;
- Enforcing laws that outlaw discrimination in consumer finance;
- Taking consumer complaints;
- Enhancing financial education;
- Researching the consumer experience of using financial products; and
- Monitoring financial markets for new risks to consumers.

The attorneys general argue that CFPB's failure to seek funding for continued operations, including operations of its consumer complaints database, will harm consumers and result in the above statutorily mandated functions not being performed. The attorneys

general ask the court to declare this action unlawful and ensure CFPB is properly funded.

Attorney General Bonta is leading this lawsuit along with the attorneys general of New York, Oregon, New Jersey, and Colorado. They are joined by the attorneys general of Arizona, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Mexico, North Carolina, Rhode Island, Vermont, and Wisconsin.

Attorney General Bonta has been an outspoken critic amid the attempts of the Trump Administration's CFPB to shrink its responsibilities and has submitted amicus briefs in Mayor and City Council of Baltimore v. Consumer Financial Protection Bureau and in National Treasury Employees Union v. Vought, lawsuits challenging the Trump Administration's efforts to dismantle the CFPB.

# # #



© 2026 DOJ

Subscribe to Our Newsletter

Enter your email Subscribe

ROB BONTA

*Attorney General*

# Attorney General Bonta Sues Trump Administration, Demands the Continued, Lawful Funding of the CFPB



**Supp. RJN Ex. 10**

Monday, December 22, 2025

Contact: (916) 210-6000, agpressoffice@doj.ca.gov

*The Consumer Financial Protection Bureau was created to protect consumers from unfair, deceptive, and abusive acts or practices, and from discrimination by Big Corporations.*

**OAKLAND** — California Attorney General Rob Bonta co-led a coalition of 22 attorneys general in filing a lawsuit challenging the Consumer Financial Protection Bureau's (CFPB) Acting Director's unlawful decision not to fund the agency's operations, preventing it from performing legally mandated functions. The lawsuit, filed in the U.S. District Court for the District of Oregon, challenges the decision by CFPB Acting Director Russell Vought to refuse to request the necessary funding for the agency from the Federal Reserve, in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). The CFPB was created to protect consumers in the financial marketplace, and it performs critical

functions necessary to the functioning of the financial system. For 14 years, the CFPB has served as an invaluable partner to state attorneys general and state banking regulators, as an enforcer, regulator, and resource for consumers. Shortly after taking office, the Trump Administration launched a campaign of destruction and systemic shuttering of the CFPB, threatening catastrophic harm to hardworking families and consumer financial markets nationwide. Today's lawsuit challenges the latest step in the Trump Administration campaign to shutter the agency.

“President Trump seems intent on making life more unaffordable for Americans — whether by withholding food assistance, pushing policies that would make energy more expensive, or by placing chaotic tariffs on essential items. At the same time, the Administration continues to abandon its responsibility to protect and defend American consumers being taken advantage of by Big Corporations, dismantling the agency that stands up for consumers against big banks, debt collectors, and credit reporting companies,” **said Attorney General Bonta.** “The Trump Administration’s latest effort to destroy the CFPB means that hundreds of thousands of consumer complaints will fall on deaf ears. If you have ever had issues with your car loan, mortgage loans, or bank fees, if you have ever disputed a credit score error and expected to have the federal government on your side, this impacts you. By refusing to fund the CFPB, even when legal and appropriate funding mechanisms are available, the Trump Administration has sharpened its message that it does not care about affordability, that it does not care to be on the side of families and working Americans. California cares. With this lawsuit, we demand that the federal government keep up its side of the deal by lawfully funding the Bureau and its critical work.”

**BACKGROUND**

After the 2008 financial crisis, Congress enacted the Dodd-Frank Act, establishing the CFPB as a federal financial regulator whose first priority is protecting consumers. The CFPB is tasked with enforcing numerous federal consumer protection statutes and enacting regulations to further these efforts.

As the cornerstone of federal consumer financial protections for 14 years, the CFPB has been an invaluable enforcement partner to California, working to protect hardworking families and make the marketplace fairer here in California and across the country, returning over $20 billion to Americans since its creation. Among other important functions, the CFPB maintains a publicly available online complaint handling system and database through which consumers can submit complaints about financial products and services and receive responses from regulated entities.

The Trump Administration has taken a series of actions intended to debilitate the CFPB, including issuing a suspension of work across the agency, terminating probationary employees, attempting to issue reduction in force notices to 90% of the CFPB's workforce — a move that was swiftly blocked by the courts. The continued gutting of the CFPB leaves no oversight over large, national banks and credit unions, guts oversight of payday lenders, the mortgage markets, and credit reporting agencies — and dramatically shrinks the Bureau's supervisorial oversight of the markets for auto finance, consumer reporting, debt collection, and international money transfer services — leaving millions of consumers unprotected.

**THE LAWSUIT**

On November 10, the CFPB gave notice that it would not request funding from the Federal Reserve to continue its operations based on legal analysis it had received from U.S. DOJ advising that it could not lawfully draw funds from the Federal Reserve because the Federal Reserve is "unprofitable." The CFPB also stated it has sufficient

funds to operate until at least December 31, 2025. At that time, the CFPB is expected to imminently cease operations, including taking its online consumer complaint handling system and database offline.

U.S. DOJ's interpretation of the statute has been widely criticized by consumer advocates as well as former CFPB and Federal Reserve officials as being unlawful. The attorneys general argue U.S. DOJ's advice comes from a misreading of language in the Dodd-Frank Act authorizing the CFPB to draw its funding from "the combined earnings of the Federal Reserve System." The CFPB and U.S DOJ's conclusion that the term "combined earnings of the Federal Reserve System" refers to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues, is an incorrect and unlawful interpretation.

In the lawsuit today, the attorneys general allege that CFPB's refusal to seek funding to continue its operations, including operating its consumer complaint database is ultra vires, contrary to law, and arbitrary and capricious as the Dodd-Frank Act clearly provides a mechanism for funding the CFPB to perform its statutorily mandatory functions — which include:

- Rooting out unfair, deceptive, or abusive acts or practices by writing rules, supervising companies, and enforcing the law;
- Enforcing laws that outlaw discrimination in consumer finance;
- Taking consumer complaints;
- Enhancing financial education;
- Researching the consumer experience of using financial products; and
- Monitoring financial markets for new risks to consumers.

The attorneys general argue that CFPB's failure to seek funding for continued operations, including operations of its consumer complaints database, will harm consumers and result in the above statutorily mandated functions not being performed. The attorneys

general ask the court to declare this action unlawful and ensure CFPB is properly funded.

Attorney General Bonta is leading this lawsuit along with the attorneys general of New York, Oregon, New Jersey, and Colorado. They are joined by the attorneys general of Arizona, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Mexico, North Carolina, Rhode Island, Vermont, and Wisconsin.

Attorney General Bonta has been an outspoken critic amid the attempts of the Trump Administration's CFPB to shrink its responsibilities and has submitted amicus briefs in Mayor and City Council of Baltimore v. Consumer Financial Protection Bureau and in National Treasury Employees Union v. Vought, lawsuits challenging the Trump Administration's efforts to dismantle the CFPB.

# # #



© 2026 DOJ

Subscribe to Our Newsletter

Enter your email Subscribe

**ROB BONTA**

*Attorney General*

# Attorney General Bonta: California's Unfair Competition Law Supersedes Insurance Policy Statute of Limitations



Thursday, April 11, 2024

Contact: (916) 210-6000, agpressoffice@doj.ca.gov

**OAKLAND** — California Attorney General Rob Bonta today filed an amicus brief in *Rosenberg-Wohl v. State Farm Fire and Casualty Co.* (State Farm), a case that hinges on whether an Unfair Competition Law (UCL) action filed by a policyholder against their insurance company is subject to the UCL's four-year statute of limitations or the Insurance Code's one-year limitations period for actions to recover on an insurance policy. The brief, filed in the California Supreme Court, argues that a UCL action is distinct from an action to recover policy benefits, therefore an insurance policy claims period cannot override the four-year statute of limitations that applies to all UCL actions. A contrary decision would hinder consumers' ability to challenge unlawful, unfair, or fraudulent conduct by insurance companies.

**Supp. RJN Ex. 11**

"We must protect consumers' right to challenge abusive business practices by insurance companies," **said Attorney General Bonta.** "California's Unfair Competition Law protects all 39 million Californians from unlawful, unfair, and fraudulent business practices by any industry, including insurance companies. The lower court got it wrong and if allowed to stand the decision threatens to undermine the broad protections afforded to Californians under the Unfair Competition Law. I urge the California Supreme Court to overturn the erroneous decision."

California's UCL prohibits businesses in California from engaging in illegal, unfair, or fraudulent practices in any aspect of their business, and allows California consumers injured by those practices to go to court to protect their rights. The UCL can also be enforced by the Attorney General and district attorneys, as well as by some city attorneys and county counsels.

The plaintiff in this case filed an insurance claim under their homeowners' insurance policy with State Farm, which the insurer denied. Roughly a year and a half later, the plaintiff filed a lawsuit against State Farm, alleging that it violated the UCL by engaging in unfair and misleading practices that included failing to properly investigate property insurance claims and failing to provide explanations for claim denials. The plaintiff sought injunctive relief that would require the company to reform its marketing practices and its process for investigating and resolving certain home-insurance claims. The Court of Appeal upheld the dismissal of the plaintiff's action as untimely, holding that the plaintiff's UCL claims were subject to the contractual one-year limitations period rather than the UCL's four-year statute of limitations because they arose from parties' contractual relationship.

In today's brief Attorney General Bonta argues that the one-year limitations period set forth in the Insurance Code does not apply to a UCL action, regardless of whether the action relates to an insurance claim. The brief also notes that the Court of

Appeal's decision departs from long-standing Supreme Court precedent holding that the UCL's statute of limitations "admits no exceptions."

Attorney General Bonta is committed to upholding Californians' protections under the UCL:

- In February, Attorney General Bonta sent a letter small banks and credit unions warning that overdraft and returned deposited item fees may violate state and federal consumer protection laws, and urged small financial institutions to eliminate these fees.
- Also in February, Attorney General Bonta filed an amicus brief in *Capito v. San Jose Healthcare System, LP*, urging the court to clarify when consumers can sue businesses for engaging in fraudulent acts or practices, and to adopt a standard for unfair acts or practices in UCL cases.
- In January 2023, Attorney General Bonta announced a lawsuit against the nation's largest insulin makers and pharmacy benefit managers for driving up the cost of the lifesaving drug through unlawful, unfair, and deceptive business practices in violation of California's consumer protection laws.
- In September 2022, Attorney General Rob Bonta announced a lawsuit against Amazon alleging that the company stifled competition and caused increased prices across California through anticompetitive contracting practices in violation of California's consumer protection and antitrust laws.

A copy of the amicus brief can be found here.

# # #

Related Professionals

# State Attorneys General Positioning to Fill Enforcement Gaps Based on Changing Priorities of Federal Agencies

April 23, 2025

PDF

Amidst the uncertainty in the current federal enforcement landscape, one message rings clear—State Attorneys General, including California's Rob Bonta, New York's Leticia James, and Oregon's Dan Rayfield, are poised to enforce laws traditionally led by federal prosecutors. In key areas such as federal anti-bribery statutes, environmental regulations, and consumer financial protection and securities laws, State Attorneys General have already staked a position as the "new enforcer on the block," in light of the diminishing role of the Securities and Exchange Commission (SEC), the U.S. Department of Justice (DOJ), and the Consumer Financial Protection Bureau (CFPB) in these enforcement areas.

## California Claims the Right to Enforce the FCPA Under California's Unfair Competition Law

On April 2, 2025, California Attorney General Bonta issued a Legal Advisory announcing that the California Department of Justice will enforce violations of the Foreign Corrupt Practices Act (FCPA) using California's Unfair Competition Law (UCL). The announcement appears to have been prompted by the Trump administration's pause on FCPA enforcement activity. Specifically, on February 10, 2025, President Trump signed an Executive Order placing a 180-day moratorium on new FCPA enforcement actions and investigations while the DOJ reviews current cases and issues updated guidelines and policies consistent with the administration's prioritization of "American economic competitiveness" and "the efficient use of Federal law enforcement resources."

The February 10 Executive Order was silent on the SEC's parallel FCPA enforcement activity. But the chief and co-chief of the agency's FCPA Enforcement Special Unit recently resigned, and the unit no longer exists. These developments signaled a retreat in federal enforcement of the FCPA's anti-bribery provisions and the related books and records and internal accounting controls provisions.

Based on AG Bonta's April 2 Legal Advisory, it appears that California and, maybe, other states are preparing to fill that void. Indeed, it explicitly reminds businesses and individuals "to continue complying with all applicable laws, including the FCPA, regardless of the federal administration's pronouncements," or else risk a UCL enforcement action brought by the state.

**Supp. Ex. 12**

California's UCL, codified at Business and Professions Code § 17200 *et seq.*, prohibits unlawful, unfair, and fraudulent business acts and practices. The UCL "borrows" other laws to make violations of those other laws actionable as unfair competitive practices. The UCL traditionally has been used to address consumer-focused laws, such as false advertisements, consumer fraud, and antitrust violations. But, as the April 2 Legal Advisory points out, litigants have previously used FCPA violations as a basis for a UCL claim. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (noting Court of Appeals' decision that UCL claim may be predicated on FCPA violation).

In addition to authorizing enforcement actions by AG Bonta, the UCL also permits suits by private plaintiffs who "suffered injury in fact" and "lost money or property as a result of" the challenged business practice. Cal. Bus. & Prof. Code § 17204. Private plaintiffs with standing may seek restitution and injunctive relief. Cal. Bus. & Prof. Code § 17203; *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 179 (1999). The California Attorney General additionally may seek civil penalties. Cal. Bus. & Prof. Code § 17206.

The Legal Advisory further warns that FCPA violations may give rise to liability under other states' consumer protection laws. As one example, New York might attempt to invoke its General Business Law Section 349(a), which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in [the] state," to target alleged FCPA violations for companies doing business in New York. Although no other state attorneys general have publicly announced their intent to prosecute FCPA violations under state law, they may do so, particularly if the forthcoming DOJ guidelines and policies memorialize a significantly narrower focus in FCPA enforcement. Companies with nationwide operations could conceivably face multi-state enforcement actions brought by coalitions of state attorneys general for corrupt business practices or inadequate internal accounting controls.

## California Could Enforce Its Climate Disclosure Rules in Contrast to the SEC's Retreat from Defending Its Climate Disclosure Rules

In addition to "borrowing" federal statutes, California has also signaled that it will be active in enforcing its own regulations that overlap with federal law. One recent example involves California's corporate climate disclosure regulations.

California's regulations are analogous to the SEC's Climate Disclosure Rules passed by the SEC under the previous administration. Adopted on March 6, 2024, the Rules required public reporting companies to make detailed and extensive disclosures about climate-related risks and greenhouse gas emissions. Shortly after the Rules were passed, the Rules faced legal challenges from both states and private parties before the Eighth Circuit (*Iowa v. SEC*, No. 24-1522 (8th Cir. March 12, 2024)). The SEC, as expected, began defending its Rules but stayed the effectiveness of the Rules pending the completion of litigation. On March 27, 2025, however, the SEC took the unusual step of voting to abandon the defense of its Climate Disclosure Rules in the case. Although the litigation remains ongoing despite the SEC's announcement, the ultimate future of the SEC's Rules is uncertain. But the Rules likely will never take effect, given that the current SEC views them as "costly and unnecessarily intrusive."

In contrast to the SEC's retreat in defending its Climate Disclosure Rules, California continues to defend its own regulations. California's corporate climate regulations face ongoing litigation in *Chamber of Commerce v. Cal. Air Resources Bd.*, No. 2:24-cv-00801 (C.D. Cal. Jan. 30, 2024). The lawsuit seeks to stop two regulations, Senate Bills 253 and 261, that mandate disclosure of various climate-related risks and data from going into effect.[1] The California AG has argued that one reason the laws were adopted is because many large companies were already

disclosing climate-related information, but those disclosures contained inaccurate and misleading statements. On April 7, 2025, AG Bonta filed an opposition to the plaintiff business group's motion seeking to enjoin the regulations on First Amendment grounds while the case proceeds on the merits. AG Bonta defended the need for California's regulations, stating that the disclosure rules will "correct a massive blind spot for consumers, investors, and policymakers, who need this information to make intelligent and well-informed economic decisions." (Dkt. No. 89 at 9:9-13 (cleaned up).)

California's regulations also will likely come under further attack by the federal government in the coming months. On April 10, 2025, President Trump issued an Executive Order condemning state and local governments who "seek to regulate energy beyond their constitutional or statutory authorities." The Executive Order notes that "[m]any States have enacted, or are in the process of enacting, burdensome and ideologically motivated 'climate change' or energy policies that threaten American energy dominance and our economic and national security." Among other states such as New York and Vermont, the Executive Order names California and points to the state's carbon use caps as an example of "radical" and problematic laws and policies in conflict with the administration's energy initiatives. The Executive Order further requires the U.S. Attorney General to report to the President within 60 days (by June 9, 2025) on actions to be taken to stop "illegal" laws and policies at the state and local level.

Though it remains to be seen which environmental laws and policies DOJ will seek to invalidate pursuant to the April 10 Executive Order, California's carbon use regulations and Senate Bills 253 and 261 are potential targets, particularly given the order's singling out of laws and policies "purporting to address 'climate change'" or involving "carbon or 'greenhouse gas' emissions, and funds to collect carbon penalties or carbon taxes," as top priorities. We would expect the respective state attorneys general would vigorously oppose any challenges mounted by DOJ. We would also expect that California would actively investigate and pursue potential violations of its climate disclosure rules unless found to be unconstitutional or invalid.

## Oregon and New York Attorneys General Using State Securities Laws for Enforcement in Areas Where the SEC Has Retreated

AG Bonta is not alone in staking out actions previously led by the SEC. In New York, AG James has initiated several enforcement actions against major cryptocurrency platforms and broker-dealers under New York's securities and commodities laws. For example, in 2023, AG James sued KuCoin and CoinEx for allegedly failing to register as a securities and commodities broker-dealer and for allegedly falsely representing itself as an exchange. And in January 2023, AG James, along with a coalition of nine other states, including California, reached a $24 million stipulated judgment against Nexo Inc. and Nexo Capital Inc., for alleged unregistered offerings and sales. Given the state's enforcement history, New York may well bring additional state enforcement actions in the cryptocurrency and other markets.

Oregon also recently took action in the cryptocurrency space. On April 19, 2025, the Oregon Attorney General filed an action against crypto exchange Coinbase alleging the exchange engaged in the unlawful sale of unregistered securities, in violation of Oregon's securities laws, through its trading platform. The press release announcing the action expressly stated that "states must fill the enforcement vacuum being left by federal regulators who are giving up under the new administration and abandoning these important cases." Indeed, the action comes on the heels of the SEC's recent decision to dismiss its ongoing related case against Coinbase.

# Dodd-Frank Empowers State Attorneys General to Directly Enforce the CFPA Even If the CFPB Does Not

In passing the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Congress specifically provided for a system of cooperative federalism and dual enforcement at the federal and state level. Under Dodd-Frank Section 1042, state attorneys general are empowered to enforce all of the safeguards created by the Consumer Financial Protection Act (CFPA), codified in Title X of Dodd-Frank, and all regulations thereunder, including a CFPA provision that makes it unlawful for entities covered by the CFPA to violate other federal consumer financial laws. This broad grant of authority gives state attorneys general coextensive power with the CFPB, the agency charged with enforcing the CFPA at the federal level, and significantly expanded states' enforcement authority to reach both the federal consumer financial protections that existed before Dodd-Frank and the new protections created by the CFPA. Section 1042 also allows state attorneys general to supervise nonbanking entities covered by the CFPA, inviting further state regulatory authority over federal consumer financial laws.

In the wake of the Trump administration's efforts to defund and dismantle the CFPB, AG Bonta joined a coalition of 23 state attorneys general as amici in two lawsuits challenging the administration's attempt to effectively shutter the CFPB (*see Mayor and City Council of Baltimore v. Consumer Fin. Prot. Bureau*, No. 1:25-cv-00458 (D. Md. Feb. 2, 2025); *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381 (D.D.C. Feb. 9, 2025)). In both cases, the state attorneys general argue that dissolving the CFPB would leave states with the sole responsibility to protect consumers from conduct regulated by the CFPB. On April 11, the D.C. Circuit stayed certain provisions of the preliminary injunction issued by the district court, and the Trump administration appears to have interpreted the stay order to allow it to proceed with a significant reduction of the CFPB. On April 17, the National Treasury Employees Union filed a motion estimating that 1,400-1,500 of its approximately 1,700 employees received layoff notices that day. The District of Columbia District Court has prohibited the administration from implementing the reduction in force until an April 28 hearing on the union's motion to enforce the preliminary injunction.

State action to enforce the CFPA would not be novel. For example, California's AG has participated in at least three enforcement actions pursuant to Section 1042 since the CFPA's enactment, including two multi-state actions involving all fifty states and the District of Columbia (*Alabama v. Nationstar Mortg. LLC*, No. 1:20-cv-03551 (D.D.C.); *Alabama v. PHH Mortg. Corp.*, No. 18-cv-0009 (D.D.C.)), and one independent action alleging a UCL violation based on the CFPA's prohibition against UDAAPs, among other claims (*California v. Volkswagen AG*, No. 3:16-cv-03260 (N.D. Cal.)). The New York AG has similarly brought at least one enforcement action under Section 1042 (*People of the State of New York v. Pa. Higher Educ. Assistance Agency*, No. 19-cv-9155 (S.D.N.Y. Oct. 3, 2019)), and led a multi-state investigation against Intuit, Inc. pursuant to Section 1042 that resulted in a $141 million settlement joined by all fifty states and the District of Columbia.

California's and New York's prior enforcement of the CFPA's consumer protection laws may increase as the capacity of the CFPB is substantially limited. Other states may also increase their enforcement of federal consumer protection laws.

# Conclusion

Recent actions and announcements by the federal government curtailing enforcement efforts in numerous areas, including the FCPA, climate-related disclosures, and the CFPA, are prompting state attorneys general to step into the perceived void, as reflected by AG Bonta's recent Legal Advisory and AG Rayfield's complaint. Companies

may want to review whether their business practices could be a predicate for a state enforcement action under the CFPA, unfair competition laws, or other state laws.



[1] Senate Bill 253 applies to any company doing business in California that generates annual revenue exceeding $1 billion and requires covered entities to measure and report greenhouse gas emissions data for the prior fiscal year. Senate Bill 261 applies to businesses operating in California with annual revenue in excess of $500 million and requires covered businesses to issue public reports on its climate-related financial risks, as well as measures taken to mitigate those risks.

*This memorandum is a summary for general information and discussion only and may be considered an advertisement for certain purposes. It is not a full analysis of the matters presented, may not be relied upon as legal advice, and does not purport to represent the views of our clients or the Firm. Jorge deNeve, an O'Melveny partner licensed to practice law in California; Michele W. Layne, an O'Melveny of counsel licensed to practice law in California; Daniel R. Suvor, an O'Melveny partner licensed to practice law in California; Jim Bowman, an O'Melveny partner licensed to practice law in California; Mark A. Racanelli, an O'Melveny partner licensed to practice law in New York; Sharon M. Bunzel, an O'Melveny partner licensed to practice law in California; David N. Kelley, an O'Melveny partner licensed to practice law in New York and Connecticut; Elizabeth L. McKeen, an O'Melveny partner licensed to practice law in California; Danielle Morris, an O'Melveny partner licensed to practice law in California; Greta L. Nightingale, an O'Melveny partner licensed to practice law in the District of Columbia; and Kelsey A. Chandrasoma, an O'Melveny counsel licensed to practice law in California, contributed to the content of this newsletter. The views expressed in this newsletter are the views of the authors except as otherwise noted.*

*© 2025 O'Melveny & Myers LLP. All Rights Reserved. Portions of this communication may contain attorney advertising. Prior results do not guarantee a similar outcome. Please direct all inquiries regarding New York's Rules of Professional Conduct to O'Melveny & Myers LLP, 1301 Avenue of the Americas, Suite 1700, New York, NY, 10019, T: +1 212 326 2000.*

RELATED PRACTICES

- White Collar Defense & Government Investigations
- State Attorneys General Litigation & Investigations
- Foreign Corrupt Practices Act Investigations & Enforcement

The Rutter Group
Civil Litigation Series

# Bus. & Prof.C. §17200 Practice

## 2023 Update

Current through the March 2023 update

WILLIAM L. STERN

**Supp. Ex. 13**

**Bus. & Prof.C. 17200 Ch. 7-A**

**Business & Professions Code Section 17200 Practice**

March 2023 Update

William L. Stern

**Chapter 7. Procedure Under the Unfair Competition Law**

## A. Standing to Sue Under §§ 17200 and 17500—Individual Claims and "Private Attorney General" Actions


1. 1. [7:2] Scope
2. 2. [7:3] Proposition 64—Elimination of "Unaffected Plaintiff" Standing
    1. a. [7:3.1] New standing rule
    2. b. [7:3.2] No "associational" standing
3. 3. [7:4] Proposition 64—Elimination of "Private Attorney General" Actions
4. 4. [7:5] Suit Not Dependent on Underlying Law
    1. a. [7:6] Suit does not depend on whether private right of action exists
        1. (1) [7:7] UCL claim even where exclusive authority vested in others
        2. (2) [7:9] *Stevens* case
        3. (3) [7:10] *Rothschild* case
        4. (4) [7:11] Interplay between suing under UCL and underlying statute

2. b. [7:11.1] Using a UCL claim to avoid procedural hurdles in the “borrowed” law
3. c. [7:12] “Transactional nexus” is required
4. d. [7:14] “Real party in interest” statute compared
5. e. [7:15] The prior rule—unaffected-plaintiff suits
6. f. [7:16.1] Private plaintiff “stands in the shoes” of the “general public”
7. g. [7:17] No bar to private suit just because there is a parallel law enforcement suit
    1. (1) [7:18] “Two-front war”
    2. (2) [7:19] “Three-front war”?
8. h. [7:22] Exclusive concurrent jurisdiction
9. i. [7:26] Competitor standing
    1. (1) [7:27] Competitor standing prior to Proposition 64
    2. (2) [7:27.1] Competitor standing after Proposition 64
    3. (3) [7:28] Other illustrative “competitor” cases
10. j. [7:29] Four limitations on “unaffected plaintiff” standing rule

1. (1) [7:30] Plaintiff had to be "competent"
2. (2) [7:32] "Unaffected" plaintiffs could proceed only in state court
3. (3) [7:34] Removal—law enforcement actions
4. (4) [7:35] UCL and FAL claims in bad faith insurance litigation
    1. (a) [7:35.1] Background—*Moradi-Shalal*
    2. (b) [7:35.2] Aftermath of *Moradi-Shalal*
    3. (c) [7:36] *Zhang v. Sup.Ct.*
        1. 1) [7:36.1] Facts of *Zhang*
        2. 2) [7:36.2] Issues for review in *Zhang*
        3. 3) [7:36.3] The holding in *Zhang*
    4. (d) [7:37] An exception?

1. [7:2] **Scope:** Private parties and public prosecutors both have standing to sue under §§ 17200 and 17500. [Bus. & Prof.C. §§ 17204, 17535] However, Proposition 64 made some important changes to private parties' standing to sue and obtain relief on behalf of others.

2. [7:3] **Proposition 64—Elimination of "Unaffected Plaintiff" Standing:** Prior to Proposition 64, Sections 17204 and 17535 permitted "any person" to sue under the UCL and false advertising laws, respectively. This language had been construed by the California courts to mean that no "transactional nexus" was required. Thus, someone completely unaffected by the defendant's business practice—e.g., someone who never bought the good or service or read or relied upon the defendant's representation or advertising—could sue. Proposition 64 changed that. *See ¶ 7:12 ff.*

a. [7:3.1] **New standing rule:** Proposition 64, approved by the California voters in November 2004, eliminated "unaffected plaintiff" standing. *See ¶ 2:47.4 ff.* It did so by adding the underlined clause and by deleting the portions shown stricken:

"Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." [Prop. 64, § 3]

If a plaintiff names multiple defendants, Proposition 64 limits standing to sue to only those defendants with whom plaintiff had dealings. [*Schulz v. Neovi Data Corp.* (2007) 152 CA4th 86, 97, 60 CR3d 810, 820]

Although not a Proposition 64 case, the district court in *In re Napster, Inc. Copyright Litig.* (ND CA 2005) 354 F.Supp.2d 1113, held that a copyright owner of sound recordings could not bring a UCL claim seeking injunction or restitution against investors in Napster, a company that operated an online audio filesharing network. The court held:

"[N]othing in the counterclaims suggests that plaintiffs are in possession of funds in which Hummer has an ownership interest. Moreover, while section 17203 allows the victims of unfair competition to seek injunctive relief as well as restitution, Hummer fails to allege that it has suffered any ongoing injury from plaintiffs' anticompetitive conduct. Nor do there appear to be any losses to which Hummer or even Napster itself would be entitled by reason of plaintiffs' gains. Accordingly, the court holds that Hummer has failed to allege any set of facts that would entitle it to restitutionary or injunctive relief under *California Business and Professions Code sections 17200* and *17203*." [354 F.Supp.2d at 1127 (emphasis added)]

For a discussion of the applicability of Proposition 64 to then-pending cases, *see* *¶ 2:47.6 ff.*

b. [7:3.2] **No "associational" standing:** As a general matter, organizations have standing to sue quite apart from the standing of their constituent members. However, in order for an association to file a lawsuit on behalf of its members, the members themselves must have the ability to bring suit.

[*Warth v. Seldin* (1975) 422 US 490, 511, 95 S.Ct. 2197, 2211-2212] Thus, in *Friends of the Earth v. Sanderson Farms, Inc*. (9th Cir. 2021) 992 F3d 939, 945, the Ninth Circuit held that advocacy groups lacked Article III standing to challenge a poultry producer's marketing of its products as "100% Natural" where the groups failed to show that they had diverted their *own* resources to combating defendants' conduct.

Proposition 64 changed that rule for claims brought under the UCL or the False Advertising Law, Bus. & Prof.C. § 17500 et seq. The requirement of Proposition 64 that the claimant must have suffered injury in fact means that an *un*injured claimant cannot take an assignment of a UCL claim from an injured assignor. For the same reason, there is no "associational standing" under the UCL even if the association's members have been injured. [*Amalgamated Transit Union, Local 1756, AFL-CIO v. Sup.Ct.* (2009) 46 C4th 993, 1002, 1004, 95 CR3d 605, 611-612, 613; accord, *Coalition for ICANN Transparency Inc. v. VeriSign, Inc*. (ND CA 2006) 452 F.Supp.2d 924, 939—dismissing UCL claim without leave to amend, brought on behalf of association]

⇨ [7:3.3] ***PRACTICE POINTER:*** The California Supreme Court granted review in *California Medical Assn. v. Aetna Health of Cal.*, rev.grntd. 1/28/21 (Case No. S269212). That was a case brought by a professional medical association against a healthcare insurer in which the association itself, apart from its members, had not lost money or property. The appeal raises two issues: (1) Does an organization that expends resources and diverts them from other activities in order to counteract a defendant's allegedly unfair competition practices satisfy the requirement of injury in fact or lost money or property in order to have standing to bring an action under

the UCL? (2) Does organizational standing depend on whether the organization has members who are also injured by the practices and who would also benefit from the requested relief?

3. [7:4] **Proposition 64—Elimination of "Private Attorney General" Actions:** Prior to Proposition 64, a private plaintiff (affected or unaffected) could obtain relief not only on his or her own behalf but also on behalf of "the general public."

Proposition 64 eliminated "representative" actions. *See* ¶ *2:47.3 ff.* It did so by adding this sentence to the end of Section 17203, which requires that any suit brought on behalf of others must now comply with class action procedure:

"Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state." [Prop. 64, § 2]

For a discussion of the applicability of Proposition 64 to pending cases, *see* ¶ *2:47.6 ff.*

In *Arias v. Sup.Ct.* (2009) 46 C4th 969, 980, 95 CR3d 588, 595, the California Supreme Court held that a claimant seeking to recover under the UCL on behalf of others must comply with class action procedure.

⇨ [7:4.1] ***PRACTICE POINTER:*** This is not true for "representative actions" brought under the Private Attorneys General Act of 2004, Lab.C. § 2699. [*Arias v. Sup.Ct.*, supra, 46 C4th at 985, 95 CR3d at 599]

4. [7:5] **Suit Not Dependent on Underlying Law:** Suits under the UCL are not dependent on rights and remedies conferred by the underlying law that is being "borrowed." This results in several principles unique to UCL jurisprudence.

a. [7:6] **Suit does not depend on whether private right of action exists:** The first unique aspect of § 17200 standing is that a claim based on "unlawful" business acts or practices does not depend on whether a private right of action exists with respect to the underlying law at issue.

The *absence* of a private cause of action conferred in a federal law being "borrowed" to state a UCL violation is not a barrier to the UCL claim. [*Washington Mut. Bank, FA v. Sup.Ct.* (1999) 75 CA4th 773, 783, 89 CR2d 560, 568]

Furthermore, Section 17200 allows a remedy even if the underlying statute confers no private right of action. [*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 C4th 553, 561-567, 71 CR2d 731, 735-740; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 C3d 197, 210-211, 197 CR 783, 790-791; *California Med. Ass'n v. Aetna U.S. Healthcare of Calif., Inc.* (2001) 94 CA4th 151, 169, 114 CR2d 109, 123; see also *Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F3d 1042, 1048; *Matoff v. Brinker Restaurant Corp.* (CD CA 2006) 439 F.Supp.2d 1035, 1038—UCL claim may "borrow" a violation of Lab.C. § 351 even though that section does not create a private right of action]

(1) [7:7] **UCL claim even where exclusive authority vested in others:** Private plaintiffs can sue to enforce underlying laws even where such laws, by their express terms, provide only for enforcement by public officers or confer no private

right of action whatsoever. [*Kasky v. Nike, Inc.* (2002) 27 C4th 939, 950, 119 CR2d 296, 303]

For example, in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 C4th 553, 573, 71 CR2d 731, 744, a private plaintiff was allowed to sue civilly for violations of a criminal law, Pen.C. § 308 (prohibiting the sale of cigarettes to minors) even though exclusive authority to enforce a criminal law is vested in law enforcement officials, such as the District Attorney or Attorney General.

[7:8] **Comment:** It is difficult to reconcile these cases with *Blanks v. Seyfarth Shaw, LLP* (2009) 171 CA4th 336, 367, 89 CR3d 710, 734: If the borrowed law confers exclusive enforcement authority in an administrative agency, that will defeat the UCL claim. [See also *Farmers Ins. Exchange v. Sup.Ct.* (2006) 137 CA4th 842, 858, 40 CR3d 653, 664-665—where Proposition 103's “Good Driver Discount” provisions (Ins.C. § 1861.10(a)) provides only for administrative enforcement, no private cause of action can be brought under the UCL] *See ¶ 5:138 ff.*

(2) [7:9] ***Stevens case:*** In *Stevens v. Sup.Ct.* (1999) 75 CA4th 594, 606, 89 CR2d 370, 378, plaintiffs were allowed to bring a UCL claim based on defendants' alleged practice of selling insurance without an agent/broker license, in alleged violation of Ins.C. § 1631. The court held that even though direct enforcement of the agent-licensing law is vested exclusively in the Commissioner of Insurance, that does not prevent a private plaintiff from suing under the UCL.

(3) [7:10] ***Rothschild* case:** In *Rothschild v. Tyco Int'l (US), Inc.* (2000) 83 CA4th 488, 99 CR2d 721, the appellate court held that a private Attorney General action was stated under

the UCL even though there was a prior False Claims Act suit already pending concerning the same subject matter. The two involved different "primary rights," said the court. [83 CA4th at 499-500, 99 CR2d at 728-729]

(4) [7:11] **Interplay between suing under UCL and underlying statute:** The difference between suing under the UCL versus the underlying statute is illustrated by *Consumers Union of United States, Inc. v. Fisher Develop., Inc.* (1989) 208 CA3d 1433, 257 CR 151. In that case, a consumer group sued a developer and homeowners' association for discriminating on the basis of age and against families with children. Only "aggrieved" persons could sue under the express terms of the underlying statute—the Unruh Civil Rights Act (Civ.C. §§ 51, 52). Clearly, the consumer *organization*, as such, was not "aggrieved" and therefore could not maintain an Unruh Act claim.

The court held, however, that the plaintiff had standing to sue under § 17200, because relief under § 17200 is *not* limited to "aggrieved" persons. However, the treble damage *remedy* and attorney fees provision available to successful plaintiffs under § 52 is not available to *non*-aggrieved plaintiffs who sue under § 17200.

*Consumers Union* was followed in *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 CA3d 1377, 271 CR 99, in which the court of appeal permitted a homeowners association to sue under § 17200 on the claim that a rental policy at an apartment complex limiting occupancy to one person per bedroom was a violation of the Unruh Civil Rights Act. The association was not a tenant and, as such, could not have sued directly under the Unruh Civil Rights Act. But by "borrowing" that alleged violation and

making it actionable under § 17200, the plaintiff association was able to get around the standing requirement.

b. [7:11.1] **Using a UCL claim to avoid procedural hurdles in the "borrowed" law:** What happens when the "borrowed" law imposes a procedural requirement, such as a prefiling certificate of merit? Can a plaintiff avoid that requirement by suing under the UCL? The cases are split. Indeed, two cases decided by the same appellate court (albeit different divisions) just five days apart reached diametrically opposite conclusions.

In *Caliber Bodyworks, Inc. v. Sup.Ct*. (2005) 134 CA4th 365, 386, 36 CR3d 31, 46, disapproved on other grounds in *ZB, NA v. Sup.Ct.* (2019) 8 C5th 175, 196, 252 CR3d 228, 242, the court of appeal held that a plaintiff suing under the UCL and "borrowing" alleged violations of the Private Attorneys General Act of 2004 (Lab.C. § 2698 et seq.) need not comply with that law's prefiling notice and exhaustion requirements. But in *In re Vaccine Cases* (2005) 134 CA4th 438, 459, 36 CR3d 80, 94, the appellate court held that a plaintiff "borrowing" alleged violations of Proposition 65 "cannot evade the requirement of presuit 60-day notice" by suing under the UCL. The California Supreme Court may have to decide these issues.

c. [7:12] **"Transactional nexus" is required:** As a result of Proposition 64, "transactional nexus" is now required. That was not true prior to Proposition 64.

Formerly, a complete stranger to the transaction could sue and obtain all of the remedies available under section 17203. That was because the statute provided that "any person" could sue on behalf of himself or herself individually, or on

behalf of the general public, to redress violations of §§ 17200 and 17500. [See former Bus. & Prof.C. §§ 17204, 17535] The courts had construed those two words—any person—literally. As the California Supreme Court noted, the Legislature intended to permit suit to be brought even by someone completely unaffected by the business practice, and even someone who suffered no harm as a result of it. [*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 C4th 553, 561-567, 71 CR2d 731, 735-740]

Proposition 64 changed that. *See* ¶ *7:3 ff.*

➪ [7:13] ***PRACTICE POINTER:*** To the extent *Stop Youth Addiction, Inc.* approved the notion of "unaffected plaintiff" standing, it has been overruled by Section 3 of Proposition 64. *See* ¶ *7:3 ff*.

d. [7:14] **"Real party in interest" statute compared:** The usual civil suit in California "must be prosecuted in the name of the real party in interest …" [CCP § 367] Section 367 requires that only the person possessing the right sued upon by reason of a substantive law can be deemed the "real party in interest." [*Powers v. Ashton* (1975) 45 CA3d 783, 787, 119 CR 729, 732] This rule is designed to protect a defendant from a multiplicity of suits and from further annoyance and vexation, and to fix and determine the real liability which is alleged in the complaint. [*Bank of Orient v. Sup.Ct.* (1977) 67 CA3d 588, 594, 136 CR 741, 744; see e.g., *Friendly Village Community Ass'n, Inc. v. Silva & Hill Const. Co.* (1973) 31 CA3d 220, 225, 107 CR 123, 126—homeowner association is not the "real party in interest" with standing to sue a condominium developer on behalf of unit owners]

e. [7:15] **The prior rule—unaffected-plaintiff suits:** In *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 C4th 553, 71 CR3d 731, a corporation formed by the mother of plaintiff's counsel for the sole purpose of bringing lawsuits under § 17200 was found to have standing to sue a retailer for alleged violations of Pen.C. § 308, namely, selling cigarettes to minors. For similar cases, see *Hernandez v. Atlantic Finance Co.* (1980) 105 CA3d 65, 71-73, 164 CR 279, 283-285—daughter of a car buyer who neither purchased a car nor borrowed money from defendants was able to sue for violations on behalf of the public as if she had; *Consumers Union of United States, Inc. v. Fisher Develop., Inc.* (1989) 208 CA3d 1433, 1440, 257 CR 151, 155—consumer organization had standing to sue to enjoin a developer and homeowner association from discriminating on the basis of age and against families with children; *Pines v. Tomson* (1984) 160 CA3d 370, 380-381, 206 CR 866, 871-872—Jewish businessman had standing to sue publisher of "Christian Yellow Pages" for discrimination; but cf. *Stoiber v. Honeychuck* (1980) 101 CA3d 903, 162 CR 194—tenant who had moved out could not sue landlord for maintaining unsafe and unsanitary buildings.

➪ [7:16] ***PRACTICE POINTER:*** To the extent *Stop Youth Addiction, Inc.* approved the notion of "unaffected plaintiff" standing, it has been overruled by Section 3 of Proposition 64. *See ¶ 7:3 ff*.

f. [7:16.1] **Private plaintiff "stands in the shoes" of the "general public":** Under the prior "unaffected plaintiff" standing rule, an unaffected plaintiff who sued on behalf of the "general public" stood in the shoes of the "victims" and,

therefore, was subject to any contract terms and obligations to which the "members of the general public" would be subject.

In *Net2Phone, Inc. v. Sup.Ct.* (2003) 109 CA4th 583, 135 CR2d 149, the appellate court held that suing in the name of an unaffected plaintiff cannot overcome the contractual forum-selection clause to which every member of the "general public" was subject: "[W]e hold that where a private plaintiff which has itself suffered no injury files a representative action under California's unfair competition law alleging that certain of defendant's contractual provisions subject its customers to an "unlawful, unfair or fraudulent business … practice" and the contract contains a forum selection provision, the plaintiff is bound by that provision just as defendant's customers would be bound had they filed the action themselves." [109 CA4th at 585, 135 CR2d at 150]

➪ [7:16.2] ***PRACTICE POINTER:*** In law enforcement actions, the People do *not* "stand in the shoes" of the victim class. *See* ¶ *9:32*.

g. [7:17] **No bar to private suit just because there is a parallel law enforcement suit:** It is no barrier to a private suit under § 17200 to say that there already exists a parallel law enforcement suit.

(1) [7:18] **"Two-front war":** Suits under § 17200 have the potential of forcing defendants to fight a "two-front war," namely, a parallel private and law enforcement action. This cannot happen in the usual law enforcement case that is brought criminally, since the civil action is usually stayed pending the outcome of the criminal proceeding.

A UCL claim is different. A private claim under § 17200 or § 17500 that is brought on behalf of the "general public" is not foreclosed merely because the People have filed a parallel civil enforcement action, nor is there any requirement that a private litigant first seek permission of the district attorney or the Attorney General before bringing suit. [*Committee to Defend Reproductive Rights v. A Free Pregnancy Ctr.* (1991) 229 CA3d 633, 641, 280 CR 329, 334]

(2) [7:19] **"Three-front war"?** It is also the case that a civil action brought under §§ 17200/17500 by law enforcement officials is not precluded just because there is, or was, or may be, a parallel *administrative* proceeding concerning the same subject matter. [See, e.g., *Setliff Bros. Service v. Bureau of Automotive Repair* (1997) 53 CA4th 1491, 62 CR2d 25; *People v. Damon* (1997) 51 CA4th 958, 59 CR2d 504] Thus, it is conceivable that a defendant could face simultaneous charges concerning the same conduct brought by private plaintiffs, by district attorneys or other law enforcement officials, and by administrative or regulatory agencies.

**[7:20 - 7:21]** ***Reserved.***

h. [7:22] **Exclusive concurrent jurisdiction:** In *Franklin & Franklin v. 7-Eleven Owners for Fair Franchising* (2000) 85 CA4th 1168, 102 CR2d 770, the appellate court affirmed dismissal of a UCL claim under the doctrine of "exclusive concurrent jurisdiction." In that case, a prior action had been filed and settled with court approval in Alameda, which vested that court with "exclusive jurisdiction" to protect its earlier judgment. According to the *Franklin & Franklin* court, the doctrine "is meant to avoid the spectacle of the same parties litigating the same issues in two different courts at the same time, including the real possibility of 'unseemly conflict

between courts that might arise if they were free to make contradictory decisions or awards at the same time or relating to the same controversy; another reason is to protect litigants from the expense and harassment of multiple litigation." [*Franklin & Franklin v. 7-Eleven Owners for Fair Franchising*, supra, 85 CA4th at 1176, 102 CR2d at 775]

➪ [7:23] ***PRACTICE POINTER:*** This doctrine may no longer be needed. It was invoked to temper the "unaffected plaintiff" rule. But that rule has been overruled by Section 3 of Proposition 64. *See* *¶ 7:3 ff*.

**[7:24 - 7:25]** ***Reserved.***

i. [7:26] **Competitor standing:** Suits under the UCL and the False Advertising Law (Bus. & Prof.C. § 17500) may be brought by competitors of the defendant. But practitioners need to be aware of the changes to competitor standing as a result of Proposition 64.

(1) [7:27] **Competitor standing prior to Proposition 64:** Prior to Proposition 64, the UCL offered business competitors a unique form of standing. *Southwest Marine, Inc. v. Triple A Machine Shop, Inc.* (ND CA 1989) 720 F.Supp. 805, is illustrative. There, plaintiff (an unsuccessful bidder on a Navy contract) sued the successful bidder alleging defendant had been able to underbid plaintiff because defendant had achieved savings by improperly disposing of hazardous waste. Defendant moved to dismiss under FRCP 12(b)(6), but the district court denied the motion, finding that plaintiff had standing to sue under § 17200 for these alleged violations. [720 F.Supp. at 808]

(2) [7:27.1] **Competitor standing after Proposition 64:** Proposition 64 changed the former open-ended standing requirement of the UCL and the false advertising laws. Now, to sue under these sections, the plaintiff must be someone "who has suffered injury in fact and has lost money or property as a result of such unfair competition" (*see* *¶ 7:71 ff.*) Whether, and to what extent, a business competitor can claim it has "suffered injury in fact and has lost money or property" has been the subject of considerable litigation.

Some courts, after the passage of Proposition 64, had equated "lost money or property" with eligibility for restitution under § 17204 (*see* *¶ 7:72.3*). But the California Supreme Court changed all that, ruling instead that "standing" for purposes of the UCL and the False Advertising Law is not dependent on whether the plaintiff can state a valid claim for restitutionary relief. [*Clayworth v. Pfizer, Inc*. (2010) 49 C4th 758, 789, 111 CR3d 666, 691; *see also* *Kwikset Corp. v. Sup.Ct.* (2011) 51 C4th 310, 330, 120 CR3d 741, 757—"we hold ineligibility for restitution is not a basis for denying standing under section 17204 and disapprove those cases that have concluded otherwise"]

A drug manufacturer having exclusive FDA authority to sell a drug approved for the stimulation of hair growth sued a competitor under the UCL over advertising the same compound as an off-label treatment for that same purpose. Citing *Clayworth* and *Kwikset*, the Ninth Circuit held that a claimant's inability to allege a claim for restitution is not a barrier to standing. Quite the contrary, the competitor had standing to sue for an injunction *and* to seek recovery in the form of lost sales, market share and asset value. [*Allergan,*

*Inc. v. Athena Cosmetics, Inc.* (Fed. Cir. 2011) 640 F3d 1377, 1382-1383]

Similarly, in *Robinson v. U-Haul Co. of Calif.* (2016) 4 CA5th 304, 318, 209 CR3d 81, 92, the appellate court held that a former truck rental franchisee had standing to sue his former franchisor under the UCL based on the latter's inclusion of noncompetition agreements in its contracts with franchisees as well as its alleged strategic use of litigation and threatened litigation and its use of those covenants for intimidation and to achieve an anticompetitive purpose.

On the other hand, the manufacturer of male-enhancement products lacked standing to sue retail stores for allegedly falsely advertising a competitor's product in violation of the UCL, FAL, and the Lanham Act. The claim that defendant's *customers* were misled by the product's advertising is a form of indirect reliance that does not satisfy standing. [*In re Outlaw Laboratory, LLP* (SD CA 2020) 463 F.Supp.3d 1068, 1086; accord, *Clorox Co. v. Reckitt Benckiser Group PLC* (ND CA 2019) 398 F.Supp.3d 623, 646—UCL claim by a competitor for making false comparison with plaintiff's products must allege plaintiff's own reliance on allegedly misleading advertisements, and cannot bootstrap reliance by defendant's consumers; *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.* (CD CA 2001) 178 F.Supp.2d 1099, 1121—summary judgment in favor of the defendant, holding that a competitor may not sue under the UCL's fraudulent prong claiming that the defendant misled the plaintiff] Likewise, the UCL claim by a taxi driver against a ride-sharing service was dismissed for lack of UCL standing and reliance because the taxi drivers themselves did not rely directly on the alleged false statements the defendant made to *its*

customers, rather, the claim was that their defendant's *customers* relied, and that was insufficient. [*Rosen v. Uber Technologies, Inc.* (ND CA 2016) 164 F.Supp.3d 1165, 1177] And in dictum, the appellate court in *Rincon Band of Luiseño Mission Indians v. Flynt* (2021) 70 CA5th 1059, 1099, 286 CR3d 29, 58 questioned "whether lost or diminished government programs and services are 'money or property' under the UCL.

(3) [7:28] **Other illustrative "competitor" cases:** Several other published decisions have allowed competitor standing:

- • *Law Offices of Mathew Higbee v. Expungement Assistance Services* (2013) 214 CA4th 544, 555, 153 CR3d 865, 874—lawyer had standing to sue non-lawyer for practicing law without a license.
- • *Overstock.com, Inc. v. Gradient Analytics, Inc*. (2007) 151 CA4th 688, 716, 61 CR3d 29, 52—finding standing under UCL where plaintiff pled that defendant's unfair business practice—i.e., intentional dissemination of false negative reports had "result[ed] in diminution in value of [plaintiff's] assets and decline in its market capitalization and other vested interests."
- • *Southwest Marine* was cited with approval in *Saunders v. Sup.Ct.* (1994) 27 CA4th 832, 33 CR2d 438. In that case, a group of certified shorthand reporters sued another group for alleged UCL violations.
- • In *AICCO, Inc. v. Insurance Co. of North America* (2001) 90 CA4th 579, 591-592, 109 CR2d 359, 369, several insurance companies, competitors of the defendant-insurer, sued under the UCL on the claim that the defendant's transfer of its "asbestos and

environmental" coverage to another company without obtaining its policyholders' consent violated Civ.C. § 1457.

- • Union locals brought § 17200 suit, claiming that hospitals' practice of including certain "anti-union" expenses in their annual cost reports seeking the Medicare reimbursement was unlawful. [*Congress of Calif. Seniors v. Catholic HealthCare West* (2001) 87 CA4th 491, 104 CR2d 655]

- • The California Attorney General was a "creditor" within the meaning of the Bankruptcy Code and, thus, had standing to seek UCL restitution order against debtor-in-bankruptcy. [*In re First Alliance Mortg. Co.* (CD CA 2001) 269 BR 428, 435]

j. [7:29] **Four limitations on "unaffected plaintiff" standing rule:** Prior to Proposition 65, when "private Attorneys General" could sue on behalf of absent parties without having to certify a class, there were nevertheless four court-imposed limitations. For example, in *Fitbug, Ltd. v. Fitbit, Inc.* (ND CA 2015) 78 F.Supp.3d 1180, 1197, the district court presiding over a competitor suit under the Lanham Act and the UCL, held that "injury in fact" was absent. The court entered summary judgment where defendant/counter-claimant was unable to prove that a single customer was diverted as a result of the allegedly deceptive use of the trademark name "Fitbit" and mark.

(1) [7:30] **Plaintiff had to be "competent":** In *Kraus v. Trinity Mgmt. Services, Inc.* (2000) 23 C4th 116, 96 CR2d 485, the Supreme Court held that if a UCL action seeks recovery on behalf of others but is brought outside of true class action

procedure, "the court may decline to entertain the [UCL] action as a representative suit" if the defendant can demonstrate either "a potential for harm or show that the action is not one brought by a competent plaintiff for the benefit of injured parties." [23 C4th at 138, 96 CR2d at 501]

The court did not define "competent." But just prior to that discussion, the *Kraus* court made reference to actions "on behalf of absent persons [that] may not, in fact, serve the public." [23 C4th at 137, 96 CR2d at 500; *see also* ¶ *7:42 ff.*]

➪ [7:31] ***PRACTICE POINTER:*** The notion that a UCL plaintiff had to be "competent" was limited to "representative" or "private Attorney General" actions. Proposition 64 eliminated "representative" actions, so the doctrine of the "competent plaintiff" is probably a dead letter too. Because suits brought on behalf of others must comply with class action procedure, this defense will instead arise in the form of "typicality" and "adequate representation."

(2) [7:32] **"Unaffected" plaintiffs could proceed only in state court:** Under the former rule that allowed "unaffected" plaintiffs to sue, such actions were confined to state court proceedings. The reason was that, in federal court, every plaintiff has to meet the standing requirements ("case or controversy") of Article III, § 2, of the US Constitution. [See *Casey v. Lewis* (9th Cir. 1993) 4 F3d 1516, 1519; *O'Connor v. Boeing North American, Inc*. (CD CA 2000) 197 FRD 404, 420; see also *MAI Systems Corp. v. UIPS* (ND CA 1994) 856 F.Supp. 538, 540-542; see also *Fiedler v. Clark* (9th Cir. 1983) 714 F2d 77, 80—suit brought under Hawaii's private Attorney General statute which confers standing on citizens of Hawaii to sue in environmental cases must be remanded]

➪ [7:33] ***PRACTICE POINTER:*** Proposition 64 eliminated the "unaffected plaintiff" standing rule, so this limitation is no longer operative. Now, UCL claimants must have suffered "injury in fact." Furthermore, the Findings state that "[i]t is the intent of the California voters in enacting this Act to prohibit private attorneys from filing lawsuits for unfair competition where they have no client who has been injured in fact under the standing requirements of the United States Constitution." [Prop. 64, § 1(e)] Thus, a UCL suit will now satisfy Article III standing requirements.

(3) [7:34] **Removal—law enforcement actions:** Article III limits the power of a law enforcement official to sue in federal court, hence, claims may be brought only in state court. In *People v. Beltz Travel Service, Inc*. (ND CA 1974) 379 F.Supp. 948, a district attorney sued under former Civ.C. § 3369. Following removal to federal court, standing was governed by federal law, which does not recognize a district attorney's power to sue on behalf of individuals other than himself. [379 F.Supp. at 950]

In *State of Nevada v. Bank of America Corp.* (9th Cir. 2012) 672 F3d 661, the Ninth Circuit held that a *parens patriae* action brought by a state Attorney General in state court under Nevada's Deceptive Trade Practices Act was not a "mass action" brought on behalf of the individuals eligible for restitution such that the action could be removed under the Class Action Fairness Act, 28 USC § 1332(d)(11). Rather, "Nevada is the real party in interest." [672 F3d at 672]

There had been a split in the federal Circuits over this question, but it was recently resolved by the Supreme Court in *Mississippi ex rel. Hood v. AU Optronics Corp.* (2014) 571 US 161, 164, 134 S.Ct. 736, 739. The court sided with the Ninth

Circuit's reading in *State of Nevada*, supra: "According to CAFA's plain text, a 'mass action' must involve monetary claims brought by 100 or more persons who propose to try those claims jointly as named plaintiffs. Because the State of Mississippi is the only named plaintiff in the instant action, the case must be remanded to state court."

(4) [7:35] **UCL and FAL claims in bad faith insurance litigation:** In *Zhang v. Sup.Ct*. (2013) 57 C4th 364, 159 CR3d 672, the California Supreme Court resolved a controversy that had been percolating since 1988: To what extent may a plaintiff "borrow" a violation of the Unfair Insurance Practices Act (UIPA, Ins.C. § 790 et seq.) and sue an insurer under the UCL or FAL? And if this can be done in a "first-party bad faith" case, can it be done in a "third-party bad faith" case too?

(a) [7:35.1] **Background—*Moradi-Shalal:*** In *Moradi-Shalal v. Fireman's Fund Ins. Cos*. (1988) 46 C3d 287, 250 CR 116, the California Supreme Court held that a stranger to an insurance contract—in insurance parlance, a non-insured or third-party—may not sue a tortfeasor's insurer under the UIPA for the tort of bad faith claims handling practices. The rationale of *Moradi-Shalal*, at least in part, was that the UIPA contemplated only administrative enforcement by the Insurance Commissioner, not lawsuits by private plaintiffs.

This raised the question: Can a plaintiff bring a UIPA claim *indirectly* by suing under the UCL—given that the UCL's and the FAL's standing rule that "any person" may sue for violations of those statutes (Bus. & Prof.C. §§ 17203, 17536)—and "borrowing" the UPIA violation?

(b) [7:35.2] **Aftermath of *Moradi-Shalal***: Following *Moradi-Shalal*, the appellate courts wrestled with these questions.

Many courts flat-out precluded the "borrowing" of a UIPA claim as part of a UCL or FAL claim for both first- and third-party bad faith cases. [See *Industrial Indemnity Co. v. Sup.Ct.* (1989) 209 CA3d 1093, 257 CR 655—no UCL claim allowed as part of third-party bad faith claim plaintiffs against their homeowner's association insurer for alleged violations of Ins.C. § 790.03; *Safeco Ins. Co. v. Sup.Ct*. (1990) 216 CA3d 1491, 1493-1494, 265 CR 585, 586-587—"Business and Professions Code [§ 17200] provides no toehold for scaling the barrier of *Moradi-Shalal* … To permit plaintiff to maintain this action would render *Moradi-Shalal* meaningless"; *Maler v. Sup.Ct.* (1990) 220 CA3d 1592, 1598, 270 CR 222, 225—plaintiffs "cannot circumvent that ban [against private actions under § 790.03] by bootstrapping an alleged violation of § 790.03 onto Business & Professions Code section 17200"] These cases were approved by the California Supreme Court in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc*. (1998) 17 C4th 553, 71 CR2d 731.

Other courts, however, viewed the impact of *Moradi-Shalal* differently. These courts held that although a party cannot plead around *Moradi-Shalal* by relabeling the UIPA claim under the UCL (*Manufacturers Life Ins. Co. v. Sup.Ct*. (1995) 10 C4th 257, 283, 41 CR2d 220, 236), certain kinds of UCL claims could proceed despite the overlap. In *State Farm Fire & Cas. Co. v. Sup.Ct. (Allegro)* (1996) 45 CA4th 1093, 1107, 53 CR2d 229, 237 (abrogated on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co*. (1999) 20 C4th 163, 184-185, 83 CR2d 548, 564), for example, the appellate court allowed a UCL claim to proceed predicated on allegations of insurer misconduct equating to common law fraud and bad faith, even though the conduct would also violate § 790.03.

Several appellate courts disagreed with *State Farm (Allegro).* For example, in *Textron Fin'l Corp. v. National Union Fire Ins. Co. of Pittsburgh* (2004) 118 CA4th 1061, 1072, 13 CR3d 586, 594-595, a first-party case, the appellate court affirmed a trial court's sustaining of a demurrer arising from an insured's UCL claim alleging that the insurer engaged in bad faith claims handling with regard to the insured's claim and the claims of others, holding that the specific allegations of wrongful conduct "are the type of activities covered" by Ins.C. § 790.03 and, thus, could not properly state a claim without running afoul of *Moradi-Shalal*.

(c) [7:36] ***Zhang v. Sup.Ct.:*** *Zhang* resolved the conflict. The California Supreme Court held in a 7-to-0 opinion that *Moradi-Shalal* does not preclude first-party UCL actions for claims mishandling: "We hold that *Moradi-Shalal* does not preclude first party UCL actions based on grounds independent from section 790.03, even when the insurer's conduct also violates section 790.03 … We have made it clear that while a plaintiff may not use the UCL to 'plead around' an absolute bar to relief, the UIPA does not immunize insurers from UCL liability for conduct that violates other laws in addition to the UIPA." [*Zhang v. Sup.Ct*. (2013) 57 C4th 364, 381, 159 CR3d 672, 676]

1) [7:36.1] **Facts of *Zhang:*** *Zhang* was a first-party bad faith case. Plaintiff Yanting Zhang sued her comprehensive general liability insurer, California Capitol Insurance Company, after it denied coverage for fire damage to her commercial property. She also alleged that California Capitol had engaged in UCL violations by promising to provide timely coverage in the event of a covered loss when it had no such intention. The trial court sustained the insurer's demurrer,

arguing that plaintiff's UCL claim was an impermissible attempt to avoid *Moradi-Shalal's* bar against private lawsuits under the UIPA. The court of appeal reversed.

2) [7:36.2] **Issues for review in *Zhang:*** "The issues for review are as follows: (1) Can an insured bring a cause of action against its insurer under the unfair competition law (Bus.& Prof.C. § 17200) based on allegations that the insurer misrepresents and falsely advertises that it will promptly and properly pay covered claims when it has no intention of doing so? (2) Does *Moradi-Shalal* bar such an action?"

3) [7:36.3] **The holding in *Zhang:*** The California Supreme Court answered the two questions on review: Yes and no, respectively.

The Court reviewed *Moradi-Shalal* and its progeny. It noted that *Moradi-Shalal* was a third-party action for damages under the UIPA, which would cause adverse consequences such as proliferating litigation and escalating insurance costs. *Zhang*, by contrast, was a first-party action (i.e., suit brought by the insurer's insured) under the UCL. Because only equitable relief (injunction and restitution) is available under the UCL, the adverse consequences stemming from a third-party action for damages were more attenuated. [*Zhang v. Sup.Ct*., supra, 57 C4th at 381-382, 159 CR3d at 687]

The Court held that the alleged conduct in *Zhang*—which included false advertising and bad faith—supported a UCL claim even though it was also prohibited by the UIPA. That is because the false advertising allegedly in that case violated other laws independent of any UIPA violation. The insurer disagreed, arguing that because the alleged false advertising *was* the claim improper claims handling, "the crux of her UCL

claim was improper claims handling," and that she was simply trying to "plead around the bar of *Moradi-Shalal*." [57 C4th at 379, 159 CR3d at 684] The Supreme Court did not directly respond to this contention. Instead, it allowed the UCL claim in first-party bad faith cases for the reasons mentioned. In doing so, it specifically disapproved of *Textron*, which was a first-party case that had disallowed a UCL claim, but it did not disapprove of the earlier third-party cases (such as *Industrial Indemnity* and *Safeco*) in which the UCL claims were not allowed. [57 C4th at 382, 159 CR3d at 688]

The post-*Zhang* cases are mixed. In *Ghazarian v. Magellan Health, Inc*. (2020) 53 CA5th 171, 266 CR3d 841, plaintiff sued a medical benefits administrator for UCL violations alleging that it adopted medical necessity guidelines for the provision of applied behavior analysis therapy that were allegedly unfair. Even though no bad faith claim was asserted against the administrator, only the health care provider (Blue Shield), the appellate court held that summary judgment was wrongly granted in favor of the administrator on the UCL claim because "it is inextricably intertwined with the conduct underlying the bad faith claim: (1) it created the medical necessity guidelines at issue in this case; (2) it initially denied plaintiffs' claim while acting as Blue Shield's mental health service administrator; and (3) it pressured [the provider] into adopting its medical necessity guidelines." [53 CA5th at 192, 266 CR3d at 860]

But in *Vulk v. State Farm Gen. Ins. Co.* (2021) 69 CA5th 243, 248 CR3d 360, the appellate court cited *Zhang* and held that the plaintiff-insureds' claims were absolutely barred in a suit against their homeowners insurer alleging that defendant had systematically underinsured homes destroyed by wildfire. In

*Vulk*, the Department of Insurance had promulgated specific regulations that standardized the components of replacement cost coverage. Thus, plaintiffs' "UCL claim fails as a matter of law to the extent it is predicated on acts prohibited by the UIPA." [69 CA5th at 261, 248 CR3d at 375]

(d) [7:37] **An exception?** But *Kentucky Central Life Ins. Co. v. LeDuc* (ND CA 1992) 814 F.Supp. 832 is to the contrary. There, the district court permitted a § 17200 claim to proceed notwithstanding *Moradi-Shalal*. In that case, a life insurance company sued a group of former agents, alleging a campaign of misrepresentations about plaintiff's financial condition. The agents, the suit alleged, told policyholders that Kentucky Central would be "the next Executive Life." They allegedly uttered these statements to induce Kentucky Central policyholders to switch to other companies after plaintiff had terminated defendant's agency contracts. Plaintiff's § 17200 "unlawful" claim was based, in part, on the agent's alleged violations of Ins.C. § 790.03.

The district court permitted the § 790.03 claim to proceed, and also allowed the § 17200 claims to proceed on the ground that plaintiffs were seeking only injunctive relief and restitution, not damages. On that basis, the court distinguished *Industrial Indemnity*, *Maler*, *Bank of the West*, and the other cases cited above, since those cases involved suits seeking damages. [*Kentucky Central Life Ins. Co. v. LeDuc*, supra, 814 F.Supp. at 838, 841-842]

© 2023 by The Rutter Group, a Thomson Reuters Business. No Claim to Orig. U.S. Govt. Works.